**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

RV HORIZONS, INC., et al.,

               Plaintiffs,                    Civil Action No. 1:18-cv-02780-NYW

vs.

JAMIE SMITH, et al.,

               Defendants.

_____/

## SMITH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

The Smith Defendants, Jamie Smith, Ryan Smith, MHPI VII, LLC ("Fund 7"), and Elevation Capital Group, LLC ("Elevation") (collectively, the "Smith Defendants"), pursuant to Fed. R. Civ. Pro. 56, move for Summary Judgment on all of the plaintiffs' claims. There was never a basis in law or fact for this action, as the dearth of evidence will show.

**I**.    **STATEMENT OF MATERIAL AND UNDISPUTED FACTS**

1.      Fund 7 was formed in April 2017. The Fund 7 Offering Package includes, among other things, the Fund Private Placement Memorandum (PPM), an affiliate Track Record, and the Fund 7 Limited Liability Agreement. (Doc. 64-1). Fund 7 was formed as an investment fund that invests in mobile home communities and self-storage facilities. Ryan Smith's affidavit is fully incorporated herein and attached as **Exhibit "A"** ("R. Smith Aff."). Ryan Smith and Jamie Smith are members of the manager of Fund 7, MHPI VII Manager, LLC. R. Smith Aff., ¶ 3. Ryan and Jamie Smith have an extensive background in the mobile home community investment industry. R. Smith Aff., ¶ 18. Dahn Corporation has an extensive background in self-storage ownership and property management. R. Smith Aff., ¶ 7. Elevation is not involved in the management of Fund 7. R. Smith Aff., ¶ 2.

2.      The Fund 7 Offering Package that forms the basis of this lawsuit merely identified the plaintiff entities as being owned or managed by "affiliates" of the members of the Fund 7 manager (i.e., Jamie Smith and Ryan Smith). [Doc. 64-1, p. 6].

3.      Jamie Smith and Ryan Smith have worked with the principals of the plaintiff entities, David Reynolds and Frank Rolfe, since 2010 on various investment funds. R. Smith Aff., ¶ 8. They still work together as principals of the manager of MHC America Fund, LLC. R. Smith Aff., ¶ 8.

4.      The general counsel for Mr. Reynolds' and Mr. Rolfe's entities, Peter Reinert, created the Fund 7 offering package. R. Smith Aff., ¶ 9. According to Mr. Reinert, Mr. Reynolds was advised of the contents of the Fund 7 Offering Package. For example, on March 15, 2017, Mr. Reinert e-mailed Mr. Smith in regards to the Fund 7 Offering Package and told him that "I had a very encouraging call with Dave [Reynolds] this afternoon. I tuned it [the documents] again this afternoon after talking with Dave." **Exhibit "B."**

5.      The next day, Mr. Smith sent his own edits to the Offering Documents. **Exhibit "C"**, a copy of comments to the Fund 7 Offering Documents made by Ryan Smith on March 16, 2017, stating that "[f]or assets acquired [by Fund 7] through an investment in MHCA [MHC America Fund, LLC], RV Horizons, Inc. will be the property manager through established MHCA agreements." Mrs. Smith communicated with Mr. Reynolds regarding the potential investment by Fund 7 into MHC America Fund. Mr. Reynolds stated that ". . . I am fine with it up to a certain amount – maybe 5 mil." **Exhibit "D."** Mr. Reynolds – through MHC America Fund – sent an e-mail to Fund 7 reminding it to complete the accredited investor verification process to complete Fund 7's $2,000,000.00 investment into MHC America Fund. **Exhibit "E."**

2

6.     Fund 7 clearly contemplated an investment in MHC America Fund and that RV Horizons would manage the properties in MHC America Fund. Because the Smiths had worked with the plaintiffs and their principals in the past and Fund 7 was contemplating an investment in some of the plaintiff entities, Mr. Reinert—also counsel to Mr. Reynold's and Mr. Rolfe's entities—required the Fund 7 Track Record to list the plaintiff entities as "affiliates" of *members* of the manager of Fund 7. J. Smith Depo., pp. 76-77, ll. 10-25, 1-3; p. 134, ll. 7-22; Reinert Depo., p. 19, ll. 3-10; R. Smith Depo., p. 71, ll. 8-19; p. 82, ll. 2-15; p. 83, ll. 9-20.

7.     Once the parties determined that Fund 7 would not invest in MHC America Fund, the Track Record and all references to the plaintiffs were removed from the Fund 7 Offering Package in summer 2018. R. Smith Aff., ¶ 13. Only 368 of the investors in Fund 7 received the Offering Package that listed the plaintiffs as affiliates of the Smiths. R. Smith Aff., ¶ 14. The remaining 402 investors never received that version of the Offering Package. *Id*.

8.     The plaintiffs sell and give away much of their "proprietary" information, including their materials and "turnaround" strategies.[1] Reynolds Depo., p. 66, ll. 21-25; p. 114; ll. 13-18; p. 128, ll. 6-15; Rolfe Depo., p. 14, ll. 9-23; **Exhibit "F"**; **Exhibit "G"**; **Exhibit "H"**.

9.     There is no evidence that the Smith Defendants downloaded or used the plaintiffs' investor lists. Reinert Depo., p. 79, ll. 4-10; Reynolds Depo., pp. 122-123, ll. 18-25, 1-4. The Smith Defendants' investor list comprises actual or potential investors who have requested to be part of the Elevation database or who are personally acquainted with the Smiths. R. Smith Depo., pp. 143-144, ll. 15-25, 1; pp. 150-151, ll. 23-25, 1-19. This database is separate and apart from the plaintiffs' purported investor list. R. Smith Depo., p. 191, ll. 14-24.

---

[1] As to the boot camp materials that were allegedly misappropriated in 2008, all of that material belonged to Niche Investment Networks. Reynolds Depo., pp. 110-111; ll. 18-25, 1-2. Niche Investment Networks is not a plaintiff in this case.

10.    All of the information contained in the Fund 7 Track Record (which has since been revised to remove the plaintiffs' names due to Fund 7's decision not to invest in MHC America Fund) has been made public by the plaintiffs. **Exhibit "I"**, MHC America Fund, LLC, Track Record and Investment Summary.[2]

11.    Investors in Fund 7 are sophisticated. Rolfe Depo., p. 64, ll. 1-7; Siragusa Depo., pp. 69-70, ll. 20-25, 1-2. Investors know that they should review the entire offering package before committing to an investment. Reinert Depo., pp. 16-17, ll. 24-25, 1-16. Fund 7 requires a minimum investment of $50,000.00. R. Smith Aff., ¶ 15.

12.    At the time the Fund 7 PPM was formed, Mr. Smith and Mrs. Smith were involved in a number of funds with the managers of the plaintiffs, including MHC America Fund, LLC. Reinert Depo., pp. 28-29, ll. 22-25, 1-7.

13.    Because Mr. Reinert required the plaintiffs' names to be listed in the Fund 7 PPM, Mrs. Smith insisted on Mr. Reinert adding the term "affiliates" to the Fund 7 PPM because she and Mr. Smith did not manage each of the funds listed. Reinert Depo., p. 47, ll. 2-22; *see also* **Exhibit "J"** (Mrs. Smith: "Definition 'Prior Fund' or 'Prior Funds': this needs to add the word affiliates as Ryan and I did not organize/manage all of those funds."). Mr. Reinert made those changes in the Fund 7 PPM. *Id*. (Mr. Reinert: "The requested change is made in the attached revised PPM and Operating Agreement.").

14.    Mr. Reinert testified that he isn't aware of any unfair promotion of Fund 7 by the Smiths. Reinert Depo., p. 51, ll. 3-5. The Smith Defendants did not use any trademarks

---

[2] The MHC America Fund PPM was modeled after the MHPI V PPM. Mr. Reinert, in addition to drafting the Fund 7 PPM, drafted each of those PPMs. MHPI V is managed solely by Ryan and Jamie Smith. Indeed, the MHPI V PPM lists the plaintiffs and their managers (Mr. Reynolds, Mr. Rolfe, and Mr. Siragusa) as affiliates of Jamie Smith and Ryan Smith. This was done because MHPI V invested $13,565,000 in AHCF 6, LLC. The MHPI V PPM was released in 2015. It is clear that the plaintiffs are only suing the defendants because they're angry over Fund 7's success, not because they believe there to be trademark violations. R. Smith Aff., ¶ 12.

belonging to the plaintiffs. R. Smith Aff., ¶ 23. The Smith Defendants did not use or misappropriate any trade secrets belonging to the plaintiffs. R. Smith Aff., ¶ 21-22. The Smith Defendants did not mislead investors looking to invest in Fund 7. R. Smith Aff., ¶ 31. The Smith Defendants did not divert investors away from MHC America Fund or MHC America Fund 2. R. Smith Aff., ¶ 31.

## II.     ARGUMENT

### A.     PLAINTIFFS' LANHAM ACT CLAIMS

Several of the plaintiffs allege that the Smith Defendants violated 15 U.S.C. § 1125(a)(1)(A) and (a)(1)(B), which protect parties from trademark infringement and unfair competition. "Trademark infringement is a type of unfair competition; the two claims have virtually identical elements and are properly addressed together. . ." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008).

The plaintiffs do not possess registered trademarks. As a result, the plaintiffs must prove that "(1) [the] identifying mark . . . is inherently distinctive *or* . . . has acquired distinctiveness through secondary meaning; (2) the mark is nonfunctional; and (3) the competitor's alleged violation of the plaintiff's rights in its mark is likely to cause consumer confusion." *Weber Luke All., LLC v. Studio 1C Inc.*, 233 F. Supp. 3d 1245, 1251 (D. Utah 2017).

Indeed, "marks are generally categorized into five categories based on their inherent level of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful." *Prince Lionheart, Inc. v. Halo Innovations, Inc.*, CIV. A. 06-CV-00324-W, 2008 WL 878985, at *9 (D. Colo. Mar. 28, 2008). "Marks that are suggestive, arbitrary, or fanciful are considered inherently distinctive and are entitled to protection." *Id.* Marks that are generic are "those that 'refe[r] to the genus of which the particular product is a species'" and are never afforded

protection. *Id.* Marks that are descriptive in nature are only protected if they have acquired "secondary meaning." *Id*.

The plaintiffs have no evidence that their names are protectable trademarks. The plaintiffs cannot prove that the alleged trademarks are either inherently distinctive or descriptive with secondary meaning. All the plaintiffs allege is that they have "established enforceable and protectable trademarks in their names because they have been exclusively using them in commerce for many years and consumers only associate these companies' services with the specific company." [Doc. 64, ¶¶ 134, 149, 164]. But Mr. Rolfe contradicted this allegation when he admitted that a consumer would not know what type of business or service the plaintiffs provided just by seeing or hearing the name. Rolfe Depo., p. 62, ll. 4-13; p. 63, ll. 18-25 ("We're not talking a bag of potato chips here so a consumer would not know what an MHPS Alumni is."). There exists *zero* evidence of secondary meaning associated with the Plaintiffs' names.

The plaintiffs' alleged marks are likely generic, or at best descriptive without secondary meaning. Take, for example, the entities using "Affordable Housing Community Fund" followed by a number. That naming convention tells the viewer *exactly* what the businesses do. Other plaintiffs, such as MHPS Alumni or MHC America, derive their names by using common industry abbreviations (e.g., "mobile home park," "mobile home community"). And worse, RV Horizons informed investors that it had adopted a new name, "Impact Communities." 2018 Q3 Macro Report excerpt [Doc 72-1]. The company announced it had "never liked the name 'RV Horizons.'" Thus, well in advance of filing the Second Amended Complaint, the plaintiffs knew that the management company was no longer using the name "RV Horizons." So, even if RV Horizons had been a protected mark, a designation vehemently disputed by the Smith Defendants, it was abandoned before the Second Amended Complaint was filed in this case. "To

6

bring a trademark infringement claim under the *Lanham Act,* a plaintiff must hold a valid trademark." *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1329 (11th Cir. 2008). A trademark is deemed abandoned and no longer valid when its use has been discontinued with intent not to resume such use. *Id*.[3]

The actions that the plaintiffs complain about are not actionable under the Lanham Act. *See, e.g., Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) ("[T]he likelihood of confusion analysis also involves a preliminary question: whether the defendants are using the challenged mark in a way that identifies the source of their goods. *If they are not then the mark is being used in a 'non-trademark way' and trademark infringement laws . . . do not even apply*.") (emphasis added). Indeed, mere publication the plaintiffs' names is not sufficient to support a claim; instead the alleged use must result in a likelihood of confusion. *See Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).

The Fund 7 Offering Documents are clear in defining and explaining the relationship between Fund 7 and the plaintiffs:

> "Prior Fund" or "Prior Funds" shall mean any of those funds organized and managed by Affiliates of the members of the Manager, including, but not limited to MHPS Alumni 1, LLC; MHPS Alumni 2, LLC; MHPS Alumni 3, LLC; Affordable Housing Community Fund 1, LLC; Affordable Housing Community Fund 2, LLC; Affordable Housing Community Fund 3, LLC; Affordable Housing Community Fund 4, LLC; Affordable Housing Community Fund 5, LLC; Affordable Housing Community Fund 6, LLC; AWA Fund, LLC; MHPI I, LLC; MHPI II, LLC; MHPI III, LLC; MHPI IV, LLC; MHPI V, LLC; and MHC America Fund, LLC.

[Doc 64-1, p. 81]. First, there is no evidence that this statement is false or inaccurate. Each of the entities listed were organized and managed by affiliates of the Smiths (i.e., members of the Manager). MHPI I-V and MHC America Fund were organized and managed by the Smiths themselves. Moreover, and importantly, the Offering Documents make clear that "[a]n

---

[3] *See also Smartling, Inc. v. Skawa Innovation Ltd.*, 358 F. Supp. 2d 124, 147 (D. Mass. 2019) (trademarks are abandoned when use has been discontinued).

investment in MHPI VII, LLC's Offering is not an investment in the Prior Funds" and "performance of the Prior Funds is not indicative of the performance of MHPI VII, LLC's, Offering." [Doc. 64-1, p. 225]. The plaintiffs cannot prove that there is a likelihood of confusion as to the source of the goods and services.

Additionally, the plaintiffs cannot prove that the Smith Defendants are using deceptively similar names, or even that the Smith Defendants are using their names as marks. Instead, the plaintiffs assert that the various plaintiff entities were identified by name in a few pages of the 242 page "Offering Package," attached to the Second Amended Complaint as Exhibit "A." In no sense is listing entities as affiliates of members akin to "using" them as trademarks.

Indeed, the Offering Package merely identifies the plaintiff entities as owned or managed by "affiliates" of the Fund 7 manager. This was no secret to the plaintiffs, as Mr. Reinert, general counsel for Mr. Reynolds' and Mr. Rolfe's entities, created the Fund 7 offering package. Because the plaintiffs had worked with the Smiths in the past and Fund 7 was contemplating an investment in one of the plaintiff entities, Mr. Reinert required the Track Record to list the plaintiff entities as "affiliates" of the managers of Fund 7. J. Smith Depo., pp. 76-77, ll. 10-25, 1-3; p. 134, ll. 7-22; *see also*, Reinert Depo., p. 19, ll. 3-10.

Moreover, the Smiths are clearly affiliates with the plaintiffs. Indeed, Mr. Siragusa drafted an e-mail recognizing that Mr. Smith, along with Mr. Siragusa and Mr. Rolfe, is a principal of MHC America Fund, LLC, and that MHC America Fund, LLC, and "their Affiliated companies, are estimated to own or control the 3rd largest number of MHCs, and the 5th largest number of mobile home lots in the country. . ."[4] **Exhibit "K."** Mr. Siragusa confirmed the accuracy of that statement in his deposition. Siragusa Depo., pp. 164-165, ll. 24-25, 1-10. Mr.

[4] Mr. Smith and Mrs. Smith are both principals—through an entity they control—of MHC America Fund, LLC. Yet, Mr. Reynolds, Mr. Rolfe, and Mr. Siragusa have caused MHC America Fund, LLC, to sue the Smiths for disclosing to potential Fund 7 investors that they are affiliated with MHC America Fund, LLC.

Rolfe even admits that he and Mr. Reynolds are affiliated with the Smiths to this day. Rolfe Depo., p. 181, ll. 4-8. Mr. Siragusa, co-manager of some of the plaintiffs, also agrees that he was affiliated with the Smiths through MHC America Fund. Siragusa Depo., pp. 81-82, ll. 25-2.

The Smiths are affiliated with the plaintiffs and their managers. For example, the Smiths along with Mr. Reynolds, Mr. Rolfe, and Mr. Siragusa are principals of the manager of MHC America Fund. J. Smith Depo., p. 70, ll. 22-23. RV Horizons acted as the property manager for the properties owned by MHC America Fund. J. Smith Depo., p. 72, ll. 9-13. The argument that the Smith Defendants diverted investors away from those plaintiffs or harmed the business of those plaintiffs for the benefit of Fund 7 by simply listing them as affiliates is illogical.

Mr. Rolfe himself doesn't even believe this to be a trademark case. Instead, he has testified that he is concerned with ***his and Mr. Reynolds'*** "body of work" and "track record" being used in the PPM. Rolfe Depo., pp. 78-79, ll. 21-25, 1-11. Further, as Mr. Reynolds puts it, his main issue here is "the use of our names inducing investors that should have probably went to MHC America Fund or MHC America Fund 2" because "a lot of people recognize [the names] Frank [Rolfe] and Dave [Reynolds] from the industry." Reynolds Depo., pp. 189-190, ll. 23-25, 3-10. Mr. Reynolds testified that "people, you know, had invested with us, you know, through MHPI 1 through 4 . . . through MHC America Fund, they see this progression of Frank and Dave is involved with everything, Frank and Dave, Frank and Dave." Reynolds Depo., p. 190, ll. 16-21. The plaintiffs can't prevail against the Smith Defendants for trademark violations simply because Mr. Reynolds feels that investors know him and Mr. Rolfe and recognize their names because ***Mr. Reynolds and Mr. Rolfe are not plaintiffs in this case***.

Mr. Rolfe recognizes that the Fund 7 name is not similar to that of any of the plaintiffs and that the investors are sophisticated and should read the PPM before making an investment

9

decision. Rolfe Depo., pp. 178-179. Mr. Reynolds testified that the plaintiffs' purported "trademarks" are only used in commerce to the extent an investor or potential investor learns about them through a boot camp or friend/family member who has invested. Reynolds Depo., pp. 42, 46-54. Mr. Reynolds acknowledges that the industry is "very small." Reynolds Depo., p. 52; ll. 15-17.

Even if the plaintiffs had protectable marks, a conclusion the Court should reject, the plaintiffs' trademark infringement and unfair competition claims fail as a matter of law as they have suffered no damages. Mr. Reynolds testified that MHPS Alumni 1-3 have no damages as a result of the complained of conduct. Reynolds Depo., pp. 11-14. In fact, those entities don't own any property or conduct business. Reynolds Depo., pp. 16-17, ll. 19-25, 1. Similarly, AHCF 1-4 do not conduct business. Reynolds Depo., pp. 19-20, ll. 24-25, 1-3. Likewise, Affordable Housing Communities Funds 5 and 6 are not open to new investors and are in the process of completing a roll-up into another fund. Reynolds' Depo., pp. 20-21. Finally, the plaintiffs' expert opines that only MHC America Fund and MHC America Fund 2 were damaged by the Smith Defendants' alleged actions.[5] Accordingly, summary judgment must be entered against the remainder of the plaintiffs.

MHC America Fund is closed to investment. Reynolds Depo., p. 135, ll. 22-24. MHC America Fund 2 was not open for investments until a year after Fund 7 landed. Reynolds Depo., p. 135, ll. 2-4. It is pure speculation that each (or any) of the investors in Fund 7 would have invested in MHC America Fund or MHC America Fund 2. Yet the plaintiffs base their entire case on this theory. Indeed, many of the investors in Fund 7 were family, friends, or employees of the Smiths or Dahn Corporation. R. Smith Aff., ¶ 16-17. Several investors had already

---

[5] A copy of the plaintiffs' expert report without attachments is attached as **Exhibit "L."**

invested in MHC America Fund and stated that they would never have invested in MHC America Fund 2 because of issues with Mr. Reynolds, Mr. Rolfe, and Mr. Siragusa. Other investors didn't even know who Mr. Reynolds, Mr. Rolfe, and Mr. Siragusa are. Several investors have executed affidavits in support of this motion. The investor affidavits are attached as **Composite Exhibit "M."**

Additionally, because Counts I and II of the Second Amended Complaint fail to state a claim, Count III for contributory trademark infringement also fails to state a claim. In order to maintain a claim for contributory trademark infringement, there must be some type of direct infringement by the third party. *Hetronic Intern., Inc. v. Hetronic Germany GmbH*, CIV-14-650-C, 2015 WL 6835428, at \*4 (W.D. Okla. Nov. 6, 2015); *see also Rosetta Stone Ltd. v. Google, Inc.*, 676 F. 3d 144, 163 (4th Cir. 2012) ("for there to be liability for contributory trademark infringement, the plaintiff must establish underlying direct infringement"). Here, the plaintiffs have not and cannot establish direct trademark infringement by anyone. The Court must enter summary judgment in favor of the Smith Defendants on Counts I, II, and III.

### B.   PLAINTIFFS' MISAPPROPRIATION OF TRADE SECRET CLAIMS

Plaintiffs seek recovery from the Smith Defendants for misappropriation of trade secrets under both federal (Count IV) and state (Count V) law. Summary judgment must be entered on these claims because the purported "trade secrets" were, in fact, not legally protected secrets, but instead publicly available information. And there's no evidence of use of the "trade secrets." Under Colorado law, a plaintiff alleging misappropriation of a trade secret must prove: (1) that he or she possessed a valid trade secret, (2) that the trade secret was disclosed or used without consent, and (3) that the defendant knew, or should have known, that the trade secret was

11

acquired by improper means. *Colo. Rev. Stat.* § 7-74-102(2); *Gates Rubber Co. v. Bando Chemical Indus., Ltd.,* 9 F.3d 823, 847-48 (10th Cir. 1993).

Likewise, the federal counterpart, The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §1836 *et seq.*, requires the plaintiffs to prove the same elements, plus that the purported trade secret relates to a product or service used in interstate or foreign commerce. *MSC Safety Sols., LLC v. Trivent Safety Consulting, LLC*, 19-CV-00938-MEH, 2019 WL 5189004, at *6 (D. Colo. Oct. 15, 2019).

The plaintiffs assert two categories of alleged trade secrets purportedly misappropriated by the Smith Defendants. First, they claim that investor information they possess is secret and was misappropriated. Second, the plaintiffs' label a "turnaround" program a trade secret and, "on information and belief," allege that the Smith Defendants misappropriated it. (Doc. 64, ¶ 85).

### i. *Plaintiffs' Information Was Not a Trade Secret.*

Courts consider several factors when evaluating trade secret status, including: "1) the extent to which the information is known outside the business; 2) the extent to which it is known to those inside the business, *i.e.,* by the employees; 3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; 4) the savings effected and the value of the holder in having the information as against competitors; 5) the amount of effort or money expended in obtaining and developing the information; and 6) the amount of time and expense it would take for others to acquire and duplicate the information." *Gates Rubber Co.*, 9 F. 3d at 848. No evidence exists that either the investor information or the "turnaround" program are protected trade secrets.

First, the boot camp materials that were allegedly misappropriated in 2008 belonged to Niche Investment Networks. Reynolds Depo., pp. 110-111; ll. 18-25, 1-2. That entity is not a

plaintiff. Niche is a separate entity owned by Mr. Reynolds and Mr. Rolfe. Aside from being outside the statute of limitations because the alleged misappropriation occurred more than twelve years ago, none of the plaintiffs have a legitimate claim for violation of trade secret laws related to the boot camp materials because they don't own the materials.

As for the "turnaround" strategies, the plaintiffs are not being candid in their Second Amended Complaint. Not only is the "turnaround" strategy not a secret, some of the plaintiffs and their affiliates sell or give away the exact information they now claim as secret. Mr. Reynolds testified that "***I wouldn't say there are secret parts*** [of the turnaround program] . . . I would say there are parts that you learn from only doing it, experience." Reynolds Depo., p. 114; ll. 13-18 (emphasis added). Mr. Reynolds further testified that the turnaround methods are "not confidential information" and that "we would give it to people or they would buy it." Reynolds Depo., p. 128, ll. 7-15.

Mr. Rolfe and Mr. Reynolds make "turnaround" strategies available on a real estate investing website. **Exhibit "N"** and **Exhibit "O."** They also give this information away at their "boot camps" - seminars on buying and running mobile home communities. The information that Mr. Reynolds and Mr. Rolfe provide to attendees includes their "secret" turnaround strategies. Rolfe Depo., p. 14, ll. 9-23; Reynolds Depo., p. 66, ll. 21-25. In fact, Mr. Rolfe gives this information to at least 400 to 800 people per year at boot camps. And these numbers don't even capture the people who purchase the information online or read the free articles posted online by Mr. Reynolds and Mr. Rolfe.

Mr. Rolfe and Mr. Reynolds also operate "Mobile Home University."  On their website, anyone with $597.00 can purchase "The Mobile Home Park Home Study Course." It includes six compact discs that will allegedly give the buyer all it will need to know to "turn around an

13

existing [mobile home park]." **Exhibit "F."** Indeed, John Oliver, the host of *Last Week Tonight*, purchased a copy of Mr. Rolfe's and Mr. Reynolds' "turnaround" strategy during his expose on Mr. Rolfe and RVH. And, Mr. Reynolds authored a free article for his website titled "How to Turnaround a Mobile Home Park." **Exhibit "H."** There is no evidence to suggest that any of this material has been subject to any effort to protect its secrecy. There are no limits on dissemination. There are no warnings. The plaintiffs do not require customers to sign non-disclosure agreements. Indeed, a purchaser or boot camp customer is free to use all the materials acquired for any reason, without limitation. Finally, the Court should note that the "turnaround" strategies amount to nothing more than a compilation of common sense tips to acquire property and improve it. They include tips like cleaning up trash, filling empty mobile home lots, repairing mobile homes, and enforcing community rules.

The plaintiffs can't prove that the "turnaround" strategy is a trade secret. *See, e.g., HiRel Connectors, Inc. v. U.S.,* No. CV01-11069, 2005 WL 4958547 at *6 (C.D. Cal. Jan. 4, 2005) (granting summary judgment on misappropriation of trade secrets claim where allegedly "secret" information was published to internet); *City of Northglenn v. Grynberg,* 846 P.2d 175 (Colo. 1993) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."). There is ample case law reflecting that the disclosure of purportedly secret information to a single person or small group can be enough to break the confidentiality required for trade secret protection. Here, the ***Plaintiffs disclosed their purported trade secrets on the internet***. Because the information was never protected, it was not a trade secret.

14

## *ii. Plaintiffs' Investor Lists Were Not Trade Secrets.*

The undisputed facts also establish that the plaintiffs took no action to protect the confidentiality of the "investor lists" or "turnaround" methods. Colorado courts require the owner of any trade secret to "have taken measures to prevent the secret from becoming available to persons other than those selected by the owner. . . ." *Harvey Barnett, Inc. v. Shidler,* 143 F. Supp. 2d 1247, 1252 (D. Colo. 2001) (citing C.R.S. § 7-74-102(4)). Such precautions must be more than normal business procedures and may include advising employees of the existence of the trade secrets, limiting access to a need-to-know basis, and controlling access to locations where the information may be learned. *Id.*

Here, the undisputed evidence establishes that the plaintiffs failed to take such measures. The circumstances here are vastly different from other cases where trade secrets have been developed at a significant cost to their owners, are identified and addressed in employee handbooks, and are protected by nondisclosure and confidentiality agreements. For example, in *Southwest Stainless, LP v. Sappington,* the company protected its proprietary pricing information by having its employees sign confidentiality agreements and reminding employees regularly of the confidential nature of the information. 582 F.3d 1176, 1189 (10th Cir. 2009). By contrast, the plaintiffs have no evidence that they ever asked anyone to sign confidentiality agreements before the alleged misappropriation supposedly occurred.

Moreover, the plaintiffs have no evidence of cost or effort used to develop or protect their "secret" information, and there is no evidence that the information at issue was considered to be a trade secret by the plaintiffs themselves or their employees. But, even if the plaintiffs had attempted to protect this information, there is absolutely no evidence that the plaintiffs' investor lists were even misappropriated or used by the Smith Defendants. Mr. Reinert testified that he is

15

not aware of any use of the plaintiffs' investor lists by the Smiths. Reinert Depo., p. 79, ll. 4-10. Mr. Reynolds testified that there is no evidence that the Smith Defendants downloaded or accessed the plaintiffs' investor lists. Reynolds Depo., pp. 122-123, ll. 18-25, 1-4. Mr. Reynolds assumes that the Smiths accessed his investor list because he doesn't otherwise "know how [the defendants] would be contacting many of the investors that they have contacted about Fund 7. . ." *Id*. This is insufficient to prove the plaintiffs' claims.

Mr. Reynolds complains that what the Smiths have the benefit of is the "experience" and "education" he and Mr. Rolfe allegedly provided throughout their many years as business partners with the Smiths. Reynolds Depo., pp. 66-69. "Experience" and "education" are not trade secrets and the Smiths are not required to unlearn their own experiences in the industry simply because they don't work with Mr. Reynolds and Mr. Rolfe on Fund 7. Furthermore, Mr. Reynolds and Mr. Rolfe are not plaintiffs. But, even if they were, they freely provided information to the Smiths and vice versa, and there is no non-compete agreement in place. Siragusa Depo., p. 80, ll. 11-14.

Mr. Reynolds also now claims that the funds' track records and distribution histories are "confidential" and thus, "proprietary." Reynolds Depo., p. 80, ll. 2-13. This is nonsense. All of the information contained in the track records has been made public by Mr. Reynolds and Mr. Rolfe in the MHC America Fund Offering Documents. **Exhibit "I."** After making this information public, the plaintiffs cannot now claim that this same information is a "trade secret."

Additionally, the plaintiffs' alleged damages defy logic. The plaintiffs claim that the Smith Defendants diverted investors who would have invested in their funds into Fund 7. Reynolds Depo., pp. 155-157. There is, however, no evidence that supports the plaintiffs' assertion that, but for the Smith Defendants, the investors in Fund 7 would have invested with

them. This is pure conjecture because Mr. Reynolds admits that the reason he originally partnered with the Smiths was because of their great "ability to raise funds." Reynolds Depo., p. 69, ll. 21-25, 1. These infirmities concerning the damages alleged by the plaintiffs are in addition to the fact that the plaintiff entities, except MHC America Fund 2 are not even open for investments, that RV Horizons doesn't have investors and is a property management company in the process of transferring all of its business to a new entity, and that MHC America Fund 2 opened for investment *after* Fund 7 began raising funds.[6]

Moreover, the evidence shows that even when Fund 7 was open for investment, Mr. Smith continued to promote MHC America Fund. **Exhibit "P"**, a November 10, 2017, e-mail from Mr. Smith to investors in MHC America Fund stating that "we have not finalized our upcoming plans" in regards to a new fund. Contrary to plaintiffs' assertions, Mr. Smith didn't ask MHC America Fund investors to invest in Fund 7 in that communication. Mr. Smith also sent a communication to investors in February 2018 stating that MHC America Fund would be the last joint fund between the Smiths, Mr. Reynolds, Mr. Rolfe, and Mr. Siragusa. **Exhibit "Q."** One investor responded asking about Fund 7. *Id*. Mr. Smith sent the inquiring investor links for both MHC America Fund and Fund 7. *Id*. Indeed, Mr. Smith and Mrs. Smith helped raise as much as $45,000,000 in capital for MHC America Fund after Fund 7 was opened. R. Smith Aff., ¶ 31.

It is clear that the information that the plaintiffs allege to have been "misappropriated" was never a trade secret in the first place and there are no cognizable damages to the plaintiffs.

---

[6] Reynolds Depo., pp. 39-40, ll. 25-1; p. 134, ll. 22-24; p. 135, ll. 2-4. MHC America Fund, LLC, was open for investment for a period of time while Fund 7 was also open for investment. Accordingly, and pursuant to advice from Mr. Reinert, the Smiths were obligated to provide prospective investors with information about both funds. *See* J. Smith Depo., p. 88, ll. 7-20. The Smiths did just that as evidenced by **Exhibit "Q"**. *See also* R. Smith Depo., p. 149, ll. 1-10.

## C.     PLAINTIFFS' COLORADO CONSUMER PROTECTION ACT CLAIM

In order to prove a private cause of action under the Colorado Consumer Protection Act ("CCPA"), a plaintiff must show: "(1) the defendant engaged in an unfair or deceptive trade practice; (2) that the challenged practice occurred in the course of defendant's business, vocation or occupation; (3) that it significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) that the plaintiff suffered the injury in fact to a legally protected interest; and (5) that the challenged practice caused the plaintiff's injury." *HealthONE of Denver, Inc. v. UnitedHealth Group Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011). In this case, the plaintiffs have failed to establish any of these elements.

"[T]hree key factors should be considered in determining whether a challenged practice has a significant public impact under the CCPA: 1) the number of consumers directly affected by the challenged practice; 2) the relative sophistication and bargaining power of the consumers; and 3) evidence that the challenged practice has previously impacted other consumers or has significant potential to do so in the future." *Campfield v. State Farm Mut. Auto. Ins. Co.*, CV 03RB0306 (BNB), 2005 WL 8163342, at *5 (D. Colo. Dec. 12, 2005), *aff'd,* 532 F.3d 1111 (10th Cir. 2008). The plaintiffs have no evidence to demonstrate the number of consumers directly affected by the alleged improper practices. "Absent some specific evidence which demonstrates the number of consumers affected" by the alleged conduct "a reasonable factfinder could not conclude" that the conduct "affects a significant number of consumers." *Id.*

Next, the plaintiffs fail to inform the Court of the sophistication of the investors in these funds. The managers of the plaintiff entities admit that investors in these funds are sophisticated. Rolfe Depo., p. 64, ll. 1-7; Siragusa Depo., pp. 69-70, ll. 20-25, 1-2; Reynolds Depo., p. 45, ll. 2-21. Additionally, the investors understand that they should review the PPM in full before making

18

an investment decision. Reinert Depo., p. 17, ll. 1-16. These are sophisticated investors, many of whom have invested *millions of dollars* through Jamie Smith and Ryan Smith in other funds. R. Smith Aff., ¶ 15. Finally, there is no potential for the Fund 7 PPM to harm investors in the future. The version of the Fund 7 Offering Package that the plaintiffs complain about hasn't been used since the summer 2018.

###        D.        UNJUST ENRICHMENT

To prove unjust enrichment, a plaintiff must demonstrate that (1) at [his or her] expense, (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying. *Oaster v. Robertson*, 173 F. Supp. 3d 1150, 1176 (D. Colo. 2016). The plaintiffs can't prove that the Smith Defendants were unjustly enriched at their expense. There is no evidence to support the plaintiffs' allegations. In fact, the evidence is to the contrary. There was no use of the plaintiffs' trademarks, there was no use of the plaintiffs' goodwill or experience, and there was no use of the plaintiffs' proprietary information.

Moreover, the plaintiffs cannot prove they have suffered any damages. The plaintiffs claim that the Smith Defendants diverted investors that would have invested in the plaintiffs' funds into Fund 7. Reynolds Depo., pp. 155-157. There is, however, not one shred of evidence to support this claim. Further, this contention completely ignores the personal relationships that the Smiths have cultivated and the many investors who invested in Fund 7 solely because of the Smiths—including the Smiths themselves, their entities, Dahn Corporation, and its employees. R. Smith Aff., ¶ 15-19. The plaintiffs also overlook the fact that since the summer of 2018, not one investor received the version of the Fund 7 Offering Package that lists the plaintiffs as affiliates. Summary judgment must be entered in favor of the Smith Defendants.

## III. CONCLUSION

The Smith Defendants are entitled to the entry of summary judgment in their favor on all claims raised against them by the plaintiffs in this shameful lawsuit. The facts in this case demonstrate that the plaintiffs have no viable Lanham Act claims against the Smith Defendants. The plaintiffs have wholly failed to show that their "marks" are inherently distinctive, or that they are descriptive and have acquired secondary meaning. Finally, the plaintiffs have not and cannot show that the Smith Defendants are using deceptively similar names or using their names as marks, meaning that the plaintiffs have not shown the requisite likelihood of confusion required to maintain a Lanham Act claim based on an unregistered trademark.

The plaintiffs' trade secret claims similarly fail because the purported trade secrets—investor information and the "turnaround" program—constituted publicly available common-sense information, the "secrecy" of which the plaintiffs made no effort to maintain. Instead, the plaintiffs published this information on the internet and distributed it at their boot camps.

Finally, the plaintiffs' claims under the Colorado Consumer Protection Act and for common law unjust enrichment fail because plaintiffs have not and cannot prove the requisite elements of such claims. For each of these reasons, and because the plaintiffs are unable to demonstrate legitimate damages, the Smith Defendants are entitled to the entry of summary judgment in their favor and against the plaintiffs on Counts I through VII of the Second Amended Complaint and Jury Demand.

Dated: March 6, 2020.

*/s/ Michael D. Crosbie* _____
**Michael D. Crosbie, Esq. (Trial Counsel)**
Florida Bar No. 72575
mcrosbie@shutts.com
**Nicole L. Ballante, Esq.**
Florida Bar No. 125356
nballante@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone:  407-423-3200
Facsimile:   407-425-8316
*Attorneys for Smith Defendants*

## CERTIFICATE OF SERVICE

I certify that on March 6, 2020, I filed the foregoing using the Court's CM/ECF system which will send a copy to all counsel of record.

*/s/ Michael D. Crosbie* _____
Michael D. Crosbie

ORLDOCS 17535681 2