RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

```
                                                                1

 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:18-CV-02780-NYW
 3
     --------------------------------------------------------
 4   VIDEOTAPED
     DEPOSITION OF DAVID REYNOLDS          October 1, 2019
 5
     --------------------------------------------------------
 6
     RV HORIZONS, INC., et al,
 7
          Plaintiffs,
 8
     v.
 9
     JAMIE SMITH, an individual, et al,
10
          Defendants.
11
     --------------------------------------------------------
12
     APPEARANCES:
13
14        SHUTTS & BOWEN, LLP
                By Michael D. Crosbie, Esquire
15                300 South Orange Avenue, Suite 1600
                  Orlando, Florida 32801
16                   Appearing on behalf of Defendants.
17        SHERMAN & HOWARD
                By Joseph C. Daniels, Esquire
18                633 Seventeenth Street, Suite 3000
                  Denver, Colorado 80202-3622
19                   Appearing on behalf of Dahn Corporation.
20        HOLLAND & HART, LLP
                By Craig Stewart, Esquire
21                555 Seventeenth Street, Suite 3200
                  Denver, Colorado 80202
22                   Appearing on behalf of Plaintiffs.
23        ALSO PRESENT: Daniel Witten, Videographer
24
25
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

11

```
 1        many of them, have rolled into or had rolled into
 2        MHC America Fund 2, and by the fact that investors
 3        were being diverted, you know, against the plan
 4        that we had had to roll all prior investors into
 5        that fund, that fund has not completed the roll-up
 6        of all the prior funds, so it's a lower base of
 7        assets for MHPS Alumni 1 investors.
 8   Q    Well, that's for the investors, but how was the
 9        fund itself harmed?
10   A    Well, I don't know that you would say the fund
11        itself was harmed.  It's the investors are part of
12        the fund as well as the sponsors which would
13        include Frank Rolfe and myself, so we were harmed
14        as well.
15   Q    Did MHPS Alumni close, liquidate, as a result of
16        the TPG transaction?
17   A    All of the assets that it had owned, all of the
18        mobile home parks, yes, they sold as a result of
19        that, yes.
20   Q    And in February 2018, MHPS Alumni was not
21        accepting any new investors, was it?
22   A    It was not.
23   Q    And the proceeds from the TPG transaction that
24        acquired all of the MHPS Alumni properties, those
25        proceeds were dispersed to investors when?  In
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

12

1      March 2018?

2  A   In March, and I believe in May as well.

3  Q   So at least in March there would not have been an

4      opportunity for MHPS Alumni investors to roll

5      their proceeds into MHC America Fund 2, correct?

6  A   No.  They were given that option to roll and so

7      they were -- in many cases they were reinvesting,

8      you know, right away once that fund was open, so

9      they were given that option.  It was impending

10     that that new fund was opening, so they were given

11     that option from the start.

12 Q   How much money was raised in MHPS Alumni?

13 A   2 million.

14 Q   How many investors?

15 A   I don't know for sure.  30 to 50, somewhere in

16     there.

17 Q   Were they accredited?

18 A   It was not -- many of them were and many of them

19     were not.  They were all sophisticated.

20 Q   Were the non-accredited investors permitted to

21     invest in MHC America Fund 2?

22 A   No.

23 Q   The same question for MHPS Alumni 2, how was it

24     harmed by my clients' action?

25 A   I mean, MHPS Alumni 2 was very much in the same

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

13

```
1    way as MHPS Alumni 1.  You know, the investors had
2    the option to roll up.  You know, fewer investors
3    rolled up into MHC America Fund 2.
4         It hasn't completed the roll-up, so a lower
5    base of assets, lower diversity, and it has taken
6    much longer to do the entire roll-up and fill that
7    fund up.
8  Q And you're talking about a lower base of assets.
9    That's in America Fund 2, correct?
10 A That's correct.
11 Q All right.  So MHPS Alumni 2, LLC, the entity did
12   not suffer any harm based on my clients' actions,
13   did it?
14 A Well, the actual entity itself?
15 Q Correct.
16 A Well, I don't really know how to answer
17   that question.  I mean, the entity itself, you
18   know, it's based on the investors and the sponsors
19   and so the sponsors and investors were harmed, but
20   the actual name of the entity was not harmed as
21   far as, you know, diverting the funds, you know,
22   to the other Fund 7.
23 Q How large in terms of investment was Alumni 2?
24 A 2 million.
25 Q And were some of the investors non-accredited?
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

14

1  A   Yes.

2  Q   So like with Alumni, some of the investors

3      wouldn't have been permitted to roll their

4      proceeds into MHC America Fund 2, correct?

5  A   That's correct.

6  Q   Did Alumni 2 liquidate as a result of the TPG

7      transaction?

8  A   It was a big part of it.  It did not fully

9      liquidate at the closing.

10 Q   How many properties did it retain at the closing

11     of the TPG transaction?

12 A   I believe there was one property remaining.

13 Q   Is that one property now in the -- I guess it

14     would be the America Fund --

15 A   It is.  Yes, I believe it is.  I'd have to look at

16     the property list to be certain, but it's one or

17     two.  I can't recall.

18 Q   All right.  How was MHPS Alumni 3 harmed by my

19     clients' actions?

20 A   So MHPS Alumni 3 is very much the same manner as

21     MHPS Alumni 1 and 2.  The roll-up was stalled

22     longer, fewer investors or fewer properties are

23     now in MHC America Fund 2.  You know, it's

24     basically the same response at the other two.

25 Q   How much has MHC America Fund 2 raised from

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

16

1    operations which, you know, RV Horizons is a

2    property management company.

3         At one point for a couple months Frank was

4    an employee of RV Horizons, so he had an

5    involvement as an employee for a brief period of

6    time.

7  Q   And how big in terms of investment was MHPS Alumni

8    3?

9  A   3 million.

10 Q   And I might have asked you this.  Some accredited

11    and some non-accredited investors?

12 A   That's correct.

13 Q   When was MHPS Alumni 3 formed?

14 A   I want to say it was around 2011.  I couldn't give

15    you the exact date.

16 Q   Were all of its property interests liquidated as a

17    result of the TPG transaction?

18 A   No, I believe it retained one property as well.

19 Q   Does MHPS Alumni 2 or Alumni 3, do any of them

20    currently own any property interest?

21 A   No.

22 Q   Do they conduct any sort of business?

23 A   Not currently.

24 Q   Are they still active limited liability companies?

25 A   I would have to look to see if we've dissolved

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

17

```
 1      them or not.
 2  Q   If you want to turn the page to paragraph 16 of
 3      the second amended complaint?
 4  A   Okay.
 5  Q   There are six entities described as Affordable
 6      Housing Community Funds.  That would be 1 through
 7      6, correct?
 8  A   Correct.
 9  Q   Do you have any idea why Fund 6 or Community Fund
10      6 is a Delaware LLC?
11  A   I couldn't tell you exactly why it's a Delaware
12      LLC, you know, part of the other ones being
13      Colorado.  It think it was at that point our
14      attorney and us decided that we should form it in
15      Delaware rather than Colorado.
16  Q   And the numbers 1, 2, 3, et cetera, those indicate
17      the order in which the funds were formed?
18  A   That's correct.
19  Q   So how was Affordable Housing Community Fund 1
20      harmed by my clients' conduct?
21  A   In really the same way.  The investors that did
22      roll-up into MHC America Fund 2, MHC America Fund
23      2 had fewer properties, fewer diversity, and it
24      basically kind of stalled out as far as that goes
25      as far as getting the roll-up plan completed.
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

19

1  Q    Okay.  Well, let me ask how big was AHCF 1 in

2       terms of investment?

3  A    5 million.

4  Q    How about AHCF 2?

5  A    10 million.

6  Q    AHCF 3?

7  A    10 million.

8  Q    And AHCF 4?

9  A    20 million.

10 Q    And who was primarily responsible for raising the

11      investments for those funds?

12 A    Eric Siragusa and Frank Rolfe.

13 Q    Now, you made a distinction between AHCF 4 and

14      AHCF 5.  Why is there a difference?

15 A    Well, AHCF 1, 2, 3 and 4 all have -- do not own

16      any more properties.  AHCF 5 and AHCF 6 are still,

17      you know, kind of in limbo for a roll-up

18      transaction, and so they still have property.

19           So that entire roll-up process has not been

20      completed for those funds at this point due to

21      fewer investors and kind of diverting the funds

22      from the other funds and what has kind of

23      transpired, you know, since that point.

24 Q    Do AHCF 1 through 4 currently do business?

25 A    They don't own any assets.  I can't tell you for

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

20

```
1        sure if the LLCs have been dissolved or not.  I
2        would have to look, but I believe they are
3        dissolved.
4   Q    On to AHCF 5, how large of a fund in terms of
5        investment was that?
6   A    25 million.
7   Q    And how many properties does it still own?
8   A    I'm going to just estimate somewhere between 7 and
9        13, somewhere in there.  I don't know the exact
10       number.
11  Q    And so how was AHCF 5 harmed by my clients'
12       conduct?
13  A    It was because of diverting the funds from the
14       other funds, you know, the MHPI funds, and
15       diverting funds into Fund 7 creating confusion to
16       the investors, you know, our investors and
17       investors that they claimed that are their
18       investors, and it has not been able to complete
19       the roll-up at this point.
20  Q    But let's assume AHCF 5, LLC completes the
21       roll-up.  Will AHCF 5 retain any profit as a
22       result of the roll-up?
23  A    Well, it will receive a profit because of the
24       roll-up.  It won't retain it because it will
25       distribute it out to the investors and the
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

21

1    sponsors.

2  Q  So if it were to receive a profit, it would be a

3     flow-through to investors and promote interests,

4     correct?

5  A  That's correct.

6  Q  Let's talk about AHCF 6.

7         Now, that is a fund that my clients through

8     their MHPI 5 Fund invested in, correct?

9  A  That is correct.

10 Q  How has AHCF 6 been harmed by my clients' conduct?

11 A  Exactly the same as AHCF 5.  You know, the fund is

12    still open.  The roll-up has not been completed.

13        We have had to go through an appraisal

14    process a few times.  You know, the investors are

15    anxious to have the roll-up completed, you know,

16    to either be in the new fund or to just get their

17    cash back, and it's just kind of in a stalled

18    process at this point.

19 Q  Well, are the investors in AHCF Fund 6 -- is the

20    fund still open for new investment?

21 A  No, the fund is not open for new investment.

22 Q  And how large was that fund in terms of

23    investment?

24 A  50 million.

25 Q  And how much did MHPI 5 invest in AHCF 6?

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

24

1  Q   But it's the entity that directed the investors in

2      that fund?

3  A   That is correct, yes, advised them.

4  Q   Okay.  So are you suggesting that there is a

5      trademark of AWA 3 that is independent of Argos

6      Wealth Advisers?

7          MR. STEWART:  Objection, form, legal

8        conclusion.  You can answer.

9  A   Well, I'm saying the AWA 3 Fund, the AWA 3 Fund,

10      the LLC, that's our -- that's the entity we do

11      business under, and so that's what we're known

12      with with clients of Argos Wealth Advisers, so I

13      would say that that's basically our trademark, our

14      business name, our DBA name.

15          MR. CROSBIE:  Just a matter of cleanup,

16        it's really of no consequence to me, Craig.  I

17        think that Elevation Capital Group, LLC may not

18        be the entity that you meant to sue.  I think

19        it's Elevation Events, LLC.

20          MR. STEWART:  There has been some

21        confusing -- do you want this on the record?

22          MR. CROSBIE:  I am pointing it out

23        because I noticed it yesterday.  We don't have

24        to do it on the record, but if you need to

25        correct a scrivener's error.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

39

1  Q    And that's the rub.  What is Impact MHC

2       Management?

3  A    It's a management company.

4  Q    Okay.  Is it an alterego of RV Horizons?

5  A    I wouldn't say it's an alterego.  It's a separate

6       newly-formed management company.

7  Q    And did it assume property management at

8       properties where RV Horizons used to be the

9       management company?

10 A    It did in some cases.  I wouldn't say "assumed."

11      It was an agreement on some of those properties

12      where RV Horizons delegated the management to

13      Impact.

14 Q    There was not an assignment of the property

15      management agreements to Impact?

16 A    No, it was a delegation.

17 Q    Okay.  And that's a written agreement?

18 A    Yes.

19 Q    Okay.  Do you have any like signs outside your

20      building in Cedar Ridge?

21 A    We do.

22 Q    What does it say on the sign?

23 A    Impact MHC or Impact Communities, I believe, the

24      new sign we just put up.

25 Q    Does RV Horizons currently have any employees?

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

40

1  A    RV Horizons currently does not have any employees.

2  Q    Are all the property management type employees

3       employed by Impact MHC?

4  A    All the employees that we have in any of our

5       various companies are employed by Impact, and then

6       the management fees for those are then separated

7       out and reimbursed by the various companies that

8       are using those management people.

9  Q    And when did that transition occur?

10 A    It was an ongoing transition throughout 2018.  It

11      started I want to say in like September was when

12      Impact actually started paying some employees.

13 Q    And did you create Impact as a result of TPG's

14      option to purchase RV Horizons?

15 A    No.

16 Q    Did you know --

17 A    It was one of the -- Impact was actually initially

18      created to operate the properties that I owned

19      separately from any of the funds.

20 Q    So you own mobile home communities separate from

21      any funds?

22 A    Yes, I have for years and years.

23 Q    I didn't know that.

24           And prior to you creating Impact to operate

25      the properties you own separate from the funds,

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

42

1      should be the manager or it basically has that in

2      many of the agreements.  And so as some of those

3      loans were paid off or new loans were put on

4      certain properties, Impact would take over the

5      management or we delegated that management.

6  Q   Okay.  So for all properties within a credit

7      facility, the property manager is either going to

8      be RV Horizons or Impact?

9  A   Yes, I believe so.  I mean, I would have to look

10     at all -- I mean, it's a lot of documentation to

11     just kind of say that I know for certain that

12     right now we have a management agreement that says

13     this is the property manager or this is the

14     delegated manager.

15          I would have to look at all of that to give

16     you the for sure answer, but the overall goal is

17     to eventually have Impact be the management

18     company for all of the properties.

19  Q   Let's go back to MHPS Alumni Funds 1 through 3.

20     How does MHPS Alumni Fund 1, 2 or 3 use its name

21     in commerce?

22  A   How does it?  How does it use its name in commerce

23     or how did it?

24  Q   Okay.  How did it use its name in commerce?

25  A   Well, it was basically -- it was used to -- it was

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

45

1       but around there.

2   Q   And is that on the low end of subsequent funds in

3       terms of the minimum investment?

4   A   I mean, it would be on the low end.  I think most

5       of the funds allowed for either a 25,000 or a

6       50,000 minimum investment.  I don't think we had

7       anything that required a higher amount.

8   Q   Did every fund that's a plaintiff have a PPM?

9   A   It did, yes.

10  Q   And as you could agree, they tend to be fairly

11      lengthy documents?

12  A   Yes.

13  Q   I think you mentioned earlier that you had some

14      non-accredited investors, but they were still

15      sophisticated?

16  A   Yes.

17  Q   So this is not like choosing a brand of green

18      beans off a store shelf, is it?  It's a

19      significant investment by these investors?

20  A   Yeah, for some of them it would be a significant

21      investment, yes.

22  Q   Did MHPS Alumni have any logos?

23  A   We had a logo.  I mean, we had a logo like on our

24      letterhead and everything for I think all of the

25      funds.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

46

1  Q    But a logo or just MHPS Alumni?

2  A    Well, that was the logo.

3  Q    So the name was the logo?

4  A    Basically, yes.

5  Q    Did MHPS Alumni investors ever receive

6       communications from MHP funds?

7  A    I'm sure it did, yes.

8  Q    And the same questions would be true for Alumni

9       fund?  Well, I guess we were covering all the

10      Alumni funds there.

11           So other than communications with investors

12      or prospective investors where the name

13      MHPS Alumni appeared, and that would include the

14      private placement memorandum, was there any other

15      public-facing use of those names?

16 A    Well, it was on, you know, the websites it was

17      certainly on as far as people seeing the PPM and

18      future additional funds down the road.  It was

19      public-facing as far as the brokers and the

20      lenders.

21 Q    Well, I'm pretty sure this was not an MHPS Alumni

22      park, but just for example say Elsmere had been.

23      If I went to the Elsmere Park would it say Elsmere

24      Mobile Home Community, an MHPS Alumni Fund

25      property?

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

47

```
 1  A    No.
 2  Q    Did any property ever indicate fund ownership?
 3  A    I don't believe so, no.
 4  Q    Did any property ever indicate "managed by
 5       RV Horizons"?
 6  A    I would say that's probably -- there probably
 7       were.  I couldn't tell you how many there were or
 8       how many there are, but I believe that is the case
 9       that it has that in some properties.
10  Q    Can you name any property that has that?
11  A    Not off the top of my head, I can't.
12  Q    How does AWA Fund use its name in commerce?
13  A    It's very similar to the Alumni funds.  The fund
14       has loan agreements, it has brokers that know
15       about it.  It's in track record documents.
16       Investors see it.  You know, future investors see
17       it, and it's really like that.  It doesn't have
18       its name on signs at the properties, but it's in
19       all these documents and it was on, in this case
20       here, the Elevation website.
21  Q    So someone goes on a PPM and sees the name AWA
22       Fund, how did they associate that with a
23       particular business if they have not been an
24       investor in AWA Fund?
25  A    Well, they would associate it because it was a
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

48

1       fund ran by Frank and Dave that Frank and Dave

2       were involved with, so they would know that it's a

3       mobile home park fund.

4    Q   Right.  Because the only investors in an AWA Fund

5       would have come through Argos Wealth Advisers,

6       correct?

7    A   Yes.

8    Q   So how is the word "AWA Fund" capable of

9       distinguishing the services AWA Fund provides from

10      those of others?

11              MR. STEWART:  Objection, legal

12        conclusion.  You can answer.

13   A   Can you repeat that?

14   BY MR. CROSBIE:

15   Q   Yeah.  How does the word "AWA Fund" -- how is the

16      word "AWA Fund" capable of distinguishing the

17      services AWA Fund provides from those of others?

18              MR. STEWART:  The same objection.

19   A   I don't know how it distinguishes it.  I mean, I

20      guess I don't really understand the question, what

21      you're trying to ask.

22   Q   I'm just reading from your complaint, the second

23      amended complaint.

24   A   What number are we at?

25   Q   43.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

49

1  A    So can you repeat your question?  Sorry.  Where is
2       it at exactly?
3  Q    How does the word "AWA Fund" or how is the word
4       "AWA Fund" capable of distinguishing the services
5       AWA Fund provides from those of others?
6             MR. STEWART:  The same objection.
7  A    When you say the word, do you mean how does the --
8  Q    The name.
9  A    The name, AWA Fund, is it capable of
10      distinguishing or how does it distinguish from
11      others?
12            I mean, it basically has a certain percent
13      ownership in the properties that it owns, you
14      know, whether it's 5 percent or 100 percent, and
15      its an entity that owns those interests in those
16      properties, and so that interest flows into the
17      fund from the SPEs to the investors, you know,
18      through all the investors that invested, and the
19      lenders see it as a separate entity, and so that's
20      how I guess it would be distinct.
21 Q    Let me ask you a question a different way.  Let's
22      talk about Alumni Fund.  How does the name MHPS
23      Alumni Fund 2 distinguish its services from the
24      name or the services provided by MHPS Alumni Fund
25      3?

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

50

1          MR. STEWART:  The same objection.

2   A    I mean, it really relates to the services that it

3        provides its investors, I guess, you should say,

4        the investors in MHPS Alumni 2 are serviced by

5        that fund, and MHPS Alumni 3 are serviced by that

6        fund, and then, you know, the lenders will see

7        certain information from each fund.

8             You know, the fund was managed by

9        RV Horizons and I think Colonial Kitchens, I

10       believe, so they managed the actual funds

11       themselves, but the investors and the lenders for

12       the most part would be the ones where it's

13       distinguished between the two.

14  Q    So would a consumer have a choice or had a choice

15       to invest in either Alumni Fund 2 or Alumni Fund 3

16       based on the different services they offered?

17  A    They would have had a choice to invest in Alumni

18       Fund 2, and then they would have had a choice to

19       invest in Alumni Fund 3.

20  Q    Would they have had a choice between the two

21       funds?

22  A    You know, I would have to look at the dates and

23       when they were opened, and if Alumni Fund 3 was

24       opened before we fully subscribed Alumni Fund 2.

25       I'd have to look at that and see if there was a

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

51

1    actually a choice in that case.

2  Q    What about were consumers given a choice to chose

3       between AHCF 3 and AHCF 4?

4  A    I mean, it's the same answer.  I mean, at a point

5       in time they probably had the choice, but it was

6       probably a very short period of time, because then

7       AHCF 3 would have closed to new investors because

8       it reached its $10 million mark and then they

9       could have a choice to invest in AHCF 4.

10 Q    What does "AHCF" stand for?

11 A    Affordable Housing Community Fund.

12 Q    And what do the AHCF entities do?

13 A    They are funds that own manufactured home

14      communities and they have multiple investors or

15      had multiple investors in the ones that closed or

16      are closing, so they had multiple investors, paid

17      out preferred returns, paid out capital gains,

18      signed on financing notes, those types of things.

19 Q    Are the Affordable Housing Community Funds

20      affordable housing community funds?

21 A    Absolutely.

22 Q    What does "MHC" stand for in MHC America Fund?

23 A    Manufactured Home Community.

24 Q    And the same questions that I had about like AWA

25      and Alumni, other than investors, PPMs,

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

52

1       potentially lenders, would any consumer have a

2       AHCF or an Affordable Housing Community Fund

3       publicly-facing name?

4               MR. STEWART:   Objection to form.   You

5         can answer.

6   A   It wouldn't be a -- you know, it was only open

7       to -- it was only open to depending on the fund,

8       sophisticated or accredited investors, and so if

9       you weren't falling into that arena, then you

10      would not have the opportunity to see it, but if

11      you wanted to invest and get the information,

12      yeah, I guess it would be public to those people

13      if they wanted to.

14              It wasn't like on a storefront window, but

15      it was circulated amongst the industry.   It's a

16      very small industry and people talk amongst

17      themselves in the industry.

18  Q   Sure.   And I think it's a fair point and I think

19      Mr. Rolfe mentioned this during the arbitration,

20      not that that's relevant here, but he mentioned a

21      brand Frank and Dave, and you mentioned that a few

22      times today.

23  A   Uh-huh.

24  Q   Do you consider "Frank and Dave" to be a brand?

25  A   I don't know the legal term of what I exactly

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

53

```
 1        describe it as, you know, but people know that
 2        Frank and Dave are -- you know, in the industry
 3        know exactly who Frank and Dave are and could tell
 4        you who we are and know what we've done.  They
 5        know our track record.  They know our history and
 6        all of that.
 7   Q    Right.  And kind of a silly example would be
 8        Ben & Jerry's for ice cream, right?
 9   A    Right.
10   Q    That may not be the corporate name.  It might be,
11        you know, generic Vermont Based Ice Cream Company,
12        Inc.
13   A    Right.
14   Q    But the brand is Ben & Jerry's like your company
15        name might be Affordable Housing Community Fund 1,
16        but the brand is Frank and Dave, right?
17             MR. STEWART:  Objection to form.
18   A    No, the brand is not Frank and Dave.  I don't
19        exactly know exactly how to answer that because
20        the actual AHCF funds are -- include more than
21        just Frank and Dave, so it includes Eric, it
22        includes in some cases some other people that did
23        some assistance like the Smiths in Fund 6, so I
24        would say that people associate the Affordable
25        Housing Community Funds for the most part with
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

54

1   Frank and Dave, but Frank and Dave is not

2   synonymous to AHCF 1 through 6.  It includes a lot

3   of different businesses that we have.

4 Q   Want to take a short break?

5        MR. STEWART:  Yes, please.

6        THE VIDEOGRAPHER:  One moment, please.

7     The time is 10:21 and we are off the record.

8        (Break taken.)

9        THE VIDEOGRAPHER:  The time is 10:32 and

10     we are back on the record.

11 BY MR. CROSBIE:

12 Q   Okay.  Mr. Reynolds, look at paragraph 49.  Let me

13     ask you first is it fair to say that for all of

14     these plaintiff funds that their use of the name

15     in commerce would be the same as you have

16     described during your last little bit of

17     testimony?

18 A   Yes.

19 Q   So if you look at 49, the second half of the

20     second sentence, "Consumers associate Affordable

21     Housing Community Fund 6 with only its business."

22        How do you know that that's what consumers

23     do?

24        MR. STEWART:  Objection to form, legal

25     conclusion.  You can answer.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

66

1      multiple websites and download newsletters and
2      summaries and reports, correct?
3   A  I assume if they have a computer and internet,
4      they probably could.
5   Q  In that sentence it concludes with, "and other
6      proprietary information."
7          What proprietary information did the Smiths
8      have access to?
9   A  They have insight into our acquisition pipelines,
10     our prior deals that we sent to them in many cases
11     that may have not worked out or may have worked
12     out, you know, deals that were kind of in the
13     pipeline.  They would have all those pipeline
14     reports.
15         They would have all the information from
16     the discussions that we had with them on kind of
17     how the business works and all the education we
18     gave to them on how we turn-around properties and
19     make them more valuable and all that type of
20     information.
21  Q  Well, the turnaround information is available to
22     anybody that attends the appropriate bootcamp,
23     right?
24  A  Well, some of it is, yeah, some of the turnaround
25     information is.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

67

1  Q  What information about turnarounds do you not give
2     to your bootcamp attendees?
3  A  Well, you can't give them your experience.
4  Q  I'm talking about tangible.  I'm not talking about
5     intangible experience.  I'm talking about tangible
6     items.
7  A  Well, you know, it would take multiple, multiple
8     books to write every experience you've had on
9     every turnaround you've had.
10 Q  I'm sorry.  I didn't mean to interrupt you.  Go
11    ahead.
12 A  And so that bootcamp attendee is not going to get
13    all of that.  It would be a ridiculous amount of
14    time and effort.  They get the general overview of
15    the turnarounds.
16 Q  But somehow Jamie and Ryan had access to what you
17    said would be books and books of every turnaround
18    experience you had?
19 A  They didn't have books and books, but they had the
20    personal knowledge, the phone conversations and
21    internal spreadsheets and memos and that type of
22    stuff.  They saw what we were doing.
23 Q  What do you mean, internal memos?
24 A  Like the projections that we put into place and we
25    had kind of a spreadsheet that showed basically

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

68

1       the plan on how to really push the value over a

2       certain timeframe and how to do that, and they had

3       that strategy.

4   Q   What spreadsheet are you referring to about how to

5       push the value?

6   A   It was a spreadsheet I shared with them, and I

7       want to say in 2017 sometime.  It basically listed

8       all the properties.

9   Q   And how did it show how to push the value?

10  A   Because it listed basically the business plan to

11      basically take the properties up another I think

12      it was $400 million in value.

13  Q   And that business plan was laid out in that

14      spreadsheet?

15  A   It certainly is, yes.

16  Q   And is there a narrative or is it just

17      projections?

18  A   It was a narrative and I walked through it with

19      them.

20  Q   Okay.  But the narrative is not in the

21      spreadsheet?

22  A   Well, I mean, if they understand the business,

23      then they could follow the spreadsheet and see the

24      narrative.  That spreadsheet is not available to

25      the general public.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

69

1  Q    Okay.  Is there any other proprietary information?

2  A    I think that would probably be the one that is the

3       most -- the biggest one.

4  Q    Did Mr. Siragusa have access to that?

5  A    Yes, he did.

6  Q    Mr. Rolfe had access to it?

7  A    I think he looked at it, yeah.  He has access

8       probably.

9  Q    Did Amy Burget have access to that spreadsheet?

10 A    Not unless she went on the computer and took it.

11 Q    And were there any legends or footnotes or footers

12      that said proprietary or confidential information

13      on that spreadsheet?

14 A    I don't know.  I'd have to look at the

15      spreadsheet, but I don't know.  I doubt that it

16      says "proprietary information" on it.

17 Q    Going to the last sentence in that paragraph, the

18      allegation is referring to the Smiths.  Their

19      roles in all of these respects always were limited

20      to obtaining investors for the funds, correct?

21 A    Yeah.  I mean, I think you probably should expand

22      it to say some communications, but mostly the only

23      reason that we had really even partnered with them

24      was for their ability to raise funds, not to

25      communicate with investors, so that was the

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

70

1       primary role was to raise money.

2   Q   Well, they also became the primary communicators

3       with investors, correct?

4   A   Well, in certain funds they did.

5   Q   The funds in which they --

6   A   After we wrote up all the communications, you

7       know, so they hit the button to send it out.

8   Q   You all wrote up --

9   A   Yeah, Frank, Dave and Eric.

10  Q   You wrote communications that went out?

11  A   Yes.

12  Q   And you all were the ones responsible for the

13      content of the communication?

14  A   Well, it depends.  You got to start going through

15      which funds you're talking about, because it's not

16      just the same for every fund.

17  Q   Well, I'm just using what you testified about.

18      You said we, Frank, Eric, you, wrote

19      communications, so I'm following up on

20      that question.

21  A   We drafted the communications, we put the reports

22      together that would go in the communications, and

23      if the Smiths were involved with a certain fund

24      that those communications were going to go to,

25      then in some cases they would have the ability to

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

80

1    would say proprietary.

2         It's enticing investors to invest in a fund

3    that we have no involvement with, but they are

4    using our track record, our history, and that's

5    what I would say is proprietary about it.  They

6    are fraudulently inducing the investors to invest

7    in a fund.

8  Q   And what confidential information did they use to

9    start Fund 7?

10 A   Well, I would say the fund track records or the

11   fund distribution histories on funds they have no

12   involvement with would be confidential.  It's not

13   their information.

14        I would say that -- you know, I'd really

15   have to go through like the track record and stuff

16   to actually point out all these items.  I can't do

17   it all from memory.  I'm happy to do that.

18 Q   And we can look at the track record in a bit.  Any

19   other confidential information that they used to

20   start Fund 7?

21 A   I would have to go through the track record.

22 Q   It would be in the track record?

23 A   Well, and the investment summary and the fund

24   documents as well and their websites and their

25   website sourcecode.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

110

1  A   Well, that was how I prefaced it.  I just wanted
2      my name off their website, but, yeah, I was
3      prefaced because we had to get it off.
4          We cannot be raising funds for any new
5      funds and, you know, you need to remove our names
6      and our pictures and all of that, because Frank
7      and I are restricted from having this type of
8      stuff out there and doing fundraising.
9  Q   All right.  Time for a break.
10             THE VIDEOGRAPHER:  One moment.  The time
11         is 11:59 and we are off the record.
12             (Break taken.)
13             THE VIDEOGRAPHER:  The time is 1:02 and
14         we are back on the record.
15  BY MR. CROSBIE:
16  Q   Okay.  Mr. Reynolds, look at Exhibit 1, page 17.
17  A   Okay.
18  Q   It talks about bootcamp.  Paragraph 73 says,
19      "Jamie Smith attended a bootcamp session and
20      obtained copies of RV Horizons proprietary and
21      copyrighted material in 2008 or thereabouts."
22          Is that RV Horizons' materials or is it
23      Niche's material?
24  A   At that point I don't -- I believe RV Horizons was
25      the manager of Niche Investments, and so that's

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

111

1     why I think we have RV Horizons on here, but it

2     would have been Niche Investment Networks.

3  Q  What proprietary information did Jamie Smith

4     obtain copies of at the bootcamp?

5  A  Well, she received a copy of our bootcamp manual,

6     sample forms and things like that, you know,

7     several forms that we used or had used

8     at that time in operating properties, a bootcamp

9     manual which was, I don't remember, 300 pages

10    long, 200 or 300 pages long.

11  Q  Yeah, but she paid and that was part of the

12     benefit of going to the camp was she got to keep

13     those materials, right?

14  A  Yeah, she got to keep them, yes.

15  Q  What parts were proprietary then?

16  A  They're proprietary.  They're written by us.  Like

17     if you go to Barnes & Noble and buy a book, you

18     get to keep it, but you can't just go and

19     plagiarize it and say it's yours.

20  Q  Okay.  That's because it's proprietary to

21     Barnes & Noble?

22  A  It's proprietary to the author or authors,

23     whatever it is.

24  Q  But there's no limitation on how those materials

25     are used, are there?

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

114

```
 1       when I wrote the article.
 2   Q   And in this article that's available for free at
 3       mobilehomeuniversity.com, you set out your
 4       turnaround program for a mobile home park,
 5       correct?
 6   A   I talk about turning around a mobile home park.  I
 7       don't set out the whole entire program.  I mean,
 8       if you could read this and then never be in the
 9       industry and go turn-around a mobile home park
10       with this six pages, more power to you.  That's a
11       very difficult program and process to turn-around
12       a mobile home park.
13   Q   Are there secrets parts of the turnaround program?
14   A   Are there secret parts?
15   Q   Yeah.
16   A   I wouldn't say there are secret parts.  I would
17       say there are parts that you learn from only doing
18       it, experience.
19   Q   Personal experience?
20   A   Personal experience, yes, absolutely.
21   Q   Okay.  But this identifies things for a
22       prospective or a current park owner, for example,
23       general clean-up, working on infrastructure items,
24       existing park-owned homes, buying and selling or
25       renting homes, preparing a budget, and then
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

122

```
 1              MR. STEWART:  Let him finish.  Let him
 2       finish.
 3  A    And the Smiths had access to that investor list,
 4       all of our prospects and investors in that
 5       Infusionsoft account.
 6  Q    So could a user go on and click on a link that
 7       says prospective investors for AHCF 5?
 8  A    I believe -- I am not the Infusionsoft expert, but
 9       they can go in and they can download every
10       investor, their names, what funds they're in, what
11       fund list they're on, so that's how they would get
12       if it's AHCF 5, what e-mails have been sent, what
13       materials have been sent to them.
14              It basically is a customer management data
15       software that lists all the e-mails you sent to
16       them, what you sent, if they clicked on it, all
17       that kind of stuff.
18  Q    And you have evidence that Mr. or Mrs. Smith went
19       in and downloaded all that information?
20  A    I -- I would say that I don't have the actual
21       evidence that I actually see the download, but I
22       am pretty certain that they did, because I don't
23       know how they would be contacting many of the
24       investors that they have contacted about Fund 7
25       when those investors had never even heard of them
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

123

1     before, and they are not part of anything they've

2     ever -- you know, signed up for anything other

3     than our investor lists or our lists, and we've

4     had those conversations with investors.

5  Q  Which investors are those?

6  A  It would be several investors.  It would be people

7     like Max Hicks and Steve and Rebecca Tefas,

8     T-E-F-A-S.  I believe Merrill Blasdell,

9     B-L-A-S-D-E-L-L.

10 Q  Anybody else you can think of?

11 A  Those are the ones I can think of off the top of

12    my head.

13 Q  Were those e-mails or telephone calls or both?

14 A  They were e-mails that they got.

15 Q  E-mails?

16 A  Yeah, that they got from the Smiths announcing

17    Fund 7.

18 Q  Well, it was kind of a -- I appreciate the length

19    of your answer, but my question was could I go in

20    and click on a link to AHCF 5 that would show me

21    prospective investors in that fund?

22 A  I don't know.  I answered that I don't know.  I

23    told you what you could -- the information you

24    could pull out of there.  I don't know exactly if

25    you click on a link, because I don't go in there

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

128

1   then for park turnaround 7 Mr. Rolfe would speak

2   about an example he had, and you would speak about

3   an example you had, and then you explained

4   whatever your Oklahoma problem was?

5 A   Yep.

6 Q   This information is not confidential, is it?

7 A   It's not confidential information, no.

8 Q   And it was not at the time it was created, was it?

9 A   No, it's not confidential.  We'd would give it to

10   people or they would buy it.

11 Q   They'd buy it as part of a package?

12 A   Right.

13 Q   And they can buy, to this day, information like

14   this off your website, correct?

15 A   They can, yes.

16 Q   Probably updated with prices and cap rate and

17   other information?

18 A   Some of it updated, yeah.

19 Q   Okay.  Then look at paragraph 83 and 84 of

20   Exhibit 1.

21 A   Okay.

22 Q   This is discussing confidential and proprietary

23   investment strategies.  It says, "Plaintiffs refer

24   to these strategies, which are central to their

25   business, as turnarounds."

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

134

```
 1       Fund 7."
 2            What other plaintiffs did the letter make
 3       it appear were involved in Fund 7?
 4  A    I'd need to look at the letter again just to see
 5       if I'm missing something, but I'd have to look at
 6       the letter.
 7  Q    Do you recall whether any other plaintiffs were
 8       mentioned in the letter?
 9  A    No, I don't, not off the top of my head.  I'd have
10       to look at it.
11  Q    And that letter recording this paragraph 87 in
12       your second amended complaint, you learned of that
13       in March 2018?
14  A    That is correct.
15  Q    And if you go to the next page, the conclusion of
16       that paragraph 87, at the bottom of page 19,
17       "Instead, the Smiths were diverting investors to
18       Fund 7 from funds plaintiffs were involved in,
19       including Funds 1 and 2."
20            Fund 1 was not open to investors on
21       March 17, 2018, was it?
22  A    The question is:  Was MHC America Fund 1 open to
23       new investors in March?
24  Q    March 17, 2018.
25  A    We were not, no.  We were not taking new investors
```

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

135

1     at that point.

2  Q   And as of March 17, 2018, America Fund 2 was not

3     open to any investors yet, correct?

4  A   It was not open at that point yet.

5  Q   The next sentence says, "The Smiths were also

6     using the advertising plaintiffs were doing for

7     Fund 1 to benefit their separate Fund 7."

8         What advertising were the plaintiffs doing

9     for Fund 1 in March 2018?

10  A   Well, they were -- you know, based on their

11     reimbursements they were having a dinner at some

12     steak house for several thousand dollars.  They

13     had used advertising.  You know, they were running

14     events in the villages promoting investments into,

15     I guess, Fund 1 and Fund 7 and billing Fund 1 for

16     it.

17  Q   On what date?

18  A   On what date?  For like the whole last year that

19     we found out.

20  Q   What's the whole last year?

21  A   From April 2017 to March 2018.

22  Q   The dinner?

23  A   Several dinners.

24  Q   The expensive dinner, the $4,000 dinner.  That

25     occurred in 2017, right?

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

155

1          LLC.

2    Q     I'm sorry.  MHC America Fund, LLC.

3    A     Okay.  So it provides management services for the

4          SPEs and MHC America.

5    Q     And so if one of those SPEs got sued, do you think

6          RV Horizons would be a defendant as well just

7          based on the fact that it provides management

8          services?

9                    MR. STEWART:   Objection, foundation.

10             You can answer.  On all these where I object,

11              you can answer.

12   A     Okay.  Yeah, I believe that -- I believe that -- I

13         mean, yes, I believe it could get sued.  I mean,

14         we have been sued when people have sued an SPE and

15         RV Horizons has been sued.

16   Q     Now, in response to Mr. Crosbie's questions in

17         terms of damages, you said several times that I

18         think the main damage here is diverting funds, is

19         that correct?

20   A     So I think -- I think the main monetary damage

21         would be the diverting of the funds which then

22         created a lack of the funding needed to do the

23         business plan we had been contemplating, but I

24         think the other -- I mean, the other is damages

25         that I think are just unknown.

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

156

1       They are unknown because we don't know the

2       extent of how many people, you know, what people

3       were told, and they received this track record

4       with our information in it.  You know, we had the

5       SEC investigation into Elevation Events, you know,

6       four or five years ago, and I had to do the

7       deposition and all that there.

8       I mean, the question is if Fund 7 doesn't

9       pan out, which I mean sometimes properties don't

10      pan out, I mean, I know Dahn knows that.

11      Sometimes it doesn't work out the way you want it,

12      but if it doesn't pan out and our name, our track

13      record, our history, our distribution history, all

14      that are in those documents that people have

15      received, that's a very big problem for us.

16      We don't want to be involved in some

17      investigation where we have nothing to do with

18      something, but our names and faces and pictures

19      were all over the stuff in the beginning.

20  Q   And so by diverting funds am I correct in

21      understanding you're really talking about

22      diverting potential investors?

23  A   Yeah, diverting investors, yes.  Correct.

24  Q   So there is a pool of investors out there, and

25      your concern is those investors might decide to go

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

157

1   with Fund 7 rather than with one of the

2   plaintiffs' funds?

3 A   Yeah.   I think the concern is that they would --

4   yeah, like you said, Fund 7 or one of the other

5   funds, but going to Fund 7 under false pretenses

6   as well.

7 Q   And I'm trying to understand the concept.

8 A   Yeah.

9 Q   Not taking money away --

10 A   Well, yeah, right.

11 Q   -- from company accounts and moving it around?

12 A   Correct.   Yeah.

13 Q   And then you also discussed about by diverting

14   some of these funds it was hindering the roll-up

15   process.

16         Do you recall that testimony?

17 A   That's correct.

18 Q   And what do you mean by the roll-up process?

19 A   So as we led up to the TPG transaction in which we

20   sold 102 properties, you know, a cut of that -- a

21   precursor to that, Ryan, Jamie, Frank, Eric and I

22   had been having numerous conversations and I guess

23   I should add Peter because he was involved with a

24   lot of that, but we were having numerous

25   conversations about basically we sell these 102

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

189

1    this is what we are going to do?

2  A  I don't know the answer to that for sure, no.  I

3    don't know who has control.  I assumed it was

4    50/50, but I do not know a hundred percent.

5  Q  So when the plaintiffs filed the complaint against

6    Dahn, it was your understanding that the company

7    decisions would be 50/50?

8  A  Yeah, that it would be made 50/50 between the two.

9  Q  And the offering material which has been marked as

10    Exhibit 2 which I think is a total of 242 pages --

11  A  Right.

12  Q  The vast majority of this document you don't have

13    an issue with, correct?

14  A  I mean, for the most part -- I mean, for the most

15    part I don't really have an issue with it.  I was

16    a little upset when I found out that it was

17    basically a redline from MHC America Fund, but I

18    mean the vast majority of it -- you know, the

19    first three big agreements, I mean, off of

20    recollection, other than a few kind of outlandish

21    statements that are in there, I don't have an

22    issue with them.

23  Q  And really I mean your concern in this lawsuit is

24    the use of plaintiffs' names in the investment

25    summary and the track record?

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

190

1           MR. STEWART:  Objection to form.  You

2       can answer.

3   A   It's the use of our names inducing investors that

4       should have probably went to MHC America Fund or

5       MHC America Fund 2.

6           It's, you know -- you know, using our

7       names, which to me, it's just a lot -- I mean,

8       everybody -- like I said before, you know, a lot

9       of people recognize Frank and Dave from the

10      industry.

11          I mean, you can go talk to anybody in the

12      industry that's been around for more than a year

13      and say who is Frank and Dave, and they will tell

14      you, but if you say who is Ryan and Jamie, nobody

15      is going to know who they are, or Brian.

16          So the fact that people, you know, had

17      invested with us, you know, through MHPI 1 through

18      4, through ACF funds, through the Alumni funds,

19      through MHC America Fund, they see this

20      progression of Frank and Dave is involved with

21      everything, Frank and Dave, Frank and Dave.

22          And so this new Fund 7 comes out.  In our

23      original discussions of MHC America Fund we called

24      it Fund 7.  Then there is this new Fund 7 that

25      comes out.  And to me, if you're selling a fund