```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

 Civil Action No. 1:18-CV-02780-NYW

 -------------------------------------------------------
 VIDEOTAPED
 DEPOSITION OF DAVID REYNOLDS          October 1, 2019

 -------------------------------------------------------

 RV HORIZONS, INC., et al,

      Plaintiffs,

 v.

 JAMIE SMITH, an individual, et al,

      Defendants.

 -------------------------------------------------------

 APPEARANCES:


      SHUTTS & BOWEN, LLP
          By Michael D. Crosbie, Esquire
            300 South Orange Avenue, Suite 1600
            Orlando, Florida 32801
              Appearing on behalf of Defendants.

      SHERMAN & HOWARD
          By Joseph C. Daniels, Esquire
            633 Seventeenth Street, Suite 3000
            Denver, Colorado 80202-3622
              Appearing on behalf of Dahn Corporation.

      HOLLAND & HART, LLP
          By Craig Stewart, Esquire
            555 Seventeenth Street, Suite 3200
            Denver, Colorado 80202
              Appearing on behalf of Plaintiffs.

      ALSO PRESENT: Daniel Witten, Videographer
```



Page 38

1    special purpose entities that owned more than one
2    property, but for the most part that was the goal
3    is to own each asset in its own special purpose
4    entity.  In many cases that's what lenders require
5    as well.
6  Q   Well, let's talk about the management.
7    RV Horizons managed all of the SPEs as the
8    manager, correct?
9  A   I would say most.  I would have to go through all
10    of the agreements to make sure that's correct.
11  Q   That's fair.  No, that's fair.  And then
12    RV Horizons was the property manager for the
13    mobile home communities owned by the SPEs,
14    correct?
15  A   That's correct.
16  Q   So let's talk about this, because I am still not
17    sure I understand.
18       Does RV Horizons currently do any property
19    management for mobile home communities?
20  A   It does.
21  Q   How many communities?
22  A   You know, I couldn't tell you off the top of my
23    head.  It's a portion of, you know, the hundred
24    and whatever 90 communities that I oversee through
25    either RV Horizons or Impact MHC Management.

Page 39

1  Q   And that's the rub.  What is Impact MHC
2    Management?
3  A   It's a management company.
4  Q   Okay.  Is it an alterego of RV Horizons?
5  A   I wouldn't say it's an alterego.  It's a separate
6    newly-formed management company.
7  Q   And did it assume property management at
8    properties where RV Horizons used to be the
9    management company?
10  A   It did in some cases.  I wouldn't say "assumed."
11    It was an agreement on some of those properties
12    where RV Horizons delegated the management to
13    Impact.
14  Q   There was not an assignment of the property
15    management agreements to Impact?
16  A   No, it was a delegation.
17  Q   Okay.  And that's a written agreement?
18  A   Yes.
19  Q   Okay.  Do you have any like signs outside your
20    building in Cedar Ridge?
21  A   We do.
22  Q   What does it say on the sign?
23  A   Impact MHC or Impact Communities, I believe, the
24    new sign we just put up.
25  Q   Does RV Horizons currently have any employees?

Page 40

1  A   RV Horizons currently does not have any employees.
2  Q   Are all the property management type employees
3    employed by Impact MHC?
4  A   All the employees that we have in any of our
5    various companies are employed by Impact, and then
6    the management fees for those are then separated
7    out and reimbursed by the various companies that
8    are using those management people.
9  Q   And when did that transition occur?
10  A   It was an ongoing transition throughout 2018.  It
11    started I want to say in like September was when
12    Impact actually started paying some employees.
13  Q   And did you create Impact as a result of TPG's
14    option to purchase RV Horizons?
15  A   No.
16  Q   Did you know --
17  A   It was one of the -- Impact was actually initially
18    created to operate the properties that I owned
19    separately from any of the funds.
20  Q   So you own mobile home communities separate from
21    any funds?
22  A   Yes, I have for years and years.
23  Q   I didn't know that.
24       And prior to you creating Impact to operate
25    the properties you own separate from the funds,

Page 41

1    who managed those properties?
2  A   They're actually managed really by myself.  We did
3    use some assistance from RV Horizons, but for the
4    most part they were kind of managed by myself and
5    Amy Burget who is kind of my executive assistant.
6  Q   Does RV Horizons or Impact, do they contract with
7    the SPEs or the funds or who to manage the
8    properties?
9  A   They contract with the SPEs to manage the
10    properties for the most part.  You know, I believe
11    in most of the fund agreements it designates that
12    RV Horizons or its delegate will be the management
13    company.
14  Q   Does Impact currently manage any properties owned
15    by MHC America Fund?
16  A   I want to say that it does, but I'm not a hundred
17    percent certain exactly.  I believe it owns -- it
18    manages properties that MHC America Fund has an
19    interest in in some manner.
20  Q   And who made the decision about which properties
21    Impact would take over the management of?
22  A   The decision has been more driven by, you know,
23    kind of the lender is the loan agreement so we
24    have existing, you know, because many of those
25    have -- you have a stipulation that RV Horizons



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS
178..181

Page 178

1    actually doing seminars, you know, like in person
2    like at the villages or that type of thing.
3         I know they were on some of the webinars
4    that were done, and they were soliciting
5    investors, you know, basically as promoting the
6    fund through the webinars which those e-blasts
7    went out to lots of investors that, you know, we
8    believe are on our proprietary lists, and so they
9    were promoting through webinar Fund 7, but as far
10   as like in person -- in a lot of cases other than
11   some of the webinars and his employees say he's
12   more like the operational person where the Smiths
13   are the investor people, similar to what the
14   historical part is.
15 Q    For the moment putting aside how the defendants
16   may have gotten the name of investors, do you have
17   any issue with Fund 7 soliciting investors?
18 A    I do not have issue with Fund 7 soliciting
19   investors generally, right.  I mean, that's their
20   right.
21 Q    And so whether it's the Dahn Corporation or the
22   other defendants, they are allowed to solicit for
23   their fund, correct?
24 A    I would agree with that.
25 Q    Your issue is whether or not they are using

Page 179

1    plaintiffs' alleged trademarks as part of that
2    solicitation, is that correct?
3  A   Yeah, the trademarks, track records, all of that
4    piece that they are using.
5  Q   Well, do you draw a distinction between a
6    trademark and the track record?
7  A   Well, I mean, the track record is more -- is
8    specifically, you know, listing out what each fund
9    did and how many properties that they have under
10   management and their, you know, loose connection
11   with affiliates and all of that, so I think
12   there's probably some distinction between -- I
13   don't say track record is -- their track record is
14   not our trademark.
15        There's pieces of it that they shouldn't be
16   using whether it's a trademark or, you know,
17   misleading or it's just not relevant.  It
18   shouldn't be in their documents.
19 Q   But you're suing on the use of the trademarks, not
20   the use of the track record, correct?
21        MR. STEWART:  Objection to foundation.
22 A   Well, so I think -- I think -- my understanding is
23   we are suing on the trademarks and then the -- and
24   the contents of the offering documents which is
25   the track record, I mean, the statements made in

Page 180

1    those track records and documents.  I think that's
2    more of a legal question than -- I mean, I just
3    can't -- I can't really make that distinction for
4    you right now, because I just don't understand
5    exactly how that -- you know, I'm not a trademark
6    attorney.
7  Q   Let me ask you this.  If you went into let's say a
8    BMW dealership and you're looking to buy a car and
9    the salesman comes over and you're asking him
10   questions about the car, and you tell him, yeah,
11   well, I'm considering this one, but I'm also
12   looking at this Mercedes model, and if the
13   salesperson says, you know what, I used to work at
14   Mercedes, and I know a lot about Mercedes.  Let me
15   tell you all the differences between this car and
16   the Mercedes model, do you think the salesperson
17   there did anything wrong by using Mercedes in that
18   discussion?
19        MR. STEWART:  Objection to foundation
20     and the hypothetical.  You can answer.
21 A   Yeah, I don't think there's any problem with that.
22   I mean, that's what their job is.
23 Q   If someone has prior experience in something,
24   they're allowed to talk about it, right?
25        MR. STEWART:  The same objection.

Page 181

1 A    I believe so, yeah.
2 BY MR. DANIELS:
3 Q    And even if it's referring to something that might
4    be trademarked, they are allowed to talk about it?
5         MR. STEWART:  The same.
6 A    I mean, I think they would be allowed to talk
7    about it, yes, yes.
8 Q    Let's put it in the context of this case.  Let's
9    say Ryan and Jamie just told potential investors
10   we worked with Dave and Frank for ten years and we
11   learned from them.  Would that be okay?
12 A    I would say, yeah, I mean, generally, they could
13   say, yes, they learned from us maybe.
14 Q    Well, would they be allowed to say we have ten
15   years of experience working with Dave and Frank?
16 A    Yes.
17 Q    And could they say, you know, Dave and Frank, they
18   ran all of these funds?
19        MR. STEWART:  Can I get a continuing
20     objection?
21 Q    Yeah, that's fine.
22 A    Dave and Frank, yeah, were involved or -- if we
23   ran them, I guess, if that's the word you want to
24   use.  I think they could say, yeah, we were
25   involved with Dave and Frank and they ran these



Page 190

1         MR. STEWART: Objection to form. You
2     can answer.
3  A   It's the use of our names inducing investors that
4     should have probably went to MHC America Fund or
5     MHC America Fund 2.
6         It's, you know -- you know, using our
7     names, which to me, it's just a lot -- I mean,
8     everybody -- like I said before, you know, a lot
9     of people recognize Frank and Dave from the
10    industry.
11        I mean, you can go talk to anybody in the
12    industry that's been around for more than a year
13    and say who is Frank and Dave, and they will tell
14    you, but if you say who is Ryan and Jamie, nobody
15    is going to know who they are, or Brian.
16        So the fact that people, you know, had
17    invested with us, you know, through MHPI 1 through
18    4, through ACF funds, through the Alumni funds,
19    through MHC America Fund, they see this
20    progression of Frank and Dave is involved with
21    everything, Frank and Dave, Frank and Dave.
22        And so this new Fund 7 comes out. In our
23    original discussions of MHC America Fund we called
24    it Fund 7. Then there is this new Fund 7 that
25    comes out. And to me, if you're selling a fund

Page 191

1     that you're calling Fund 7 on both sides, it
2     confuses the heck out of investors, and I wonder
3     whatever happened to MHPI Fund 6.
4         But, I mean, it's all those little pieces.
5     I just -- we don't want people to feel like we're
6     involved with something that we're not, which many
7     people have said that -- you know, or had called
8     before they invested and said, hey, are you guys
9     involved with this? And we're like, no, we're not
10    involved with that, and so they don't invest. Or
11    people, you know, say, oh, my gosh, I invested
12    there and you're not involved, that kind of thing.
13        And so we don't want to be, you know, five
14    years down the road, you know, sitting there and
15    getting a call from the SEC saying, hey, Frank and
16    Dave, you know, these investors said you guys were
17    involved with Fund 7 and now it's bankrupt, you
18    know, we want you to come in and talk to us.
19    That's one problem, and we're not confident in the
20    Smiths' operational skills whatsoever.
21 Q   And at the time the offering materials were first
22    prepared in April of 2017, you still had a
23    business relationship with the Smiths, correct?
24 A   We did, yes, uh-huh.
25 Q   So if this track record and investment summary was

Page 192

1     presented to Dahn Corporation and they reviewed
2     it, would they have any reason to think that you
3     and Frank had a problem with this?
4         MR. STEWART: Foundation.
5  A   You know, I think -- I think that's just really
6     hard to answer because I don't know how -- I mean,
7     I saw an e-mail where Brian Dahn wrote to Ryan and
8     Jamie Smith, what is MHCA? He doesn't even know
9     what MHC America Fund is, and that was like in
10    April 2017.
11        So to me, it's like, you know, what does he
12    know, what doesn't he know, you know, and what
13    does everybody else at Dahn Corp. know? Because,
14    I mean, you've got to think that -- I mean, I
15    would think that Elizabeth and the Dahn employees
16    know about MHC America Fund because they are
17    helping investor relations, but I don't know -- I
18    mean, I think this is so hard to answer because I
19    just don't know what he knew or what they knew.
20 Q   If you go to page 223 of Exhibit 2 --
21 A   Right.
22 Q   And this is the track record, correct?
23 A   This is -- yeah, I mean, that's part of -- I guess
24    you would call the track record, the track record
25    document, yep.

Page 193

1  Q   And here it's discussing prior similar funds?
2  A   Yes.
3  Q   And it lists out many of the plaintiffs
4     in this case, correct?
5  A   It does.
6  Q   On this chart here?
7  A   Yeah, or abbreviations of them, yeah.
8  Q   Now, these track records are used to provide
9     historical information to potential investors,
10    correct?
11 A   That's correct.
12 Q   Investors understand that they're not investing in
13    one of these prior similar funds, correct?
14 A   They should understand that, yes. I'm not saying
15    that they all do, but they should.
16 Q   So it's your understanding that most investors
17    looking at this would realize, okay, this is data
18    regarding prior funds?
19 A   Correct.
20 Q   And then at the top there it says affiliates of
21    the members of the manager of MHPI 7, LLC have a
22    strong track record that spans two decades.
23        Do you see that?
24 A   Yep.
25 Q   And that's, from my understanding of



Page 210

1  A     That is my understanding.  That's the way I recall
2        it, yes, when I looked at this months and months
3        ago.
4  Q     Are you aware of any Dahn Corporation created
5        document that uses any of the plaintiffs'
6        trademarks?
7  A     You know, I think I'm aware of Fund 7 documents
8        which I think are somewhat signed off on by Dahn,
9        but as far as like Dahn Corporation, you know,
10       writing it for -- you know, writing on behalf of
11       Dahn Corporation, I can't say that I'm aware of
12       anything right now, but not to say that I haven't
13       seen something in the past.  I just don't recall
14       for sure, but I can't give you an example right
15       this moment.
16 Q     If you go to interrogatory number 13, and this
17       asks describe in detail the legal and factual
18       basis for your contention that Dahn had the
19       ability to direct or control Elevation and
20       Fund 7's alleged use of your trademarks.
21             And in the response it says, "Based on the
22       perceptions by the plaintiffs of the interactions
23       between Dahn and the other Smith defendants,
24       including statements made by the Smith defendants
25       to the principles of the plaintiff, Dahn appears

Page 211

1        to control all decisions related to Fund 7."
2              And my question is what facts do you have
3        to support the statement that Dahn appears to
4        control all decisions related to Fund 7?
5  A     Which one are we on?
6  Q     13.
7  A     Okay.  I got it.  Well, at this point I think we
8        have a copy of the agreements, so we're reviewing
9        the PPM and the LLC agreement for the fund,
10       Fund 7.
11 Q     But what in that agreement gives Dahn control over
12       all decisions?
13 A     I mean, I'd have to go back and look at it, but I
14       think -- when you say control, I think it means
15       like it's 50/50 and so they would control all the
16       decisions in some manner.
17             I mean, it's like if there's a deadlock
18       then they're basically controlling that.  You
19       can't proceed.  I mean, I don't -- I don't really
20       know the exact -- I don't recall what the exact
21       language is that we reviewed on that agreement,
22       but it appeared to me when I kind of reviewed this
23       and talking with our attorneys that they were in
24       control or basically when you're 50/50 and there's
25       no -- what am I trying to say?

Page 212

1              I think there was actually something in
2        there that basically says if there is a deadlock
3        then Dahn gets to choose, if I'm not mistaken.  I
4        could be wrong, but I think there is something in
5        that agreement that basically gives them the
6        ultimate right.
7  Q     And again this goes back to our earlier
8        conversation about using corporate forms.
9  A     Right.
10 Q     And at the end of the day, all decisions of a
11       corporation are made by people, right?
12 A     Correct.
13 Q     But the point of the corporate form is that,
14       barring certain circumstances, the individuals
15       don't get sued.  The corporation does, right?
16             MR. STEWART:  Objection, foundation.
17 A     I mean, I think that typically that's the goal is
18       that the corporation gets sued and not the
19       individual.  I think that's the reason you set up
20       the entities for sure.
21 Q     So in this case why not sue just Fund 7?  Why
22       bring Dahn Corporation into it if all the actions
23       are being taken by Fund 7?
24             MR. STEWART:  The same objection, legal
25       conclusion.  You can answer.

Page 213

1  A     I think it's identifying the major players of
2        Fund 7, plus Fund 7.  That's the rationale that we
3        had.
4  Q     But why do you need the major players in it if the
5        conduct is by Fund 7?
6              MR. STEWART:  The same objection.
7  A     I think that's -- I mean, I think it's advice from
8        our attorneys that we would go that route.
9  BY MR. DANIELS:
10 Q     Now, when this lawsuit was filed, you were
11       involved in other lawsuits with the Smith
12       defendants, correct?
13 A     I guess you would say arbitrations are lawsuits,
14       yes.
15 Q     Yeah, arbitrations, lawsuits?
16 A     Right.
17 Q     There was other litigation going on with Ryan and
18       Jamie Smith?
19 A     Correct.  Yes.
20 Q     Dahn Corporation wasn't involved in any of those
21       lawsuits, correct?
22 A     That is correct, as far as I know.
23 Q     But by dragging Dahn Corporation into this
24       lawsuit, it might put pressure on Ryan and Jamie
25       Smith, correct?



Page 214

1       MR. STEWART: Objection to form.
2  A   Well, I mean, I think it would right a wrong, you
3      know, and certainly would pressure them if they
4      are filing lawsuits like sending mail out to your
5      best friends.
6           I mean, I think it's -- I think we have had
7      this problem that was ongoing and we had talked
8      about filing or putting some type of action in
9      back in April or May when we actually sent the
10     letter out from the Lowndes firm to tell them to
11     get our names off their stupid crap, and after
12     multiple, multiple times they still hadn't done
13     it.
14 Q   Did you ever send that letter to Dahn Corporation?
15 A   I don't know where it was -- I don't know who all
16     received it. It was sent to the -- it was sent --
17     I don't know who -- I would have to look at the
18     letter. I don't know. I think Lowndes at this
19     point I think they still -- they may have still
20     represented them or that's when they stopped
21     representing them legally. I don't recall
22     exactly, but I think Lowndes was like where they
23     were supposed to deliver stuff for Fund 7. Now
24     I'm just kind of speculating a little bit because
25     I don't know for sure.

Page 215

1  Q   Are you aware of any cease and desist
2      correspondence or other communication regarding
3      these trademarks in this case that was ever sent
4      to Dahn Corporation prior to the filing of the
5      lawsuit?
6  A   I am not aware of ever sending it to the
7      Dahn Corporation, no, I am not aware of that.
8  Q   And then if you go back to interrogatory number
9      12, and this one asks identify the date on which
10     you first discovered the investor information link
11     on Dahn's website that is discussed in paragraph
12     97 of your second amended complaint.
13          Do you see that?
14 A   I do.
15 Q   Now, you have an understanding that Dahn had filed
16     a motion to dismiss in this case on plaintiffs'
17     first amended complaint?
18 A   Yes.
19 Q   And that was granted?
20 A   Well, I think it was granted partially maybe
21     should be more the way to describe that.
22 Q   It allowed plaintiffs the opportunity to include
23     additional allegations against Dahn, correct?
24 A   That's right, that's correct, yes.
25 Q   And the second amended complaint which is the one

Page 216

1      we've been discussing today, that has allegations
2      regarding this investor information link, correct?
3  A   This one does have that in there. I'd have to
4      compare them to see if the other one did, but this
5      one does have it in there, yes.
6  Q   Well, I'll represent to you that it was not in
7      there.
8  A   Okay.
9  Q   And so in this interrogatory it states, "Plaintiff
10     state they learned of the investor information
11     link on Dahn's website in advance of filing the
12     second amended complaint."
13 A   Okay.
14 Q   So my question is: Did you discover the investor
15     information link in between the first amended
16     complaint and the second amended complaint?
17 A   I don't recall when that happened. I would have
18     to go back through all my e-mails to our counsel
19     and all that to see when that was discovered.
20     I don't recall.
21 Q   So sitting here today when plaintiffs filed either
22     the original complaint or the first amended
23     complaint, you don't recall whether or not
24     plaintiffs were aware of the investor information
25     link on the Dahn webpage?

Page 217

1       MR. STEWART: Objection to form and
2      foundation, misstates the testimony and the
3      interrogatory.
4  A   I don't recall the date off the top of my head.
5      I don't recall. I mean there's so much different
6      things going back and forth and e-mails and all.
7      I just don't recall the date on this one.
8  Q   Do you think upon further digging you could figure
9      out the exact date?
10 A   I think it's very likely that I probably could,
11     yes.
12 Q   And then going up to interrogatory number 10, that
13     states, "Describe in detail when and how you
14     became aware that Dahn, separate and apart from
15     any of the other defendants, infringe your
16     trademarks." And there the answer is the spring
17     of 2018.
18          Do you see that?
19 A   Yes.
20 Q   And so my first question is: Is that separate
21     from when you discovered the infringement by the
22     other defendants?
23 A   Yeah, that's a tough one. I think I -- I think
24     we're aware of what the other defendants were
25     doing with much more clarity much earlier than --



Page 218

1   and then in the spring that's when I got the
2   letter which then allowed me to go download all
3   these documents, the track records and all that
4   from that letterhead that had a link to it.
5       That's when, you know, I had more
6   information or enough information to know that,
7   well, Dahn is involved with the management, the
8   property management, you know, and they were --
9   you know, they basically must have signed off on
10  all the different documents.
11      So that's -- I was aware of issues with the
12  Smiths prior to really Dahn.  I mean, I just never
13  interacted with Dahn.  I didn't really ever -- I
14  talked to him, I think, once and maybe e-mailed
15  once with him like months before that.
16      You know, I just don't -- I just don't
17  recall like -- I mean, I knew they were involved
18  with Dahn and the fund, but I don't recall like
19  specifically anything that Dahn did or didn't do,
20  because I didn't know who signed what
21  at that point, so it really was the spring when I
22  really knew the brunt of what I know.
23  Q   As to Dahn?
24  A   Right.
25  Q   You might have had information regarding the other

Page 219

1   defendants prior to that, is that correct?
2   A   That is correct, yes, because prior to that it was
3       the majority of issues were with investors and
4       confusing investors, and that was always coming
5       back not really to Dahn, but to the Smiths because
6       they are the ones out there communicating with all
7       the investors.
8       (Discussion off the record.)
9       THE VIDEOGRAPHER:  The time is 4:03 and
10      we are off the record.
11      (Break taken.)
12      THE VIDEOGRAPHER:  This is beginning of
13      media unit number four.  The time is 4:04 and we
14      are back on the record.
15  BY MR. DANIELS:
16  Q   Mr. Reynolds, I believe you testified earlier that
17      you are now aware that Peter Reinert served as
18      counsel for Fund 7, correct?
19  A   That is correct.
20  Q   When did you first learn that Mr. Reinert was
21      legal counsel for Fund 7?
22  A   I want -- I want to say that it was -- boy, this
23      is tough because I just don't recall exactly the
24      date.
25      I mean, I knew -- I knew at some point, I

Page 220

1   think it was in January or February of 2018, that
2   he -- that he had mentioned that he had done some
3   work on Fund 7, I believe, for the Smiths
4   at that point and whatever eight months later.
5   Q   Sitting here today, do you have any knowledge of
6       whether or not Mr. Reinert reviewed and approved
7       the offering materials including the track record?
8   A   So I believe he approved most everything.  I -- I
9       don't know that I ever saw an e-mail where he
10      approved the track record.
11      I think I saw an e-mail from one of the
12      associates at Lowndes that approved the track
13      record.  I don't know that I ever saw that he
14      approved it.
15  Q   Do you think that makes a difference if it was Mr.
16      Reinert versus one of his associates?
17      MR. STEWART:  Objection, form, legal
18      conclusion.  You can answer.
19  A   Yeah, I mean, that's -- that's beyond what I know,
20      you know, between attorneys and what the
21      difference is.  I don't know the answer to that.
22  BY MR. DANIELS:
23  Q   But is it your testimony that the best of your
24      recollection that you discovered that Mr. Reinert
25      was providing legal services to Fund 7 in

Page 221

1   January/February of 2018?
2   A   That's correct, or that he had provided those --
3       he had provided the services.  I didn't know that
4       he was still providing services.
5   Q   Let's mark this as 11.
6       (Exhibit 11 marked.)
7   A   Okay.
8   Q   And you see at the very top Mr. Rolfe forwarded
9       you this e-mail chain on May 17th, 2017?
10  A   That's correct.
11  Q   And do you see that it starts with an announcement
12      regarding Fund 7?
13  A   Yes.
14  Q   And then Mr. Siragusa e-mails Ryan and Jamie and
15      asks what prior funds did you send this out to.
16      Do you see that?
17  A   Yes.
18  Q   And then there are some communications between
19      Mr. Rolfe and Mr. Reinert that have been redacted,
20      correct?
21  A   That's correct.
22  Q   And I'm assuming the e-mail you would have
23      received in 2017, this wouldn't have been
24      redacted, correct?
25  A   That would probably be correct, yes.



Orange Legal
800-275-7991