**EXHIBIT 5**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02780-NYW

RV HORIZONS, INC., et al.,

Plaintiffs,

vs.

JAMIE SMITH, et al.,

Defendants.

---

**DECLARATION OF DAVE REYNOLDS**

---

I, Dave Reynolds, do hereby state and aver, under penalty of perjury, and under 28 U.S.C. § 1746, that the following statements are true and correct:

1. My name is Dave Reynolds. I am over the age of eighteen, and I make the statement in this affidavit based upon my personal knowledge. If called to testify, I could and would truthfully testify to everything contained herein.

2. True and correct copies of the exhibits referenced herein are contained in the Joint Appendix of Exhibits for Plaintiffs' Responses to Motions for Summary Judgment.

3. In the mid-1990s, I purchased my first mobile home community ("MHC") in Limon, Colorado. Since then, I have grown what started as a venture financed by my personal credit cards into a multi-million-dollar business. Through my overall investment venture, I operate my funds nationwide and, to date, have collectively purchased in excess of $500 million in assets, including more than 400 mobile home communities with over 30,000 lots in 30 states.

EXHIBIT

1

4. In the early 2000s, I first met Frank Rolfe ("Rolfe"). Rolfe had also been involved in MHCs for many years in Texas, Louisiana, and Missouri. For many years, Rolfe and I worked together to author books, manage websites, run seminars, and run bootcamps (which occur normally eight times a year, around the country) all about investing in and managing MHCs.

5. Around 2008, I first met Eric Siragusa, who learned of my business with Rolfe and was initially interested in getting more involved in my investment funds as an investor and who Rolfe and I brought in to assist us in investor relations and fund management beginning in 2011.

6. Around 2008, I first Jamie Smith. Ms. Smith attended a bootcamp offered by me and Rolfe. After the bootcamp, Ms. Smith told me and Rolfe about how she and her husband, Mr. Smith, had recently purchased several MHCs, but the experience was going terribly for them because they lacked the skills and time to professionally manage MHCs. Since I have known the Smiths, they have not been involved in any real MHC property management work. While the Smiths have been involved in some funds in an investor-relations capacity, they have never been involved in the property management, operations, acquisitions, or financing.

7. In 2010, I decided that there might be value in combining my and Rolfe's MHC management and investment experience with the Smiths' experience networking with potential investors. We decided to combine our respective experiences—on one hand, the Smiths in networking with potential investors through seminars, and on the other, my and Rolfe's experience in identifying, acquiring, managing, and repositioning MHCs and networking and fundraising with our bootcamp attendees.

8. Our work with the Smiths continued for many years, with me and my team managing the investment funds and underlying assets, and with the Smiths capitalizing on their

network of investors to bring people to the funds. But that all fell apart in March 2018 when I learned that the Smiths had been lying to investors about my involvement in their separate fund, MHPI VII, LLC ("Fund 7").

9. The primary business strategy is to acquire, add value to, and reposition under-valued, under-managed, under-performing, improperly capitalized, and income-generating manufactured housing properties in the United States. To accomplish this strategy, I have to specialize both in overall investment strategy (including managing prospective and current investors) and underlying asset management of the properties. I have been in this industry for 25 years and have a nationwide presence.

10. At the highest level, a limited liability company is set up to fund and own an interest, in whole or in part, in a special purpose entity ("SPE"), which in turn owns a manufactured housing community or a group of communities. Among those high-level LLCs were the following.

11. MHPS Alumni, LLC ("Alumni 1"), MHPS Alumni 2, LLC ("Alumni 2"), and MHPS Alumni 3, LLC ("Alumni 3") (collectively, "Alumni 1-3") – these funds did not involve the Smiths or their companies.

12. MHPI I, LLC; MHPI II, LLC; MHPI III, LLC; and MHPI IV, LLC (individually, e.g., "MHPI I"; collectively, "MHPI 1-4") – the Smiths and their companies participated in promoting these funds to investors. I, through an entity, am the co-manager of these funds.

13. Affordable Housing Community Fund 1, LLC ("AHCF 1"), Affordable Housing Community Fund 2, LLC ("AHCF 2"), Affordable Housing Community Fund 3, LLC ("AHCF 3"), Affordable Housing Community Fund 4, LLC ("AHCF 4"), Affordable Housing Community Fund 5, LLC ("AHCF 5"), and Affordable Housing Community Fund 6, LLC

("AHCF 6") (collectively, AHCF 1-6) – these funds did not involve the Smiths or their companies (other than a passive investment the Smiths made in AHCF 6 through their entity, MHPI V, LLC and an interest that the Smiths have in AHCF 6 Class A, LLC through their entity MHPI V A, LLC). I, through an entity, am the manager of these funds.

14. AWA Fund, LLC ("AWA") – this fund did not involve the Smiths or their companies. I, through an entity, am the manager of this fund.

15. Each of these high-level LLCs contracted or continues to contract with RV Horizons, which identifies potential manufactured housing communities, negotiates for acquisition, and manages manufactured housing communities.

16. While the investors of our funds must meet securities law requirements for accreditation, they are normally not represented by counsel when they invest in our funds, nor do they normally have any specialized knowledge for MHC investments.

17. My entities have expended significant funds using their names in commerce and with investors, including spending hundreds of millions purchasing MHCs. My entities operate nationwide and, to date, have collectively purchased in excess of $500 million in assets, including more than 400 mobile home communities with over 30,000 lots in 30 states.

**RV Horizons**

18. I am the president of RV Horizons, Inc., which has been transferring responsibilities and management gradually to Impact MHC Management, Inc. ("Impact") since July 2018.

19. RV Horizons has been doing business under its name since 2007.

20. RV Horizons, along with Impact, handles the day-to-day property management work, all over the country, for the properties owned by my investment funds. In particular, RV Horizons handles the asset identification and acquisition process for the investment funds.

21. Ryan and Jamie Smith have never been involved with RV Horizons.

22. In July 2018, RV Horizons began to delegate and transfer over management of the MHCs to Impact. I decided to rebrand the management company to something that would create a company culture aimed at a positive impact on our residents, associates, vendors, and the industry as a whole. RV Horizons, Inc was created initially to manage a few RV Parks, which it did very successfully for many years. I felt that it was time to change the name to something that would better represent the focus of our company. RV Horizons, because of its ongoing work for many of the funds listed below, still uses the name RV Horizons in commerce.

**MHPS Alumni Funds**

23. In 2010, together with Rolfe, I created my investment fund, MHPS Alumni, LLC.

24. MHPS Alumni, LLC ("Alumni 1") is a Colorado limited liability company that has been exclusively doing business under that name since 2010. Ex. 11; Ex. 12.

25. MHPS Alumni, LLC has used its name in commerce when dealing with investors, and investors associate MHPS Alumni and Alumni 1 with this entity. Ex. 29 at RVH_Fed_076864; Ex. 36; Ex. 37 at RVH_Fed_076919.

26. MHPS Alumni experienced a full liquidation event because of the sale of properties to a private equity company that occurred on February 28, 2018. All of the MHPS Alumni properties were sold. After all of the MHPS Alumni properties were sold, MHPS Alumni was wound up, meaning that investors experienced a distribution of their investment proceeds in accordance with the MHPS Alumni operating documents.

27. Because MHPS Alumni is still part of my own track record, I still rely on the success of MHPS Alumni when conducting business in the marketplace.

28. Together with MHPS Alumni, LLC, we had two subsequent funds. MHPS Alumni 2, LLC, and MHPS Alumni 3, LLC.

29. MHPS Alumni 2, LLC ("Alumni 2") is a Colorado limited liability company that has been exclusively doing business under that name since 2010. Ex. 13; Ex. 14; Ex. 21.

30. Investors associate MHPS Alumni 2 and Alumni 2 with that entity. Ex. 25; Ex. 36; Ex. 37 at RVH_Fed_076919.

31. MHPS Alumni 3, LLC ("Alumni 3") is a Colorado limited liability company that has been exclusively doing business under that name since 2010. Ex. 15; Ex. 16; Ex. 22.

32. Investors associate MHPS Alumni 3 and Alumni 3 with that entity. Ex. 36; Ex. 37 at RVH_Fed_076919.

33. Both MHPS Alumni 2 and Alumni 3 had properties sold to TPG, a private equity group, in February 2018. During the remainder of 2018, the two funds sold off their remaining properties. The investors in MHPS Alumni 2 and MHPS Alumni 3 experienced a complete distribution event by the end of 2018.

34. MHPS Alumni 1 through 3 are investment funds that invest in MHCs. I, through the management structure for these funds, created a return on investment for investors by successfully acquiring, managing, and selling MHCs.

35. The manager of all three Alumni funds is RV Horizons, Inc. and Colonial Kitchen, LLC.

36. Although Alumni 1 through 3 were closed to new investments while the Defendants had their Fund 7 open, all three funds continued to operate (*e.g.*, purchase or sell

MHCs through underlying SPEs, make distributions to investors, conduct day-to-day investor relations) until the entities were voluntarily dissolved by the manager after the complete distributions at the end of 2018.

37. We named the MHPS Alumni funds as such because these funds included investors who were "alumni" of the bootcamps run by me and Rolfe.

38. If new funds flow to MHPS Alumni, those funds are still distributed in accordance with the Alumni 1 through 3 operating documents.

**AHCF Funds**

39. Affordable Housing Community Fund 1, LLC ("AHCF 1") is a Colorado limited liability company that has been exclusively doing business under that name since 2011. Ex. 17; Ex. 18; Ex. 31.

40. Investors associate both the name Affordable Housing Community Fund 1 and AHCF 1 with that entity. Ex. 194; Ex. 23; 36; 37 at RVH_Fed_076919.

41. AHCF 1 sold its properties to TPG. After selling all of its properties, by the end of 2018, AHCF 1 made all distributions to investors in accordance with the AHCF 1 operating documents.

42. Although AHCF 1 was closed to new investments while the Defendants had their Fund 7 open, it continued to operate (*e.g.*, purchase or sell MHCs through underlying SPEs, make distributions to investors, conduct day-to-day investor relations) until it was voluntarily dissolved by the manager after the investors experienced a complete distribution event at the end of 2018.

43. Affordable Housing Community Fund 2, LLC ("AHCF 2") is a Colorado limited liability company that has been exclusively doing business under that name since 2012. Ex. 26; Ex. 27.

44. Investors associate the names Affordable Housing Community Fund 2 and AHCF 2 with that entity. Ex. 24; Ex. 30; Ex. 36; Ex. 37.

45. AHCF 2 sold most of its properties in the TPG transaction. Throughout 2018, AHCF 2 continued to sell its remaining properties. By the end of 2018, AHCF 2 made all distributions to investors in accordance with the AHCF 2 operating documents.

46. Although AHCF 2 was closed to new investments while the Defendants had their Fund 7 open, it continued to operate (*e.g.*, purchase or sell MHCs through underlying SPEs, make distributions to investors, conduct day-to-day investor relations) until it was voluntarily dissolved by the manager after the investors experienced a complete distribution event at the end of 2018.

47. Affordable Housing Community Fund 3, LLC ("AHCF 3") is a Colorado limited liability company that has been exclusively doing business under that name since 2012. Ex. 39; Ex. 40.

48. Investors associate the names Affordable Housing Community Fund 3 and AHCF 3 with that entity. Ex. 42; Ex. 43; Ex. 44.

49. AHCF 3 sold most of its properties in the TPG transaction. Throughout 2018, AHCF 3 continued to sell its remaining properties. By the end of 2018, AHCF 3 made all distributions to investors in accordance with the AHCF 3 operating documents.

50. Although AHCF 3 was closed to new investments while the Defendants had their Fund 7 open, it continued to operate (*e.g.*, purchase or sell MHCs through underlying SPEs,

make distributions to investors, conduct day-to-day investor relations) until it was voluntarily dissolved by the manager after the investors experienced a complete distribution event at the end of 2018.

51. Affordable Housing Community Fund 4, LLC ("AHCF 4") is a Colorado limited liability company that has been exclusively doing business under that name since 2013. Ex. 45; Ex. 46.

52. Investors associate the names Affordable Housing Community Fund 4 and AHCF 4 with that entity. Ex. 199; Ex. 200.

53. AHCF 4 sold most of its properties in the TPG transaction. Throughout 2018, AHCF 4 continued to sell its remaining properties. By the end of 2018, AHCF 4 made all distributions to investors in accordance with the AHCF 4 operating documents.

54. Although AHCF 4 was closed to new investments while the Defendants had their Fund 7 open, it continued to operate (*e.g.*, purchase or sell MHCs through underlying SPEs, make distributions to investors, conduct day-to-day investor relations) until it was voluntarily dissolved by the manager after the investors experienced a complete distribution event at the end of 2018.

55. Affordable Housing Community Fund 5, LLC ("AHCF 5") is a Colorado limited liability company that has been exclusively doing business under that name since 2014. Ex. 48; Ex. 49.

56. Investors associate both the names Affordable Housing Community Fund 5 and AHCF 5 with that entity. Ex. 50; Ex. 63; E. 88.

57. AHCF 5 sold some of its properties in the TPG transaction. Throughout 2018 and 2019, AHCF 5 continued to sell its remaining properties. By the end of 2019, AHCF 5 made all distributions to investors in accordance with the AHCF 5 operating documents.

58. Although AHCF 5 was closed to new investments while the Defendants had their Fund 7 open, it continued to operate (*e.g.*, purchase or sell MHCs through underlying SPEs, make distributions to investors, conduct day-to-day investor relations) until it was voluntarily dissolved by the manager after the investors experienced a complete distribution event at the end of 2019.

59. Affordable Housing Community Fund 6, LLC ("AHCF 6") is a Colorado limited liability company that has been exclusively doing business under that name since 2015. Ex. 53; Ex. 54.

60. Investors associate both the names Affordable Housing Community Fund 6 and AHCF 6 with that entity. Ex. 58; Ex. 63; Ex. 64; Ex. 88.

61. AHCF 6 sold some of its properties in the TPG transaction. Since 2018, AHCF 6 has continued to sell some of its properties, but it has not sold everything. AHCF 6 still owes MHCs.

62. Although AHCF 6 was closed to new investments while the Defendants had their Fund 7 open, it continues to operate (*e.g.*, purchase or sell MHCs through underlying SPEs, make distributions to investors, conduct day-to-day investor relations).

63. AHCF 1, AHCF 2, AHCF 3, AHCF 4, AHCF 5, and AHCF 6 are investment funds that invest in MHCs. I, through the funds' management structure, created and continue to create a return on investment for investors by successfully acquiring, managing, and selling MHCs.

64. If new funds flow to AHCF 1, AHCF 2, AHCF 3, AHCF 4, AHCF 5, or AHCF 6, those funds are still distributed in accordance with the operating documents.

**AWA Funds**

65. AWA Fund, LLC ("AWA Fund") is a Colorado limited liability company that has been exclusively doing business under that name since late 2014. Ex. 51; 52.

66. Investors associate the name AWA Fund with that entity. Ex. 202; Ex. 203; Ex. 204.

67. AWA Fund is an investment fund that invests in MHCs. I, through the fund's management structure, created return on investment for investors by successfully acquiring, managing, and selling MHCs.

68. I formed AWA Fund 2, LLC ("AWA Fund 2") in 2017.

69. In late 2018, AWA Fund merged with AWA Fund 2 into AWA Fund 3, LLC. All the goodwill and financial benefit from AWA Fund should flow to AWA Fund 3. The original AWA investors were either redeemed or merged into AWA Fund 3 in 2018.

70. AWA Fund 3 is currently operating (*e.g.*, owns MHCs, makes investor distributions).

**MHPI Funds**

71. I was involved in some funds with Ryan and Jamie Smith in four additional investment funds: MHPI I, LLC; MHPI II, LLC; MHPI III, LLC; and MHPI IV, LLC.

72. For MHPI I through MHPI IV, my company, RV Horizons, served as the co-manager of those funds together with entities controlled by Ryan and Jamie Smith.

73. For these funds, my company, RV Horizons, handled all property management for the underlying MHCs (which are owned by separate SPEs).

74. For these funds, I made all of the day-to-day property management and the vast majority of the investment fund management decisions with extraordinarily little involvement from Ryan or Jamie Smith.

75. After Ryan Smith's misconduct related to MHPI IV, the Smiths' entity was removed as co-manager of MHPI IV. In its place, Mile High Management, LLC was appointed as co-manager with RV Horizons.

**MHC America Fund**

76. MHC America Fund, LLC ("America Fund") is a Delaware limited liability company that has been exclusively doing business under that name since 2016. America Fund was formed in 2016, and it included all of the sponsors previously spread among Alumni 1-3 (Reynolds and Rolfe), MHPI 1-4 (Reynolds, Rolfe, and the Smiths), and AHCF 1-6 (Reynolds, Rolfe, and Siragusa). Ex 59; Ex. 60.

77. Although the Smiths did not have any involvement in AWA 2 management, I gave them a partial ownership interest in the sponsor entity for AWA 2 in exchange for their promise to work with us on America Fund. We had agreed that, going forward, we would work together on one fund, America Fund, and not have separate funds.

78. Investors associate the names MHC America Fund, LLC and America Fund with just that entity. Ex. 61; Ex. 63; Ex. 129.

79. MHC Class C, LLC is a member of America Fund and is, generally speaking, the "sponsor" entity for the fund. Once the investors in the other investment classes have received their preferred return and the return of their initial capital, any remaining profits are split with 50 percent going to Class A and B as a group and 50 percent going to Class C.

80. Class C receives an acquisition fee when America Fund acquires a property. There are also loan guarantee fees paid to whoever guarantees the loan. I am the only one who has guaranteed any of the loans, and that is because of my track record and great reputation with lenders. There are disposition fees of up to 1 percent for properties sold, which Class C may receive if the sale is profitable. These fees are all outlined in the operating documents.

81. An asset management fee is paid to the fund manager. The amount changes year after year, and it is only paid if all the preferred returns are caught up. Otherwise, it is accrued. This fee is outlined in the operating documents.

82. In the event of a partial or final liquidation by reason of a sale of America Fund assets, America Fund first pays investors preferred returns, it then pays the fund's sponsors asset management fees, it then returns to investors their invested capital, and the remainder is split 50 percent to investors, and 50 percent to Class C. While the Smiths were involved with America Fund, they were only involved in investor sourcing and relations. Their responsibilities included finding potential investors and encouraging those investors to invest in America Fund.

83. America Fund is currently managed by three co-managers, Mile High MHC Management, LLC, Mountain Top MHC Management, LLC, and Tri-Peaks MHC Management, LLC.

84. From 2016 until May 2019, MHCA Management, LLC ("MHCA Management") was the sole manager of America Fund. In May 2019, two additional managers of America Fund were appointed, Mile High MHC Management, LLC ("Mile High") and Mountain Top MHC Management, LLC ("Mountain Top")". From May 2019 until February 2020, MHCA Management was co-manager with Mile High and Mountain Top. MHCA Management was

dissolved and canceled in February 2020. In March 2020, Tri-Peak MHC Management, LLC was appointed as a co-manager of America Fund.

85. Ryan and Jamie Smith currently have no involvement in the management of America Fund. They have no membership interest in any of America Fund's three co-managers.

86. Before MHCA Management was dissolved and canceled in February 2020, DTR MHP Management, LLC ("DTR MHP Management") was the managing member of MHCA Management. Through RV Horizons, Inc., I am the managing member of DTR MHP Management.

87. In April 2016, all members of MHCA Management unanimously appointed my entity, DTR MHP Management, as the managing member of America Fund. Ex. 69.

88. Ryan and Jamie Smith had a minority interest in MHCA Management, but they were not involved in the actual management for MHCA Management because, after April 2016, DTR MHP Management was the managing member of MHCA Management. Just like in our earlier funds (MHPI I through IV), the Smiths would provide investor relations work, and I would provide my experience in sourcing acquisitions, financing, operations, and dispositions. The Smiths had to rely on my track record and experience because they lacked their own.

89. Because of their promise to use their efforts to find investors for America Fund, the Smiths received a minority interest in our sponsor entity, MHC Class C, LLC.

90. The Smiths were not involved, whatsoever, in the management of America Fund or the management of the underlying assets (the MHCs that are held by SPEs).

91. My company, RV Horizons, handled the property management for all of the MHCs that were held by separate SPEs.

92. Throughout 2017 and into early 2018, all of the sponsors involved in America Fund (myself, Rolfe, Siragusa, and the Smiths) were supposed to be working toward a new fund, MHC America Fund 2, LLC ("America Fund 2") and to return capital and profits to the prior funds. The Smiths knew about and were actively involved in this plan, at least as far as I understood. As it turns out, the Smiths had been deceiving me (and investors) for much of 2017 and into 2018.

93. America Fund closed to new investment on February 28, 2018. Even though America Fund is closed to new investment, it still continues to operate (*e.g.*, purchases or sells MHCs and makes investor distributions).

94. Also on February 28, 2018, my funds closed on a sale of properties to TPG, which caused a full or substantial liquidation event for many of my prior funds. This liquidation event was a great benefit for investors. They saw a huge return of capital. It was our (myself, Rolfe, Siragusa, and the Smiths) plan to encourage investors to redeploy this capital into America Fund 2.

**America Fund 2**

95. MHC America Fund 2, LLC ("America Fund 2") was formed on March 8, 2018, and America Fund 2 opened to investment on May 14, 2018. It is still currently open. Ex. 155; Ex. 161.

96. America Fund 2 pays its sponsor, MHC America Fund 2 Class B, LLC, fees and a waterfall sponsorship similar to the fees and sponsorship paid to Class C for America Fund.

97. After America Fund closed to new investments on February 28, 2018, the strategy was to focus our efforts then on America Fund 2. The goal was to create a larger fund with more diversity for investors, continue to simplify our fund structure for a future exit, create a stronger

balance sheet to obtain better financing terms from lenders, and to give the existing investors in prior funds that wished to have liquidity that option, and for those that wanted to continue receiving preferred returns and capital appreciation that option by have them invest into America Fund 2.

98. Throughout 2017 and into 2018, I intended that Ryan and Jamie Smith be involved in America Fund 2. For months leading up to the close of MHC America Fund, I corresponded with the Smiths, along with Siragusa and Rolfe, about the strategy and plans for America Fund 2.

99. But all that changed on March 13, 2018, when I received a letter from Ryan Smith, purportedly on behalf of the MHPI IV manager, encouraging investors to invest in the Smiths' Fund 7, not America Fund 2.

**The Fund 7 Deception**

100. While I knew generally that the Smiths were interested in and exploring a self-storage investment fund with Dahn Corporation, I did not know any real specifics about MHPI VII, LLC ("Fund 7") until I received a letter on March 13, 2018 and followed the links in that letter to get a copy of the Fund 7 Offering Package, which occurred almost a year after Fund 7 launched in April 2017.

101. I learned of Fund 7 in May 2017 when investors began getting confused about whether I was involved in Fund 7 and whether Fund 7 was related to my earlier and existing funds. Ex. 180; Ex. 95.

102. There was considerable consumer confusion after Ryan Smith sent out an invitation for a "New Fund Announcement" with a "Launch call invitation…" Ex. 90; Ex. 101.

103. On May 11, 2017, an investor forwarded to Mr. Siragusa a copy of the Fund 7 announcement, asking questions about Fund 7 and saying that there was a "[d]ecent chance I'll see you Tue night…" Ex. 91.

104. Mr. Siragusa forwarded the confused investor's email to the Smiths, copying me on the email, asking, "What prior funds did you send this out to? Did you send it to MHCA investors?" Ex. 91.

105. Mr. Smith responded, saying that he had sent it to MHPI I through MHPI V investors. "No emails sent to MHC America investors or any other Prior Fund--just those who have been in our ECG database for many years." Ex. 91.

106. The consumer confusion continued over the next few weeks with the ramping up of Fund 7. For example, on May 18, 2017, another investor emailed after receiving the Fund 7 launch invitation, asking, "How does this relate to you guys? Is it another channel to get to investors?" Ex. 102.

107. Based on the consumer confusion, Mr. Rolfe reached out to RV Horizon's new general counsel Peter Reinert. Mr. Reinert had joined RV Horizons as its general counsel on April 17, 2017. On May 18, 2017, Mr. Rolfe forwarded to Mr. Reinert the confused investor's email, copying me, asking Mr. Reinert for his thoughts. Ex. 102.

108. In responding to Mr. Rolfe's email about why investors thought that we (me, Rolfe, and Siragusa) were involved in Fund 7, Mr. Reinert said, "Since it appears to be creating some confusion with your investors you may want to reach out to Ryan and Jamie. I do not know to what extent they have discussed with you all being a feeder for MHC America Fund or not or co-investing with TPG? Let me know." Ex. 102.

109. Despite promises from the Smiths that they would address the consumer confusion related to Fund 7, the issues continued throughout 2017 and into 2018.

110. For example, in October 2017, Mr. Siragusa sent an email to Mr. Rolfe, with a copy to me, detailing how investors continued to ask him questions about Fund 7, believing that we were involved in Fund 7. Ex. 126. Mr. Reinert asked Mr. Siragusa to keep track of the confused consumers.

111. In March 2018, the Smiths' deception only increased. After we had just closed America Fund to new investment and closed on the TPG transaction, all of us—me, Rolfe, Siragusa, and the Smiths—were supposed to be working toward America Fund 2. At least, I believed that to be the plan based on statements made to me by the Smiths and dozens, if not hundreds, of email exchanges about the strategy for America Fund 2.

112. But on March 13, 2018, I received a letter in the mail, dated February 27, 2018, purportedly sent on behalf of the mangers of MHPI IV (which includes me), congratulating me as an investor in MHPI IV for the distribution I was set to receive as a result of the TPG transaction. Ex. 193 (letter); Ex. 150 (memorandum that was included with the cover letter in Ex. 193). This letter from Mr. Smith was dated *before* the TPG deal closed on February 28, 2018. He had apparently been planning to divert returned investor capital toward Fund 7 even before we had completely closed on the deal.

113. I have an investment in MHPI IV because an investor in that fund wanted to be bought out, so I purchased her interest through an entity called Niche Investment Network, LLC.

114. The letter explained that "MHPI IV, LLC recently completed the sale of several assets. As a result, the Mangers are distributing to Members a total of $1,9000,000.00. We think this is great news!" Ex. 150.

115. The letter continued, "Should you wish to create additional income by redeploying all, or part, of the capital that we are currently returning, you might consider our newest fund MHPI VII, LLC ('Fund 7'). Fund 7 is currently making monthly distributions, carries a 10% Preferred Return, and has a 20%, or greater, anticipated return target. For more information on this Fund, or to make an investment, visit http://www.elevationfund.com/start or call 407-602-7662." Ex. 150.

116. Mr. Smith's letter, encouraging me to redeploy my new capital into "our" new Fund 7, was deceptive. There was no "our" new fund because I am the co-manager of MHPI IV, but am not involved in Fund 7. I did not authorize this letter.

117. Despite that, the letter said, "[a]s mentioned in the Cover Letter, for those wanting to put this capital back to work, you might consider our newest fund MHPI VII, LLC ("Fund 7"). Fund 7 is currently making monthly distributions, carries a 10% Preferred Return and as a return target of 20% or more, per year for Class A Members. As a Member of a Prior Fund, you would receive Class A treatment. For more information on this Fund, or to make an investment, visit http://www.elevationfund.com/start or call 407-602-7662." Ex. 193.

118. I did not, as co-manager of MHPI IV, authorize Ryan Smith to send out any letters promoting Fund 7, let alone promoting it as "our" new fund.

119. This letter was an absolute shock to me. The plan at this time was that Ryan and Jamie Smith were supposed to be working on encouraging the investors from the MHPI funds and America Fund, many of whom had received considerable capital as a result of the TPG transaction, to redeploy that capital into America Fund 2.

120. During our discussions about the strategy for America Fund 2, Mr. Smith always wanted to set the preferred return at a rate lower than 10 percent, suggesting instead 7 to 8

percent, and he never asked to have the distributions paid on a quarterly, not monthly, basis. After I had more information about Fund 7, Mr. Smith's requests for America Fund 2 made sense because he wanted to be able to tell potential investors that Fund 7 had a higher preferred return and had monthly, not quarterly, distributions.

121. Through this litigation, I have also learned that Ryan Smith sent the same type of letters promoting Fund 7 to all investors in MHPI I, MHPI II, MHPI III, and MHPI IV. I serve as the co-manager for all of those entities. I did not authorize Ryan Smith to promote Fund 7 to MHPI I through IV or to claim that "our" new fund was Fund 7.

122. After receiving the MHPI IV letter advertising and promoting Fund 7 as "our" new fund, I began investigating Fund 7.

123. After receiving the letter, I reached out to Mr. Reinert. Ex. 159. I told Mr. Reinert that, "[w]e have some issues. I received the attached letter today as I bought out one of the investors in MHPI IV. I am sure that Ryan/Jamie had no idea that this went to me. As suspect per one of our calls they are pushing everyone that is getting cashed out to their Fund 7 and not to MHCA 2." Ex. 159.

124. Ryan Smith was using the return of investor capital that began occurring in February 2018 (and continued over the coming months) to benefit Fund 7 and to harm America Fund 2.

125. Worse than just unfairly and without authorization capitalizing on the return of investor capital to the investors in my investment funds, I began doing additional investigating into Fund 7 and discovered that information related to me, Rolfe, and Siragusa was contained throughout the materials related to Fund 7.

126. When I visited the Elevation Capital Group website, it listed me, Rolfe, and Siragusa as principals of Elevation Capital Group. None of us have ever been principals of Elevation Capital Group.

127. For example, Elevation's July 20, 2017, newsletter includes information regarding recent positive press generated by RV Horizons and characterizes RV Horizons as Elevation's "management company." This is not true. This same newsletter expressly states that "[a]ny reference to 'we', 'our' or 'fund', regardless of capitalization, shall refer to MHC America Fund, LLC, and its Affiliates." The terms "we," "our," and "fund" are then used throughout the July 20 newsletter. *See* http://elevationcapitalgroup.com/newsletter-0617/ (last visited October 30, 2018). This page has since been removed from the Elevation Capital Group website.

128. On their website and in their newsletters, the Smiths use the Plaintiffs' photos without permission and did not remove those for several months even after demands had been made. The Smiths included the Plaintiffs' names (including the names of certain managers and specialists) in their website's source code. For instance, the names of Reynolds, Rolfe, and Eric Siragusa appear in the source code on the following website pages: https://elevationcapitalgroup.com/, http://elevationcapitalgroup.com/faq/, http://elevationcapitalgroup.com/who-we-are/, http://elevationcapitalgroup.com/jamie-smith/, and http://elevationcapitalgroup.com/what-we-do/ (last visited October 30, 2018). These pages have since been changed.

129. I also explained to Mr. Reinert in my March 13, 2018, email that, "I then followed the link on their letter and Frank, Eric and I are all over their Fund 7 materials and offering docs." Ex. 159. It was not until this point that that I had ever seen Fund 7 Offering Package.

130. Mr. Reinert directed that we investigate Fund 7.

131. The Fund 7 Offering Package I reviewed at the time included two supplements, the Subscription Booklet, Fund 7 Operating Agreement, Track Record, and Investment Summary.

132. I first reviewed the Track Record and Investment Summary because those are the pieces that investors tend to review first (these documents tend to be shorter and easier to read).

133. The Investment Summary falsely claimed that the members of the Fund 7 manager "and their Affiliates" operate the 5th largest number of MHCs with an excess of 250 MHCs containing over 25,000 lots under management in 29 states. Ex. 126; Ex. 95. Those statistics related to my funds, not the Smiths.

134. The Investment Summary falsely claimed that Dave Reynolds, Frank Rolfe, Eric Siragusa and RV Horizons were "Affiliates" of Fund 7. Ex. 10 at MHPI000211-12. I was not, nor have I ever been, affiliated with Fund 7 in any capacity. RV Horizons was not, nor has it ever been, affiliated with Fund 7 in any capacity.

135. The Investment Summary falsely claimed that the members of the Fund 7 manager were "backed by a strong extended team" run by Dave Reynolds for property management services. Ex. 10 at MHPI000212. Neither me, nor RV Horizons, have at any point "backed" Fund 7, its manager, or the members of its manager. RV Horizons was not going to provide any property management services for Fund 7.

136. One of the first pages of the Track Record was a table with distribution histories for all of my prior funds, listing them by name, including funds that the Smiths had zero involvement with. Ex. 10 at MHPI000217.

137. The Track Record included the distribution history of my funds by listing Alumni 1-3, AHCF 1-6, AWA, and MHC America Fund by name on separate pages. Ex. 10 at MHPI000222-23, 25-28, 30, 32-34.

138. The Track Record included a map and bar graph of the "properties of the affiliates of the members of the manager" and those properties are owned by my funds. Ex. 10 at MHPI000218. The Fund 7 Offering Package did not include any MHCs owned by the Smiths because it only included MHCs managed by RV Horizons.

139. The Track Record listed only "[p]roperties managed by RV Horizons." Ex. 10 at MHPI000217 n.4.

140. The false statements and the use of my funds' names also appeared in the Fund 7 Private Placement Memorandum ("Fund 7 PPM") and Fund 7 LLC Agreement ("LLC Agreement").

141. The Fund 7 PPM claimed that "Prior Fund" or "Prior Funds" included the Alumni funds, AHCF funds, AWA Fund, and MHC America Fund. Ex. 10 at MHPI000075. Neither the Smiths, nor Dahn, were involved in any of the Alumni funds, AHCF funds, or AWA fund. The inclusion of my funds as "Prior Funds" was therefore false.

142. In PPM, Elevation Capital Group claimed to have "over 75 years of combined real estate investing experience[.]" Ex. 10 at MHPI000060. Elevation Capital Group claimed that its "management team and their Affiliates have purchased in excess of $375 million of assets including more than 200 mobile home park communities representing over 20,000 lots in 26 states[.]" Ex. 10 MHPI000060. Those statistics apply to my funds and track record, not the Smiths. The Smiths never negotiated, did due diligence, guaranteed loans, operated, turned

around, or sold any of the properties for my funds. The Smiths were simply involved with fund raising and investor relations.

143. The Fund 7 LLC Agreement also claimed that "Prior Fund" or "Prior Funds" included the MHPS Alumni funds, AHCF funds, AWA Fund, and MHC America Fund. Ex. 10 at MHPI000093. Neither the Smiths, nor Dahn, were involved in any of the Alumni funds, AHCF funds (other than their passive involvement in AHCF 6), or AWA fund. The inclusion of my funds as "Prior Funds" was therefore false.

144. And for America Fund, I, as the manager of America Fund through my role with MHCA Management, never gave Ryan or Jamie Smith permission to use the America Fund name, distribution history, or properties to promote Fund 7.

145. I, as the manager of America Fund through my role with MHCA Management, never gave anyone associated with Fund 7 permission to use the America Fund Operating Agreement as a template for the Fund 7 Operating Agreement.

146. To date, a majority of the co-managers of MHC America Fund has never given anyone related to Fund 7 permission for Fund 7 to use MHC America Fund's trademarks and distribution history.

147. To me, based on the multiple references to me, RV Horizons, and my investment funds, it looked like the Offering Package was telling potential and current investors of Fund 7 that I was personally involved in Fund 7.

148. Based on my experience in the industry, the purpose of a track record is to show potential investors in your fund your past experience managing investment funds, the properties those funds have ownership in, and who will be backing the investment fund.

149. The Fund 7 Track Record does not list any MHCs that were just owned by the Smiths (some of which the Smiths had from the 2000s), as opposed to MHCs owned by my funds. The Fund 7 Track Record only includes properties that RV Horizons and my prior investments funds had acquired, financed, operated, and sold.

150. Based on my experience in the industry, the purpose of an investment summary is to detail to potential investors in your fund how the fund will be structure and who will be backing the investment fund.

151. I was never going to be involved with Fund 7 in any capacity.

152. I had never worked with Dahn Corporation before.

153. Brandon Reynolds, my son, also found that they had continued to include the biographies of me, Frank Rolfe, and Eric Siragusa on their Elevation Capital Group website. I had previously asked them to take down our biographies. In the spring of 2018, I again asked Ryan to take down these biographies. After that, Ryan Smith told me that he had removed our biographies from the Elevation Capital Group website, but he hadn't.

154. In March 2018, I decided that I did not want to do business with Ryan or Jamie Smith any longer. I made the decision that they would not be allowed to participate in America Fund 2.

155. I also asked Ryan and Jamie Smith to remove me from the Fund 7 materials, but they didn't. It wasn't until May 2018, that they removed me from the Fund 7 Offering Package. Ex. 165; Ex. 10-C. Even after that point, though, the Fund 7 Offering Package continued to include false statements based on their misuse of my funds' track records. Those false statements persist even to today.

156. In May 2018, the Smiths issued Supplement 4 to the Fund 7 Offering Package. Ex. 10-C. Supplement 4 included a new version of the Investment Summary. While my name, biography, and picture had been removed from the Investment Summary, the actual Supplement 4 did not include any language to investors explaining that I had been incorrectly listed as an affiliate of Fund 7.

157. But even in the Supplement 4, the Smiths continued to include the distribution history for all of my funds, including the Alumni funds, AHCF funds, and AWA fund, none which involved the Smiths or Dahn. Ex. 10-C at MHPI020629, 34-35, 37-40, 42, 44-46.

158. Through this litigation, I have learned that Ryan and Jamie Smith claim to have included my personal information and information regarding my funds because they were contemplating a potential investment by Fund 7 into America Fund.

159. At no point prior to the April 2017 launch of Fund 7 did anyone acting on behalf of Fund 7 approach me about a potential investment by Fund 7 into America Fund.

160. It was not until July 2017 that I learned that Ryan and Jamie Smith were interested in having Fund 7 make an investment into America Fund.

161. There were two pieces to the Smiths' requests in July 2017. First, they wanted preferred returns for their Fund 7 investment into America Fund through a side letter agreement. Because I did not want to prefer Fund 7 over any other investors in America Fund, I declined. Second, the Smiths wanted to receive an additional interest in Class C based on their theoretical investment by Fund 7 into America Fund. I declined on both fronts. Ex. 112.

162. In October 2017, Ryan and Jamie Smith again approached me about a potential investment by Fund 7 into America Fund. The Smiths wanted a "side letter agreement" between Fund 7 and America Fund whereby Fund 7 would receive preferred treatment compared to the

other America Fund investors. Together with Rolfe and Siragusa, we declined to agree to any side letter agreement between Fund 7 and America Fund.

163. Because Jamie Smith only wanted to have Fund 7 invest in America Fund if there was a side letter agreement, in October 2017, she told me, Eric, and Frank that Fund 7 would not be making an investment in America Fund. Ex. 124.

164. I never, at any point before or after Mr. Reinert became employed by RV Horizons, authorized Mr. Reinert to allow Ryan Smith, Jamie Smith, Elevation Capital Group, Fund 7, or Dahn to use trademarks belonging to RV Horizons, the Alumni Funds, the AHCF Funds, AWA Fund, or America Fund for the purposes of Fund 7.

165. I never, at any point before or after Mr. Reinert became employed by RV Horizons, authorized Mr. Reinert to allow Ryan Smith, Jamie Smith, Elevation Capital Group, Fund 7, or Dahn to claim that Fund 7 was affiliated with me or RV Horizons, the Alumni Funds, the AHCF Funds, AWA Fund, or America Fund.

166. I never, at any point before or after Mr. Reinert became employed by RV Horizons, authorized Mr. Reinert to allow Ryan Smith, Jamie Smith, Elevation Capital Group, Fund 7, or Dahn to use the distribution histories for the Alumni Funds, the AHCF Funds, AWA Fund, or America Fund for the purposes of Fund 7.

167. I never, at any point before or after Mr. Reinert became employed by RV Horizons, authorized Mr. Reinert to allow Ryan Smith, Jamie Smith, Elevation Capital Group, Fund 7, or Dahn to use the property management experience of RV Horizons for the purposes of Fund 7.

168. Separate from the July 2017 and October 2017 issues mentioned above, I never spoke or emailed with Mr. Reinert about Fund 7 making any investment into America Fund.

169. Mr. Reinert is no longer employed by RV Horizons as general counsel.

170. Even if Fund 7 were contemplating an investment into America Fund, there is no reason that the Fund 7 Offering Package would need to include my personal information or information related to my entities.

171. I never had any conversations or emails with Ryan Smith about him including my personal information or information related to my entities in the Fund 7 Offering Package.

172. I never had any conversations or emails with Jamie Smith about her including my personal information or information related to my entities in the Fund 7 Offering Package.

173. I never had any conversations or emails with anyone at Dahn about it including my personal information or information related to my entities in the Fund 7 Offering Package.

174. Based on testimony I've read from the Defendants in this litigation, I've learned that they believed Mr. Reinert to have represented Fund 7 both before and after he joined RV Horizons on April 17, 2017. Mr. Reinert never told me that he represented Fund 7 while he was at Lowndes, before he became general counsel of RV Horizons on April 17, 2017. After Mr. Reinert became general counsel of RV Horizons, he did not tell me that he had ever represented Fund 7. Mr. Reinert never told me whether he continued to provide any services for Fund 7 after he became general counsel of RV Horizons.

175. Before March 2018, I never spoke or emailed with Mr. Reinert about the Fund 7 Offering Package including any information related to me or my entities.

176. I had no conversations with Mr. Reinert about Fund 7 before he joined RV Horizons on April 17, 2017.

177. Mr. Reinert had never told me that Fund 7 was using my personal information or information related to my entities in the Fund 7 Offering Package.

178. On March 15-16, 2017, I was not emailing with Mr. Reinert about Fund 7 as the Smiths claim to be the case. *See* Ex. 191. During that time, I was working with Mr. Reinert on the terms of his employment agreement with RV Horizons. Ex. 205; Ex. 206; Ex. 207.

179. After Mr. Reinert joined RV Horizons on April 17, 2017, I did not know that he was still considered a "shareholder emeritus" at his old firm, Lowndes. I did not know that Mr. Reinert was still purporting to provide legal services to clients through his status at Lowndes. I did not know that Mr. Reinert was still purporting to provide legal services to Fund 7 through his shareholder emeritus status at Lowndes.

180. Even after Mr. Reinert joined RV Horizons, and after investors began getting confused, Mr. Reinert never told me that he had any involvement with Fund 7. Instead, he was always shocked and concerned about what the Smiths were doing with Fund 7.

181. Mr. Reinert only expressed shock and concern to me about what Fund 7 had done in its Offering Package. Mr. Reinert's shock and concern about Fund 7's actions continued through the day he ceased being general counsel of RV Horizons.

182. Mr. Reinert is no longer general counsel of RV Horizons.

183. Until I received the MHPI IV letter on March 13, 2018, I believe that Ryan and Jamie Smith were working toward the creation of and promotion of America Fund and America Fund 2.

184. In fact, in the weeks after I confronted them about their actions in sending the MHPI IV letter, Ryan and Jamie Smith were conciliatory. Ex. 162. They wanted to continue to work on America Fund 2. Ex. 162; Ex. 163.

185. But on March 26, 2018, I sent them an emailing explaining that they would not be involved in America Fund 2. Ex. 164. I explained that, "After discussion with Frank and Eric

regarding the proposed splits for MHCA 2, your letter to investors with the TPG distribution checks promoting Fund 7, and also the continued investor confusion regarding Fund 7 we have decided to proceed with MHCA 2 with just Frank, Eric and myself as the Sponsors. We recognize that you have apologized for your letter promoting your Fund 7 but the fact remains that this was in our view a serious breach of our business relationship." Ex. 164.

186. Fund 7 operates in the same industry as America Fund and America Fund 2.

187. I have never allowed anyone to claim the track record and distribution history for any of my funds that I was not a manager or member of.

**Infusionsoft**

188. I have maintained an investor list for my various funds for many years. I maintain that investor list in Infusionsoft.

189. I do not, nor have I ever, sold my investor list.

190. The Smiths used their access to the RV Horizons Infusionsoft account to promote Fund 7 in the spring of 2018. Because they repeatedly misused my investor list for the benefit of Fund 7, I instructed Brandon Reynolds to shut off the Smiths' access in the spring of 2018.

191. Ryan and Jamie Smith would use leads generated through the America Fund website, which is related to Infusionsoft, to divert investors away from America Fund and America Fund 2 into Fund 7.

192. Ryan Smith and Jamie Smith, in September 2019, and again, in March 2020, sent out a mass communication using the America Fund investor list to disparage me, Frank Rolfe, and Eric Siragusa.

**Damages Suffered**

193. By falsely claiming my company, RV Horizons, was affiliated with Fund 7, Defendants unfairly traded on RV Horizons' reputation and goodwill. Because in my opinion it does not appear that Fund 7 is financially succeeding, any failures by Fund 7 will harm RV Horizons' reputation and goodwill. Just being associated with Fund 7 has already harmed RV Horizons' reputation and goodwill because, based on the Fund 7 Supplements detailing its MHC acquisitions, Fund 7 has been unable to acquire sufficient MHCs and profitably manage the ones it has purchased. Additionally, based on my review of the Fund 7 audited financials, Fund 7's inability to successfully acquire and manage its MHCs has had resulted in an unsustainable path for Fund 7 going forward, which means that investors will soon (if not already) start seeing problems related to their Fund 7 investments.

194. Because of our track record, the vast majority of our investors are repeat investors. Many of our early Alumni 1 through 3 investors invested in later funds, including America Fund and America Fund 2. The same is true of our investors in the early AHCF 1 through 6 funds. The ability to meet the expectations of investors by properly managing properties and funds to allow distribution of returns, return of capital, and distribution of funds beyond initial capital, is what encourages those investors to invest in later funds. Repeat investors are critical in the industry.

195. From April 2017, when Fund 7 first opened, through February 28, 2018, America Fund was open and accepting new investors. If the Smiths diverted investors away from America Fund, which they did, that caused harm to America Fund and its sponsor entity, Class C. The Smiths did this from April 2017 through February 2018 because there was greater personal upside for them in Fund 7 as opposed to America Fund—they own 16% of Class C, whereas they hold 50% of the sponsor entity in Fund 7.

196. After the TPG transaction closed on February 28, 2018 and America Fund closed to new investment, the Defendants' efforts to divert investors toward Fund 7 and away from America Fund 2 harmed America Fund 2 and its sponsor, Class B. The Smiths intentionally capitalized on the return of capital to investors as a result of the TPG transaction to solicit investors to Fund 7 and away from America Fund 2. For example, the day before the TPG deal closed, Ryan Smith (together with the help of Brian Dahn) drafted a letter to investors, encouraging them to invest in "our" new Fund 7. That letter should have directed investors to invest in "our" new America Fund 2. The sale of properties to TPG and our resulting ability to distribute millions in investor capital, based on my past experience in my earlier funds, should have been a considerable benefit for our next fund, America Fund 2.

197. The Alumni Funds, AHCF Funds, AWA Fund, and America Fund have built considerable brand reputation and goodwill as a result of their successful distribution histories. If investors were interested investing additional funds with the managers of the Alumni Funds, AHCF Funds, AWA Fund, and America Fund, that necessarily would be because of existing reputation and goodwill. The reputation and goodwill of the Alumni Funds, AHCF Funds, AWA Fund, and America Fund—which is reflected in the manger's track record—should have flowed to America Fund and America Fund 2. Instead, from April 2017 through October 2018 (when the Fund 7 Offering Package finally removed the distribution histories for those funds), the defendants were using those reputations and that goodwill to unfairly benefit Fund 7. The Defendants, by falsely associating Fund 7 with the Alumni Funds, AHCF Funds, AWA Fund, and America Fund, unfairly traded the Alumni Funds, AHCF Funds, AWA Fund, and America Fund's reputations and goodwill to the detriment of those funds, America Fund, and America Fund 2. Not only that, the Defendants did so to their own considerable financial gain.

198. Additionally, any failures by Fund 7 will necessarily harm the reputation and goodwill of anyone associated with Fund 7, and because of the Defendants' conduct related to Fund 7, my reputation and the reputation and goodwill of RV Horizons, the Alumni Funds, the AHCF Funds, AWA Fund, and America Fund have been unnecessarily put at risk by the Defendants.

Dated April 17, 2020

Dave Reynolds

14494290_v12