## EXHIBIT 3

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-CV-02780-NYW

--------------------------------------------------------

VIDEOTAPED
DEPOSITION OF DAVID REYNOLDS            October 1, 2019

--------------------------------------------------------

RV HORIZONS, INC., et al,

    Plaintiffs,

v.

JAMIE SMITH, an individual, et al,

    Defendants.

--------------------------------------------------------

APPEARANCES:


       SHUTTS & BOWEN, LLP
          By Michael D. Crosbie, Esquire
          300 South Orange Avenue, Suite 1600
          Orlando, Florida 32801
            Appearing on behalf of Defendants.

       SHERMAN & HOWARD
          By Joseph C. Daniels, Esquire
          633 Seventeenth Street, Suite 3000
          Denver, Colorado 80202-3622
            Appearing on behalf of Dahn Corporation.

       HOLLAND & HART, LLP
          By Craig Stewart, Esquire
          555 Seventeenth Street, Suite 3200
          Denver, Colorado 80202
            Appearing on behalf of Plaintiffs.

       ALSO PRESENT: Daniel Witten, Videographer



**Orange Legal**
**800-275-7991**

Page 2

1    Pursuant to Notice, the deposition of DAVID REYNOLDS,
2  called by the Defendants, was taken on Tuesday, October 1,
3  2019, commencing at 9:00 a.m. at 555 Seventeenth Street,
4  Suite 3200, Denver, Colorado, before Anne Marie Sager, Court
5  Reporter and Notary Public within and for the State of
6  Colorado.
7
8              I N D E X
9
   DEPOSITION OF DAVID REYNOLDS
10
   EXAMINATION BY:                        PAGE
11
     Mr. Crosbie                            5
12
     Mr. Daniels                          149
13
                              INITIAL
14  EXHIBITS                  REFERENCE
15  Exhibit 1   Second Amended Complaint
               (52 pages)                   7
16
    Exhibit 2   Private Placement Memorandum
17             (242 pages)                  7
18  Exhibit 3   Second Amended Complaint
               (52 pages)                   7
19
    Exhibit 4   Article by Dave Reynolds
20             (8 pages)                   113
21  Exhibit 5   Bootcamp Manual
               27 pages                    125
22
    Exhibit 6   PowerPoint Presentation
23             RVH_Fed_054921 through 054967  194
24
25

Page 3

1   Exhibit 7   E-mail from Siragusa
               RVH_Fed_054217 through 054220  198
2
    Exhibit 8   E-mail chain
3              RVH_Fed_064786 through 064788  204
4   Exhibit 9   Interrogatory Answers
               (16 pages)                  206
5
    Exhibit 10  Mini-U-Storage webpage
6              (3 pages)                   208
7   Exhibit 11  E-mail chain
               RVH_Fed_001213 through 001217  221
8
    Exhibit 12  Article by Frank Rolfe
9              (4 pages)                   225
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Here begins the
3  videotaped deposition of David Reynolds taken in
4  the matter of case number 1:18-CV-02780-NYW, RV
5  Horizons, Incorporated, et al, versus
6  Jamie Smith, Ryan Smith, MHP Portfolio, LLC, et
7  al, to be heard in the United States District
8  Court for the District of Colorado.
9        The deposition is being held at
10  Holland & Hart, LLP, 555 Seventeenth Street,
11  Suite 3200, Denver, Colorado.  Today's date is
12  October the 1st, 2019.  The time is 9:00 AM.
13  The court reporter is Anne Sager.  The video
14  specialist is Daniel Witten on behalf of
15  Orange Legal.
16        Would counsel please introduce
17  theirselves, after which the court reporter will
18  swear in the witness.
19        MR. STEWART:  Craig Stewart with Holland
20  & Hart for plaintiffs.
21        MR. CROSBIE:  Michael Crosbie with
22  Shutts & Bowen for Jamie Smith, Ryan Smith, MHPI
23  7 and Elevation Capital Group.
24        MR. DANIELS:  Joe Daniels with
25  Sherman & Howard on behalf of Dahn Corporation.

Page 5

1        (Witness sworn in under oath.)
2        DAVID REYNOLDS,
3  being first duly sworn in the above cause, was examined and
4  testified as follows:
5        EXAMINATION
6  BY MR. CROSBIE:
7  Q    Good morning, Mr. Reynolds.
8  A    Good morning.
9  Q    We have done this in the not too distant past.
10  A    Correct.
11  Q    So are there any rules I need to repeat or
12       anything?
13  A    I don't believe so.
14  Q    Okay.  If you have any questions, feel free to
15       interrupt and let me know, about the process.
16            What role did you have in the creation of
17       the complaint in this case?
18  A    I worked with our attorneys in going through all
19       of the various items that we felt were the basis
20       for the claim and we went through all of those
21       various items and put together the claim with the
22       help of our attorneys.
23  Q    Okay.  Were you responsible for the allegation in
24       the very first complaint that Fund 7 had been
25       formed in secret?



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

6..9

Page 6

1   A   Yes.
2   Q   Even though you knew about the existence of
3       Fund 7?
4   A   I did not, not when it was formed.
5   Q   All right. Well, let's talk about the complaint.
6       I am going to use that as a roadmap. If you would
7       like, I have got a copy of the motion, the
8       complaint, the private placement memorandum for
9       Fund 7 and your redline, Craig.
10          MR. STEWART: Okay. And when you're
11      referring to the complaint, you are referring to
12      the second amended complaint?
13  Q   Correct. Correct. The second amended complaint.
14      Yeah, so just for the record, there was a first
15      complaint that said Fund 7 was formed in secret,
16      and then I called Peter Reinert and I said, Peter,
17      what's going on?
18          Shortly after that there was a first
19      amended complaint filed that removed the
20      allegation about the secrecy, and then after a
21      motion to dismiss we are now left with the second
22      amended complaint, and so that's how we got here.
23  A   Which is the top one?
24  Q   That's the motion to -- to file it. The next
25      document would be the second amended complaint,

Page 7

1       and maybe if we could mark those as Exhibits 1
2       through 4, so it would be the unopposed motion.
3       Actually, we don't even need to mark the unopposed
4       motion.
5           (Exhibit 1 marked.)
6           (Exhibit 2 marked.)
7           (Exhibit 3 marked.)
8   BY MR. CROSBIE:
9   Q   Okay. Let's look at the page number 3 under the
10      heading "The Plaintiffs."
11  A   Okay.
12  Q   How has MHC America Class C been harmed by the
13      conduct of the defendants?
14  A   Well, funds were diverted from the raising in
15      MHC America Fund into Fund 7 which reduced the
16      amount of funds that were coming to MHC America
17      Fund which thereby limits the total amount of the
18      fund and the total amount of properties that it
19      could have purchased. And so this Class C will
20      have lesser potential profits based on those
21      properties, you know, fewer properties.
22  Q   And how much was diverted from MHC America Fund to
23      Fund 7?
24  A   At this point, I can't tell you exactly how much
25      was diverted, because we don't have the discovery

Page 8

1       documents we have asked for.
2   Q   Do you have an estimate what was diverted?
3   A   I would estimate -- I really don't have an
4       estimate. It would be north of 15 million.
5   Q   How much did MHC America Fund raise when it was
6       open for investment?
7   A   Approximately 120 million.
8   Q   And that's the largest fund you had been involved
9       with, correct?
10  A   Up to that point, yes.
11  Q   All right. And why did MHC America Fund stop
12      raising money?
13  A   MHC America stopped raising money because of --
14      you know, we had a large transaction, sale, with
15      TPG.
16  Q   And you as a function of that sale were going to
17      be prohibited from fundraising for other funds in
18      the future, correct?
19  A   For a period of time, yes.
20  Q   Do you know how much MHC America Fund raised
21      between April 1st, 2017 and February 28, 2018?
22  A   I couldn't tell you the number on that, no.
23  Q   More than 60 million?
24  A   I would have to look at when the funding came in.
25      It was probably half of what was total raised

Page 9

1       probably at least.
2   Q   Look at, back on this page, MHC America 2 Class B.
3       How was it harmed by the actions of my clients?
4   A   The Class B, the Class B is the class sponsors,
5       you know, promote, of the MHC America Fund 2, and
6       with your clients diverting money, you know, from
7       other prior funds into Fund 7 rather than the
8       whole plan that we all -- when I say we all,
9       myself, Frank, Eric Siragusa, Ryan and Jamie had
10      all agreed to push all prior funds into a roll-up
11      fund called MHC America Fund 2 which did not
12      happen.
13  Q   And you recall that around March 26th or 28th of
14      2018 you told Jamie and Ryan for two or three
15      reasons they would not be involved in
16      MHC America Fund 2, correct?
17  A   Yes, I did tell them that.
18  Q   And when was Fund 7 diverting investors from
19      MHC America Fund 2?
20  A   I would say probably January and February for sure
21      of 2018, March of 2018.
22  Q   April of 2018?
23  A   I don't know. I don't have all the discovery
24      requests that we have asked for, so I don't know
25      how long they had been diverting funds.



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS
10..13

Page 10

1 Q    And MHC America Fund 2 did not open to investors
2      until May of 2018, correct?
3 A    That's correct.
4 Q    Okay.  So in January and February and March of
5      2018 no investor could have invested in
6      MHC America Fund 2, could they?
7 A    Well, they couldn't have invested in the fund
8      at that point.
9 Q    Because the only fund out of the 16 or 17 funds
10     that we're all aware of that was open for
11     investors during that time period was Fund 7,
12     correct?
13 A   Can you repeat that question?
14 Q   Well, that's probably not accurate.  The only fund
15     that was open for investors to invest in between
16     March 1 of 2018 and May of 2018 was Fund 7?
17 A   MHC America Fund 1 was still open at that point.
18     We had subscriptions coming in March and I believe
19     April of 2018, but we had not finalized the
20     MHC America Fund 2 at that point, so I believe
21     Fund 7 was still open, so besides MHC America Fund
22     1, it would be Fund 7.
23 Q   How was MHPS Alumni, LLC harmed by my clients'
24     actions?
25 A   MHPS Alumni was a prior fund and those investors,

Page 11

1      many of them, have rolled into or had rolled into
2      MHC America Fund 2, and by the fact that investors
3      were being diverted, you know, against the plan
4      that we had had to roll all prior investors into
5      that fund, that fund has not completed the roll-up
6      of all the prior funds, so it's a lower base of
7      assets for MHPS Alumni 1 investors.
8 Q    Well, that's for the investors, but how was the
9      fund itself harmed?
10 A   Well, I don't know that you would say the fund
11     itself was harmed.  It's the investors are part of
12     the fund as well as the sponsors which would
13     include Frank Rolfe and myself, so we were harmed
14     as well.
15 Q   Did MHPS Alumni close, liquidate, as a result of
16     the TPG transaction?
17 A   All of the assets that it had owned, all of the
18     mobile home parks, yes, they sold as a result of
19     that, yes.
20 Q   And in February 2018, MHPS Alumni was not
21     accepting any new investors, was it?
22 A   It was not.
23 Q   And the proceeds from the TPG transaction that
24     acquired all of the MHPS Alumni properties, those
25     proceeds were dispersed to investors when?  In

Page 12

1      March 2018?
2 A    In March, and I believe in May as well.
3 Q    So at least in March there would not have been an
4      opportunity for MHPS Alumni investors to roll
5      their proceeds into MHC America Fund 2, correct?
6 A    No.  They were given that option to roll and so
7      they were -- in many cases they were reinvesting,
8      you know, right away once that fund was open, so
9      they were given that option.  It was impending
10     that that new fund was opening, so they were given
11     that option from the start.
12 Q    How much money was raised in MHPS Alumni?
13 A    2 million.
14 Q    How many investors?
15 A    I don't know for sure.  30 to 50, somewhere in
16     there.
17 Q    Were they accredited?
18 A    It was not -- many of them were and many of them
19     were not.  They were all sophisticated.
20 Q    Were the non-accredited investors permitted to
21     invest in MHC America Fund 2?
22 A    No.
23 Q    The same question for MHPS Alumni 2, how was it
24     harmed by my clients' action?
25 A    I mean, MHPS Alumni 2 was very much in the same

Page 13

1      way as MHPS Alumni 1.  You know, the investors had
2      the option to roll up.  You know, fewer investors
3      rolled up into MHC America Fund 2.
4      It hasn't completed the roll-up, so a lower
5      base of assets, lower diversity, and it has taken
6      much longer to do the entire roll-up and fill that
7      fund up.
8 Q    And you're talking about a lower base of assets.
9      That's in America Fund 2, correct?
10 A   That's correct.
11 Q   All right.  So MHPS Alumni 2, LLC, the entity did
12     not suffer any harm based on my clients' actions,
13     did it?
14 A   Well, the actual entity itself?
15 Q   Correct.
16 A   Well, I don't really know how to answer
17     that question.  I mean, the entity itself, you
18     know, it's based on the investors and the sponsors
19     and so the sponsors and investors were harmed, but
20     the actual name of the entity was not harmed as
21     far as, you know, diverting the funds, you know,
22     to the other Fund 7.
23 Q   How large in terms of investment was Alumni 2?
24 A   2 million.
25 Q   And were some of the investors non-accredited?



Page 14

1  A  Yes.
2  Q  So like with Alumni, some of the investors
3     wouldn't have been permitted to roll their
4     proceeds into MHC America Fund 2, correct?
5  A  That's correct.
6  Q  Did Alumni 2 liquidate as a result of the TPG
7     transaction?
8  A  It was a big part of it. It did not fully
9     liquidate at the closing.
10 Q  How many properties did it retain at the closing
11    of the TPG transaction?
12 A  I believe there was one property remaining.
13 Q  Is that one property now in the -- I guess it
14    would be the America Fund --
15 A  It is. Yes, I believe it is. I'd have to look at
16    the property list to be certain, but it's one or
17    two. I can't recall.
18 Q  All right. How was MHPS Alumni 3 harmed by my
19    clients' actions?
20 A  So MHPS Alumni 3 is very much the same manner as
21    MHPS Alumni 1 and 2. The roll-up was stalled
22    longer, fewer investors or fewer properties are
23    now in MHC America Fund 2. You know, it's
24    basically the same response at the other two.
25 Q  How much has MHC America Fund 2 raised from

Page 15

1     investors?
2  A  It's approximately 80 million, 82 million,
3     somewhere around there.
4  Q  And if you know, how much of that was investor
5     money rolling from a prior fund and being
6     redeployed in America Fund 2?
7  A  I would say it's probably around 75 percent.
8  Q  And the other 25 percent would be new money?
9  A  New money from investors or friends and family of
10    those investors type thing.
11 Q  I probably should have done this because whoever
12    reads this or sees this video is not going to know
13    everything of the plaintiffs, and I'll try and
14    make it easy.
15       Are you somehow involved either
16    individually or through an entity in each
17    plaintiff?
18 A  Yes.
19 Q  And is Mr. Rolfe either individually or through
20    one of his entities involved in each plaintiff?
21 A  Yes.
22 Q  I am not trying to trick you. Is he involved in
23    RV Horizons?
24 A  Well, he's not an actual employee of RV Horizons,
25    but he does assist in some manner with our

Page 16

1     operations which, you know, RV Horizons is a
2     property management company.
3        At one point for a couple months Frank was
4     an employee of RV Horizons, so he had an
5     involvement as an employee for a brief period of
6     time.
7  Q  And how big in terms of investment was MHPS Alumni
8     3?
9  A  3 million.
10 Q  And I might have asked you this. Some accredited
11    and some non-accredited investors?
12 A  That's correct.
13 Q  When was MHPS Alumni 3 formed?
14 A  I want to say it was around 2011. I couldn't give
15    you the exact date.
16 Q  Were all of its property interests liquidated as a
17    result of the TPG transaction?
18 A  No, I believe it retained one property as well.
19 Q  Does MHPS Alumni 2 or Alumni 3, do any of them
20    currently own any property interest?
21 A  No.
22 Q  Do they conduct any sort of business?
23 A  Not currently.
24 Q  Are they still active limited liability companies?
25 A  I would have to look to see if we've dissolved

Page 17

1     them or not.
2  Q  If you want to turn the page to paragraph 16 of
3     the second amended complaint?
4  A  Okay.
5  Q  There are six entities described as Affordable
6     Housing Community Funds. That would be 1 through
7     6, correct?
8  A  Correct.
9  Q  Do you have any idea why Fund 6 or Community Fund
10    6 is a Delaware LLC?
11 A  I couldn't tell you exactly why it's a Delaware
12    LLC, you know, part of the other ones being
13    Colorado. I think it was at that point our
14    attorney and us decided that we should form it in
15    Delaware rather than Colorado.
16 Q  And the numbers 1, 2, 3, et cetera, those indicate
17    the order in which the funds were formed?
18 A  That's correct.
19 Q  So how was Affordable Housing Community Fund 1
20    harmed by my clients' conduct?
21 A  In really the same way. The investors that did
22    roll-up into MHC America Fund 2, MHC America Fund
23    2 had fewer properties, fewer diversity, and it
24    basically kind of stalled out as far as that goes
25    as far as getting the roll-up plan completed.



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS
18..21

Page 18

1  Q   AHCF 1, were its property interests liquidated in
2      the TPG transaction?
3  A   It may have -- I can't recall.  It may have had
4      one property left too.  I just don't recall a
5      hundred percent.  It was liquidated shortly
6      thereafter, but I don't recall if there was one or
7      not left.
8  Q   Okay.  So the fund, the LLC itself was not harmed?
9      It was the investors and MHC America Fund 2 that
10     was harmed?
11 A   The investors and the sponsors and MHC
12     America Fund 2.
13 Q   Who were the sponsors of AHCF 1?
14 A   AHCF Management was the management company, and
15     AHCF Class A, LLC was the sponsor.
16 Q   And I understand that you and Mr. Rolfe were
17     involved in that.  Was Mr. Siragusa involved in
18     AHCF 1?
19 A   Yes.
20 Q   In a promote position?
21 A   That's correct.
22 Q   The same questions for -- well, let me ask you
23     this.  Would your answers be the same for fund
24     AHCF 2 through 5?
25 A   I would say through 4 it would be, yes.

Page 19

1  Q   Okay.  Well, let me ask how big was AHCF 1 in
2      terms of investment?
3  A   5 million.
4  Q   How about AHCF 2?
5  A   10 million.
6  Q   AHCF 3?
7  A   10 million.
8  Q   And AHCF 4?
9  A   20 million.
10 Q   And who was primarily responsible for raising the
11     investments for those funds?
12 A   Eric Siragusa and Frank Rolfe.
13 Q   Now, you made a distinction between AHCF 4 and
14     AHCF 5.  Why is there a difference?
15 A   Well, AHCF 1, 2, 3 and 4 all have -- do not own
16     any more properties.  AHCF 5 and AHCF 6 are still,
17     you know, kind of in limbo for a roll-up
18     transaction, and so they still have property.
19     So that entire roll-up process has not been
20     completed for those funds at this point due to
21     fewer investors and kind of diverting the funds
22     from the other funds and what has kind of
23     transpired, you know, since that point.
24 Q   Do AHCF 1 through 4 currently do business?
25 A   They don't own any assets.  I can't tell you for

Page 20

1      sure if the LLCs have been dissolved or not.  I
2      would have to look, but I believe they are
3      dissolved.
4  Q   On to AHCF 5, how large of a fund in terms of
5      investment was that?
6  A   25 million.
7  Q   And how many properties does it still own?
8  A   I'm going to just estimate somewhere between 7 and
9      13, somewhere in there.  I don't know the exact
10     number.
11 Q   And so how was AHCF 5 harmed by my clients'
12     conduct?
13 A   It was because of diverting the funds from the
14     other funds, you know, the MHPI funds, and
15     diverting funds into Fund 7 creating confusion to
16     the investors, you know, our investors and
17     investors that they claimed that are their
18     investors, and it has not been able to complete
19     the roll-up at this point.
20 Q   But let's assume AHCF 5, LLC completes the
21     roll-up.  Will AHCF 5 retain any profit as a
22     result of the roll-up?
23 A   Well, it will receive a profit because of the
24     roll-up.  It won't retain it because it will
25     distribute it out to the investors and the

Page 21

1      sponsors.
2  Q   So if it were to receive a profit, it would be a
3      flow-through to investors and promote interests,
4      correct?
5  A   That's correct.
6  Q   Let's talk about AHCF 6.
7      Now, that is a fund that my clients through
8      their MHPI 5 Fund invested in, correct?
9  A   That is correct.
10 Q   How has AHCF 6 been harmed by my clients' conduct?
11 A   Exactly the same as AHCF 5.  You know, the fund is
12     still open.  The roll-up has not been completed.
13     We have had to go through an appraisal
14     process a few times.  You know, the investors are
15     anxious to have the roll-up completed, you know,
16     to either be in the new fund or to just get their
17     cash back, and it's just kind of in a stalled
18     process at this point.
19 Q   Well, are the investors in AHCF Fund 6 -- is the
20     fund still open for new investment?
21 A   No, the fund is not open for new investment.
22 Q   And how large was that fund in terms of
23     investment?
24 A   50 million.
25 Q   And how much did MHPI 5 invest in AHCF 6?



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

22..25

Page 22

1  A   I want to say approximately 13 to 14 million.
2  Q   Do you know how much capital, if any, MHPI 5 has
3      received back from Fund 6?
4  A   How much capital they have received?
5  Q   Yeah.
6  A   It was probably about 60 percent of it, 50 to
7      60 percent of their capital plus their preferred
8      returns.
9  Q   So let me just see if I got this right. You're
10      saying that my clients who control MHPI 5 acted to
11      harm an entity in which they had invested
12      $13 million?
13  A   Yes.
14  Q   My clients also directed other investors to invest
15      in Fund 6, correct?
16  A   I don't know that they did or they did not. They
17      were -- I couldn't tell you that. I don't know.
18      I have not seen any e-mails confirming that. I
19      have heard them say that, but I've never seen an
20      e-mail or had somebody confirm that to me.
21  Q   When was AHCF 6 formed?
22  A   I'll say 2014 or 2015, somewhere in there.
23  Q   How many properties does it currently have an
24      interest in?
25  A   Off the top of my head, I am going to say

Page 23

1      somewhere in that 10 to 15 range, you know,
2      approximately. It could be higher a little bit or
3      lower a little bit, but I think it's in that
4      range.
5  Q   Did AHCF 5 or 6 sell any properties to
6      MHC America Fund 2?
7  A   I mean, effectively it sold properties to
8      MHC America Fund 2, yes, that's correct.
9  Q   Look at number 22 on the second amended complaint.
10      It's AWA 3 Fund. What does AWA stand for?
11  A   Argos Wealth Advisers.
12  Q   All right. Do you or any of your entities have a
13      trademark on the name Argos Wealth Advisers?
14  A   No, we do not.
15  Q   Has Argos Wealth Advisers authorized you to
16      protect their abbreviation for their trade name?
17  A   That's not the abbreviation for their trade name.
18      That's the abbreviation for the fund. That's why
19      we named it that was because it was with Argos
20      Wealth Advisers.
21  Q   Right. But it's Argos Wealth Advisers. That's
22      the name of the entity that has invested in that
23      fund, correct?
24  A   Argos Wealth Advisers is not the name of the
25      entity that invested in the fund, no.

Page 24

1  Q   But it's the entity that directed the investors in
2      that fund?
3  A   That is correct, yes, advised them.
4  Q   Okay. So are you suggesting that there is a
5      trademark of AWA 3 that is independent of Argos
6      Wealth Advisers?
7          MR. STEWART: Objection, form, legal
8      conclusion. You can answer.
9  A   Well, I'm saying the AWA 3 Fund, the AWA 3 Fund,
10      the LLC, that's our -- that's the entity we do
11      business under, and so that's what we're known
12      with with clients of Argos Wealth Advisers, so I
13      would say that that's basically our trademark, our
14      business name, our DBA name.
15          MR. CROSBIE: Just a matter of cleanup,
16      it's really of no consequence to me, Craig. I
17      think that Elevation Capital Group, LLC may not
18      be the entity that you meant to sue. I think
19      it's Elevation Events, LLC.
20          MR. STEWART: There has been some
21      confusing -- do you want this on the record?
22          MR. CROSBIE: I am pointing it out
23      because I noticed it yesterday. We don't have
24      to do it on the record, but if you need to
25      correct a scrivener's error.

Page 25

1          MR. STEWART: I'm not sure it is based
2      on the testimony in Delaware, but noted.
3          MR. CROSBIE: Yeah. No problem.
4  BY MR. CROSBIE:
5  Q   All right. Let's talk about your experience in
6      the industry. This will be a little repetitive of
7      what we talked about before, but when did you get
8      into the mobile home industries, I'll call it?
9  A   I want to say it was 1994 when I first got
10      involved with it.
11  Q   And for some period of time it was just you and
12      family and friends running individual parks?
13  A   It was my wife and I, and we were running the
14      properties ourselves in the beginning, and then
15      ultimately we hired my mom who helped do some of
16      that work and also work on our other businesses,
17      my brother Perry who was involved very early on,
18      and then his wife after that.
19  Q   And when did you first begin doing business with
20      Mr. Rolfe?
21  A   I want to say it was 2006, 2005, somewhere in that
22      timeframe.
23  Q   Was that running mobile home communities or was
24      that for the book writing and bootcamp side?
25  A   Yeah, initially it was for we wrote -- you know,



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

26..29

Page 26

1    he wrote books and I wrote books, and we created
2    kind of what we called a home study course for
3    investing in mobile home parks and RV parks and
4    billboards, and then the bootcamps came after that
5    in 2008.
6  Q    I see and I have seen it before that you've
7        remarked or noted that you and your affiliated
8        entities were the fifth largest mobile home
9        community owner in the country?
10 A    At one point all the entities that I was part of
11       was the fifth largest in the country, yes.
12 Q    Okay.  And that would include MHPI 1 through 4?
13 A    That's correct.
14 Q    And it would include MHC America Fund?
15 A    That's correct.
16 Q    And those are funds that my clients were involved
17       in?
18 A    That's correct.
19 Q    Again, a bit repetitive, but can you tell me how
20       you came to meet Jamie Smith?
21 A    She attended, I think, either our very first or
22       our second bootcamp in 2008.
23 Q    And she met you personally?
24 A    Well, she met Frank and I.  We were both teaching
25       the bootcamp.

Page 27

1  Q    Okay.  And at that time did she tell you whether
2        she and Mr. Smith owned any mobile home
3        communities?
4  A    At that point she -- I believe she had said that
5        she was interested in getting into the business of
6        buying mobile home communities, but not that she
7        owned any.  I can't recall.  I mean, that's a long
8        time ago.  I don't recall if she said she owned
9        one or not.  It was more she wanted to get into
10       the business.
11 Q    Did Ms. Smith stay in touch with you after the
12       bootcamp?
13 A    It was off and on.  She would e-mail me once in a
14       while, not a whole lot for about two years.
15 Q    So up until about 2010?
16 A    Like late 2009, early 2010.
17 Q    So in terms of those communications, what did you
18       all discuss, if you can remember?
19 A    In?
20 Q    2008 to 2009 or 2010.
21 A    I mean, in 2008, I mean, I think she was -- if I
22       recall, she was looking for me to send her any
23       deals that I thought were good that she could buy,
24       I recall, and then like in 2009 -- there was
25       pretty much a big gap there, and then I think in

Page 28

1    2009 she had -- you know, late 2009 we just kind
2    of started talking.
3        Frank and I were seeing potential for an
4    opportunity to buy a lot of properties because of
5    the economy and where it was at, and she reached
6    back out and I think she had told me that she had
7    a lot of contacts through her seminars and things
8    that they were putting on.  And I think we started
9    talking about possibly doing some type of a fund
10   together to acquire properties and that.
11 Q    Did Mrs. Smith tell you that she had ever raised
12       private investment funds for anything prior to you
13       all doing your first fund?
14 A    I don't think -- I don't think that she told me
15       that she had.  I don't believe she had.
16 Q    Did Mr. Smith ever tell you that prior to your
17       first fund that he had done any sort of
18       fundraising?
19 A    I don't think so.  I didn't really talk to
20       Mr. Smith before that time frame.  I didn't really
21       talk to him, I think, until 2010.
22 Q    If you don't -- if she didn't tell you that she
23       had any fundraising experience, why would you
24       partner with Mr. and Mrs. Smith to raise private
25       investment money for a mobile home fund?

Page 29

1  A    Well, why would we partner with them?
2  Q    Yes.
3  A    Well, it was because she claimed that she had a
4        lot of contacts and people through their
5        real estate seminars that they were doing and that
6        people had asked -- I believe asked her in the
7        past, you know, is there a way to get involved in
8        buying properties, you know, not necessarily
9        mobile home parks, but it was just I know when we
10       do seminars people asked us all the time if they
11       can partner with us and things like that.
12       And so, you know, we had been doing those
13       bootcamps for a couple years and we had multiple,
14       multiple people wanting to partner or invest with
15       us, you know, from those bootcamps.  And when she
16       mentioned that she had all those people it was
17       kind of like, okay, well, you have a different set
18       of people from, you know -- I don't remember what
19       it was, Wealth Rock or whatever it was called
20       at that point.
21       You know, that she might have investors as
22       well that potentially would want to partner and
23       get involved in the business.  So, you know, that
24       was basically it.  You know, at that point we saw
25       an opportunity to acquire a lot of properties at



Page 30

1    good prices and we wanted to raise funds to do
2    that.
3 Q    **Your first fund with the Smiths, and I'm not going**
4    **to debate which fund was first, but your first**
5    **fund with the Smiths was MHPI 1, LLC?**
6 A    That is correct.
7 Q    **And who among the team was responsible for getting**
8    **the entity formed and the offering documents**
9    **prepared?**
10 A    At that point it was she had reached -- I think
11    Mrs. Smith had reached out to an attorney that she
12    knew, and I was fine with her doing that.
13 Q    **An attorney in Orlando?**
14 A    I can't tell you. I think in Florida somewhere.
15    I don't know if they were in Orlando or not.
16 Q    **In 2010, how many mobile home communities had**
17    **Mr. Rolfe owned to your knowledge?**
18 A    How many he had owned in his career?
19 Q    **Yeah.**
20 A    Probably 40 or 45, somewhere in that range.
21 Q    **What was the size in terms of investments of the**
22    **MHPI 1 fund?**
23 A    2 million.
24 Q    **Okay. Turn to paragraph 33 of the second amended**
25    **complaint. Oh, I'm sorry. Above that. It's the**

Page 31

1    **tail end of paragraph 32 which is also on the same**
2    **page. The last part of that allegation says,**
3    **"Until the Smiths later decided to steal the**
4    **history and goodwill of the plaintiffs and**
5    **unfairly compete."**
6    **What do you mean by the Smiths later**
7    **decided to steal the history?**
8 A    We're on 32?
9 Q    **The bottom of 32, which would be the top of**
10    **page 7.**
11 A    Well, that relates to the Smiths basically
12    using -- well, the Smiths had basically one
13    function, you know, as far as any of the funds we
14    had, MHPI 1, 2, 3, 4 or MHC America Fund, and that
15    was basically working with investors and raising
16    money and investor communications.
17    They had no real involvement with acquiring
18    properties, managing properties, selling
19    properties, financing properties, any of that type
20    of stuff. And so when they basically set up
21    various websites and we saw the documents that
22    they wrote for Fund 7 and the track record and the
23    investment summary and all that, and then in one
24    place they're claiming that they have operated all
25    these properties and are great at buying and

Page 32

1    selling properties and that type of stuff, it's
2    not true because that was all done by us and not
3    by them.
4    And so they are basically using our track
5    record, our management company, our management
6    history, our funds, MHPS Alumni 1, 2, 3 and AHCF 1
7    through 4, you know, our distribution history, and
8    basically saying, well, these are our prior funds,
9    and they have no involvement with them, and
10    they're basically using that to raise capital from
11    investors.
12 Q    **And you're aware that Peter Reinert is the**
13    **attorney who supervised the preparation of all of**
14    **those documents?**
15 A    I am aware of that now, yes.
16 Q    **And he was doing that even before he was hired by**
17    **RV Horizons in April 2017, correct?**
18 A    I'm aware of that now.
19 Q    **And he worked on it after he was hired by**
20    **RV Horizons?**
21 A    Yes, I'm aware of that now.
22 Q    **I'm sorry. Back to paragraph 33. That describes**
23    **your -- I guess your high-level business strategy**
24    **and approach, is that correct?**
25 A    Yes.

Page 33

1 Q    **And part of my brain is wanting to ask questions**
2    **about the arbitration, so I'm trying to reset.**
3    **You say, "Plaintiffs specialize both in**
4    overall investment strategy (including managing
5    prospective and current investors)."
6    **What do you mean by that?**
7 A    Where are we at?
8 Q    **Paragraph 33. "Plaintiffs specialize both in**
9    **overall investment strategy."**
10    **Do you see that?**
11 A    Well, it relates to managing the -- managing the
12    assets and the funds so that the investors should
13    get a good return based on their investment in the
14    properties or in the funds themselves.
15 Q    **Well, I'm a little more narrow than that. You say**
16    **in the second sentence, "Plaintiffs specialize**
17    **both in overall investment strategy (including**
18    **managing prospective and current investors)."**
19    That's what I want to focus on.
20 A    Okay.
21 Q    **So what do you mean by overall investment**
22    **strategy?**
23 A    Well, the overall investment strategy is basically
24    you have a fund and it has a certain number of
25    properties in it, and you acquire properties so



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

34..37

Page 34

1   that the fund has some type of a balance where it
2   has properties that are maybe more stabilized,
3   properties that are less stabilized that have more
4   upside, and you kind of combine that to work
5   towards maximizing not only the cash flow, but the
6   ultimate exit and return to the investors.
7   Q   But what's the overall investment strategy in
8       that?
9   A   Buying good mobile home parks that are owned by
10      the fund that have good parameters around them.
11  Q   And which plaintiffs specialize in the overall
12      investment strategy?
13  A   Well, I think all.
14          MR. STEWART:  That part of the overall
15      investment?
16  A   That would include all of the plaintiffs -- or not
17      all the plaintiffs.  You know, I'm going to go
18      back and look at the plaintiffs.
19  Q   That's fine.
20  A   Well, yeah, I mean it would be RV Horizons and
21      then really the members of the -- the members of
22      the Class C and the managers of the various funds.
23  Q   So for example MHC America Fund Class C, MHCA
24      Management, those type of entities would be in
25      charge of the overall investment strategy?

Page 35

1   A   Well, those would include the people that are in
2       charge of the overall investment strategy, yes.
3   Q   Okay.  So the individual human beings who are
4       either in the promote or the management entities
5       of the funds?
6   A   As far as when you say overall investment
7       strategy, that would have some input from all
8       those people, yeah.
9   Q   You go on to say, "Plaintiffs have been in this
10      industry for many years and have a nationwide
11      presence."
12          Which plaintiffs have a nationwide
13      presence?
14  A   Well, I think that would certainly be Frank, Dave
15      and Eric.
16  Q   What about MHP Funds, LLC, does that have a
17      nationwide presence?
18  A   Yes.  It does, yes.
19  Q   All right.  Do you have an e-mail address that's
20      dreynolds@MHPSfunds or something like that?
21  A   Yeah, dave@MHPfunds.  It's how most of the lenders
22      and brokers know to contact me and it's kind of
23      the overall overarching entity that's used to put
24      properties under contract.
25  Q   And that was also the entity that signed the

Page 36

1   letter of intent with TPG, right?
2   A   I would have to look back at that.  It might have
3       been.  I just don't recall off the top of my head.
4       It probably was one of the signors at some point.
5   Q   Just a letter of intent, not the contract, or any
6       of the supplements to the contract?
7   A   Yeah, I'd have to look.
8   Q   Are the Smiths through their entity a member of
9       the Class C MHC America promote structure?
10  A   Yes, I believe so, yes.  Well, they have a -- I
11      can't remember the name of their entity, but, yes,
12      their entity, you know, it's not them personally,
13      but they have an entity as part of the Class C.
14  Q   Right.  And you're not personally a part of the
15      Class C either, are you?
16  A   No.
17  Q   Mr. Rolfe is not either?
18  A   No.
19  Q   Mr. Siragusa is not either?
20  A   No.
21  Q   So in paragraph 37, the last sentence, you say,
22      "The Smiths are not involved in or members of
23      Class C."  That's not correct, is it?
24  A   I need to read the whole thing here.
25  Q   That's fine.  I'm out here for three days.

Page 37

1   A   Well, the Smiths through their entity are involved
2       in MHC America Fund Class C, and they also have a
3       small -- you know, not part of the Class C, but a
4       small sponsor interest in or not necessarily --
5       yeah, I guess you could call it sponsor, but not
6       really a sponsor.  They had an interest in the
7       Class A of AHCF 6, I believe, a small interest
8       there, but not Class B or C.
9   Q   Well, they also had an interest in Class A of
10      America Fund as well through their investment,
11      correct?
12  A   Yes, they do.
13  Q   Let's step back.  Let me go back to paragraph 34
14      and 35.  Take a second to review that.
15  A   Okay.
16  Q   So this is talking about the special purpose
17      entities.  Has each fund you have been involved in
18      operated using special purpose entities to own in
19      whole or part interest in properties?
20  A   I believe so, yes.  I think all of the funds have,
21      you know, for the most part have one asset and one
22      entity basically.
23          You know, there's exceptions to the rule
24      where maybe there was an acquisition of multiple
25      properties in one purchase where there was some



Page 38

special purpose entities that owned more than one property, but for the most part that was the goal is to own each asset in its own special purpose entity. In many cases that's what lenders require as well.
**Q Well, let's talk about the management. RV Horizons managed all of the SPEs as the manager, correct?**
A I would say most. I would have to go through all of the agreements to make sure that's correct.
**Q That's fair. No, that's fair. And then RV Horizons was the property manager for the mobile home communities owned by the SPEs, correct?**
A That's correct.
**Q So let's talk about this, because I am still not sure I understand.**
**Does RV Horizons currently do any property management for mobile home communities?**
A It does.
**Q How many communities?**
A You know, I couldn't tell you off the top of my head. It's a portion of, you know, the hundred and whatever 90 communities that I oversee through either RV Horizons or Impact MHC Management.

Page 39

**Q And that's the rub. What is Impact MHC Management?**
A It's a management company.
**Q Okay. Is it an alterego of RV Horizons?**
A I wouldn't say it's an alterego. It's a separate newly-formed management company.
**Q And did it assume property management at properties where RV Horizons used to be the management company?**
A It did in some cases. I wouldn't say "assumed." It was an agreement on some of those properties where RV Horizons delegated the management to Impact.
**Q There was not an assignment of the property management agreements to Impact?**
A No, it was a delegation.
**Q Okay. And that's a written agreement?**
A Yes.
**Q Okay. Do you have any like signs outside your building in Cedar Ridge?**
A We do.
**Q What does it say on the sign?**
A Impact MHC or Impact Communities, I believe, the new sign we just put up.
**Q Does RV Horizons currently have any employees?**

Page 40

A RV Horizons currently does not have any employees.
**Q Are all the property management type employees employed by Impact MHC?**
A All the employees that we have in any of our various companies are employed by Impact, and then the management fees for those are then separated out and reimbursed by the various companies that are using those management people.
**Q And when did that transition occur?**
A It was an ongoing transition throughout 2018. It started I want to say in like September was when Impact actually started paying some employees.
**Q And did you create Impact as a result of TPG's option to purchase RV Horizons?**
A No.
**Q Did you know --**
A It was one of the -- Impact was actually initially created to operate the properties that I owned separately from any of the funds.
**Q So you own mobile home communities separate from any funds?**
A Yes, I have for years and years.
**Q I didn't know that.**
**And prior to you creating Impact to operate the properties you own separate from the funds,**

Page 41

**who managed those properties?**
A They're actually managed really by myself. We did use some assistance from RV Horizons, but for the most part they were kind of managed by myself and Amy Burget who is kind of my executive assistant.
**Q Does RV Horizons or Impact, do they contract with the SPEs or the funds or who to manage the properties?**
A They contract with the SPEs to manage the properties for the most part. You know, I believe in most of the fund agreements it designates that RV Horizons or its delegate will be the management company.
**Q Does Impact currently manage any properties owned by MHC America Fund?**
A I want to say that it does, but I'm not a hundred percent certain exactly. I believe it owns -- it manages properties that MHC America Fund has an interest in in some manner.
**Q And who made the decision about which properties Impact would take over the management of?**
A The decision has been more driven by, you know, kind of the lender is the loan agreement so we have existing, you know, because many of those have -- you have a stipulation that RV Horizons

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

42..45

Page 42

1    should be the manager or it basically has that in
2    many of the agreements.  And so as some of those
3    loans were paid off or new loans were put on
4    certain properties, Impact would take over the
5    management or we delegated that management.
6  Q    Okay.  So for all properties within a credit
7        facility, the property manager is either going to
8        be RV Horizons or Impact?
9  A    Yes, I believe so.  I mean, I would have to look
10       at all -- I mean, it's a lot of documentation to
11       just kind of say that I know for certain that
12       right now we have a management agreement that says
13       this is the property manager or this is the
14       delegated manager.
15           I would have to look at all of that to give
16       you the for sure answer, but the overall goal is
17       to eventually have Impact be the management
18       company for all of the properties.
19  Q    Let's go back to MHPS Alumni Funds 1 through 3.
20       How does MHPS Alumni Fund 1, 2 or 3 use its name
21       in commerce?
22  A    How does it?  How does it use its name in commerce
23       or how did it?
24  Q    Okay.  How did it use its name in commerce?
25  A    Well, it was basically -- it was used to -- it was

Page 43

1    used and known by our people that were bootcamp
2    attendees, anybody that had invested with us.
3    They knew us as the Alumni funds at that point in
4    time, and then subsequent to that, you know, since
5    2010, and when people would associate, you know,
6    look at Alumni funds, they would associate that
7    with Frank and Dave, and so that's basically how
8    it was used.
9  Q    MHPS, does that stand for Mobile Home Park School?
10  A    No.  It's Mobile Home Park.  I don't recall why we
11       have the S.  It might have just been MHPs.  I
12       don't know why.
13  Q    Okay.  So it could have been Mobile Home Parks
14       Alumni?
15  A    It wasn't a school, you know.
16  Q    And "alumni" indicates investors who had attended
17       a bootcamp?  Is that what it's meant to indicate?
18  A    Pretty much, yes.  The alumni part, yes.
19  Q    Okay.  How else is MHPS Alumni used in commerce or
20       was it used in commerce?
21  A    Well, it would be -- it was owning mobile home
22       parks through its SPEs that it owned that it was a
23       member of.  It from time to time signed on loan
24       agreements of whatever sort.  It owned mobile home
25       parks that RV Horizons managed, so it was the same

Page 44

1    way that any company owns things.  It owned these
2    properties and was associated with Frank and Dave.
3  Q    When would consumers be exposed to the name
4        MHPS Alumni?
5  A    I would say that they were exposed to it in
6        e-mails that we sent out.  They were exposed to it
7        from other people that were invested in one of the
8        funds, the MHPS Alumni funds, you know, that they
9        told friends and family about.  They would have
10       been exposed there, you know, here is these
11       MHPS Alumni funds.
12           You know, consumers would have seen it in
13       our AHCF 1, 2, 3, 4, 5 and 6 funds, you know,
14       basically because that's our track record we had
15       in our funds.  The MHC America Fund 1 and I
16       believe MHC America Fund 2 and potentially in the
17       MHPI funds that we were involved with.
18           So anybody that ever saw those PPMs or
19       track records would have been exposed to it which
20       could be thousands and thousands of people.
21  Q    When you mentioned PPM, that's private placement
22       memorandum?
23  A    Yes.
24  Q    What was the minimum investment in MHPS Alumni?
25  A    I want to say 25,000.  I don't recall for sure,

Page 45

1    but around there.
2  Q    And is that on the low end of subsequent funds in
3        terms of the minimum investment?
4  A    I mean, it would be on the low end.  I think most
5        of the funds allowed for either a 25,000 or a
6        50,000 minimum investment.  I don't think we had
7        anything that required a higher amount.
8  Q    Did every fund that's a plaintiff have a PPM?
9  A    It did, yes.
10  Q    And as you could agree, they tend to be fairly
11       lengthy documents?
12  A    Yes.
13  Q    I think you mentioned earlier that you had some
14       non-accredited investors, but they were still
15       sophisticated?
16  A    Yes.
17  Q    So this is not like choosing a brand of green
18       beans off a store shelf, is it?  It's a
19       significant investment by these investors?
20  A    Yeah, for some of them it would be a significant
21       investment, you know.
22  Q    Did MHPS Alumni have any logos?
23  A    We had a logo.  I mean, we had a logo like on our
24       letterhead and everything for I think all of the
25       funds.



**Orange Legal**
**800-275-7991**

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

46..49

Page 46

1  Q   But a logo or just MHPS Alumni?
2  A   Well, that was the logo.
3  Q   So the name was the logo?
4  A   Basically, yes.
5  Q   Did MHPS Alumni investors ever receive
6      communications from MHP funds?
7  A   I'm sure it did, yes.
8  Q   And the same questions would be true for Alumni
9      fund?  Well, I guess we were covering all the
10     Alumni funds there.
11         So other than communications with investors
12     or prospective investors where the name
13     MHPS Alumni appeared, and that would include the
14     private placement memorandum, was there any other
15     public-facing use of those names?
16 A   Well, it was on, you know, the websites it was
17     certainly on as far as people seeing the PPM and
18     future additional funds down the road.  It was
19     public-facing as far as the brokers and the
20     lenders.
21 Q   Well, I'm pretty sure this was not an MHPS Alumni
22     park, but just for example say Elsmere had been.
23     If I went to the Elsmere Park would it say Elsmere
24     Mobile Home Community, an MHPS Alumni Fund
25     property?

Page 47

1  A   No.
2  Q   Did any property ever indicate fund ownership?
3  A   I don't believe so, no.
4  Q   Did any property ever indicate "managed by
5      RV Horizons"?
6  A   I would say that's probably -- there probably
7      were.  I couldn't tell you how many there were or
8      how many there are, but I believe that is the case
9      that it has that in some properties.
10 Q   Can you name any property that has that?
11 A   Not off the top of my head, I can't.
12 Q   How does AWA Fund use its name in commerce?
13 A   It's very similar to the Alumni funds.  The fund
14     has loan agreements, it has brokers that know
15     about it.  It's in track record documents.
16     Investors see it, you know, future investors see
17     it, and it's really like that.  It doesn't have
18     its name on signs at the properties, but it's in
19     all these documents and it was on, in this case
20     here, the Elevation website.
21 Q   So someone goes on a PPM and sees the name AWA
22     Fund, how did they associate that with a
23     particular business if they have not been an
24     investor in AWA Fund?
25 A   Well, they would associate it because it was a

Page 48

1      fund ran by Frank and Dave that Frank and Dave
2      were involved with, so they would know that it's a
3      mobile home park fund.
4  Q   Right.  Because the only investors in an AWA Fund
5      would have come through Argos Wealth Advisers,
6      correct?
7  A   Yes.
8  Q   So how is the word "AWA Fund" capable of
9      distinguishing the services AWA Fund provides from
10     those of others?
11         MR. STEWART:  Objection, legal
12     conclusion.  You can answer.
13 A   Can you repeat that?
14 BY MR. CROSBIE:
15 Q   Yeah.  How does the word "AWA Fund" -- how is the
16     word "AWA Fund" capable of distinguishing the
17     services AWA Fund provides from those of others?
18         MR. STEWART:  The same objection.
19 A   I don't know how it distinguishes.  I mean, I
20     guess I don't really understand the question, what
21     you're trying to ask.
22 Q   I'm just reading from your complaint, the second
23     amended complaint.
24 A   What number are we at?
25 Q   43.

Page 49

1  A   So can you repeat your question?  Sorry.  Where is
2      it at exactly?
3  Q   How does the word "AWA Fund" or how is the word
4      "AWA Fund" capable of distinguishing the services
5      AWA Fund provides from those of others?
6          MR. STEWART:  The same objection.
7  A   When you say the word, do you mean how does the --
8  Q   The name.
9  A   The name, AWA Fund, is it capable of
10     distinguishing or how does it distinguish from
11     others?
12         I mean, it basically has a certain percent
13     ownership in the properties that it owns, you
14     know, whether it's 5 percent or 100 percent, and
15     its an entity that owns those interests in those
16     properties, and so that interest flows into the
17     fund from the SPEs to the investors, you know,
18     through all the investors that invested, and the
19     lenders see it as a separate entity, and so that's
20     how I guess it would be distinct.
21 Q   Let me ask you a question a different way.  Let's
22     talk about Alumni Fund.  How does the name MHPS
23     Alumni Fund 2 distinguish its services from the
24     name or the services provided by MHPS Alumni Fund
25     3?



Page 50

1    MR. STEWART:  The same objection.
2  A    I mean, it really relates to the services that it
3    provides its investors, I guess, you should say,
4    the investors in MHPS Alumni 2 are serviced by
5    that fund, and MHPS Alumni 3 are serviced by that
6    fund, and then, you know, the lenders will see
7    certain information from each fund.
8       You know, the fund was managed by
9    RV Horizons and I think Colonial Kitchens, I
10    believe, so they managed the actual funds
11    themselves, but the investors and the lenders for
12    the most part would be the ones where it's
13    distinguished between the two.
14  Q    So would a consumer have a choice or had a choice
15    to invest in either Alumni Fund 2 or Alumni Fund 3
16    based on the different services they offered?
17  A    They would have had a choice to invest in Alumni
18    Fund 2, and then they would have had a choice to
19    invest in Alumni Fund 3.
20  Q    Would they have had a choice between the two
21    funds?
22  A    You know, I would have to look at the dates and
23    when they were opened, and if Alumni Fund 3 was
24    opened before we fully subscribed Alumni Fund 2.
25    I'd have to look at that and see if there was a

Page 51

1    actually a choice in that case.
2  Q    What about were consumers given a choice to chose
3    between AHCF 3 and AHCF 4?
4  A    I mean, it's the same answer. I mean, at a point
5    in time they probably had the choice, but it was
6    probably a very short period of time, because then
7    AHCF 3 would have closed to new investors because
8    it reached its $10 million mark and then they
9    could have a choice to invest in AHCF 4.
10  Q    What does "AHCF" stand for?
11  A    Affordable Housing Community Fund.
12  Q    And what do the AHCF entities do?
13  A    They are funds that own manufactured home
14    communities and they have multiple investors or
15    had multiple investors in the ones that closed or
16    are closing, so they had multiple investors, paid
17    out preferred returns, paid out capital gains,
18    signed on financing notes, those types of things.
19  Q    Are the Affordable Housing Community Funds
20    affordable housing community funds?
21  A    Absolutely.
22  Q    What does "MHC" stand for in MHC America Fund?
23  A    Manufactured Home Community.
24  Q    And the same questions that I had about like AWA
25    and Alumni, other than investors, PPMs,

Page 52

1    potentially lenders, would any consumer have a
2    AHCF or an Affordable Housing Community Fund
3    publicly-facing name?
4       MR. STEWART:  Objection to form.  You
5    can answer.
6  A    It wouldn't be a -- you know, it was only open
7    to -- it was only open to depending on the fund,
8    sophisticated or accredited investors, and so if
9    you weren't falling into that arena, then you
10    would not have the opportunity to see it, but if
11    you wanted to invest and get the information,
12    yeah, I guess it would be public to those people
13    if they wanted to.
14       It wasn't like on a storefront window, but
15    it was circulated amongst the industry.  It's a
16    very small industry and people talk amongst
17    themselves in the industry.
18  Q    Sure.  And I think it's a fair point and I think
19    Mr. Rolfe mentioned this during the arbitration,
20    not that that's relevant here, but he mentioned a
21    brand Frank and Dave, and you mentioned that a few
22    times today.
23  A    Uh-huh.
24  Q    Do you consider "Frank and Dave" to be a brand?
25  A    I don't know the legal term of what I exactly

Page 53

1    describe it as, you know, but people know that
2    Frank and Dave are -- you know, in the industry
3    know exactly who Frank and Dave are and could tell
4    you who we are and know what we've done.  They
5    know our track record.  They know our history and
6    all of that.
7  Q    Right.  And kind of a silly example would be
8    Ben & Jerry's for ice cream, right?
9  A    Right.
10  Q    That may not be the corporate name.  It might be,
11    you know, generic Vermont Based Ice Cream Company,
12    Inc.
13  A    Right.
14  Q    But the brand is Ben & Jerry's like your company
15    name might be Affordable Housing Community Fund 1,
16    but the brand is Frank and Dave, right?
17       MR. STEWART:  Objection to form.
18  A    No, the brand is not Frank and Dave.  I don't
19    exactly know exactly how to answer that because
20    the actual AHCF funds are -- would be more than
21    just Frank and Dave, so it includes Eric, it
22    includes in some cases some other people that did
23    some assistance like the Smiths in Fund 6, so I
24    would say that people associate the Affordable
25    Housing Community Funds for the most part with



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

54..57

Page 54

1 Frank and Dave, but Frank and Dave is not
2 synonymous to AHCF 1 through 6. It includes a lot
3 of different businesses that we have.
4 Q   Want to take a short break?
5        MR. STEWART:  Yes, please.
6        THE VIDEOGRAPHER:  One moment, please.
7 The time is 10:21 and we are off the record.
8        (Break taken.)
9        THE VIDEOGRAPHER:  The time is 10:32 and
10 we are back on the record.
11 BY MR. CROSBIE:
12 Q   Okay.  Mr. Reynolds, look at paragraph 49.  Let me
13   ask you first is it fair to say that for all of
14   these plaintiff funds that their use of the name
15   in commerce would be the same as you have
16   described during your last little bit of
17   testimony?
18 A   Yes.
19 Q   So if you look at 49, the second half of the
20   second sentence, "Consumers associate Affordable
21   Housing Community Fund 6 with only its business."
22   How do you know that that's what consumers
23   do?
24        MR. STEWART:  Objection to form, legal
25 conclusion.  You can answer.

Page 55

1 A   Well, it's just my understanding that if somebody
2 is an investor in AHCF 6 that they're basically
3 only looking at it as far as its business goes.
4 It's not, you know, some other company's business.
5 It's their business, the Affordable Housing
6 Community Fund 6 business.
7 Q   Okay.  Look at paragraph 51.
8      Does this accurately set forth the
9   management entities for each fund?
10 A   I believe it did when this was filed, but it's no
11 longer completely accurate.
12 Q   What part is inaccurate?
13 A   MHPI 4 is no longer managed by MHP Portfolio, and
14 there is two additional managers in MHC America
15 Fund.
16 Q   Any other changes or inaccuracies?
17 A   Not without looking at the -- I would have to go
18 back and look at all my documents to know, but
19 those are the two, the ones that stick out.
20 Q   Look at 52.  It talks about MHPI 1 through 4 and
21   it says the Smiths or their entities were
22   responsible for promoting those funds to potential
23   investors, correct?
24 A   That's correct.
25 Q   For MHPI Fund 1 it was a new fund.  It was a new

Page 56

1   venture, right?
2 A   Yes.  That was the first fund that we did with the
3 Smiths.
4 Q   Right.  And so to the extent they had collected
5   lists of potential investors, it would have been
6   as a result of their work doing seminars, correct?
7 A   Well, seminars or whatever other work they did to
8 get those investors.  I couldn't opine on how all
9 they got the investors.
10 Q   And so their work giving seminars or whatever they
11   were doing was sort of a genesis of the investor
12   list for MHPI 1 through 4, correct?
13 A   I would say for MHPI 1 and 2 that would be pretty
14 accurate.  For fund 3 and 4 they were doing
15 more -- you know, they were advertising the fund
16 and promoting it more online and through other
17 various means, so it wasn't their seminar
18 investors that they knew.  It was more people they
19 were trying to attract into the fund to make an
20 investment.
21 Q   And the Smiths maintained a database of accredited
22   investors, correct?
23 A   I don't know.  I have never seen a copy of any of
24 their databases.
25 Q   And the Smiths have always controlled the investor

Page 57

1   databases for the MHPI funds, correct?
2 A   When you say controlled, do you mean they have not
3 shared thom with me?
4 Q   No.  I mean, they controlled access to that
5   investor information.
6 A   They controlled the e-mail addresses and phone
7 numbers of those investors.  I had all the other
8 additional information because of doing
9 tax returns and K-1s.
10 Q   But in terms of maintenance as a list, they had a
11   list of accredited investors that they maintained
12   and controlled, correct?
13 A   I don't know what they have.  I mean, I had a list
14 of the investors, when they invested and all that
15 information, and I kept track of it for
16 distributions and tax returns.
17 Q   Okay.  So this paragraph says in the second
18   sentence, "In this capacity, the Smiths had access
19   to plaintiffs' prospective and current investor
20   list, marketing materials and other proprietary
21   information."
22      Do you see that?
23 A   I do.
24 Q   What investor lists did the Smiths have access to?
25 A   Well, there was a list of properties or a list of



1    funds that had each investor's name and the e-mail
2    addresses and all that information that they had
3    access to.
4  Q    Which funds were listed?
5  A    I want to say Alumni 1, 2, 3, AHCF 1 through 6 as
6    it kind of went through the history, maybe up
7    through 5.  I can't recall exactly.
8  Q    MHPI funds as well?
9  A    Uh-huh.
10          MR. STEWART:  Answer out loud, please,
11    Dave.
12  A    Yes.  I'm sorry.  Yes.
13  Q    And who owned -- were there multiple lists of
14    investors?
15  A    Were there multiple lists of investors?  I mean, I
16    think there was lots of investor list versions
17    created on -- you know, that we had on our side
18    over time.  I don't know exactly how many lists
19    that the Smiths had.
20  Q    Well, I'm just trying to get to the bottom of this
21    allegation.  Where were the lists stored?
22  A    At this point our list was stored on our Infusion
23    account and on our spreadsheet that had all of the
24    funds and the investors information.
25  Q    And the Smiths access to Infusionsoft was cut off,

1    correct?
2  A    It was cut off.  It was cut off much, much later.
3    We're not talking about MHC America Fund here, I
4    don't believe.
5  Q    Okay.  So all we're talking about is MHPI 1
6    through 4?
7  A    That's correct.
8  Q    Okay.  And Mr. and Mrs. Smith were in charge of
9    fundraising for MHPI 1 through 4, correct?
10  A    That's correct.
11  Q    In fact, do you recall once that Mr. Smith asked
12    you if you wanted him to reach out to potential
13    investors who had contacted them about investing
14    in a fund, but didn't invest, to keep the names
15    active?
16  A    That's a very unclear question, so do I remember
17    at a point in time where he asked me?
18  Q    Yeah, I agree with you.  It wasn't a great
19    question, and I've got the e-mail so I don't need
20    to go through it with you.
21  A    Okay.
22  Q    What do you mean by "prospective" in here?
23          Do the plaintiffs maintain a list of
24    prospective investors in addition to a list of
25    current investors?

1  A    Well, we certainly did maintain those lists.  We
2    had -- when it was all moved to Infusionsoft that
3    included all prospective investors as well so,
4    yes, we included -- you had a list of prospective
5    investors as well.
6  Q    Okay.  And this, again, related to MHPI 1 through
7    4.  These would have been prospects that the
8    Smiths had identified through their fundraising
9    efforts, correct?
10  A    Well, are we talking about our lists of investors
11    or their lists of investors?
12  Q    I'm trying to figure that out.  Let's go back to
13    the sentence.  "In this capacity, the Smiths had
14    access to plaintiffs' prospective and current
15    investor list."
16          Let's start with this.  Which plaintiffs
17    maintained prospective investor lists?
18  A    All of the funds, you know, which would include
19    Alumni 1 through 3 and AHCF 1 through 6 at this
20    point would have -- would basically be a
21    accumulation of all of the investors and investor
22    contacts that we have had at that point.  It
23    grows, every fund, every year, every day.
24  Q    Is there a prospective investor list owned by any
25    fund?

1  A    Well, I mean, I would say that there is.  Each
2    fund that you had its prospective investors that
3    were contacted or made contact with, you know,
4    whoever was raising money, you know, that would be
5    a prospective investor for that fund, so that list
6    should be basically, you know, whoever -- it
7    should be the list for the fund.
8  Q    Who owned or who owns Infusionsoft?
9  A    I guess the Infusionsoft Company does.
10  Q    And who has a license on your side for the
11    software?
12  A    We have, I think, two or three different licenses
13    and the Smiths have a couple as well to their own
14    Infusionsoft account.
15  Q    Do you recall that once there was a discussion
16    about merging the Smiths' investor list with I'll
17    say the plaintiffs' investor list?
18  A    There was a discussion of that, yes.
19  Q    And Mr. Smith said he didn't want to do that?
20  A    After he got access to our list, that's correct.
21  Q    Because their list was exclusively accredited
22    investors, correct?
23  A    I don't know why he did that.  I wasn't very happy
24    about it.
25  Q    You go on in this sentence to talk about marketing



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

62..65

Page 62

1   materials.  What marketing materials did the
2   Smiths have access to?
3   A    They had access to all of our prior marketing
4        materials for Alumni funds and the ACF funds.
5   Q    Describe the marketing materials, please.
6   A    So that would be our write-ups of why mobile home
7        parks are good investments, why to invest in
8        mobile home parks, what are the strategies that we
9        undertake in investing in mobile home parks.  It
10       would be our track record.
11            It would be a record of our prior
12       distributions for prior funds including the
13       experience of Frank Rolfe and myself, you know,
14       describe our management of properties for multiple
15       years, you know, 15 to 25 years being the time the
16       fund was being raised, so it would be basically
17       all of the information that we had put together,
18       you know, for the last probably 15 years before we
19       started doing a fund, plus then all of the funds
20       that, you know, we had done, you know, we had
21       created updated track records and marketing
22       materials and webinars and all that type of stuff.
23  Q    And everything you have described is publicly
24       available, correct?
25  A    Well, publicly available?  I would say it's not

Page 63

1        available to the general public, but I mean people
2        that have went through and been an investor or
3        potentially some prospective investors may have
4        seen some of that, yes.
5   Q    But I'm not saying whether a person has seen
6        everything.  Everything you described is
7        publicly available.
8            A person who is interested could lay their
9        hands on it immediately, correct?
10  A    No, not everything.
11  Q    What is not available to the public that you
12       described?
13  A    Well, if the public asked for a copy of our PPM
14       for AHCF 5, we're not going to give it to them
15       today.
16  Q    It's not materially different than the PPM for
17       AHCF 6, is it?
18  A    I'm sure there's differences, but I don't think
19       that was the question, are they different.  They
20       don't have access to all of our documents and
21       track records and all of that, no.
22  Q    Well --
23  A    I mean on a new fund if they meet the requirements
24       they could get a copy of the current PPM, the
25       current track record, the current marketing

Page 64

1        materials that we would provide with that PPM.
2   Q    And that would include all the past information,
3        all the past track record, all the Frank and Dave
4        information, correct?
5   A    You know, I think it would include -- it would
6        include at least a lot of that information.  I
7        don't know that it would include everything that
8        we had ever put into every other fund document.
9   Q    So all the materials you described, everything you
10       described was at one point publicly available,
11       correct?
12            MR. STEWART:  Objection to form,
13       foundation.
14  A    I would say this.  It was available to those who
15       inquired and had met certain criteria for us to
16       distribute it.
17  Q    Must an investor prove they're accredited before
18       they can see the PPM?
19  A    It depends on what fund you're talking about.
20  Q    Is there a fund where an investor must prove that
21       they're accredited before they can see the PPM?
22  A    They have to say that they're accredited, I
23       believe, in the MHC America Fund 2 before they get
24       the information.
25  Q    That's the only fund that had that requirement?

Page 65

1   A    Well, MHC America Fund 1, I believe, they had to
2        do that as well.
3   Q    And you're basing that on what?
4   A    What?
5   Q    What information are you basing that conclusion
6        on?
7   A    I was basing that on just basically what I
8        remember, the website stating that you had to
9        agree that you're accredited before you could go
10       to the download.  I don't recall -- I guess I
11       should say I don't recall.
12  Q    And then the information about you and Mr. Rolfe
13       and your history and how to invest in mobile home
14       parks, all of that has been or currently is
15       publicly available as well, correct?
16  A    You say publicly available.  I mean, it's not
17       available to the general public.  A lot of people
18       have copies of it, you know, depending on where
19       they got it.
20  Q    Anybody that wants it can get it?
21  A    They buy it.
22  Q    They can buy it or they can photocopy it from
23       somebody?
24  A    Yeah, they can plagiarize it, right.
25  Q    Yeah, they can plagiarize it.  They could go to



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

66..69

Page 66

1    multiple websites and download newsletters and
2    summaries and reports, correct?
3  A    I assume if they have a computer and internet,
4    they probably could.
5  Q    In that sentence it concludes with, "and other
6    proprietary information."
7        What proprietary information did the Smiths
8    have access to?
9  A    They have insight into our acquisition pipelines,
10    our prior deals that we sent to them in many cases
11    that may have not worked out or may have worked
12    out, you know, deals that were kind of in the
13    pipeline.  They would have all those pipeline
14    reports.
15        They would have all the information from
16    the discussions that we had with them on kind of
17    how the business works and all the education we
18    gave to them on how we turn-around properties and
19    make them more valuable and all that type of
20    information.
21  Q    Well, the turnaround information is available to
22    anybody that attends the appropriate bootcamp,
23    right?
24  A    Well, some of it is, yeah, some of the turnaround
25    information is.

Page 67

1  Q    What information about turnarounds do you not give
2    to your bootcamp attendees?
3  A    Well, you can't give them your experience.
4  Q    I'm talking about tangible.  I'm not talking about
5    intangible experience.  I'm talking about tangible
6    items.
7  A    Well, you know, it would take multiple, multiple
8    books to write every experience you've had on
9    every turnaround you've had.
10  Q    I'm sorry.  I didn't mean to interrupt you.  Go
11    ahead.
12  A    And so that bootcamp attendee is not going to get
13    all of that.  It would be a ridiculous amount of
14    time and effort.  They get the general overview of
15    the turnarounds.
16  Q    But somehow Jamie and Ryan had access to what you
17    said would be books and books of every turnaround
18    experience you had?
19  A    They didn't have books and books, but they had the
20    personal knowledge, the phone conversations and
21    internal spreadsheets and memos and that type of
22    stuff.  They saw what we were doing.
23  Q    What do you mean, internal memos?
24  A    Like the projections that we put into place and we
25    had kind of a spreadsheet that showed basically

Page 68

1    the plan on how to really push the value over a
2    certain timeframe and how to do that, and they had
3    that strategy.
4  Q    What spreadsheet are you referring to about how to
5    push the value?
6  A    It was a spreadsheet I shared with them, and I
7    want to say in 2017 sometime.  It basically listed
8    all the properties.
9  Q    And how did it show how to push the value?
10  A    Because it listed basically the business plan to
11    basically take the properties up another I think
12    it was $400 million in value.
13  Q    And that business plan was laid out in that
14    spreadsheet?
15  A    It certainly is, yes.
16  Q    And is there a narrative or is it just
17    projections?
18  A    It was a narrative and I walked through it with
19    them.
20  Q    Okay.  But the narrative is not in the
21    spreadsheet?
22  A    Well, I mean, if they understand the business,
23    then they could follow the spreadsheet and see the
24    narrative.  That spreadsheet is not available to
25    the general public.

Page 69

1  Q    Okay.  Is there any other proprietary information?
2  A    I think that would probably be the one that is the
3    most -- the biggest one.
4  Q    Did Mr. Siragusa have access to that?
5  A    Yes, he did.
6  Q    Mr. Rolfe had access to it?
7  A    I think he looked at it, yeah.  He has access
8    probably.
9  Q    Did Amy Burget have access to that spreadsheet?
10  A    Not unless she went on the computer and took it.
11  Q    And were there any legends or footnotes or footers
12    that said proprietary or confidential information
13    on that spreadsheet?
14  A    I don't know.  I'd have to look at the
15    spreadsheet, but I don't know.  I doubt that it
16    says "proprietary information" on it.
17  Q    Going to the last sentence in that paragraph, the
18    allegation is referring to the Smiths.  Their
19    roles in all of these respects always were limited
20    to obtaining investors for the funds, correct?
21  A    Yeah.  I mean, I think you probably should expand
22    it to say some communications, but mostly the only
23    reason that we had really even partnered with them
24    was for their ability to raise funds, not to
25    communicate with investors, so that was the



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS
70..73

Page 70

1    primary role was to raise money.

2  Q    Well, they also became the primary communicators

3      with investors, correct?

4  A   Well, in certain funds they did.

5  Q    The funds in which they --

6  A   After we wrote up all the communications, you

7     know, so they hit the button to send it out.

8  Q    You all wrote up --

9  A   Yeah, Frank, Dave and Eric.

10  Q    You wrote communications that went out?

11  A   Yes.

12  Q    And you all were the ones responsible for the

13      content of the communication?

14  A   Well, it depends.  You got to start going through

15     which funds you're talking about, because it's not

16     just the same for every fund.

17  Q    Well, I'm just using what you testified about.

18      You said we, Frank, Eric, you, wrote

19      communications, so I'm following up on

20      that question.

21  A   We drafted the communications, we put the reports

22     together that would go in the communications, and

23     if the Smiths were involved with a certain fund

24     that those communications were going to go to,

25     then in some cases they would have the ability to

Page 71

1    comment or such on those communications, you know,

2    depending on what timeframe we're in, but they

3    would have the ability to comment on it.

4      As far as the MHPI funds go, we basically

5    would send them that information and then

6    basically never see another -- again, you know,

7    pre about March 2018 they basically just sent out

8    whatever they felt like based on what we gave

9    them.

10      But on MHC America Fund, you know, there

11    was sometimes where they made comments and wanted

12    to change the communications which in some cases

13    we did, and then they sent it out that way, but

14    they never sent out communications with the other

15    funds.

16  Q    The Alumni or AWA?

17  A   That's correct.

18      MR. STEWART:  Just to be clear,

19     paragraph 52 regards MHPI 1 through 4.

20  A   Yeah.  Correct.  MHPI 1 through 4.  Sorry.

21  BY MR. CROSBIE:

22  Q    Well, if it relates to MHPI 1 through 4, the

23      proprietary information you were telling me about

24      and the marketing materials you were telling me

25      about relate to MHPI 1 through 4, correct?

Page 72

1  A   No.  I was telling you -- I was giving you related

2     to the whole vast experience and all of the funds,

3     not just MHPI 1 through 4 when I said that.

4  Q    Which law firm put together the organizational and

5      operating papers for MHC America Fund?

6  A   That would have been the Lowndes law firm,

7     L-O-W-N-D-E-S, and I know there's other names

8     after it.

9  Q    Under the direction of Peter Reinert?

10  A   Yes.

11  Q    And who among the individuals selected Lowndes and

12      Mr. Reinert to create MHC America Fund?

13      MR. STEWART:  I'm sorry.  Can you say

14     that again?  I apologize.

15  BY MR. CROSBIE:

16  Q    Yeah.  Who among the individuals was responsible

17      for selecting Lowndes and Mr. Reinert to organize

18      the MHC America Fund?

19  A   Well, I think all of the individuals that were

20     contemplating this agreed to select Lowndes.

21  Q    And Mr. Reinert was based in Orlando?

22  A   That's correct.

23  Q    And who was, if you can tell me, among the

24      individuals the primary contact between the fund

25      managers and Lowndes in the creation of the

Page 73

1    organizational documents and the PPM?

2  A   I would say that would have been -- I mean, I

3     would say probably Eric, the Smiths and myself.  I

4     don't think Frank was too involved with the

5     contact on that.

6  Q    Okay.  So by this point, by June 2016 the Smiths

7      were doing more than just fundraising, correct?

8  A   Well, I don't know exactly what they were all

9     doing in June 2016, but they weren't really doing

10     anything else besides fundraising and investor

11     communications with the MHPI funds.

12  Q    And helping organize and create the

13      MHC America Fund?

14  A   Well, that was a collaboration of creating a fund,

15     so we're all working together to collaborate and

16     discuss.

17      You know, there was documents that went

18     around, you know, basically with various,

19     you know, fund discussions or, you know, here is

20     the items we need to discuss or agree upon when we

21     put the fund together, so it was a collaboration.

22      They weren't -- they were not the attorneys

23     putting the fund documents together.  They gave

24     input which -- you know, a lot more input than I

25     knew about now that I've seen some of the



Page 74

1    discovery responses.
2 Q    In connection with the creation of the America
3     Fund the Smiths were not ultimately given as large
4     a percentage of the promote interest as had
5     initially been indicated to them, correct?
6 A    I don't believe that's correct, no.
7 Q    And to make up for it, the Smiths were paid fees
8     totaling approximately $445,000 in connection with
9     the AWA fund, right?
10       MR. STEWART:  Objection to foundation
11     based on the previous answer.
12 A    That's not why they were paid those funds, no.
13 Q    Okay.  Explain why they were paid $445,000.
14 A    Because in 2016, Frank, Eric, Ryan and Jamie and I
15     had a series of conversations, you know, probably
16     some e-mails and then several phone calls where we
17     discussed that, you know, did it really make a lot
18     of sense to have the Smiths out there raising
19     money on MHPI funds, us raising money on AHCF
20     funds, and then having investor confusion of like
21     what fund should I go into, for one thing.
22       And the thought process was, you know, they
23     had raised this MHPI 5 fund which was now
24     investing in an AHCF 6 fund which just completely
25     confused the investors.

Page 75

1    You know, we had all kinds of calls, you
2     know, like I don't understand this, what does this
3     mean.  And so we had a series of phone calls and
4     we discussed like we should all come together
5     under basically one fund, work together.
6       They and Eric who basically that was their
7     roles was to raise capital, they would work
8     together to raise the capital.  They would split
9     in that percent, and then Frank and I would
10     continue to do what we have done in the past and
11     basically operate everything else.
12       And that was the agreement.  We were going
13     to stop all other fundraising and we were going to
14     work together and have one fund with the investors
15     and with going forward to acquire properties.
16       And so that's -- you know, that was
17     basically the discussion.  And then in those
18     discussions, you know, AWA, we had ran a fund, AWA
19     1, which was through Argos, and then we had
20     discussion, well, you know, AWA 2, there is this
21     group of investors that want to up and put more
22     money in, and we said if they do that then what --
23     even though it doesn't take any of your time, you
24     have no involvement with it, we're just going to
25     give you a portion of that because we're basically

Page 76

1    saying that we're working together going forward
2     and in doing that if there is another source of
3     capital we are going to give them a piece of it,
4     and that's why they were given that money and
5     those agreements and the percentages.
6 Q    What agreements were Jamie and Ryan supposed to
7     sign in connection with getting that money?
8 A    They weren't supposed to sign any agreements.  We
9     were just taking them on their good faith and
10     word, which was a bad idea on our part.
11       But on the AWA agreements we sent them a
12     Class C agreement to sign giving them a membership
13     interest in it, which they never did sign.
14 Q    And have you produced a copy of that in this case?
15 A    Maybe Ryan and Jamie have it.  They then sent it
16     around to Peter and asked him questions.  I mean,
17     I don't know.  I assume it was.  It's still on our
18     e-mails.  I mean, I believe it was.  I mean, it's
19     in your documents here talking about it.
20 Q    Well, it's talking about relevant agreements and
21     it doesn't define in here what the agreements
22     were, and then you said there were no agreements.
23     You were taking them on their good faith.
24 A    That was to combine the funds, not the AWA
25     agreements.

Page 77

1 Q    Okay.  When did you become aware that the Smiths
2     were going to start or had started their Fund 7?
3 A    I would have to say that that -- I was initially
4     made aware of it, I want to say, somewhere in
5     mid-2016 or '17, and at that point it was they
6     were working with this guy named Brian Dahn and he
7     was in the self-storage business and that they
8     were going to start a self-storage fund, you know,
9     somewhere in that timeframe, and it may have been
10     a little bit earlier in 2017, but it was just
11     mostly like a concept of they're going to start
12     raising money to acquire storage facilities.
13 Q    I know you have seen the private placement
14     memorandum for Fund 7?
15 A    I have, yes.
16 Q    And you know it describes a fund for investing in
17     self-storage and mobile home communities?
18 A    That's correct, yes.  I saw that in March of 2018.
19 Q    So you hadn't downloaded the PPM prior to that?
20 A    No.  The first time I knew about it was when I got
21     a letter from the Smiths, you know, with my
22     investment in MHPI 4 and trying to get me to
23     invest in Fund 7.
24 Q    That's the first time you knew about Fund 7?
25 A    The first time I saw the PPM.  Before that I just



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                    78..81

Page 78

1   assumed it was a self-storage fund.  I never
2   looked at the PPM or saw it beforehand.
3 Q   What proprietary or confidential information of
4   the plaintiffs did the Smiths use to start Fund 7?
5        MR. STEWART:  Objection to form,
6   overbroad.  You can answer.
7 A   I mean, I would certainly be happy to go through
8   the documentation, the investment summary, the
9   track record, you know, their original versions of
10   the PPM and their original websites and all of
11   that where they listed all of our prior funds
12   which would include the Alumni funds, the AHCF
13   funds.  It would show all of the distribution
14   history.  They have no involvement with those and
15   they're not a manager.
16        They would list that as if, you know,
17   basically saying, well, here's what we've done,
18   look at all this great stuff we have done, and
19   they have no involvement in it.
20        They are touting RV Horizons and that
21   RV Horizons, you know, helped them find them properties
22   and kind of making the assumption that RV Horizons
23   will be there to manage their properties, saying
24   that they have actually acquired and done the
25   diligence on and managed, you know, whatever,

Page 79

1   $350 million worth of mobile home parks, which
2   they have not.
3        (Discussion off the record.)
4        THE VIDEOGRAPHER:  The time is 11:10.
5   We are off the record.
6        (Break taken.)
7        THE VIDEOGRAPHER:  This is the beginning
8   of media unit number two.  The time is 11:11 and
9   we are back on the record.
10 BY MR. CROSBIE:
11 Q   Before we took our break you said that the Smiths
12   touted RV Horizons in their offering papers, is
13   that correct?
14 A   In their offering paper or -- whether it was in
15   the offering papers or their website they touted
16   it in, I think, multiple forms.
17 Q   Well, RV Horizons is not mentioned in the PPM
18   until 200 pages in.  Does that sound right?
19 A   Yeah, I'd have to look at it again.
20 Q   And back to what my question was, my question was
21   what confidential or proprietary information did
22   the Smiths use to start Fund 7?
23 A   Well, proprietary information would be track
24   records on funds that they have no involvement
25   with that we have involvement with.  You know, I

Page 80

1   would say proprietary.
2        It's enticing investors to invest in a fund
3   that we have no involvement with, but they are
4   using our track record, our history, and that's
5   what I would say is proprietary about it.  They
6   are fraudulently inducing the investors to invest
7   in a fund.
8 Q   And what confidential information did they use to
9   start Fund 7?
10 A   Well, I would say the fund track records or the
11   fund distribution histories on funds they have no
12   involvement with would be confidential.  It's not
13   their information.
14        I would say that -- you know, I'd really
15   have to go through like the track record and stuff
16   to actually point out all these items.  I can't do
17   it all from memory.  I'm happy to do that.
18 Q   And we can look at the track record in a bit.  Any
19   other confidential information that they used to
20   start Fund 7?
21 A   I would have to go through the track record.
22 Q   It would be in the track record?
23 A   Well, and the investment summary and the fund
24   documents as well and their websites and their
25   website sourcecode.

Page 81

1 Q   Which investors did the Smiths divert from
2   America Fund 2 to their Fund 7?
3        MR. STEWART:  Objection to form.  You
4   can answer.
5 A   I mean, I think in a lot of cases that would be a
6   great question for them and for them to provide
7   the discovery that we need to see to see whether
8   it's the 15 that we know about or is it like 500.
9        We don't know where it is, because we
10   haven't contacted all the investors yet to see,
11   you know, who all thinks we're part of something
12   that we're not.
13 Q   Who are the 15?
14 A   I can't name them off the top of my head.
15 Q   Can you name any of them?
16 A   What's that?
17 Q   Can you name any?
18 A   So what was the question again?  Which investors
19   did they divert or did they try to divert?
20 Q   It was divert.  And you said is it the 15 we know
21   about or is it 500.
22 A   So first of all, we don't know who all is invested
23   in Fund 7, so I can't tell you the answer to that.
24 Q   But you said there were 15 you knew about?
25 A   I knew of like 15 or so that were trying to be



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS
82..85

Page 82

1    diverted there, yes.
2  Q    Tried to be diverted?
3  A    Like were reaching out about a -- you know,
4    reaching out about MHC America Fund and then were
5    sent back an e-mail saying, well, you could invest
6    in MHC America fund or you can invest in our other
7    Fund 7, you know, that type of e-mail or response.
8  Q    And you understand that if there were two open
9    funds in which the Smiths are involved that they
10    can't favor one or the other.  They have to
11    mention both, right?
12  A    Well, I don't know what -- you know, one is
13    supposed to be a self-storage fund and one is
14    supposed to be a mobile home park fund.
15         I think that's the difference, and if
16    they're coming in through an MHC America Fund
17    e-mail address or from our advertising, then
18    they're sending out e-mails regarding Fund 7, I
19    don't think that's proper.
20  Q    Okay.  But the fact is that there is a requirement
21    that they have to identify the existence of more
22    than one fund that's open for investment?
23         MR. STEWART:  Objection, foundation.
24  A    You'd have to show me the requirement.  I don't
25    know.  I mean, I think it should be a requirement

Page 83

1    that they tell us what they're doing.
2  Q    And then you mentioned that people were reaching
3    out through the advertising.  What advertising did
4    you mean when you referenced it a few seconds ago?
5  A    Well, there were advertising on, you know, my
6    website for one, you know, paying whatever it was,
7    you know, the advertising cost for that, for the
8    banner clicks.
9  Q    For what?
10  A    To attract investors.
11  Q    To what?
12  A    MHC America Fund.
13  Q    Okay.  And I'm sorry.  How did that end up
14    diverting investors to Fund 7?
15  A    Because then people would click on the advertising
16    and get into their pipeline and then they would
17    pitch them on Fund 7.
18  Q    How do you know that?
19  A    Because I have seen a lot of e-mails regarding
20    that.
21  Q    You have seen e-mails about people clicking on a
22    banner ad on your website for MHC America Fund and
23    Jamie and Ryan trying to divert them into Fund 7?
24  A    No, I saw a lot of e-mails with diversions and we
25    had a lot of discussions with various investors

Page 84

1    that were told, you know, that that's what they
2    were doing.
3  Q    Can you name any of those investors?
4  A    I think all of our -- all those were in the
5    discovery requests that we gave.  You know, I
6    think -- I'm not going to name them.  I don't know
7    the names of every one of those exactly what
8    e-mail or the circumstances were around each one
9    of those investors, but it was multiple investors
10    that that happened to.
11  Q    And the e-mails will say that Jamie and Ryan tried
12    to divert them into Fund 7?
13  A    No.  They were basically e-mails diverting them
14    and confusing them into Fund 7.  You know,
15    basically when you have two funds that they're
16    raising funds for that they are calling Fund 7,
17    then that's very misconceiving to investors who
18    are like, well, I'm in Fund 7.
19         They call up and say, hey, Frank, you know,
20    I'm investing in Fund 7, and Frank is like, well,
21    we're not involved in Fund 7.  Well, Jamie and
22    Ryan told me they were, or they would call Eric
23    and do the same thing.  It was multiple, multiple
24    occasions of that.
25  Q    You think that Jamie and Ryan told investors that

Page 85

1    you or Frank was involved in Fund 7?
2  A    Absolutely I do.
3  Q    And you've got e-mails to back that up?
4  A    No.  I have people that have -- I think there are
5    a couple e-mails regarding that, yes.  But we have
6    many conversations, and I would be happy to ask
7    any one of the Fund 7 investors what they were
8    told.
9  Q    MHC America Fund closed to investors in
10    February 2018, although I think you said there
11    were some subscriptions still coming in after
12    that?
13  A    We had a few, yeah, subscriptions and a few people
14    asked about investing in it still, yes, and we
15    allowed them in.
16  Q    You allowed them in, new investors after
17    February 2018?
18  A    I think there was a few that were allowed in, yes,
19    that hadn't fully subscribed yet, you know, one or
20    two.
21  Q    May I see what we marked as Exhibit 2?  I want to
22    make sure you've got all the documents there
23    before I start asking questions.  Okay.  Look at
24    what's been marked as Exhibit 3, and that starts
25    out with supplement -- I'm sorry.



Page 86

1      Exhibit Number 2. Exhibit Number 2 starts out
2      with a supplement to the MHPI 7 PPM.
3  A    Okay.
4  Q    Is that correct?
5  A    That's what it says, yes.
6  Q    Okay. And then if you flip a few pages in is
7      there another supplement to the PPM?
8  A    Yes.
9  Q    Okay. So these are attached as part of the
10      exhibits to your complaint.
11          Do either of these supplements mention
12      any of the plaintiffs to your knowledge?
13  A    Well, not to my knowledge. I'd have to read them
14      to give you the exact answer though.
15  Q    Have you read them before?
16  A    Yes.
17  Q    Okay. And then if you look -- and they're
18      numbered. Thank you, by the way, for doing that.
19      Page 7 on the bottom is numbered by your law firm.
20  A    By who?
21  Q    Your law firm put these numbers in so it would be
22      easier for us and for the court, and this is the
23      PPM prepared, as we discussed earlier, by Lowndes
24      under the supervision of Mr. Reinert?
25  A    Okay.

Page 87

1  Q    And you said you didn't review this until
2      March 2018?
3  A    That's correct.
4  Q    And is RV Horizons or any of the plaintiffs
5      mentioned to your knowledge anywhere in the PPM?
6          MR. STEWART: I'll object to foundation.
7  Q    Are you aware of any mention? And I'm just
8      talking about before we get to the exhibits to the
9      PPM are you aware of any mention of any of the
10      plaintiffs in the private placement memo?
11  A    And when is this? Is this the original one?
12  Q    That's the original, April 1, 2017.
13  A    Yeah. I mean, I would have to say I am not aware
14      that it specifically lists out RV Horizons in the
15      PPM.
16  Q    Or any of the plaintiffs.
17          MR. STEWART: I think he expanded it to
18      all plaintiffs.
19  A    That's correct.
20  Q    So that goes to page 88, and then beginning on
21      page 89 is the limited liability company agreement
22      for MHPI 7.
23          Are you aware or do you know whether there
24      are any references to any of the plaintiffs in
25      this operating agreement?

Page 88

1  A    I am not aware that it actually says RV Horizons
2      or any of the plaintiffs' names in the operating
3      agreement. I'd have to -- I'm going through here
4      though.
5  Q    Okay. And then if you go to page 132 that begins
6      the subscription booklet.
7  A    132?
8  Q    132. And are you aware of any reference to any of
9      the plaintiffs in the subscription booklet?
10  A    I'm not aware of any of the plaintiffs in the
11      subscription booklet that I'm aware of here.
12  Q    Okay. You mentioned investment summary earlier
13      which would begin on page 199 of this exhibit. Is
14      this one of the documents that you found
15      objectionable?
16  A    Is this the original investment summary or one of
17      the newer ones?
18  Q    It's the one that was attached to your complaint
19      or the plaintiffs' complaint.
20  A    Okay. All right. Yes, this is something I did
21      have an issue with, yes.
22  Q    Okay. And the date of this is also -- it
23      would have been the same April 1st date as the
24      PPM?
25          MR. STEWART: Objection, foundation.

Page 89

1  A    Well, I don't know. I don't know what date it was
2      filed or formed. It seems like after reading
3      through some of the e-mails that this wasn't
4      created until after the other agreements.
5  Q    Okay. And so you talk about members of the
6      manager -- or you don't talk about it. Under the
7      introduction section on page 201 --
8  A    Yes.
9  Q    It talks about the members of the manager and
10      their affiliates. Do you see that?
11  A    Page 201?
12  Q    Yeah. Members of the manager.
13  A    Okay.
14  Q    Members of the manager and their affiliates have
15      significant prior experience in acquiring and
16      managing both self-storage facilities and
17      manufactured housing communities, correct?
18  A    That's what it says, yes.
19  Q    All right. And so if you go on back to page 217
20      of the exhibit --
21  A    Yep.
22  Q    You see where there's a section entitled
23      "affiliates." Right?
24  A    Yes.
25  Q    And at this time, you, Mr. Rolfe and Mr. Siragusa



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                                    90..93

Page 90

1    were affiliated through your relationship in the
2    MHPI funds and MHC America Fund, correct?
3            MR. STEWART:  Object to foundation.
4  A    That's not correct.
5  Q    Well, you were not affiliated with the Smiths in
6    August 2017?
7  A    That wasn't your question.  That wasn't your
8    question.  You said me, Frank and Eric were
9    affiliated with them through the MHPI funds and
10    MHC America Fund.
11  Q    Okay.
12  A    That is not correct.
13  Q    How is that not correct?
14  A    Eric Siragusa was never affiliated with them and
15    the MHPI funds.
16  Q    Okay.  So he was just in the MHC America Fund
17    then, right?
18  A    That's correct.
19  Q    So otherwise my statement was correct?
20            MR. STEWART:  I'll still object on
21    foundation.
22  Q    And this is 217 pages into this exhibit.  This is
23    the first mention that we have seen of
24    RV Horizons, is that correct?
25  A    It's the first mention that we see without me

Page 91

1    reading the documents again, yes.
2  Q    Okay.  And so far we haven't seen mention of any
3    of the other plaintiffs, but understanding you
4    have not read every page of this, right?
5  A    Correct.
6  Q    And then we've got the manager's track record?
7            MR. STEWART:  Page please?
8  Q    I'm sorry.  Page 223.  It would be prior similar
9    funds.
10  A    It's page what?
11  Q    223.  And this lists the various funds in which --
12    which actually plaintiffs or many of which are
13    plaintiffs in this case, correct?
14  A    Yes, this lists many of the plaintiffs, correct.
15  Q    And it does it -- the row at the top does it by
16    date of the creation of the fund?
17  A    Yes, that shows the date of the fund creation,
18    yes.
19  Q    The first fund is MHPI 1 dated February 2010?
20  A    Okay.
21  Q    That's correct?
22  A    I mean, that's what's on the document.
23  Q    And on page 223 we see these names, MHPI, MHPS
24    Alumni, AHCF, MHCA.
25            Is it your contention that the defendants

Page 92

1    are using those names as trademarks on this page?
2            MR. STEWART:  Objection to foundation.
3  A    Well, I would say that they're using them as they
4    are commonly referred to for people that are
5    investors or prospective investors or bankers or
6    lenders would see them.
7  Q    And so you object to the identification of the
8    funds of affiliates of the members being
9    identified on this table 1 on page 223?
10            MR. STEWART:  The same objection.
11  A    Can you repeat the question, please?
12  Q    You object to the identification of these funds in
13    which affiliates of the members participated on
14    this page?
15            MR. STEWART:  Objection to foundation.
16  A    Affiliates of the members -- affiliates of the
17    members of who?  What members are you talking
18    about?
19  Q    Affiliates of the members of the manager of MHPI
20    7.
21  A    So who are the members of the manager of MHPI 7?
22  Q    Well, you can look back, but I'm not going to
23    indulge many more questions.  I'm the one who asks
24    the questions.
25            MR. STEWART:  It's a foundational

Page 93

1    question.
2  A    Let me look back and figure it out.
3  Q    Okay.
4  A    Well, actually, I don't think I have the
5    management agreement here.
6  Q    It would be the investment summary beginning on
7    page 213.
8  A    So you're talking about the members of the manager
9    of MHPI 7, Fund 7?
10  Q    Correct.
11  A    So I don't believe that this shows that.
12  Q    That's probably fair.  So let's just go on then.
13    We'll go back to 223 where we have the first
14    mention of the plaintiff that we've seen, and if
15    you go on to page 227 there begins a distribution
16    history.
17  A    That's correct.
18  Q    And who provided this distribution history that's
19    displayed in here for these funds, do you know?
20  A    Well, we certainly didn't -- nobody provided it to
21    them for the formation of Fund 7.  They took it
22    out of the MHC America Fund information or they
23    got it in some other means.  It was not provided
24    for the purpose of this.
25  Q    This information was available though in the MHC



Page 94

1    **America Fund PPM or offering?**
2  A    It was, yes, it was available for that because we
3    were involved with that fund.  You know, Frank,
4    Dave and Eric were involved in that fund.
5         I don't see any distribution history for
6    any funds that Ryan and Jamie or any parks or
7    track record of any parks that they owned that
8    were not owned with Frank, Dave and Eric.
9  Q    **Well, this is just for MHC funds, correct, the**
10       **distribution history?  That's what it says, right?**
11  A    No, this says MHC funds.  I guess they could have
12    thrown in sons and everybody else if they wanted
13    to if they own a share of them or something.
14  Q    **But this is just for funds.  You talked about**
15       **Jamie and Ryan's parks.  This is a distribution**
16       **history for prior MHC parks, right?**
17  A    This is MHC funds.  I don't know.  Who is MHC
18    funds?  We're MHP funds.
19  Q    **Okay.  So they're not talking about MHP funds**
20       **here, are they?**
21  A    Well, they are, but they're mislabeling it and
22    they're using MHP funds and the distribution
23    history for promoting investors to a fund we're
24    not involved with.
25  Q    **And I believe that concludes -- if you go to**

Page 95

1    **page 242, that should be the last page of**
2    **Exhibit 2.**
3  A    Okay.
4  Q    **Is that correct?**
5  A    Yes, 242.
6  Q    **Okay.  If you'd clip that back together so she**
7    **doesn't yell at you.**
8  A    Yep, I will.
9  Q    **I'd asked you earlier in the deposition if any**
10   **plaintiff was mentioned in the PPM prior to the**
11   **first 200 pages, and with the caveat that we**
12   **didn't look at every single word, but it's**
13   **fair to say that based on that summary review no**
14   **plaintiff is mentioned prior to the 200th page of**
15   **the PPM, correct?**
16       MR. STEWART:  Objection, foundation.
17  A    I don't believe any of the plaintiffs are
18    mentioned in those first 200 pages by name, but
19    what I do believe is that -- is that things the
20    plaintiffs have accomplished and done are
21    mentioned in there as being, you know, something
22    that they are saying that they now have done or
23    have completed or been able to accomplish, so not
24    using the names, but using the general idea of
25    what we have accomplished without using our names.

Page 96

1  Q    **You're aware that Ms. Smith wrote a book called**
2    **Trailer Cash?**
3  A    I am, yes.
4  Q    **And you were aware as of 2011 that she had**
5    **published that book, correct?**
6  A    Boy, I don't remember the year for sure when she
7    published it, but I mean it was back in that
8    timeframe.
9  Q    **Did you provide her any comments on the book prior**
10       **to publication?**
11  A    I did not.  I didn't actually read the book or
12    even really look at it until all these -- until
13    late last year 2018.
14  Q    **After this case was filed?**
15  A    Before the case was filed.
16  Q    **What proprietary or copyrighted materials**
17       **belonging to the plaintiffs did Ms. Smith use in**
18       **that book?**
19  A    Well, she used -- you know, one was basically a
20    quick valuation formula that I had created and
21    basically used that in there as a 60/70 rule that
22    she had basically put in there.
23         She used basically -- a lot of times just
24    summarized documents that we had put together or
25    given her from bootcamps or from some of the stuff

Page 97

1    we had.  You know, the prior investment summaries
2    and things that we had put together in our prior
3    funds, so she had taken that stuff.
4  Q    **Well, you said "we" and "our."  Who are you**
5    **referring to?**
6  A    Well, Frank and I.  I should say Frank and I, not
7    necessarily Eric, but Frank and I had put together
8    books that we wrote, articles we wrote.  She in
9    many cases used, you know, not always
10    word-for-word, but a very close summary or many
11    word-for-word things with some other comments at
12    the end or before or in between.  I'd have to get
13    the book open and go through it and start pointing
14    them out.
15  Q    **Okay.  So what the material that you claim that**
16    **she used belongs to any plaintiff in this case?**
17  A    I would say that it belongs to the -- I don't know
18    that I would say that it belongs to any of the
19    fund plaintiffs.  I would say RV Horizons and
20    really through the -- really RV Horizons, I think,
21    for the most part on that.  You know, I'd have to
22    look at the plaintiffs again.  Yeah, so I would
23    say RV Horizons.
24  Q    **And RV Horizons has copyrighted material that it**
25    **owns?**



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

98..101

Page 98

1  A    It has proprietary information. I wouldn't say it
2       has anything that's actually been copyrighted, you
3       know, with a copyright on it, but it's proprietary
4       information, and myself as the president and sole
5       shareholder of RV Horizons. You know, other
6       businesses I'm involved with do have copyrighted
7       materials.
8  Q    Would that be Niche Investments or Niche
9       Investments?
10 A    It would be Niche Investment Network, LLC.
11 Q    But none of the plaintiffs have asserted a claim
12      for copyright infringement in this case, have
13      they?
14 A    I'd have to go through. I don't believe that
15      there is a copyright infringement, but I'd have to
16      review it again. I know we discussed that and
17      then we amended the complaint.
18 Q    Well, I don't want to know what you all talked
19      about.
20          MR. STEWART: Thank you.
21 BY MR. CROSBIE:
22 Q    You've mentioned the -- and we really haven't
23      talked about Dahn, Brian Dahn or Dahn Corporation
24      much so far, have we?
25 A    No.

Page 99

1  Q    We talked about Elevations website and there are
2       allegations that the Elevation website included
3       RV Horizons' business history and misrepresented
4       to visitors that Elevation shared that history.
5           Is that currently on their website?
6  A    I haven't been to their website recently, but it
7       was for a very, very long time.
8  Q    And Elevation Capital was a sub-sponsor of the
9       MHC America Fund, correct?
10 A    A sub-sponsor? I don't think Elevation Capital
11      was on any of the agreements we have with the
12      Smiths on MHC America Fund.
13 Q    And you've been aware for years that Elevation
14      Capital's website has promoted MHC America Fund,
15      correct?
16 A    No, I don't know that. We had our own website for
17      MHC America Fund.
18 Q    So you're not aware that the Elevation Capital
19      website promoted the America fund?
20 A    You know, I couldn't say one way or the other. I
21      just don't know for sure. It promoted investing
22      in funds, but I don't remember which funds before
23      the America fund.
24 Q    Yeah. You knew that they were posting the
25      newsletters that Mr. Rolfe drafted on that

Page 100

1       website, correct?
2  A    I found that out when we were putting this case
3       together when I started searching historical
4       things and back links and all that.
5  Q    Yeah, because y'all changed your allegation. The
6       first complaint said that they were using
7       information written by posting newsletters written
8       by Frank Rolfe, and that was true, right?
9          MR. STEWART: Form.
10 A    Direct me to the document, I guess, or page.
11 BY MR. CROSBIE:
12 Q    I don't have the original complaint there, but
13      there was a further edit to the complaint, and if
14      you look at page --
15          MR. STEWART: What exhibit are you on?
16          MR. CROSBIE: I'm on Exhibit 3.
17          MR. STEWART: Thanks.
18 Q    At the top it's going to say page 15 of 52.
19      Do you see that, the redline paragraph 68?
20 A    Where it's redlined?
21 Q    Yeah.
22 A    I do see that, yes.
23 Q    Because that statement that's redlined out was
24      true. These newsletters were written primarily by
25      Mr. Rolfe, right?

Page 101

1  A    There were -- yeah, most of the newsletters were
2       at least contributed in a major part by Mr. Rolfe,
3       yes.
4  Q    But for the second amended complaint that part of
5       the paragraph has been edited out, right? That
6       would be looking at Exhibit Number 1 on page 68.
7       I'm sorry. I think it's going to be paragraph
8       number 68. You can compare that to paragraph 68
9       in Exhibit 3.
10 A    Okay.
11 Q    So that was information that -- and it's no secret
12      and Mr. Rolfe has testified about writing
13      newsletters and reports frequently, correct?
14 A    Correct. Yes.
15 Q    And then if you look back at again page 63 -- I'm
16      sorry -- paragraph 63.
17          MR. STEWART: Are we back on Exhibit 1?
18 Q    Back on Exhibit 1, yes. Thank you. 63, 64, 65,
19      66, you're talking about newsletters from 2016,
20      right?
21 A    That appears -- I'd have to look and see what the
22      attachment was, but, yeah.
23 Q    I'm just looking at your complaint.
24 A    Right.
25 Q    And Fund 7 didn't exist in 2016, did it?



Page 102

1  A    Yeah, I don't believe it existed in 2016.  That
2       would be Fund 5.
3  Q    And Fund 5 was a fund of funds, right?
4  A    Well, I don't exactly know what Fund 5 was now at
5       this point.
6  Q    Fund 5 has never owned a property interest?
7  A    I have no idea.
8  Q    Was Fund 5 raising money at this point?
9  A    I believe so, yes.
10 Q    But the big venture in 2016 was the newly-launched
11      MHC America Fund?
12 A    That's correct, yes.
13 Q    And all of these newsletters were related to
14      MHC America Fund, correct?
15 A    I mean, I think they probably were most likely
16      related to MHC America Fund.
17 Q    Right.
18 A    But the problem is it doesn't list
19      MHC America Fund or it lists that they're written
20      by Elevation Events or Elevation Capital and
21      doesn't lay claim to who actually wrote them, and
22      where is the information about Frank and Dave and
23      Eric who actually wrote the newsletter.
24          It's now basically being taken and with
25      either a name of Ryan or I think there was

Page 103

1       somebody else at one point that was putting his
2       name on them as, you know, they wrote them.
3           At least that's the way I would interpret
4       it when I go read an article and it says
5       "Ryan Smith."  I assume Ryan Smith is saying that
6       he wrote the article and not giving credit for who
7       wrote the article.
8  Q    Well, did anybody complain in October 2016 or
9       November 2016 about the way these newsletters were
10      written by Mr. Rolfe were published?
11 A    These newsletters we actually found prior to
12      filing the case.  We had never seen the stuff
13      before or I had never seen the stuff before.
14 Q    Had you visited Elevation's website in 2016?
15 A    I really hadn't really visited Elevation's website
16      that often other than -- not deep into it, not
17      like trying to back-link into stuff they removed
18      and have hidden and that type of stuff.
19 Q    But to your knowledge no one complained about the
20      way these newsletters were published prior to
21      2018?
22 A    Well, the newsletters were sent out to our
23      investors, and then I don't know what they did
24      with the newsletters after that other than publish
25      them on their website with their names as -- you

Page 104

1       know, touting them as the author.
2  Q    Touting who as the author?
3  A    Whoever put their name at the bottom, many of
4       these, you know, Ryan or I forget the other guy's
5       name, but it's an exhibit, I believe.  I don't
6       have a problem with the newsletters being on a
7       website as long as it gives credit to who wrote
8       it.
9  Q    In paragraph 68 there is an allegation in these
10      monthly newsletters, and that's where it used to
11      say written primarily by Rolfe.  Elevation also
12      solicits inquiries about Fund 7 using
13      RV Horizons's history, positive press and
14      management experience, none of which it was
15      authorized to use to promote investment in Fund 7.
16          Which specific newsletters promote or used
17      RV Horizons to promote Fund 7?
18 A    I would have to go back and look through the
19      newsletters.  I think they were attached to some
20      agreement of some sort somewhere.
21 Q    What do you mean, some agreement of some sort?
22 A    Like in one of our filings, I guess, I should say.
23 Q    Okay.  Well, clearly it wouldn't be any of the
24      2016 newsletters, would it?
25 A    I would not say "clearly." I don't know.  I would

Page 105

1       have to look at the newsletters.
2  Q    And then we've got a new -- you can look back at
3       Exhibit 3 looking at the paragraph 69 that's
4       redlined in.
5  A    Yep.
6  Q    Did you provide this information to be included in
7       the complaint?
8  A    I reviewed this and had discussions with our
9       attorneys about it.
10 Q    Okay.  So the redline shows the changes from the
11      first amended complaint to the second amended
12      complaint?
13 A    Okay.
14 Q    So the first amended complaint said these monthly
15      newsletters were written primarily by Rolfe.
16 A    What number are you on?
17 Q    68 and the redline.
18 A    Okay.
19 Q    And in these newsletters, monthly newsletters
20      written primarily by Rolfe, that's edited out and
21      then there is this new paragraph added in alleging
22      that Elevation reappropriated some content that
23      had previously been written by Rolfe.
24          What proof do you have for that?
25 A    I believe it was in the newsletters where it was



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                      106..109

Page 106

1   actually encouraging people to invest in Fund 7.
2   It was basically Frank's or our newsletters that
3   had been written.
4        You know, people would click here and it
5   would link to that newsletter and talk about how
6   great the business is, and then it would say
7   invest in Fund 7 type thing.  And that was
8   provided in our -- I believe it was in one of the
9   attachments in our complaint.
10  Q    That doesn't sound like reappropriated some
11       content.  That sounds like it provided a link to
12       content written by Mr. Rolfe.
13  A    Yeah.  I mean, it's wordsmithing, I guess.  I
14       don't know.  They were using content that
15       Mr. Rolfe had provided to them for use in
16       distribution to our other funds that they would
17       have the right to use it for, and then they were
18       passing it off as basically content that they
19       wrote to garner investors in funds that are not
20       including us.
21  Q    What plaintiffs' names appear in the Elevation
22       website sourcecode?
23  A    Well, I know my name is in there multiple times
24       and I know RV Horizons was in there multiple
25       times?

Page 107

1   Q    In the sourcecode?
2   A    In the sourcecode.  And I believe Frank's name was
3        in there multiple times and Eric's name was in
4        there multiple times, and I think, you know, over
5        time they -- after a couple letters or threatening
6        phone calls they removed some stuff, but then they
7        left stuff in there, and some of it was buried in
8        sourcecode so basically the search engines would
9        see it even though it doesn't show up as text
10       because basically if you have a white page and
11       white text it doesn't show up, but it still
12       diverts people there when you do a search.
13            So all our names were in there multiple
14       times at some point, and then over time, you know,
15       some of that was removed and then some of the kind
16       of hidden sourcecode was put in there to keep
17       those names in there.
18  Q    When did that happen?
19  A    I don't know.  You would have to ask Ryan and
20       Jamie because that's who ran the website.
21  Q    I asked for which plaintiffs' names are in the
22       sourcecode.
23  A    Today?
24  Q    I'm just looking at your complaint.  What
25       plaintiffs' names are in the sourcecode, and the

Page 108

1   only plaintiff you told me was RV Horizons.
2        Any other plaintiff name in the sourcecode?
3   A    Yeah, I would say that there were no other named
4        plaintiffs in the sourcecode that I can recall.
5   Q    Well, that's strange because the allegations --
6        I'm asking a question now.  You can follow up
7        later.
8        Paragraph 71 says this is a coding tactic
9        to attract investors to the Smiths' website when
10       investors type in the plaintiffs' names in a
11       search engine, the "plaintiffs" being plural.
12       The only plaintiff name would be
13       RV Horizons, correct?
14  A    I would have to say that I would have to look at
15       that sourcecode information that I reviewed and to
16       give you the exact answer who was all named in
17       there.
18            I do recall, you know, personal names and
19       I do recall RV Horizons at one point, and if they
20       had this track record and all that in the website
21       at one point then those names would be in there as
22       well, but the website changed after each time we
23       basically demanded them to remove this, remove
24       that type stuff, you know, throughout 2017 and
25       2018.

Page 109

1   Q    You asked them to remove stuff from the website in
2        2017?
3   A    We did, yes.
4   Q    What did you ask them to remove in 2017?
5   A    I asked them to remove -- boy, I would have to
6        really think through that.  So I asked them to
7        remove our photos for one thing, asked them to
8        remove our track record.  I think I asked them to
9        remove our investment, you know, any of the stuff
10       on the investment summary.
11  Q    In 2017 you did all this?
12  A    In late 2017, yes.
13  Q    Was it by e-mail?
14  A    I think the initial one was via phone call and
15       then I think, you know, we had followed up with --
16       I think it was an e-mail that Eric sent me or
17       something.
18            You know, he was pretty upset about
19       something and so I called them and said you guys
20       got to get this stuff off here, because we're not
21       involved, off this Fund 7 website, and then we
22       followed up again in like February of 2018 and
23       then again in like May 2018 or June 2018.
24  Q    Well, the February 2018 follow-up was because of
25       your obligations to TPG, correct?



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

110..113

Page 110

1  A    Well, that was how I prefaced it.  I just wanted
2       my name off their website, but, yeah, I was
3       prefaced because we had to get it off.
4              We cannot be raising funds for any new
5       funds and, you know, you need to remove our names
6       and our pictures and all of that, because Frank
7       and I are restricted from having this type of
8       stuff out there and doing fundraising.
9  Q    All right.  Time for a break.
10             THE VIDEOGRAPHER:  One moment.  The time
11      is 11:59 and we are off the record.
12             (Break taken.)
13             THE VIDEOGRAPHER:  The time is 1:02 and
14      we are back on the record.
15 BY MR. CROSBIE:
16 Q    Okay.  Mr. Reynolds, look at Exhibit 1, page 17.
17 A    Okay.
18 Q    It talks about bootcamp.  Paragraph 73 says,
19      "Jamie Smith attended a bootcamp session and
20      obtained copies of RV Horizons proprietary and
21      copyrighted material in 2008 or thereabouts."
22             Is that RV Horizons' materials or is it
23      Niche's material?
24 A    At that point I don't -- I believe RV Horizons was
25      the manager of Niche Investments, and so that's

Page 111

1       why I think we have RV Horizons on here, but it
2       would have been Niche Investment Networks.
3  Q    What proprietary information did Jamie Smith
4       obtain copies of at the bootcamp?
5  A    Well, she received a copy of our bootcamp manual,
6       sample forms and things like that, you know,
7       several forms that we used or had used
8       at that time in operating properties, a bootcamp
9       manual which was, I don't remember, 300 pages
10      long, 200 or 300 pages long.
11 Q    Yeah, but she paid and that was part of the
12      benefit of going to the camp was she got to keep
13      those materials, right?
14 A    Yeah, she got to keep them, yes.
15 Q    What parts were proprietary then?
16 A    They're proprietary.  They're written by us.  Like
17      if you go to Barnes & Noble and buy a book, you
18      get to keep it, but you can't just go and
19      plagiarize it and say it's yours.
20 Q    Okay.  That's because it's proprietary to
21      Barnes & Noble?
22 A    It's proprietary to the author or authors,
23      whatever it is.
24 Q    But there's no limitation on how those materials
25      are used, are there?

Page 112

1              MR. STEWART:  Objection, foundation,
2       legal conclusion.  You can answer.
3  A    There is no limitation on how the materials are
4       used?
5  Q    Correct.
6  A    I don't understand the question.  What do you
7       mean, there's no limitation?
8  Q    Well, someone buys a book at Barnes & Noble.
9       We'll call it a how-to book.  They're entitled to
10      use all the information in there to do whatever it
11      is that book teaches, right?
12             MR. STEWART:  The same objection.
13 A    Well, I would say that if they buy a how-to book
14      then that's -- if they agree with what the how-to
15      book says they should -- you know, if they agree
16      with that then they can use that information.  I
17      don't have a problem with that.
18 Q    And you all put a -- you all being -- well, I
19      guess it wouldn't be the plaintiffs.  Who owns
20      mobilehomeuniversity.com?
21 A    That would be Niche Investment Network, LLC.
22 Q    Which is not a plaintiff in this case, correct?
23 A    No, it's not specifically a plaintiff, no.
24 Q    So Niche through mobilehomeuniversity.com offers
25      to anyone who wants to visit that site free

Page 113

1       information about running mobile home parks,
2       correct?
3  A    There is free information on the site, yes,
4       that's correct, and there is a forum on there as
5       well.
6  Q    Mark this as Exhibit 4.
7              (Exhibit 4 marked.)
8  BY MR. CROSBIE:
9  Q    Do you recognize what we have marked as Exhibit 4?
10 A    Yeah.  It looks like an article I wrote many years
11      ago.
12 Q    How many years ago?
13 A    I would have to say it's probably more than
14      ten years, maybe eight to ten or more.  I don't
15      remember.  I haven't written an article for a long
16      time.
17 Q    Well, if you look at page 6, at the time of this
18      article you're holding yourself out as the fifth
19      largest owner of mobile home parks in the U.S.
20             Were you the fifth largest owner of mobile
21      home parks in the U.S. ten years ago?
22 A    Well, the answer to that is no, but in this
23      article it's just basically -- this article must
24      have been posted.  I don't know when it was
25      posted, but that's more of a bio as of today, not



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                                    114..117

Page 114

1      when I wrote the article.
2   Q    And in this article that's available for free at
3      mobilehomeuniversity.com, you set out your
4      turnaround program for a mobile home park,
5      correct?
6   A    I talk about turning around a mobile home park. I
7      don't set out the whole entire program. I mean,
8      if you could read this and then never be in the
9      industry and go turn-around a mobile home park
10      with this six pages, more power to you. That's a
11      very difficult program and process to turn-around
12      a mobile home park.
13   Q    Are there secrets parts of the turnaround program?
14   A    Are there secret parts?
15   Q    Yeah.
16   A    I wouldn't say there are secret parts. I would
17      say there are parts that you learn from only doing
18      it, experience.
19   Q    Personal experience?
20   A    Personal experience, yes, absolutely.
21   Q    Okay. But this identifies things for a
22      prospective or a current park owner, for example,
23      general clean-up, working on infrastructure items,
24      existing park-owned homes, buying and selling or
25      renting homes, preparing a budget, and then

Page 115

1      additional random thoughts on turning-around a
2      mobile home park, correct?
3   A    Yeah. It has lots of different -- lots of
4      different pieces of it, high level.
5   Q    And beginning at the bottom of page 6 there is a
6      list of popular articles, for example. It goes on
7      to page 7.
8   A    Okay.
9   Q    And I suppose those are links to additional
10      articles like this that would inform the reader
11      about buying or owning mobile home parks?
12   A    Through what part of that page 7? Through what
13      part of page 7, the first part, the three
14      articles?
15   Q    Yes.
16   A    Well, I assume those are probably articles. Frank
17      writes articles, basically five articles a month.
18   Q    And then if you go below that there are a number
19      of links to a variety of resources including
20      articles, audios, videos, books, newsletters.
21      Do you see that?
22   A    Yes.
23   Q    So those would all be available to the public if
24      they clicked on those links, correct?
25   A    Yeah, either to listen to for free or pay for.

Page 116

1   Q    So you claim that Mrs. Smith after she attended
2      your bootcamp she then began teaching a bootcamp
3      on mobile home investing, and then you write, "The
4      plaintiffs then learned from several students and
5      investors that the Smiths' bootcamp materials were
6      in many cases word-for-word the same as
7      RV Horizons material."
8      Do you see that?
9   A    Where are we at?
10   Q    Paragraph 74.
11   A    Of Which?
12   Q    Exhibit 1.
13   A    Okay. I see that.
14   Q    Which plaintiffs learned from students?
15   A    Well, that would be more of a personal. You know,
16      we learned, you know, Frank and I learned and
17      Brandon as well.
18   Q    Who is Brandon?
19   A    My son.
20   Q    When did you learn that the bootcamp material was
21      the same as RV Horizons material?
22   A    Well, when I got absolute proof of it, it was in
23      -- I want to say I got all the information from
24      bootcamp in 2018 prior to filing this case that I
25      had the absolute copies of everything.

Page 117

1   Q    When did you start to learn about it?
2   A    It would have been happening -- you know, it
3      happened early in -- I want to say 2009, but we
4      never had -- I never saw the absolute materials
5      that they created at that point.
6      It was more Frank because they were asking
7      him to come help them teach because they didn't
8      know exactly how to discuss the operations as well
9      as Frank did, and he was at their bootcamp or when
10      they were at our bootcamp. They were needing
11      somebody to actually fill in for them because they
12      didn't have enough content to teach.
13   Q    I'm baffled then. "The plaintiffs then learned
14      from several students and investors that the
15      Smiths' bootcamp materials were in many cases
16      word-for-word the same as RV Horizons material."
17      Did that happen in 2009 or did that happen
18      in 2018?
19   A    Well, it initially happened in 2009 and I
20      confirmed the actual documents. I got the actual
21      documents in 2018, the full set of documents.
22   Q    How did you get the full set of documents?
23   A    One of our bootcamp attendees sent them to us.
24   Q    Who was that?
25   A    I don't recall off the top of my head. I'd have



**Orange Legal**
**800-275-7991**

RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                           118..121

Page 118

1    to look at the e-mails.
2  Q    So there are e-mails from this person?
3  A    There is an e-mail right before we filed the case.
4  Q    Okay.
5  A    I think it was to Frank or myself.  I do not
6    recall exactly.  That's when I saw, you know, the
7    full set of documents.
8  Q    You had never asked before that despite hearing
9    information?
10  A    Well, it was mostly Frank was dealing with the
11    university and all that stuff.  I was running a
12    growing business on mobile home park operations.
13  Q    So but anyway Frank hears this in 2009 and yet you
14    do business with the Smiths for eight years?
15  A    Well, Frank saw it in person, I believe, when he
16    was down teaching at bootcamps and saw their
17    materials that they were having -- that they were
18    running through.
19       You'd have to ask Frank on that, because I
20    wasn't there teaching at the bootcamps and seeing
21    the actual materials, and at that point I didn't
22    really -- you know, I didn't really feel like they
23    were a threat, because I didn't take them serious
24    on what they had to say or what they had to do as
25    far as, you know, we had the bootcamp business and

Page 119

1    it would be very difficult to take that over from
2    us when we have all the contacts and resources out
3    there.
4  Q    Have you given that e-mail from the bootcamp
5    attendee and what you described as the complete
6    set of bootcamp materials to your attorneys?
7  A    Well, I gave all of our e-mails to the company
8    that basically swiped all -- I don't recall
9    exactly.  I didn't like send our e-mails to the
10    attorneys.  Somebody got on my computer and pulled
11    all the data, you know, all the e-mails,
12    everything out, and that's how it was provided.  I
13    don't know -- I don't know what happened to them
14    after that.
15  Q    Look at paragraph 76.
16  A    Okay.
17  Q    "The structure, organization, order and formulas
18    of the Smiths' bootcamp material mirrors that of
19    Niche and RV Horizons."
20       Which one, is it Niche or is it RV Horizons
21    that has the structure, organization, order and
22    formula for the bootcamp material?
23  A    Well, I mean, it's basically based on RV Horizons'
24    experience.  You know, it was written by me for
25    the material for Niche.

Page 120

1  Q    Who owns it?
2  A    Who owns what?
3       MR. STEWART:  Objection to form,
4    foundation.
5  BY MR. CROSBIE:
6  Q    The structure, organization, order and formulas.
7  A    Well, I think the person that -- the owner would
8    be whoever wrote the material.
9  Q    Who wrote the materials?
10  A    That would be a combination of Frank and I through
11    our companies and our company's experience.
12  Q    In the next paragraph over on page 18 it says in
13    summary, "Trailer Cash had many pages that were a
14    summary of RV Horizons bootcamp materials."
15       When did you discover that?
16  A    I discovered that when I actually read the book
17    before we filed this case.
18  Q    How has RV Horizons been harmed by the alleged use
19    of its bootcamp materials by the Smiths?
20  A    Well, I think, you know, whether it's RV Horizons
21    or whatever entity, it's the fact that somebody is
22    using material that I created and Frank created
23    based on the experience of operating properties
24    through RV Horizons, and now passing that off as
25    their own and basically calling it their own and,

Page 121

1    you know, potentially investors get harmed.  It
2    could harm RV Horizons and it could also harm
3    investors if they're not understanding what
4    they're passing off.
5  Q    Well, my question was how was RV Horizons harmed,
6    and you kind of gave a long answer, but has
7    RV Horizons been harmed by the use of the bootcamp
8    material?
9  A    Yeah.  I mean, I think it's -- RV Horizons is not
10    the actual -- the company that is currently
11    holding the bootcamp, so I don't think RV Horizons
12    actually, that entity itself, has been harmed.  I
13    can't think of any monetary.  It's the owners of
14    RV Horizons.
15  Q    And none of the other plaintiffs hold bootcamps,
16    do they?
17  A    They do not.
18  Q    We've talked about investor lists a little bit.
19    Do you say these investor lists exist in, among
20    other places, the Infusionsoft software?
21  A    Our investor list and all of our prospect lists
22    was in Infusion software in 2016 and 2017 and
23    2018.  All of the our lists were in there, and the
24    Smiths had --
25  Q    Okay.  Let me ask questions.



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                                122..125

Page 122

1        MR. STEWART:  Let him finish.  Let him
2     finish.
3  A    And the Smiths had access to that investor list,
4     all of our prospects and investors in that
5     Infusionsoft account.
6  Q    So could a user go on and click on a link that
7     says prospective investors for AHCF 5?
8  A    I believe -- I am not the Infusionsoft expert, but
9     they can go in and they can download every
10    investor, their names, what funds they're in, what
11    fund list they're on, so that's how they would get
12    if it's AHCF 5, what e-mails have been sent, what
13    materials have been sent to them.
14         It basically is a customer management data
15    software that lists all the e-mails you sent to
16    them, what you sent, if they clicked on it, all
17    that kind of stuff.
18  Q    And you have evidence that Mr. or Mrs. Smith went
19    in and downloaded all that information?
20  A    I -- I would say that I don't have the actual
21    evidence that I actually see the download, but I
22    am pretty certain that they did, because I don't
23    know how they would be contacting many of the
24    investors that they have contacted about Fund 7
25    when those investors had never even heard of them

Page 123

1     before, and they are not part of anything they've
2     ever -- you know, signed up for anything other
3     than our investor lists or our lists, and we've
4     had those conversations with investors.
5  Q    Which investors are those?
6  A    It would be several investors.  It would be people
7     like Max Hicks and Steve and Rebecca Tefas,
8     T-E-F-A-S.  I believe Merrill Blasdell,
9     B-L-A-S-D-E-L-L.
10  Q    Anybody else you can think of?
11  A    Those are the ones I can think of off the top of
12    my head.
13  Q    Were those e-mails or telephone calls or both?
14  A    They were e-mails that they got.
15  Q    E-mails?
16  A    Yeah, that they got from the Smiths announcing
17    Fund 7.
18  Q    Well, it was kind of a -- I appreciate the length
19    of your answer, but my question was could I go in
20    and click on a link to AHCF 5 that would show me
21    prospective investors in that fund?
22  A    I don't know.  I answered that I don't know.  I
23    told you what you could -- the information you
24    could pull out of there.  I don't know exactly if
25    you click on a link, because I don't go in there

Page 124

1     and do it.  That would be -- I mean, Ryan is an
2     Infusion expert, so he could probably tell you
3     that, and I'm sure that, you know, Eric could as
4     well.  It's like the investor communication portal
5     which that's not what I spend the most time on.
6  Q    I think you mentioned that you or I guess probably
7     RV Horizons, to be more accurate, had two or three
8     licenses for Infusionsoft and you thought the
9     Smiths might have one or two?
10  A    No, I didn't say RV Horizons did.
11  Q    Who does have the licenses?
12  A    I want to say -- I want to say that we have two or
13    three licenses, one of them the Infusionsoft
14    account registered through Niche Investment
15    Network.
16         Niche Investment Network uses one license,
17    and then we had another license used for the
18    investor lists, prospect lists, and so it was
19    separate, but it was all paid for by Niche
20    Investments.
21  Q    Was there a third license?
22  A    Well, I think then we added other licenses for
23    people to actually go into it, and like I think it
24    was maybe there's two licenses and then each
25    license you can have a certain number of

Page 125

1     authorized users or something like that.
2  Q    How many authorized users?
3  A    I think it was like five.  I'm not sure.  I think
4     three of them were -- you know, one was Ryan, one
5     was Jamie, and one was maybe Elizabeth Pelkey and
6     one was Amy and one was Eric, if I'm not mistaken.
7  Q    Not Brandon?
8  A    Brandon is the overseer of the whole thing.
9  Q    So he's like the administrator and would have
10    access to everything?
11  A    I think so, yes.
12  Q    I'm going to hand you what we will mark as
13    Exhibit 5.
14         (Exhibit 5 marked.)
15  BY MR. CROSBIE:
16  Q    Do you recognize Exhibit 5 as an excerpt from the
17    mobile home park investing bootcamp manual?
18  A    Is this from our manual or the Smiths' manual?
19    I'm not sure.
20  Q    Your manual.
21  A    Okay.  It's been a long time since I've reviewed
22    this, but, yes, it looks like it, similar to one,
23    yes.
24  Q    And this talks about turnaround of mobile home
25    parks in a little more detail, because it talks



1    about when out of state, correct?
2  A    Yes, it talks about how to buy and turnaround a
3    mobile home park when you live out of state, yes,
4    that's correct.
5  Q    And then there are lots of notes, examples of
6    turnaround efforts or things to address as part of
7    this manual, correct?
8  A    Yeah. It's like a case study, I believe, of one
9    of the properties that we turned around, you know,
10    before and after photos, and the sort of things we
11    did.
12  Q    And then page, it's kind of cut off, 143 shows an
13    example of a -- was this an actual park in
14    Plainview, Texas?
15  A    This was, yes.
16  Q    It shows cost estimates and things that you had to
17    do to turn around the Plainview, Texas park?
18  A    Which page are you on?
19  Q    144, 145, 146.
20  A    Well, 143 is basically the basic business plan of
21    what we were doing, it looks like.
22  Q    All right.
23  A    144 through 146 is just a sample price -- modeling
24    price guide in 2009, so ten years ago.
25  Q    And then there is a -- on page 147 a park

1    turnaround 3, the quick NOI boost. "NOI" is net
2    operating income?
3  A    That's correct.
4  Q    And you are giving examples of how to quickly
5    boost NOI in a mobile home park?
6  A    Yeah. Basically, yes, correct.
7  Q    And then on the next page, 148, there's McCook,
8    Nebraska, a park that you turned-around?
9  A    I wouldn't say that we turned it around
10    completely, but we turned it around partially,
11    yes.
12  Q    And then the next page, 149, I guess this is the
13    fourth version of a park turnaround saw at a lower
14    cap rate, and you offer suggestions on how to
15    lower the cap rate?
16  A    Yeah.
17  Q    And then on page 150 you've got three more park
18    turnarounds, and I take it -- look at park
19    turnaround 7.
20  A    Okay.
21  Q    It says "Frank examples" underneath it. Dave
22    examples, Dave Oklahoma problem.
23  A    Okay.
24  Q    So is this a manual where in the bootcamp you and
25    Mr. Rolfe would use this as kind of an outline and

1    then for park turnaround 7 Mr. Rolfe would speak
2    about an example he had, and you would speak about
3    an example you had, and then you explained
4    whatever your Oklahoma problem was?
5  A    Yep.
6  Q    This information is not confidential, is it?
7  A    It's not confidential information, no.
8  Q    And it was not at the time it was created, was it?
9  A    No, it's not confidential. We'd would give it to
10    people or they would buy it.
11  Q    They'd buy it as part of a package?
12  A    Right.
13  Q    And they can buy, to this day, information like
14    this off your website, correct?
15  A    They can, yes.
16  Q    Probably updated with prices and cap rate and
17    other information?
18  A    Some of it updated, yeah.
19  Q    Okay. Then look at paragraph 83 and 84 of
20    Exhibit 1.
21  A    Okay.
22  Q    This is discussing confidential and proprietary
23    investment strategies. It says, "Plaintiffs refer
24    to these strategies, which are central to their
25    business, as turnarounds."

1    Is that correct?
2  A    Yeah, that's what it says in there, yes, that's
3    correct.
4  Q    And the next paragraph says, "These turnarounds
5    are kept confidential." Right?
6  A    Okay.
7  Q    You've just conceded that they're not
8    confidential, right?
9  A    I conceded that the example in the bootcamp
10    material was not confidential. I didn't go
11    through every turnaround we've ever done.
12  Q    That was Exhibit 5. Exhibit 4 was from the
13    website about mobile home park turnarounds as
14    well, correct, Exhibit 4 that we looked at a
15    little while ago?
16  A    Yeah, that was about mobile home park turnarounds,
17    correct, yes. What I am saying is that there is
18    more to turning-around a mobile home park than me
19    writing an article or somebody going to listen to
20    us talk for a couple hours on a turnaround.
21    For instance, that Plainview example, that
22    was Todd Burget's first turnaround deal that he
23    came and worked for us, and I talked to Todd
24    Burget every day for probably six months while he
25    was doing that turnaround and giving him my



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

130..133

Page 130

1    experience, so that's the confidential, the
2    turnaround. It's not just in a book.
3  Q    It's your experience?
4  A    It's experience that I have passed around like in
5    that big spreadsheet I talked about. That's the
6    steps to basically turning the -- you know,
7    creating all that value for the fund.
8  Q    Does Mr. Rolfe also have this personal experience
9    for turnarounds?
10  A    Absolutely.
11  Q    What do you know about Dahn Corporation?
12  A    Just what do I know in general or --
13  Q    Yeah, what do you know in general.
14  A    I know that they were a self-storage operator.
15    They've raised funds from investors. They have
16    bought self-storages. They sold self-storages.
17    They were foreclosed on self-storages. They
18    bought more self-storages.
19        You know, that's their business is they buy
20    and sometimes build self-storage facilities. I
21    mean, that's kind of what I know about them in
22    general. I've never met Brian Dahn or any of the
23    other people.
24  Q    Well, I don't want to steal Joe's thunder, so I'm
25    not going to ask any more about that.

Page 131

1        Paragraph 87 of Exhibit 1.
2  A    Okay.
3  Q    Do you recall that we talked about the March or
4    the February letter that Mr. Smith sent to
5    investors in Fund 4, correct?
6  A    Right.
7  Q    Talking about the $1.9 million proceeds from the
8    TPG transaction?
9  A    That's correct, yes.
10  Q    And then suggesting that there would be an
11    opportunity to redeploy those proceeds into
12    Fund 7?
13  A    Yes, that was the -- was in the letter, part of
14    it, yeah.
15  Q    Well, then this may just -- it wasn't Fund 3. It
16    wasn't a letter as a manager of Fund 3, was it?
17  A    No. He sent the letter out. He sent that letter
18    out to Fund 4. Also received a letter in Fund 3,
19    which I don't know what happened to, but he
20    confirmed that he sent it out for Fund 3, 2 and 1,
21    so each one of the funds, MHPI 1, 2, 3, 4 he sent
22    out. He has not produced that in discovery
23    either, those letters, but I have a couple
24    investors that said they will give them to me.
25  Q    Which investors are those?

Page 132

1  A    In the MHPI funds.
2  Q    Who are they?
3  A    I don't know. Do I need to disclose that?
4        MR. STEWART: Yeah. That's not
5    confidential.
6  A    So Russell Shippee, S-H-I-P-P-E-E.
7  Q    Okay.
8  A    Bradley Carole, I think, it is, Brad Carole, and
9    there's a couple other I don't even know off the
10    top of my head that I've gotten e-mails from
11    people saying let me know what I need, if I need
12    something.
13  Q    You've gotten e-mails from other investors?
14  A    A lot of MHPI investors recently.
15  Q    Which fund?
16  A    Which fund what?
17  Q    Which MHPI fund? All four funds or just MHPI 4?
18  A    Which MHPI fund what?
19  Q    You said, "I got a lot of e-mails from MHPI."
20  A    Okay. So what funds did I get e-mails? I got
21    e-mails, I think, from Fund 2, 3 and 4 with a lot
22    of those people. Some of the people I got e-mails
23    from were also in Fund 1. Plus I've had several
24    phone calls with the investors as well.
25  Q    And I don't want to spend too much time on this,

Page 133

1    because I think we covered it, but you said
2    that -- in paragraph 87 you allege about four
3    lines down that Ryan Smith used investor contact
4    information stored in Infusionsoft to send this
5    letter.
6        Do you see that?
7  A    Yes, I do.
8  Q    Okay. Stored in Infusionsoft licensed to
9    Elevation Capital Group or licensed to Niche
10    Investments or who?
11  A    It just says Infusionsoft, so I would assume the
12    Infusionsoft, whatever we used for MHPI 1 through
13    4 funds.
14  Q    The one that Ryan and Jamie used?
15  A    The one that I don't have access to. I don't have
16    the e-mails or any of that information even though
17    I'm the manager.
18  Q    Okay. MHPI 4 is not a plaintiff in this case, is
19    it?
20  A    It does not appear to be.
21  Q    Then towards the bottom of that paragraph, the
22    third line up, the sentence starts, "The letter
23    made it appear that the managers of MHPI 3 and 4,
24    including RV Horizons, as well as other
25    plaintiffs, were involved in and supporting of



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

134..137

Page 134

1    Fund 7."
2         What other plaintiffs did the letter make
3    it appear were involved in Fund 7?
4  A    I'd need to look at the letter again just to see
5     if I'm missing something, but I'd have to look at
6     the letter.
7  Q    Do you recall whether any other plaintiffs were
8     mentioned in the letter?
9  A    No, I don't, not off the top of my head.  I'd have
10     to look at it.
11 Q    And that letter recording this paragraph 87 in
12     your second amended complaint, you learned of that
13     in March 2018?
14 A    That is correct.
15 Q    And if you go to the next page, the conclusion of
16     that paragraph 87, at the bottom of page 19,
17     "Instead, the Smiths were diverting investors to
18     Fund 7 from funds plaintiffs were involved in,
19     including Funds 1 and 2."
20         Fund 1 was not open to investors on
21     March 17, 2018, was it?
22 A    The question is:  Was MHC America Fund 1 open to
23     new investors in March?
24 Q    March 17, 2018.
25 A    We were not, no.  We were not taking new investors

Page 135

1     at that point.
2  Q    And as of March 17, 2018, America Fund 2 was not
3     open to any investors yet, correct?
4  A    It was not open at that point yet.
5  Q    The next sentence says, "The Smiths were also
6     using the advertising plaintiffs were doing for
7     Fund 1 to benefit their separate Fund 7."
8         What advertising were the plaintiffs doing
9     for Fund 1 in March 2018?
10 A    Well, they were -- you know, based on their
11     reimbursements they were having a dinner at some
12     steak house for several thousand dollars.  They
13     had used advertising.  You know, they were running
14     events in the villages promoting investments into,
15     I guess, Fund 1 and Fund 7 and billing Fund 1 for
16     it.
17 Q    On what date?
18 A    On what date?  For like the whole last year that
19     we found out.
20 Q    What's the whole last year?
21 A    From April 2017 to March 2018.
22 Q    The dinner?
23 A    Several dinners.
24 Q    The expensive dinner, the $4,000 dinner.  That
25     occurred in 2017, right?

Page 136

1  A    No, 2018.
2  Q    March?
3  A    That's when I got the reimbursement was in March.
4  Q    Well, that's not what I asked.  I asked when did
5     the dinner occur?
6  A    I believe it was in March.
7  Q    But this question -- and we kind of got
8     side-tracked.  Your allegation is the Smiths were
9     also using the advertising plaintiffs were doing.
10     What advertisements or advertising were the
11     plaintiffs doing?
12 A    We were running ads on the website, the
13     mobilehomeparkstore.com website and Google ads,
14     they were being ran.
15 Q    For who?
16 A    For MHC America Fund.
17 Q    Who was running the ads?
18 A    Well, they were running on my website.
19 Q    What website?
20 A    Mobilehomeparkstore.com.
21 Q    But your allegation says using the advertising
22     plaintiffs, which is plural, were doing, so what
23     plaintiffs were running ads?
24 A    Well, MHC America Fund through, I guess, Ryan,
25     Jamie, Dave, Frank and Eric.

Page 137

1  Q    That's the only plaintiff that was advertising?
2  A    Plaintiffs.  Let me look at the plaintiffs again.
3     So RV Horizons and MHC America Fund were
4     advertising at that point.
5  Q    They were advertising on March 17th, 2018 for
6     America Fund?
7  A    I think this is referring to historically.  I
8     don't think it says that this was for March 2017.
9     This is basically saying that they have been
10     diverting funds using advertising.  It doesn't
11     give a timeframe.
12 Q    Okay.  Again, I don't understand.  How were the
13     Smiths using advertising for Fund 1 to benefit
14     Fund 7?
15 A    Well, if somebody goes to a website, they click on
16     a banner.  It takes them to MHC America Fund
17     website.  They get an e-mail from somebody.  It
18     goes to like Elizabeth or I forget all their Dahn
19     employees that they had working for them.  Jamie,
20     Ryan, Elizabeth.  I can't remember.
21         And then they reach out to the investors
22     and in many cases we see e-mails where they reach
23     out to investors saying, you know, thanks for
24     inquiring into MHC America Fund, and by the way,
25     we have this other fund, Fund 7, that you can



Page 138

1    invest in, and it pays out monthly distributions
2    and it has a 10 percent preferred return.
3  Q    You've got multiple e-mails saying that?
4  A    Yeah.  And those are from Jamie and Ryan's e-mail
5    accounts in MHC America Fund that they did not
6    produce.
7  Q    Because they don't have access to it, do they?
8  A    They had access to it up until a couple months
9    ago.  And most of those had Elevation Capital
10    e-mails on it too which has still not been
11    produced either, so they haven't produced any of
12    those.
13  Q    When did you learn that Peter Reinert at Lowndes
14    had been responsible for preparation of the PPM
15    for Fund 7?
16  A    I would have to say that was like in 2018 maybe,
17    January or February, somewhere in there.  I
18    couldn't give you exact dates for sure.  That's my
19    recollection it was like in that timeframe like
20    right before the TPG closing.
21  Q    It was contemplated that Fund 7 could potentially
22    co-invest with MHCA during their respective
23    lifetimes, correct?
24  A    So that -- that was contemplated after -- when I
25    read the documents I saw that that was

Page 139

1    contemplated in the Fund 7 documents, and then in
2    like late 2017, maybe September, October, it came
3    up that Jamie or Ryan said, you know, they were
4    looking, you know, with their self-storage fund
5    they were looking to maybe co-invest or like do a
6    fund of funds with MHC America Fund, and they were
7    wanting to put together a side letter agreement,
8    and so that's kind of one of the contemplations
9    that came up.
10        I think we might have seen it a month or
11    two earlier where they said that were -- they
12    might do a fund to fund investment into MHCA with
13    their self-storage fund, but that's about all I
14    know.
15        I mean, I didn't really know that they
16    were -- I didn't know they had it in the documents
17    at that point like in March when I actually saw
18    the documents.
19        (Discussion off the record.)
20        THE VIDEOGRAPHER:  The time is 1:51 and
21    we are off the record.
22        (Break taken.)
23        THE VIDEOGRAPHER:  This is the beginning
24    of media unit number three.  The time is 1:57
25    and we are on the record.

Page 140

1  BY MR. CROSBIE:
2  Q    Okay.  Mr. Reynolds, turn to page 31 of Exhibit 1,
3    paragraph 130.  I just want to clear up a little
4    bit.  The second sentence in paragraph 130 says,
5    "This action by Fund 7 has the potential of
6    diverting current or potential investors away from
7    Funds 1 and 2, which RV Horizons manages."
8        That's not accurate, is it?
9  A    I don't think you read -- are we reading the same
10    thing?
11  Q    Paragraph 130.
12  A    Potentially?  Where do you see "could
13    potentially."
14  Q    The sentence starts out, "This action by Fund 7."
15  A    On 130?  Okay.  The second sentence.  I'm sorry.
16    Okay.  Sorry.  What was the question now?
17  Q    It's not correct that RV Horizons manages Funds 1
18    and 2.  That would be America Funds 1 and 2.
19  A    That's correct, yes.  It does not actually manage
20    those funds.  It's a property manager for those
21    funds.
22  Q    How have the defendants solicited investors by use
23    of commercial advertising?
24  A    Well, that would be advertising on
25    mobilehomeparkstore.com, a commercial website.

Page 141

1  Q    For Fund 7?
2  A    Well, they were using advertising for
3    MHC America Fund, and then they were using Google
4    ad words for Fund 7 which they were -- you know,
5    it looked like they were targeting to make it hit
6    up on mobilehomeparkstore.com where you can add
7    sites to it, and so then we had to remove that so
8    that those ads would not show up.
9  Q    When did that happen?
10  A    When did we remove them?
11  Q    Yeah.
12  A    I want to say June, May/June, when I saw them, of
13    2018.
14  Q    2018?
15  A    Yeah, when I started seeing those ads.  You know,
16    they were commercial advertising in newspapers,
17    you know, soliciting investors to go to events
18    they were holding to talk about the investments.
19  Q    And did they mention in those newspaper
20    advertisements anything other than MHPI Fund 7?
21  A    Well, I've seen some samples that had MHC America
22    Fund on them, so I don't know -- they haven't
23    produced the documents we've asked for, so it's
24    hard to actually tell you whether they do or not,
25    because we don't have them, so we had to go to the



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

142..145

Page 142

1 newspapers in the villages to find out, but we
2 don't have all of their advertising.  We don't
3 have like anything we have asked for.
4 Q    Well, that assumes that what you have asked for
5      exists.
6 A    It exists on one e-mail account, but I would
7      assume that would mean it would exist on the other
8      two in many cases.
9           But I saw e-mails where they were
10     discussing the fact that they are running these
11     newspaper ads and they're getting signed off by
12     Peter Reinert to go ahead.
13 Q    And those were all produced in the Delaware
14      arbitration at least, right?
15 A    I don't know.  I saw those in this production,
16      those e-mails.
17 Q    Okay.  Well, one of those e-mails to or from Peter
18      Reinert was actually marked as an exhibit in the
19      Delaware arbitration.
20 A    Okay.  It may have been.  I just don't recall.  So
21      I guess the answer to the question would be
22      advertising on mobilehomeparkstore, advertising
23      through Google ad words, advertising in various
24      newspapers, and I believe other online avenues,
25      but I couldn't name every one of them because I

Page 143

1 don't have that information yet.
2 Q    Has MHC America Class C suffered loss of goodwill,
3      damage to reputation, or loss of business as a
4      result of the defendants' actions?
5 A    MHC Class A?
6 Q    Class C.
7 A    Class C.  Are you reading this from somewhere?
8 Q    I'm reading it from a few places.
9 A    Well, did it lose -- did you say economic
10     interest?
11 Q    Loss of goodwill, damage to reputation, loss of
12      business as a result of.
13 A    I would say loss of business because like earlier
14     when we talked about it there was less money going
15     into MHC America Fund which was the mobile home
16     park acquisition fund than could have went in
17     there because they were diverting or raising two
18     different funds at the same time, one that we
19     thought was just for self-storage for the most
20     part of it, and then they started diverting other,
21     you know, investors that were getting paid off
22     into Fund 7 which then reduced the amount of the
23     roll-up and the whole idea of us working together
24     to create one new vehicle with the Smiths, and so,
25     yes, it does cause damage when they are diverting

Page 144

1 funds that does not accomplish the business plan
2 that we have been working on for months.
3 Q    But MHCA America Fund Class C has not distributed
4      any money to its members yet, correct?
5 A    Well, that's correct.  And it won't until the fund
6      is pretty much wound up and sold.  That's the
7      promote interest.  That's the back-end mostly.
8      It's a smaller back-end because there's fewer
9      properties.
10 Q    But you were aware that Fund 7 was going to be
11      involved in mobile home communities before March
12      of 2018, right?
13 A    I was aware that they were going to -- well, I was
14     aware that they wanted to co -- or do a fund of
15     funds with MHC America Fund 1.  I was aware of
16     that.
17          And then at a point, and I don't recall
18     exactly when it was, but it was like kind of late
19     after the LOI was signed with TPG so, boy, July,
20     August, somewhere in there, basically I had a
21     conversation with Jamie and, you know, basically
22     said, you know, we talked about it and we said
23     that, you know, that we would be restricted from
24     buying new properties at some point here in the
25     future when we closed on this deal, and the

Page 145

1 conversation was, well, and if you're not -- if
2 you decide to raise funds, and at that point I
3 think they contemplated raising a fund with Eric
4 and working with him going forward, because he
5 would not be restricted.
6          And at that point I think I said, well, if
7 TPG -- if there's deals that they don't want and
8 there are deals we're not buying with MHC America
9 Fund, I'm happy to share those deals with you for
10 this fund or whatever fund you have going on.
11          At that point I was thinking MHPI 5 was
12 maybe buying some mobile home park deals, if I was
13 going forward those to them.  I didn't really know
14 anything about Fund 7 other than I thought it was
15 a self-storage fund.
16 Q    You keep saying self-storage.  Fund 7 made an
17      offer to buy all the remaining property interest
18      in MHPI 2, 3 and 4 in 2017, right?
19 A    It did after the TPG offer, yes, I think in
20     September, somewhere in there.
21 Q    Yeah.  So you were aware by September of 2017 that
22      they were looking at mobile homes as part of their
23      asset base for that fund, right?
24 A    Well, at that point I knew that they were making
25     an offer on the properties they already were



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                    146..149

Page 146

1    involved with in the MHPI fund.  I didn't know
2    they were looking for other properties.
3  Q    And you know those properties were mobile home
4    properties, right?
5  A    Well, at that point, yeah, I obviously knew the
6    offer they made was mobile home properties.
7  Q    And you discussed with them the possible sale of
8    the Homosassa mobile home park to their Fund 7,
9    right?
10 A    Yeah.  I don't know that we discussed what fund it
11    would be in.  I think my interpretation much later
12    on was that it was Fund 5 was going to be
13    acquiring any other mobile home parks.
14 Q    How did you -- had you ever heard from anybody
15    that MHPI 5 had ever bought a mobile home park or
16    park interest?
17 A    Well, I mean, I hadn't heard anything from anybody
18    that Fund 5 or Fund 7 had bought a park interest.
19 Q    But you definitely heard that Fund 7 wanted to?
20 A    Well, when I got that offer, yeah.
21 Q    But the Homosassa, they never offered -- it was
22    never contemplated that Fund 5 would own any
23    property interest?
24 A    I had no involvement with Fund 5, so I don't
25    really know what fund -- I don't think they made

Page 147

1    an offer on Homosassa with the fund as the buyer.
2  Q    And you knew that Fund 5 had invested in
3    approximately $13 million into AHCF 6, right?
4  A    I did, yes, but I never saw like the Fund 5
5    documents.  I don't know what they said.
6  Q    What do you mean, the Fund 5 documents?
7  A    Like I assume there is documents for Fund 5, you
8    know, a PPM and stuff.
9  Q    Did you ever ask to see them?
10 A    No.  It wasn't a fund that I was involved with.
11    They were just making an investment.
12 Q    Have any of the Alumni funds suffered a loss of
13    goodwill, damage to reputation or loss of business
14    as a result of the defendant's actions?
15 A    I mean, I think some of that is to be determined
16    as far as like goodwill or reputational risk
17    because we don't know -- I don't know the extent
18    of who they solicited to for Fund 7.
19        I don't know how Fund 7 is going to turn
20    out in the end.  I don't know who they told -- you
21    know, who they told that Frank and I were involved
22    with Fund 7 to entice them to join Fund 7.
23        So I don't know all of those items, but we
24    are severely worried about the fact that if it
25    doesn't go well these investors are going to come

Page 148

1    back on us that were potentially misled or enticed
2    to go into Fund 7 from our track records and
3    history.
4  Q    A track record and history that were buried 200
5    pages into the PPM?
6  A    Most of the time Ryan sent that track record out
7    as a separate document to investors when they're
8    looking to invest.
9  Q    How do you know that?
10 A    Because I saw e-mails to that effect.
11 Q    You saw e-mails to that effect when?
12 A    Discovery docs and also from his MHCA e-mails.
13 Q    That he was just sending a track record?
14 A    Uh-huh.  Many, many times.  He sent some investors
15    the track record for MHC America Fund and Fund 7
16    at the same time, and not once did he ever say
17    Dave Reynolds and Frank Rolfe are not involved in
18    this fund, this is just Eric's fund or Ryan's.
19    It's basically Fund 7 or other fund.  And when you
20    think "our" and he's writing from MHCAmerica.com
21    you would think "our" means, you know, Frank,
22    Dave, Eric, Ryan, Jamie.
23 Q    Okay.  What I think is probably the most efficient
24    use of time is for me to suspend my questioning
25    and let Joe do his bit, and then if I need to

Page 149

1    follow up, I will.  Otherwise, I don't know that I
2    have anything else to ask.
3        MR. STEWART: That's acceptable.
4        MR. CROSBIE: Okay.  Thank you.
5        EXAMINATION
6  BY MR. DANIELS:
7  Q    Mr. Reynolds, my name is Joe Daniels.
8  A    Hi.
9  Q    I'm one of the attorneys for Dahn Corporation.
10    Okay?
11 A    Okay. Nice to meet you.
12 Q    So do you have an understanding that
13    Dahn Corporation is a separate entity from MHPI 7,
14    LLC?
15 A    Well, I think -- I believe Dahn Corporation is a
16    separate entity.  I'm not exactly sure how all
17    their entities intermingle, but my understanding
18    is that Brian Dahn and Dahn Corporation have
19    some -- are managers of MHPI Fund 7 in some manner
20    like half or 50/50 managers or something like
21    that.
22 Q    And my question is a bit more basic.  Do you have
23    an understanding that Dahn Corporation is a
24    separate legal entity from MHPI 7, LLC?
25 A    Yes.



**Orange Legal**
**800-275-7991**

1  Q    Okay. And that it's a separate legal entity from
2       Elevation Capital Group, LLC?
3  A    Correct.
4  Q    And so do you have an understanding as to why
5       Dahn Corporation is a defendant in this case?
6  A    Well, I understand -- did you say
7       Dahn Corporation?
8  Q    Yes.
9  A    Well, my understanding is that when we were doing
10      kind of our research or whatever that entailed, my
11      assumption was Dahn Corporation -- like the
12      e-mails I had had from Ryan and Jamie and even one
13      from Brian Dahn at one point, but I just kind of
14      thought Dahn Corporation was either the manager or
15      member or co-owner or something of MHPI Fund 7.
16           I don't know exactly how all
17      interrelated at that point, but that was the best
18      notion that I had. I know we agreed to put it in
19      the documents, in the complaint.
20 Q    And are you aware of anything that
21      Dahn Corporation did in regards to this case
22      that's separate from what Fund 7 or the Smiths
23      did?
24 A    That's separate or any different than what they
25      did, right?

1  Q    Uh-huh.
2  A    I don't think -- I would not say that I know of
3       anything like that, no.
4  Q    Now, earlier in your deposition, Mr. Crosbie kind
5       of went through the various plaintiffs and just
6       confirmed that you have some involvement with each
7       of the plaintiffs, is that correct?
8  A    Correct. Yes.
9  Q    How are you defining "involvement"?
10 A    So I would say it would be an ownership interest,
11      you know, ultimately to myself or one of my
12      entities, and then to myself, I guess, or,
13      you know, like a majority manager or managing
14      member or something to that effect where I'm
15      actually kind of in control of most of those
16      entities or I have an ownership stake.
17 Q    Do you personally have any ownership interest in
18      any of plaintiffs?
19 A    RV Horizons, I do.
20 Q    The rest of them you would potentially have an
21      ownership interest through another LLC or other
22      legal entity?
23 A    That's correct.
24 Q    And kind of at a very macro level, the way the
25      plaintiffs make money is through owning mobile

1       home communities, correct?
2  A    Yeah. Owning them and operating them properly and
3       hitting goals, yes.
4  Q    So owning the real property and then generating
5       income from that real property?
6  A    Correct.
7  Q    Do any of the plaintiffs own title to any of the
8       real property?
9  A    I don't think the plaintiffs -- they don't hold
10      the actual title to the real property. They would
11      own the membership interest of the SPE that is the
12      owner of the real property.
13 Q    So we'll deal with RV Horizons in a second, but
14      my understanding is that for the rest of the
15      plaintiffs they are entities that hold interests
16      in other entities that hold interest in real
17      property?
18 A    That's correct for the most part, yes.
19 Q    Why do you set it up that way? Why don't you just
20      have like the MHC Fund, LLC, for example, own the
21      real property?
22 A    Well, for one reason is you want to have -- you
23      want to have -- you want to spread the risk. You
24      don't want to have one entity owning all the
25      properties, because one humongous lawsuit of some

1       sort could wipe out all kinds of properties, you
2       know what I mean?
3            So you want to separate those ownership
4       interests, and the more you do that, the less
5       likely you have one lawsuit at one property wipe
6       out a fund, so that's one reason. Lenders require
7       it for the most part every time. They want SPEs,
8       and so that's two big reasons.
9  Q    And so one of the reasons to your understanding is
10      it kind of shields the other entities from
11      potential lawsuit risk?
12 A    Correct.
13 Q    So if one LLC gets involved in a lawsuit, it
14      doesn't wrap in all the other LLCs, correct?
15 A    That's my understanding for the most part, yes.
16 Q    Even though all the LLCs may work together and
17      share resources?
18 A    Yeah, and that's why the management company is
19      really separate. You don't have employees of the
20      SPEs. You want to separate that out, so if there
21      was ever an issue there it's not hopefully getting
22      sued on the management level, because it has no
23      assets really.
24 Q    And so then going back to my earlier questions
25      about Dahn, and I think your testimony was your



Page 154

1    understanding Dahn was going to be involved in
2    kind of the management role?
3  A    So my understanding was they were in a management
4    role and then I'm assuming the sponsor role as
5    well.
6  Q    And if you understand that Dahn Corporation is a
7    separate legal entity and you understand this
8    concept that, you know, separate legal entities
9    kind of shield you from liability, I want to go
10    back to my question.
11        What is your understanding of why
12    Dahn Corporation is a defendant in this lawsuit?
13        MR. STEWART:  Objection, foundation.
14    You can answer.
15  A    Well, I mean, it was my understanding they were
16    involved in Fund 7 in raising capital, using their
17    track record in the PPM and their names are all --
18    you know, their names, and I believe
19    Dahn Corporation is kind of all in the documents
20    and the track record and the investment summary
21    documents and on the websites and things like
22    that.
23  Q    Does RV Horizons provide management services for
24    MHC Fund, LLC?
25  A    Well, there's no such thing as actually MHC Fund,

Page 155

1    LLC.
2  Q    I'm sorry.  MHC America Fund, LLC.
3  A    Okay.  So it provides management services for the
4    SPEs and MHC America.
5  Q    And so if one of those SPEs got sued, do you think
6    RV Horizons would be a defendant as well just
7    based on the fact that it provides management
8    services?
9        MR. STEWART:  Objection, foundation.
10    You can answer.  On all these where I object,
11    you can answer.
12  A    Okay.  Yeah, I believe that -- I believe that -- I
13    mean, yes, I believe it could get sued.  I mean,
14    we have been sued when people have sued an SPE and
15    RV Horizons has been sued.
16  Q    Now, in response to Mr. Crosbie's questions in
17    terms of damages, you said several times that I
18    think the main damage here is diverting funds, is
19    that correct?
20  A    So I think -- I think the main monetary damage
21    would be the diverting of the funds which then
22    created a lack of the funding needed to do the
23    business plan we had been contemplating, but I
24    think the other -- I mean, the other is damages
25    that I think are just unknown.

Page 156

1    They are unknown because we don't know the
2    extent of how many people, you know, what people
3    were told, and they received this track record
4    with our information in it.  You know, we had the
5    SEC investigation into Elevation Events, you know,
6    four or five years ago, and I had to do the
7    deposition and all that there.
8        I mean, the question is if Fund 7 doesn't
9    pan out, which I mean sometimes properties don't
10    pan out, I mean, I know Dahn knows that.
11    Sometimes it doesn't work out the way you want it,
12    but if it doesn't pan out and our name, our track
13    record, our history, our distribution history, all
14    that are in those documents that people have
15    received, that's a very big problem for us.
16        We don't want to be involved in some
17    investigation where we have nothing to do with
18    something, but our names and faces and pictures
19    were all over the stuff in the beginning.
20  Q    And so by diverting funds am I correct in
21    understanding you're really talking about
22    diverting potential investors?
23  A    Yeah, diverting investors, yes.  Correct.
24  Q    So there is a pool of investors out there, and
25    your concern is those investors might decide to go

Page 157

1    with Fund 7 rather than with one of the
2    plaintiffs' funds?
3  A    Yeah.  I think the concern is that they would --
4    yeah, like you said, Fund 7 or one of the other
5    funds, but going to Fund 7 under false pretenses
6    as well.
7  Q    And I'm trying to understand the concept.
8  A    Yeah.
9  Q    Not taking money away --
10  A    Well, yeah, right.
11  Q    -- from company accounts and moving it around?
12  A    Correct.  Yeah.
13  Q    And then you also discussed about by diverting
14    some of these funds it was hindering the roll-up
15    process.
16        Do you recall that testimony?
17  A    That's correct.
18  Q    And what do you mean by the roll-up process?
19  A    So as we led up to the TPG transaction in which we
20    sold 102 properties, you know, a cut of that -- a
21    precursor to that, Ryan, Jamie, Frank, Eric and I
22    had been having numerous conversations and I guess
23    I should add Peter because he was involved with a
24    lot of that, but we were having numerous
25    conversations about basically we sell these 102



Page 158

1    properties and we then take the rest of the funds
2    and all the properties that they have, the
3    remaining properties, and we roll them up into
4    this new MHC America Fund 2, so all those
5    properties get rolled up, then the properties get cashed
6    out, but then they can reinvest in MHCA 2 and we
7    will push to do that.
8        We had spreadsheets of like, okay, well, I
9    think 50 percent of these we'll move into Fund 2
10   and so forth.  So by them, you know, basically
11   sending the letters out to the MHPI Funds that
12   took out -- you know, I don't remember the number,
13   but, you know, several, you know, 30, 40 million,
14   25, 30 million, potential investors, and then by
15   potentially, you know, selling Fund 7 to people
16   like in MHC America Fund, you know, when they're
17   getting e-mails there or, you know, whatever it
18   is, not really focusing -- they were going to
19   roll-up the MHPI 5 into the MHCA 2, so kind of
20   the -- you know, losing those investors stakes to
21   basically fund MHCA 2 so that we could actually
22   accomplish all of this in a very short period of
23   time, if that makes sense.
24 Q    Sort of.  But I mean is it possible that an
25       investor could invest in both Fund 7 and one of

Page 159

1       plaintiffs' funds?
2  A    Yeah.  I think there's probably several that that
3    probably happened, yes.
4  Q    And so the diverting of funds would be people who
5       decide to only invest in one fund and they invest
6       in Fund 7?
7  A    Well, so I think there's two cases of it.  One is
8    diverting funds, so diverting funds from the MHPI
9    funds, right?  So that's one instance.
10       Jamie is a manager through her entity.  I'm
11   a manager through my entity.  If Ryan sends an
12   e-mail or letter to each one of those investors
13   basically saying you're getting money back and,
14   hey, by the way, invest your money into Fund 7,
15   without my approval as a manager that -- and with
16   the fact that they are sending them e-mails all
17   the time, we are ready to roll, we are going to
18   push all the people into a fund, MHCA Fund 2,
19   we're going to knock it out of the park and all
20   this kind of stuff.
21       They sent that out without my approval to
22   all investors.  That's just not proper to me.  So
23   that's one cause of like diverting funds to their
24   fund.
25       Secondly, if they're pushing Fund 7, I

Page 160

1    mean, obviously in Fund 7 they're -- you know,
2    they have a different ownership stake and all that
3    so, you know, if they're really trying to look out
4    for themselves, they are going to push as many
5    people to Fund 7 as they can or an MHC America
6    fund because they have a 50 percent ownership
7    rather than a 14.9 or whatever it is in MHCA 2, so
8    it benefits the Smiths a whole lot because now
9    they are pushing everybody to Fund 7, which we're
10   not involved with, but still using our things.
11       I mean, there's a lot of places where I
12   feel like they skirted around with kind of
13   diverting funds, you know, advertising for one
14   fund, but then maybe trying to back-door them into
15   the Fund 7.
16 Q    In what you have just described, how is
17       Dahn Corporation involved?
18 A    Well, so my understanding is that -- and I wish I
19   had their names here, but Elizabeth Pelkey and I
20   can't think of her other name, but there's two or
21   three Dahn employees that were on all these
22   e-mails and they were sending out some of these
23   e-mails regarding the Fund 7 when people inquired
24   about MHC America Fund, and I believe they're Dahn
25   employees, and then just the fact that Brian Dahn

Page 161

1    signed off on the track record and I believe Nancy
2    and Michelle or Kristin or something like that
3    signed off on the track record or the investment
4    summary, you know, basically without verifying
5    that we're not even using our pictures and our
6    likeness and our history.  That's kind of the
7    extent.
8  Q    So do you think Dahn Corporation had an obligation
9       to review the track record and approve it before
10      it went out?
11           MR. STEWART:  Objection, foundation.
12 A    Well, I believe that -- I believe that
13   Dahn Corporation or I guess I should say somebody
14   at Dahn Corporation who is signing off on it.  I
15   don't know if Brian or the people I just mentioned
16   actually signed off on it through Dahn Corporation
17   or personally, but I think they have
18   Dahn Corporation e-mails, so I think somebody at
19   least had the obligation to review it and comment
20   on it and change it if it's not correct.
21 Q    Do you think anyone that would have had an
22       opportunity to review the track record and
23       investment summary and the offering package and
24       they had the opportunity to review it and they
25       didn't raise any issues with the use of



**Orange Legal**
**800-275-7991**

Page 162

1 plaintiffs' names is liable for damages
2 in this case?
3     MR. STEWART: The same objection,
4 foundation.
5 A I think I need to have you ask that one more time
6 because I'm not sure I quite got it. It was a
7 long question.
8 Q Sure. Do you think anyone that would have
9 reviewed the offering package materials which
10 would include the track record and investment
11 summary, they had the opportunity to review and
12 comment on those materials, are they liable now
13 for the content of those materials?
14     MR. STEWART: The same objection.
15 A Well, I wouldn't say anybody. I wouldn't say
16 anybody. I would say that whoever is signing the
17 agreement for Fund 7 as the manager or sponsor,
18 that they should be liable for what's in their
19 documents.
20 Q Do you hold that same view for the businesses that
21 you're involved in?
22 A That if I review something and it doesn't have the
23 -- yeah, I would feel the same way as far as if
24 we're doing a fund and it has my track record, I'm
25 not going to go use somebody else's track record,

Page 163

1 yeah. I feel that way. I think you have to
2 review the documents.
3 Q Now, my understanding with the fund entities is
4 that they're only open to investors for a certain
5 period of time, is that correct?
6 A Yeah. Typically a one-year period. Sometimes
7 they were extended like to a two-year period, yes,
8 and maybe three years actually.
9 Q So of the plaintiffs in this case, which ones are
10 still accepting investors?
11 A MHC America Fund 2.
12 Q Is that the only one?
13 A Yes.
14 Q And so all the other plaintiffs are no longer
15 accepting investors?
16 A That's correct.
17 Q Do you know if that would have been true
18 at the time the original complaint was filed?
19 A That is correct.
20 Q So if those plaintiffs were no longer accepting
21 investors, how were they damaged in this case?
22 A So they were damaged because -- because the
23 investors -- you know, you may not have been able
24 to -- I mean, they're damaged because, you know,
25 the roll-up process did not -- was not able to

Page 164

1 occur on a timely basis on some of those funds
2 like AHCF 6, AHCF 5, and those investors and the
3 sponsors. They would be damaged.
4     And then, you know, the ones that took
5 longer, I mean, we had planned to do the roll-up
6 like by the end of April or something like that,
7 but, you know, really didn't -- it still hasn't
8 completed, but, you know, we didn't even get to
9 the first piece of it until July, so it was a
10 timing damage, and people were expecting to get
11 their money back or be able to roll-up or reinvest
12 in another fund at that point.
13     So it's really to the investors and the
14 sponsors that were damaged because what we had
15 told investors what was happening, you know, which
16 would include e-mails from Eric and Ryan to
17 basically all the funds what was going to happen
18 never happened, and people were expecting it to
19 happen in many cases, and so it kind of damages,
20 you know, kind of reputational damages and
21 economically for investors and sponsors.
22 Q So were all the other plaintiffs going to be
23 rolled up into MHC America Fund 2?
24 A That's correct.
25 Q So the damages were -- the damages to MHC America

Page 165

1 Fund 2, would those be the same damages to the
2 other plaintiffs?
3 A I mean, it would be similar damages in some ways
4 because MHC America Fund 2 would include some of
5 the other investors and the other plaintiffs
6 because not all the investors roll up, so that
7 would include those investors or new investors
8 that came in, so it would create problems there
9 and I guess damages and then -- but the investors
10 that were cashing out of the other funds and just
11 not reinvesting, then there's no real damage to
12 them, I mean, as far as MHC America Fund 2, just
13 the investors that rolled or, you know,
14 reinvested, I should say.
15 Q So if you had an investor in a plaintiff that's
16 not MHC America Fund 2 and they decided not to
17 roll up --
18 A Right.
19 Q -- would they be damaged in this case?
20 A Well, they are damaged to the extent that they
21 were expecting to get their money a lot sooner if
22 they haven't got it, then they did, and, you know,
23 the AHCF 5 and 6 investors that haven't still got
24 it, they are damaged because they haven't got it
25 and maybe they wanted to reinvest.



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS
166..169

Page 166

1    And then the actual funds, you know, and
2  the sponsors, they are damaged because, you know,
3  we basically got people saying you guys told us
4  this was going to happen last year, and we're
5  still not to that point, so it's really that --
6  the least damage would be the ones that were
7  cashed out and went on their merry way already and
8  they're no longer in the funds.
9  Q    If MHC America Fund 2 was able to complete its
10       roll-up on the timeframe that it had planned for,
11       would there be any damages?
12  A   I would say that if it was able to complete it --
13  I mean, I don't know how to answer that one
14  because of the -- because the -- if everything had
15  went as planned where the Smiths were involved and
16  they were pushing to help raise money and move
17  money into MHC America Fund 2 investors there and
18  everything, we had the financing all lined out,
19  yeah, so I don't think there would have been the
20  damage, because then we would have had, you know,
21  the extra capital we needed to carry out a bigger
22  boost to our business plan and increase more value
23  to the investors, so it would have had -- you
24  know, it would not have had the damage if we had
25  carried out the business plan, no.

Page 167

1  Q    And what I'm trying to understand is it seems a
2       damage is stemming from plaintiffs' inability to
3       fulfill its business plan as planned and it is
4       putting all of that blame on the defendants
5       in this case, and I'm wondering could there be any
6       other factors that would have prevented plaintiffs
7       from meeting their business plan?
8  A   Well, I mean, I -- I think what happened is it
9  stemmed other issues. You know, when you're not
10  able to fulfill what you tell investors as far as
11  like we're rolling all these properties up and
12  then they keep asking month after month, you know,
13  why haven't you done this, why haven't you done
14  this, that creates issues and unless investors --
15  investors talk.
16       They get, you know, a little worried and
17  that creates issues there, but, I mean, you know,
18  there is other issues that when all of a sudden
19  you go from running a business and trying to
20  execute the plan and then all of a sudden you're
21  involved with hours and hours of litigation, that
22  doesn't really help what you're trying to
23  accomplish, so it takes away some time there. So
24  certainly I would say that that has diverted from
25  the ability to get everything done we needed to

Page 168

1  do, but it's really the fact that we're
2  anticipating doing it this way, one way, and then
3  when things blow up like that and everybody is
4  working -- not working together and working apart,
5  then that creates problems, and that's from the
6  disagreements, I guess, we had, you know, having
7  to remove the Smiths from MHC America Fund 2.
8  Q    And you mentioned a moment ago that you have seen
9       e-mails from who you believe were Dahn employees
10       to potential investors about Fund 7, is that
11       correct?
12  A   That's correct.
13  Q    And do you know if those e-mails have been
14       produced in this case?
15  A   So Elizabeth Pelkey, I believe, is one of the
16  people, and so I have all e-mails from her from
17  the MHCAmerica.com fund server, so I own the
18  domain and have the access to all that, so I have
19  all her e-mails, and I saw in those e-mails that
20  she was doing that, and I saw -- there's somebody
21  else. I just can't remember her name, but similar
22  things like that.
23  Q    Would these people have MHC America e-mail
24       addresses?
25  A   Yeah, like epelkey or

Page 169

1  elizabeth.pelkey@MHCAmericafund.com. And so she
2  would send out an e-mail out from that e-mail
3  address to a potential investor, and that investor
4  could have came in from say an e-mail blast about
5  MHC America Fund, so an e-mail goes out to an
6  investor.
7       You know, here is information on
8  MHC America Fund, you know, and there's some link.
9  And, by the way, you can also invest in MHPI Fund
10  7 and here's a link, so, yes, there were e-mails
11  like that from the MHCAmericafund.com e-mail
12  domain which leads me to believe there are even
13  more e-mails on the Elevation e-mail domains.
14  Q    So going back to my original question, to your
15       knowledge have those e-mails been produced in this
16       case?
17  A   No. You guys have not produced them.
18  Q    Well, the MHC America Fund e-mails, you said you
19       own that e-mail account?
20  A   Well, I own the domain. I revoked access of it
21  from, you know, from Brian and Jamie when I
22  decided that they were basically not doing any
23  favors to MHC America Fund.
24  Q    And I am just trying to understand.
25  A   Yeah.



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

170..173

Page 170

1  Q    So you have e-mails from an account on the MHC
2       American Fund that you control?
3  A    I do, yes.
4  Q    Okay.  Have those e-mails been produced?
5  A    Well, I just took control of those so I
6       actually -- I have not produced them, but
7       my understanding would be that they would be
8       produced from your side, but we have not produced
9       them.  I just basically got them, if that makes
10      sense.
11  Q   It doesn't unfortunately.
12  A   So it's a -- so what it is, and I'm probably the
13      worst person to explain it, but it's like a Google
14      suite or I forget what it's called.  There's some
15      way you go into Google and you sign up for like
16      some account and then you can have an e-mail
17      address for all these different domains, right?
18          And then there is an administrator which I
19      am the administrator, and so there is an e-mail
20      account for Dave at MHC America Fund and then one
21      for Ryan and Jamie and Elizabeth and Amy, I
22      believe, and probably the other people in their
23      office.
24          So basically they had all their e-mails.
25      You know, it basically works like any Google

Page 171

1   e-mail account, and then, you know, once I started
2   seeing, you know, the fact that -- really once
3   they started sending out e-mails to investors,
4   you know, about the litigation going on, you know,
5   during depositions, I was like, you know what?
6   I'm stopping this.
7          They are not going to have -- be sending
8   e-mails out from MHC America Fund, so I took
9   control.  I changed their passwords and I removed
10  their access to get new e-mails.  They still
11  should have all their e-mails.
12  Q   And that's what I'm trying to understand, the
13      historical e-mails.  Do you have access to those?
14  A   So I have a big Google file, yes, of those, yes.
15  Q   Okay.
16  A   For Ryan, Jamie and Elizabeth.
17  Q   And your understanding is that they should still
18      have access to their historical e-mails?
19  A   Yes.  The way it's set up, it's an iMap account,
20      so iMap, and so as long as -- so basically the way
21      it works is they can -- my assumption is that they
22      have always used Outlook, which I believe they do,
23      so they download all the e-mails there.  As long
24      as I don't delete the e-mails, they still have
25      access to the e-mails.

Page 172

1  Q    And so what you have seen are e-mails from the
2       MHC America Fund e-mail account that you believe
3       were written by Dahn employees?
4  A    That's correct.  Correct.  Yes.
5  Q    Other than the fact that it's the MHC America Fund
6       e-mail account, to your knowledge were any of the
7       plaintiffs' alleged trademarks in this case used
8       in those e-mails?
9  A    Other than the MHCA or MHC America Fund logos and
10      that would be I think -- I think that would
11      probably be the most of it.  I think they were
12      using MHP funds in a couple cases, but not -- they
13      weren't e-mailing for the other ones.
14  Q    All right.  So let's go to the complaint, the
15      second amended complaint which is Exhibit 1.
16  A    Okay.
17  Q    Let's go to page 19.
18  A    Okay.
19  Q    Paragraph 86 states, "Beginning in 2016 or 2017,
20      the Smiths, together with Dahn, began soliciting
21      investors, including investors located in
22      Colorado, for Fund 7."
23          And so besides the e-mails we have just
24      discussed, what other knowledge do you have of
25      Dahn soliciting investors?

Page 173

1  A    I mean, as far as Dahn soliciting investors, that
2       would be from -- it would be from -- so I didn't
3       have like the e-mails at that point like I do now
4       for the new stuff.
5          I mean, I had several e-mails from
6       investors, but we had historical investors that
7       would e-mail us that we had, you know, worked with
8       for a long time where they had sent out like an
9       e-mail blast on Fund 7 or a webinar for Fund 7,
10      and then so we would see that information.
11          You know, those investors would contact us
12      and say, hey, you know, are you guys part of this
13      or I should I invest in this, or what's going on
14      here, I thought we were doing MHC America Fund.
15          So there was -- there was probably -- and
16      that's -- I'd have to say there was probably like
17      ten or twelve instances of that in like 2017.
18          You know, probably the first one I can
19      recall is May of 2017, and then I think June and
20      then at several of our bootcamps, you know, from
21      Frank and Brandon basically saying that people
22      were getting this information from the Smiths, and
23      then Eric had several conversations with people,
24      you know, regarding that -- you know, they were
25      being -- they were forwarded e-mails like



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

174..177

Page 174

1    Elizabeth or the other person that I can't think
2    of her name, that they were soliciting for Fund 7.
3  Q   So again are you discussing communications from
4    people who you believe are Dahn employees?
5  A   Yes, in some cases, yes.
6  Q   Are you aware of any situations where a Dahn
7    employee was soliciting investors from a
8    Dahn Corporation e-mail account?
9  A   I would have to look at the e-mails. I don't know
10   for sure. The way it worked was like -- there was
11   oftentimes those e-mails would be like I'm going
12   to say Elizabeth would e-mail, and then like Brian
13   Dahn was on the e-mail or Nancy Naeve or whatever
14   was on the e-mail with a Dahn e-mail address, I
15   believe, and I can't be certain.
16       A lot of times there was like multiple
17   people copied. It was like you got a Dahn e-mail
18   domain, you got an Elevation e-mail domain and you
19   got a mobile home MHC America Fund. I mean, it
20   was like all over the place.
21  Q   So you believe there might be e-mails between
22   someone using a Dahn e-mail account and a
23   potential investor for Fund 7?
24  A   So I am not saying that I know of somebody from
25   Dahn who actually e-mailed to Fund 7 like from at

Page 175

1    Dahn.com e-mail, but what I'm saying is that there
2    were, I think, Dahn employees or like Nancy or
3    Brian or somebody that was on those e-mails as
4    like a BCC or a CC and they were involved with it.
5        They weren't -- they were the one
6    e-mailing, making the e-mail, but it was one of
7    the people, you know, the Elizabeth and the other
8    person.
9  Q   So Elizabeth might be the one making the e-mail?
10  A   Yeah. Elizabeth might make the e-mail and copy
11   somebody at Dahn and copy Jamie, copy Ryan, maybe
12   one at MHC America and one at Elevation and one at
13   Smith Companies. I mean, the e-mail, they were
14   all over the place with the domains being used.
15  Q   So was it your understanding that any time a Dahn
16   employee, regardless of the e-mail address they
17   used or the Dahn e-mail address appears anywhere
18   in the e-mail, that that's a form of
19   Dahn Corporation soliciting investors?
20  A   Well, I mean, the way I understand it is if they
21   are an employee of Dahn then that is related to
22   Dahn Corporation.
23  Q   But wouldn't the person -- the potential investor
24   receiving the e-mail, would they know that?
25  A   Well, I don't know that the people receiving the

Page 176

1    e-mail would know exactly what company they are
2    working for, especially when they are sending an
3    e-mail from, you know, MHC America Fund or
4    something that's not related, so, yeah, I wouldn't
5    know.
6  Q   But you wouldn't know what this -- the person who
7    was writing the e-mail, they might be a Dahn
8    employee, but you don't know in what capacity they
9    were writing that e-mail?
10  A   I mean, when you say capacity, like capacity as
11   what level they sat at Dahn Corp. or what level
12   they sat at -- I mean, we didn't have them as
13   employees at MHC America Fund, so I'm not really
14   sure like what you're asking.
15  Q   Let me put it this way. If you sent out an e-mail
16   from your MHC America Fund account and for
17   whatever reason the content of that e-mail gets
18   you sued, do you believe that that ropes in every
19   single other entity you might be involved in?
20       MR. STEWART: Objection to foundation.
21  A   Well, no, I would not assume that, no, not at all.
22  Q   And so I'm trying to understand why you believe
23   Dahn Corporation should be a defendant in this
24   lawsuit just because an employee of Dahn may have
25   sent an e-mail regarding Fund 7 while not using a

Page 177

1    Dahn account?
2       MR. STEWART: While not or while?
3  Q   While not using a Dahn account.
4  A   Well, you know, to me -- to me, if they would have
5    sent it out just Fund 7 and it's not from an MHC
6    America Fund investor or if it's a Fund 7 e-blast
7    and then they write an e-mail about Fund 7 to that
8    investor and it's from an MHCAmerica.com e-mail
9    address, it's probably not the hugest deal.
10       But if it's an e-blast from MHC America
11   Fund and they write an e-mail from MHC America
12   Fund, but they also include Fund 7 and MHC America
13   Fund then, yes, I think that's a problem.
14       So it's not necessarily where the e-mail
15   address comes from. It's more of, you know, the
16   intent of what they're doing. You know, are they
17   actually trying to divert funds from what they
18   should -- you know, our understanding that they
19   are raising money for MHC America Fund.
20  Q   So besides the e-mails we have been discussing, do
21   you have any other knowledge regarding how
22   Dahn Corporation solicited investors?
23  A   You know, other than their employees, you know,
24   which we have talked about, I don't have any
25   knowledge of Brian Dahn or anybody else like



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

178..181

Page 178

1    actually doing seminars, you know, like in person
2    like at the villages or that type of thing.
3         I know they were on some of the webinars
4    that were done, and they were soliciting
5    investors, you know, basically as promoting the
6    fund through the webinars which those e-blasts
7    went out to lots of investors that, you know, we
8    believe are on our proprietary lists, and so they
9    were promoting through webinar Fund 7, but as far
10   as like in person -- in a lot of cases other than
11   some of the webinars and his employees say he's
12   more like the operational person where the Smiths
13   are the investor people, similar to what the
14   historical part is.
15 Q    For the moment putting aside how the defendants
16      may have gotten the name of investors, do you have
17      any issue with Fund 7 soliciting investors?
18 A    I do not have issue with Fund 7 soliciting
19   investors generally, right.  I mean, that's their
20   right.
21 Q    And so whether it's the Dahn Corporation or the
22      other defendants, they are allowed to solicit for
23      their fund, correct?
24 A    I would agree with that.
25 Q    Your issue is whether or not they are using

Page 179

1    plaintiffs' alleged trademarks as part of that
2    solicitation, is that correct?
3 A    Yeah, the trademarks, track records, all of that
4    piece that they are using.
5 Q    Well, do you draw a distinction between a
6      trademark and the track record?
7 A    Well, I mean, the track record is more -- is
8    specifically, you know, listing out what each fund
9    did and how many properties that they have under
10   management and their, you know, loose connection
11   with affiliates and all of that, so I think
12   there's probably some distinction between -- I
13   don't say track record is -- their track record is
14   not our trademark.
15       There's pieces of it that they shouldn't be
16   using whether it's a trademark or, you know,
17   misleading or it's just not relevant.  It
18   shouldn't be in their documents.
19 Q    But you're suing on the use of the trademarks, not
20      the use of the track record, correct?
21       MR. STEWART:  Objection to foundation.
22 A    Well, so I think -- I think -- my understanding is
23   we are suing on the trademarks and then the -- and
24   the contents of the offering documents which is
25   the track record, I mean, the statements made in

Page 180

1    those track records and documents.  I think that's
2    more of a legal question than -- I mean, I just
3    can't -- I can't really make that distinction for
4    you right now, because I just don't understand
5    exactly how that -- you know, I'm not a trademark
6    attorney.
7 Q    Let me ask you this.  If you went into let's say a
8      BMW dealership and the salesman comes over and you're asking him
9      questions about the car, and you tell him, yeah,
10     well, I'm considering this one, but I'm also
11     looking at this Mercedes model, and if the
12     salesperson says, you know what, I used to work at
13     Mercedes, and I know a lot about Mercedes.  Let me
14     tell you all the differences between this car and
15     the Mercedes model, do you think the salesperson
16     there did anything wrong by using Mercedes in that
17     discussion?
18       MR. STEWART:  Objection to foundation
19     and the hypothetical.  You can answer.
20 A    Yeah, I don't think there's any problem with that.
21   I mean, that's what their job is.
22 Q    If someone has prior experience in something,
23      they're allowed to talk about it, right?
24       MR. STEWART:  The same objection.

Page 181

1 A    I believe so, yeah.
2 BY MR. DANIELS:
3 Q    And even if it's referring to something that might
4      be trademarked, they are allowed to talk about it?
5       MR. STEWART:  The same.
6 A    I mean, I think they would be allowed to talk
7    about it, yes, yes.
8 Q    Let's put it in the context of this case.  Let's
9      say Ryan and Jamie just told potential investors
10     we worked with Dave and Frank for ten years and we
11     learned from them.  Would that be okay?
12 A    I would say, yeah, I mean, generally, they could
13   say, yes, they learned from us maybe.
14 Q    Well, would they be allowed to say we have ten
15      years of experience working with Dave and Frank?
16 A    Yes.
17 Q    And could they say, you know, Dave and Frank, they
18      ran all of these funds?
19       MR. STEWART:  Can I get a continuing
20     objection?
21 Q    Yeah, that's fine.
22 A    Dave and Frank, yeah, were involved or -- if we
23   ran them, I guess, if that's the word you want to
24   use.  I think they could say, yeah, we were
25   involved with Dave and Frank and they ran these



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

182..185

Page 182

1    funds.  I think that's probably fine to say.
2  Q    You just want to make sure if they're discussing
3       your prior funds that there is proper disclosure?
4  A    Well, I think -- I think that's part.  I think
5       there has to be proper disclosure for sure, but I
6       also think that they should not be putting certain
7       things in the documents even if there is a
8       disclosure.
9  Q    And why is that?
10 A    Because it's not related to what they have
11      accomplished.  I think it's misleading investors.
12 Q    If you go to page 20 in Exhibit 1, and you have
13      paragraph 88, "Upon information and belief, the
14      Smiths, MHP, and Dahn were using plaintiffs'
15      confidential, proprietary investor lists and
16      contact information to solicit investors for
17      Fund 7."
18         What information do you have that Dahn used
19      plaintiffs' confidential and proprietary investor
20      lists?
21 A    I don't have -- I don't have like -- I mean,
22      you're saying Dahn.  Are you saying Dahn Corp.?
23 Q    Yes.  They are the defendant.
24 A    So, I mean, I don't know is it Dahn Corp. or I
25      don't know who sent out all the e-mails.  I don't

Page 183

1       know who sent -- I'm assuming Ryan Smith sent them
2       out through his Infusion account, but I don't know
3       if Dahn Corp. sent them out or Jamie sent them out
4       or Elizabeth or whoever sent them out, so I don't
5       specifically know who sent them out.
6          I don't know who has access to the list,
7       but what I have seen is that many things that we
8       sent to Ryan like, you know, really confidential
9       stuff, he sent on to Dahn, like lists of
10      properties we might sell or various other
11      spreadsheets, so I'm wondering, you know, maybe he
12      sent those to Dahn.
13         I don't know what -- what all he sent, so I
14      can't tell you that Dahn Corp. sent them out or
15      Ryan or who, but I'm well certain that somebody
16      was using our list and sending them out through
17      that Fund 7.
18 Q    Well, if you don't know whether or not Dahn was
19      using them, why is Dahn included in this
20      allegation?
21 A    Well, Dahn is a party to the Fund 7 agreements.
22 Q    But you still don't have any information that Dahn
23      used the investor lists, correct?
24 A    Well, Fund 7 used the investor lists, and so as
25      Dahn is part of Fund 7, that would make me feel

Page 184

1       like Dahn used them or it benefited from them or
2       something like that.
3  Q    In your view is anything Fund 7 did Dahn is liable
4       for as well?
5  A    Well, I wouldn't say anything Fund 7 did Dahn
6       would be liable for.  I think anything that he
7       approved or had a say so in Fund 7 he probably
8       should be -- anything that he had the authority or
9       needed to have the authority to approve of or, you
10      know, had the say so to do, he probably should --
11      you know, it should be liable for that case, you
12      know, for things that -- like if Ryan Smith is the
13      one that downloaded the list, never shared it with
14      Dahn, and sent it out, then I don't know that I
15      would say Ryan Smith personally or his personal
16      theft would be a Dahn problem.
17         So I think the distinction would be, you
18      know, does Dahn have knowledge and does Dahn
19      participate in what was going on with Fund 7 on
20      that piece of it.
21 Q    So are you saying that if let's say Ryan or Jamie
22      pulled names off of plaintiffs' investor list and
23      then separately said to Dahn Corp., hey, would you
24      mind contacting these investors and just gave them
25      some names, Dahn might not have done anything

Page 185

1       wrong there because they didn't know where the
2       investor names were coming from?
3  A    I mean, yeah, I think -- the way you say it, I
4       would say, yeah, Dahn, if they don't know where
5       it's coming from, I don't -- I would not say
6       that -- you know, I don't know.
7          I actually don't really know the law on all
8       this.  I mean, I just morally I would say, yeah,
9       you know, they probably shouldn't be liable, but
10      maybe legally, I don't know, maybe they should
11      because they should -- maybe there is legal
12      arguments that they should do diligence or
13      something.
14 Q    And you're not aware of any facts that
15      Dahn Corporation knew that they had possession of
16      any confidential and proprietary investor lists,
17      is that correct?
18 A    And when you say they, the Smiths, I mean, Ryan
19      and Jamie?
20 Q    No, Dahn Corporation.  You don't have any
21      knowledge or facts that Dahn Corporation to the
22      extent they had plaintiffs' confidential investor
23      list, you don't have any knowledge or facts that
24      Dahn Corporation knew that?
25 A    That they knew that or they have that?  Sorry.



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

186..189

Page 186

1 Q   That they knew it.
2 A   I do not have that information, correct.
3 Q   And so is the reason that they're included in
4     paragraph 88 is you are assuming that they do?
5 A   Well, in paragraph 88, you know, the assumption is
6     that the Smiths, MHP and Dahn, MHP being Fund 7,
7     the Smiths and Dahn being managers or whatever
8     that legal structure is, are part of Fund 7, that
9     they're all involved with obtaining that -- you
10     know, obtaining benefit from those investor lists.
11 Q   Well, wouldn't every single investor in Fund 7
12     technically benefit from that?
13 A   Of them having our investor list?
14 Q   Well, let me put it this way.  Your concern is
15     that Dahn is going to benefit because they own an
16     interest in Fund 7?
17         MR. STEWART:  Objection to foundation.
18 A   Well, Dahn would benefit because they get -- I
19     believe they get acquisition fees, management
20     fees, disposition fees, asset management fees,
21     capital raising fees, loan guarantee fees, all
22     those type of fee structures, plus they have a
23     back-end promote, so the more investment dollars
24     come in, assuming they invest in good properties
25     and make money, the more money Dahn Corporation

Page 187

1     gets.
2 Q   Yeah.  So the more money Fund 7 makes, the more
3     money Dahn makes?
4 A   Assuming they put the money to good use and make
5     money with it.
6 Q   And my question is:  Isn't that true for all
7     investors in Fund 7?  If Fund 7 makes more money,
8     the investors make more money?
9         MR. STEWART:  Objection to form,
10     foundation, misstates the testimony.  You can
11     answer.
12 A   Well, if the Fund 7 investors -- if the Fund 7
13     makes money and the investors make a good return
14     then, yeah, they would be benefited by having a
15     good return, yes.
16 Q   I'm going to the next page, page 21, paragraph 92.
17     The complaint states, "The Smiths and Dahn have
18     prepared a private placement memorandum and other
19     related marking materials."
20         And my question is:  What facts do you have
21     that Dahn prepared the private placement
22     memorandum and other related marketing materials?
23 A   Well, based on the fact that my -- my assumption
24     is Dahn is a manager and a property manager for
25     the fund and a sponsor.  It's my assumption just

Page 188

1     because of what I think I had heard from Jamie at
2     one point that, you know, she was doing a fund for
3     self-storages with Dahn.
4         My assumption there would be that, you
5     know, Dahn didn't just sign off on it without
6     reviewing it and, you know, wouldn't just like let
7     Ryan and Jamie go write the documents up and say,
8     here, sign this, and you sign it, and that's it.
9     I would assume they would get legal advice or
10     something, so it's an assumption that, you know,
11     parties to an agreement are involved in that
12     agreement for the most part.
13 Q   And do you have any knowledge that
14     Dahn Corporation had control over what went into
15     the private placement memorandum?
16 A   Well, at this point with some of the production
17     stuff that I have seen, yes, they were involved
18     with making comments and redlines and making
19     changes to that type of stuff, yes.
20 Q   And I want to draw a distinction between having
21     involvement and having control.
22         So for example, are you aware that if there
23     was a disagreement between the other defendants
24     and Dahn Corporation about what was going to go in
25     the offering materials that Dahn could have said

Page 189

1     this is what we are going to do?
2 A   I don't know the answer to that for sure, no.  I
3     don't know who has control.  I assumed it was
4     50/50, but I do not know a hundred percent.
5 Q   So when the plaintiffs filed the complaint against
6     Dahn, it was your understanding that the company
7     decisions would be 50/50?
8 A   Yeah, that it would be made 50/50 between the two.
9 Q   And the offering material which has been marked as
10     Exhibit 2 which I think is a total of 242 pages --
11 A   Right.
12 Q   The vast majority of this document you don't have
13     an issue with, correct?
14 A   I mean, for the most part -- I mean, for the most
15     part I don't really have an issue with it.  I was
16     a little upset when I found out that it was
17     basically a redline from MHC America Fund, but I
18     mean the vast majority of it -- you know, the
19     first three big agreements, I mean, off of
20     recollection, other than a few kind of outlandish
21     statements that are in there, I don't have an
22     issue with them.
23 Q   And really I mean your concern in this lawsuit is
24     the use of plaintiffs' names in the investment
25     summary and the track record?



Page 190

1         MR. STEWART:  Objection to form.  You
2    can answer.
3  A    It's the use of our names inducing investors that
4    should have probably went to MHC America Fund or
5    MHC America Fund 2.
6         It's, you know -- you know, using our
7    names, which to me, it's just a lot -- I mean,
8    everybody -- like I said before, you know, a lot
9    of people recognize Frank and Dave from the
10   industry.
11        I mean, you can go talk to anybody in the
12   industry that's been around for more than a year
13   and say who is Frank and Dave, and they will tell
14   you, but if you say who is Ryan and Jamie, nobody
15   is going to know who they are, or Brian.
16        So the fact that people, you know, had
17   invested with us, you know, through MHPI 1 through
18   4, through ACF funds, through the Alumni funds,
19   through MHC America Fund, they see this
20   progression of Frank and Dave is involved with
21   everything, Frank and Dave, Frank and Dave.
22        And so this new Fund 7 comes out.  In our
23   original discussions of MHC America Fund we called
24   it Fund 7.  Then there is this new Fund 7 that
25   comes out.  And to me, if you're selling a fund

Page 191

1    that you're calling Fund 7 on both sides, it
2    confuses the heck out of investors, and I wonder
3    whatever happened to MHPI Fund 6.
4         But, I mean, it's all those little pieces.
5    I just -- we don't want people to feel like we're
6    involved with something that we're not, which many
7    people have said that -- you know, or had called
8    before they invested and said, hey, are you guys
9    involved with this?  And we're like, no, we're not
10   involved with that, and so they don't invest.  Or
11   people, you know, say, oh, my gosh, I invested
12   there and you're not involved, that kind of thing.
13        And so we don't want to be, you know, five
14   years down the road, you know, sitting there and
15   getting a call from the SEC saying, hey, Frank and
16   Dave, you know, these investors said you guys were
17   involved with Fund 7 and now it's bankrupt, you
18   know, we want you to come in and talk to us.
19   That's one problem, and we're not confident in the
20   Smiths' operational skills whatsoever.
21  Q    And at the time the offering materials were first
22   prepared in April of 2017, you still had a
23   business relationship with the Smiths, correct?
24  A    We did, yes, uh-huh.
25  Q    So if this track record and investment summary was

Page 192

1    presented to Dahn Corporation and they reviewed
2    it, would they have any reason to think that you
3    and Frank had a problem with this?
4         MR. STEWART:  Foundation.
5  A    You know, I think -- I think that's just really
6    hard to answer because I don't know how -- I mean,
7    I saw an e-mail where Brian Dahn wrote to Ryan and
8    Jamie Smith, what is MHCA?  He doesn't even know
9    what MHC America Fund is, and that was like in
10   April 2017.
11        So to me, it's like, you know, what does he
12   know, what doesn't he know, you know, and what
13   does everybody else at Dahn Corp. know?  Because,
14   I mean, you've got to think that -- I mean, I
15   would think that Elizabeth and the Dahn employees
16   know about MHC America Fund because they are
17   helping investor relations, but I don't know -- I
18   mean, I think this is so hard to answer because I
19   just don't know what he knew or what they knew.
20  Q    If you go to page 223 of Exhibit 2 --
21  A    Right.
22  Q    And this is the track record, correct?
23  A    This is -- yeah, I mean, that's part of -- I guess
24   you would call the track record, the track record
25   document, yep.

Page 193

1  Q    And here it's discussing prior similar funds?
2  A    Yes.
3  Q    And it lists out many of the plaintiffs
4    in this case, correct?
5  A    It does.
6  Q    On this chart here?
7  A    Yeah, or abbreviations of them, yeah.
8  Q    Now, these track records are used to provide
9    historical information to potential investors,
10   correct?
11  A    That's correct.
12  Q    Investors understand that they're not investing in
13   one of these prior similar funds, correct?
14  A    They should understand that, yes.  I'm not saying
15   that they all do, but they should.
16  Q    So it's your understanding that most investors
17   looking at this would realize, okay, this is data
18   regarding prior funds?
19  A    Correct.
20  Q    And then at the top there it says affiliates of
21   the members of the manager of MHPI 7, LLC have a
22   strong track record that spans two decades.
23        Do you see that?
24  A    Yep.
25  Q    And that's, from my understanding of



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

194..197

Page 194

1 your testimony, that's where you really have an
2 issue is the fact that they are making it sound
3 like they are affiliated with these other prior
4 funds. Is that a correct summary?
5 A    Yes, I think that would be -- yeah, that's
6    definitely part of it, that they're saying that
7    they are affiliated with the funds that they are
8    not affiliated with and -- yes.
9 Q    Now, some of the funds on this list they are
10    affiliated with, correct?
11 A    That's correct.
12 Q    And you would agree that for a lot of the kind of
13    marketing and soliciting the plaintiffs do, they
14    often lump all of the funds together, correct?
15 A    Yes. Correct.
16 Q    And Ryan and Jamie would be a part of those
17    solicitations, correct, where all the funds were
18    discussed together?
19 A    They were part of that for sure on
20    MHC America Fund, yes.
21        (Exhibit 6 marked.)
22        (Discussion off the record.)
23        THE VIDEOGRAPHER:  The time is 3:17 and
24    we are off the record.
25        (Break taken.)

Page 195

1        THE VIDEOGRAPHER:  The time is 3:28 and
2    we are back on the record.
3 BY MR. DANIELS:
4 Q    Okay.  Mr. Reynolds, I had handed you before our
5    break Deposition Exhibit Number 6.
6 A    Yes.
7 Q    And my first question is do you recognize
8    this document?
9 A    It looks like, yes, it looks like an investment
10    fund summary for -- I think it's a set of slides
11    for like a PowerPoint of some sort that was done.
12 Q    So it would have been part of a presentation?
13 A    Correct.
14 Q    And so the five names we see on the front here,
15    yourself, Frank Rolfe, Eric Siragusa, then Ryan
16    Smith and Jamie Smith, would they have all
17    presented at this presentation?
18 A    I don't know if everybody presented.  I think it
19    was -- boy, I just don't recall who all presented.
20    I mean, I think I did and Frank, and I don't know
21    that Jamie did.  I think maybe Eric and Ryan did
22    somewhat, but I just don't recall for sure.
23 Q    And would it be common for Ryan or Jamie to
24    present at one of these presentations?
25 A    So I don't recall -- I don't recall if this is

Page 196

1    a -- like a presentation that we did like all
2    together on like a webinar or if this is something
3    that Ryan was doing separately with Jamie maybe at
4    some of their villages presentations or what have
5    you.  I just don't know where all this was used.
6 Q    Well, would you do presentations with Ryan and
7    Jamie?
8 A    I think I did two in the last ten years maybe.
9 Q    Would this presentation though have been on behalf
10    of MHC America?
11 A    It would have been, yeah, for raising funds for
12    MHC America Fund.
13 Q    And so would this be to current investors,
14    potential investors?  Who is the audience?
15 A    So this would be for current and potential
16    investors.
17 Q    And if you go to the page that has the -- well, I
18    guess it's slide 10.  Do you see the slide
19    numbers?
20 A    I don't see that.
21 Q    It's also the one that has the Bates number 54930.
22 A    With the pictures?  Okay.
23 Q    So on that slide it's "Meet the MHC America team."
24    Correct?
25 A    Correct.

Page 197

1 Q    And then Ryan and Jamie's pictures are on there,
2    correct?
3 A    That's correct.
4 Q    And then if you flip to slide 12 where it says MHC
5    America and affiliate snapshot, do you see that?
6 A    Yep.
7 Q    So the data on this slide, it would include more
8    than just the MHC America Fund, correct?
9 A    This would include -- yes, it would include more,
10    correct.
11 Q    So when you would do these presentations to
12    investors or potential investors, even if it was
13    MHC America Fund, you would often lump in all of
14    the funds?
15 A    So if we were doing those like Frank and I or
16    Eric, we would lump in all -- you know, we would
17    lump in all the funds that Frank and I were
18    involved with.
19        So I think that's the distinguishing mark
20    is if it includes Frank and I and we're promoting
21    this fund, then it lumps it all in.  If it
22    doesn't, then it shouldn't lump all the stuff in
23    that somebody else doesn't have a relationship
24    with.
25 Q    I mean, that disclosure is not made anywhere in



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

198..201

Page 198

1    this document, correct?
2  A   The disclosure for?
3  Q   Well, let me put it this way.  It doesn't say
4    anywhere in here that Ryan Smith and Jamie Smith
5    are not involved in all of the funds discussed in
6    this presentation?
7  A   I don't think it does.  I'd have to review.  I saw
8    some disclaimer, but I don't know what it said.  I
9    passed by it here.  It doesn't look like it says
10   that, no.
11 Q   Let's mark this as Exhibit 7.
12         (Exhibit 7 marked.)
13 Q   Do you recognize this e-mail?
14 A   You know, I don't really recognize it because I
15   don't think I was copied on it, and I don't really
16   remember it.
17 Q   And who is Eric Siragusa?
18 A   Eric Siragusa is part of the sponsorship of
19   MHC America Fund and then the AHCF funds and the
20   MHC America Fund 2 and the AWA funds.
21 Q   And would you understand that what Mr. Siragusa is
22   providing here is some bio summaries for a
23   presentation?
24 A   Yeah.  I'm not sure who wrote the bios, but maybe
25   Eric did.  I don't know where this came from, but,

Page 199

1    yeah.  I mean, it looks like he's writing bios for
2    a presentation or they're included.
3  Q   And, again, for Ryan Smith it says Ryan Smith is a
4    principle of MHC America LLC.  MHCA and their
5    affiliated companies are estimated to own and
6    control the third largest number of MHCs and the
7    fifth largest number of mobile home lots in the
8    country.
9         Do you see that?
10 A   I do.
11 Q   So again that's referring more to than just the
12   funds in MHC America, LLC, correct?
13 A   That's correct.
14 Q   And in 2016 would you have had any problem with
15   this bio being used in connection with Ryan?
16 A   For this purpose I would not have a problem with
17   it because it's related to a fund that actually
18   has members that have the 21,000 lots.  You know,
19   the common bond was Frank and I in all the funds,
20   so we're included, so I don't have a problem with
21   it.
22 Q   But Ryan Smith personally wouldn't be affiliated
23   with all those funds is your testimony, correct?
24 A   Ryan Smith would not be personally affiliated,
25   right.  It looks like the bio almost is the same

Page 200

1    for the first line or two.
2  Q   For all three individuals?
3  A   It does, yeah.
4  Q   Yeah.  And earlier in your testimony with
5    Mr. Crosbie I recall you saying that the Smiths'
6    involvement was really just contacting investors
7    or communicating with investors, is that correct?
8  A   Fundraising and communications basically.
9  Q   I mean, I think you said they didn't do a lot of
10   the market analysis and that type of work?
11 A   None of it that I'm aware of.
12 Q   But in this bio for Ryan it states, you know, he
13   brings with him more than 15 years of business
14   experience in market evaluation, property
15   analysis, management systems, due diligence and
16   investor relations.
17        Do you see that?
18 A   I do, yes.
19 Q   So you disagree with that statement?
20 A   You know, I think it's very false -- you know,
21   false advertising for the most part, yes.  I do
22   pretty much disagree with it.  I mean, I don't
23   think Ryan has done like much of that at all for
24   15 years.
25 Q   Do you know if MHC America ever used this bio?

Page 201

1  A   I don't know for sure.  I mean, I really don't,
2    because I was not part of this e-mail string that
3    I'm aware of.
4  Q   If they did, do you think they were providing
5    accurate information to their investors?
6  A   Well, I mean, if it used it and, you know, it
7    wasn't retracted or something -- it's certainly
8    not providing the level of accuracy that I would
9    consider accurate, so I would say probably some of
10   it isn't accurate maybe.  I just don't know what
11   was used.
12 Q   If Dahn Corporation was aware of these materials
13   or similar materials where Ryan and Jamie were
14   being discussed in connection with basically all
15   the Dave and Frank funds, do you think they would
16   have any reason to have concern with the track
17   record in Exhibit 2?
18        MR. STEWART:  Objection, foundation.
19 A   I mean, I think -- I think it just really depends
20   on -- I think so much depends on what they really
21   know about Brian and Jamie and what their
22   involvement was.
23        You know, I don't know if Ryan and Jamie
24   said, well, we have been managing all these
25   properties, we have been doing the diligence,



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

202..205

Page 202

1    we've been acquiring them, we find them.
2         If they are telling Dahn that, then he's
3    probably not going to have a problem with it.  But
4    if they're we're just specifically fundraisers and
5    communications with investors and that's all we do
6    and we're not involved in these other funds then,
7    you know, I think he would have -- probably should
8    have a problem with it.
9         But, I mean, I just don't know the
10   relationship, and I think -- I think without
11   knowing that I think you can't really answer
12   the question the way that I think -- you know, I
13   just don't know the answer.
14  Q    So if we don't have a lot of information and
15       answers regarding Dahn Corporation, why was it
16       made a defendant in this case?
17            MR. STEWART:  Objection, foundation.
18  A    I mean, the reasoning is it's -- it's part of
19   Fund 7 and as being part of Fund 7 they are
20   benefiting from the track record, they are
21   benefiting from the investors that were diverted.
22       You know, basically all the claims that we
23   made, you know, is our best belief at that point
24   that they're benefiting and they're guilty of this
25   stuff.  I mean, without having something to the

Page 203

1    contrary, we just -- that's our best belief that
2    they are, and that's why they're involved.
3   Q    So your understanding was because they're
4        benefiting from Fund 7 that they should be brought
5        into this lawsuit?
6            MR. STEWART:  Objection, foundation.
7   A    Well, they are benefiting from Fund 7.  They are
8    collecting management fees for managing the
9    properties in Fund 7.  They are collecting
10   acquisition fees, disposition fees.
11       I mean, they are getting all these fee
12   streams in Fund 7, and part of the reason that
13   those fees are higher and the properties they can
14   buy are more is because of the diverting of
15   investors, misleading investors with track records
16   and investment summaries and not disclosing to
17   investors that we're not involved, Frank and I are
18   not involved and Eric.
19       That's -- you know, that's where I feel --
20   you know, they're involved with all those
21   different pieces and they should be -- you know,
22   without evidence to the contrary, I think they
23   should be part of the case, and that was our best
24   belief when we filed the suits.
25  Q    You don't think the fact that they are a separate

Page 204

1    legal entity makes any difference, that they're
2    not Fund 7?  They are not the ones putting out the
3    offering package?
4            MR. STEWART:  Objection, foundation,
5    legal conclusion.
6   A    Well, they are -- I don't know.  You know, I'm not
7    going to answer the -- I can't like opine on all
8    the legal corporation stuff, but if they're a
9    manager of Fund 7, a sponsor of Fund 7, property
10   manager of Fund 7, if Dahn Corporation is doing
11   that, which my assumption is that's what they were
12   doing, then they should be brought in.  Whether
13   they're a legal separate entity or not, they are
14   controlling or benefiting from Fund 7.
15            (Exhibit 8 marked.)
16  BY MR. DANIELS:
17  Q    Take a moment to read through it, but just let me
18       know if you recognize what has been marked as
19       Exhibit 8.
20  A    Yeah.  It looks like an e-mail with me and one of
21   our investors and I think a few of our different
22   funds like the AHCF funds and MHC America Fund 1,
23   I believe.
24  Q    And is this one of the e-mails you've been
25       referring to when you hear from investors and they

Page 205

1    are confused?
2   A    Let me just look at the beginning of it.  No, this
3    is not necessarily one of those, no.  I would not
4    say that.  I mean, it has a reference to Dahn, but
5    it's more of a -- I think they found about Fund 7
6    and were asking about my knowledge, I guess, of
7    Dahn.
8   Q    Well, they are asking whether or not you or the
9        entities you're involved with have any affiliation
10       with Brian Dahn, correct?
11  A    That's correct.
12  Q    And in response at the top of this chain of
13       e-mails you write, "Thanks.  We have never been
14       affiliated with Brian Dahn, just a few of his
15       partners."
16  A    Right.
17  Q    And the partners you're referring to are Ryan and
18       Jamie Smith, correct?
19  A    That is correct.
20  Q    So you're at least telling this investor that you
21       have an affiliation with Ryan and Jamie, correct?
22  A    Well, when I say -- yeah.  When I say affiliated,
23   I mean we were involved with MHC America Fund and
24   MHPI 1 through 4.
25  Q    But you don't break it down by entity, correct?



Page 206

1  A    Well, no.  I mean, if I wrote e-mails like that
2      that's all I'd be doing the rest of my life, I get
3      so many e-mails.
4  Q    We'll mark this as Exhibit 9.
5           (Exhibit 9 marked.)
6  BY MR. DANIELS:
7  Q    So let me know if you recognize Exhibit 9.
8  A    Yes.  It looks like our response to
9      Dahn Corporation's first interrogatories and
10     requests for production.
11 Q    And if you go to the very last page where it says
12     verification?
13 A    Okay.
14 Q    Is that your signature?
15 A    That is.
16 Q    Okay.  If you go to interrogatory number 8, and
17     this has to do with the legal and factual basis
18     for plaintiffs' contention that Dahn infringed any
19     of the trademarks at issue in this case, and I'm
20     just trying to clarify here.
21         Are you aware of anything other than the
22     offering package that has been attached to the
23     complaint where Dahn has infringed the plaintiffs'
24     trademarks?
25 A    Well, it would just be in the -- it would be in

Page 207

1      any of like the webinar things where he was part
2      of that or Dahn was part of that.  I mean, the
3      e-mails, you know, that type of stuff.
4          I'm not thinking of anything else.  You
5      know, the website where it's Fund 7 and Dahn's
6      picture is on there and all the Dahn employees,
7      but I think that's the most of it.  I can't think
8      of anything else right this minute.
9  Q    And so again going back to the e-mails and the
10     webinars, the trademarks aren't used in those,
11     correct?
12 A    Well, I think the trademarks are used in some of
13     those, yes.
14 Q    Which trademarks?
15 A    Like in the webinar I think they are showing the
16     prior funds, you know, the plaintiffs' funds and
17     the returns and the distributions and that type of
18     thing, and the webinar, and on the website as
19     well.
20 Q    Do you know if Dahn prepared those materials?
21 A    I don't know who for sure prepared the materials.
22     I believe Dahn -- like I said before, Dahn is part
23     of Fund 7 in one of the capacities I mentioned,
24     but I don't know who prepared them and actually
25     posted them.  I do know if you go to Dahn's

Page 208

1      website and click on it, it brings you to Fund 7.
2  Q    Let's take a look that.  We will mark this as
3      Exhibit 10.
4  A    Okay.
5           (Exhibit 10 marked.)
6  BY MR. DANIELS:
7  Q    And do you recognize this as a print-off of the
8      Dahn webpage you were just referring to?
9  A    It looks somewhat familiar, yes.  I haven't been
10     on there for a while, but it looks similar to the
11     one I signed before, yes.
12 Q    And you would agree that nowhere on this webpage
13     are any of the plaintiffs' trademarks used,
14     correct?
15 A    On this webpage?
16 Q    Yes.
17 A    I don't see them on the webpage.
18 Q    Instead if you go to page 3, there is a line
19     there.  It would be a link if you were actually
20     online.  It says investor information.  Do you see
21     that?  It's kind of down near the bottom.  It's in
22     small print.  Do you see that, investor
23     information?
24 A    Yes.
25 Q    And that is what you're saying links to the Fund 7

Page 209

1      website?
2  A    Well, I don't know if that does.  You know, before
3      there used to be a big old button on the website,
4      if I recall correctly.
5  Q    But it was always a link that just said investor
6      information, correct?
7  A    Yeah, I believe.  I don't know if it just said
8      investor information, but it said -- I thought it
9      said something like "invest in our fund" or
10     something along those lines.
11         It's been a long time.  I'd have to go back
12     through and see if I have like an old -- you know,
13     go to the way-back machine and see what it looked
14     like way back.
15 Q    When did you first come across this webpage?
16 A    You know, I would have to say I don't know for
17     sure.  I'd have to say probably mid last year, you
18     know, 2018, somewhere in that timeframe when we
19     started really researching what was going on.
20 Q    When you saw the Dahn webpage?
21 A    Yeah, I guess the -- I don't recall if it was the
22     Mini-U-Storage site webpage or the Dahn Corp.
23     I don't recall exactly what the domain was.
24 Q    But anyways, your understanding there's a link and
25     then it goes to the Fund 7 webpage, correct?



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

210..213

Page 210

1  A     That is my understanding.  That's the way I recall
2        it, yes, when I looked at this months and months
3        ago.
4  Q     Are you aware of any Dahn Corporation created
5        document that uses any of the plaintiffs'
6        trademarks?
7  A     You know, I think I'm aware of Fund 7 documents
8        which I think are somewhat signed off on by Dahn,
9        but as far as like Dahn Corporation, you know,
10       writing it for -- you know, writing on behalf of
11       Dahn Corporation, I can't say that I'm aware of
12       anything right now, but not to say that I haven't
13       seen something in the past.  I just don't recall
14       for sure, but I can't give you an example right
15       this moment.
16  Q    If you go to interrogatory number 13, and this
17       asks describe in detail the legal and factual
18       basis for your contention that Dahn had the
19       ability to direct or control Elevation and
20       Fund 7's alleged use of your trademarks.
21            And in the response it says, "Based on the
22       perceptions by the plaintiffs of the interactions
23       between Dahn and the other Smith defendants,
24       including statements made by the Smith defendants
25       to the principles of the plaintiff, Dahn appears

Page 211

1        to control all decisions related to Fund 7."
2             And my question is what facts do you have
3        to support the statement that Dahn appears to
4        control all decisions related to Fund 7?
5  A     Which one are we on?
6  Q     13.
7  A     Okay.  I got it.  Well, at this point I think we
8        have a copy of the agreements, so we're reviewing
9        the PPM and the LLC agreement for the fund,
10       Fund 7.
11  Q    But what in that agreement gives Dahn control over
12       all decisions?
13  A     I mean, I'd have to go back and look at it, but I
14       think -- when you say control, I think it means
15       like it's 50/50 and so they would control all the
16       decisions in some manner.
17            I mean, it's like if there's a deadlock
18       then they're basically controlling that.  You
19       can't proceed.  I mean, I don't -- I don't really
20       know the exact -- I don't recall what the exact
21       language is that we reviewed on that agreement,
22       but it appeared to me when I kind of reviewed this
23       and talking with our attorneys that they were in
24       control or basically when you're 50/50 and there's
25       no -- what am I trying to say?

Page 212

1             I think there was actually something in
2        there that basically says if there is a deadlock
3        then Dahn gets to choose, if I'm not mistaken.  I
4        could be wrong, but I think there is something in
5        that agreement that basically gives them the
6        ultimate right.
7  Q     And again this goes back to our earlier
8        conversation about using corporate forms.
9  A     Right.
10  Q    And at the end of the day, all decisions of a
11       corporation are made by people, right?
12  A     Correct.
13  Q    But the point of the corporate form is that,
14       barring certain circumstances, the individuals
15       don't get sued.  The corporation does, right?
16            MR. STEWART:  Objection, foundation.
17  A    I mean, I think that typically that's the goal is
18       that the corporation gets sued and not the
19       individual.  I think that's the reason you set up
20       the entities for sure.
21  Q    So in this case why not sue just Fund 7?  Why
22       bring Dahn Corporation into it if all the actions
23       are being taken by Fund 7?
24            MR. STEWART:  The same objection, legal
25       conclusion.  You can answer.

Page 213

1  A    I think it's identifying the major players of
2       Fund 7, plus Fund 7.  That's the rationale that we
3       had.
4  Q    But why do you need the major players in it if the
5       conduct is by Fund 7?
6            MR. STEWART:  The same objection.
7  A    I think that's -- I mean, I think it's advice from
8       our attorneys that we would go that route.
9  BY MR. DANIELS:
10  Q    Now, when this lawsuit was filed, you were
11       involved in other lawsuits with the Smith
12       defendants, correct?
13  A    I guess you would say arbitrations are lawsuits,
14       yes.
15  Q    Yeah, arbitrations, lawsuits?
16  A    Right.
17  Q    There was other litigation going on with Ryan and
18       Jamie Smith?
19  A    Correct.  Yes.
20  Q    Dahn Corporation wasn't involved in any of those
21       lawsuits, correct?
22  A    That is correct, as far as I know.
23  Q    But by dragging Dahn Corporation into this
24       lawsuit, it might put pressure on Ryan and Jamie
25       Smith, correct?



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

214..217

Page 214

1      MR. STEWART:  Objection to form.
2  A    Well, I mean, I think it would right a wrong, you
3      know, and certainly would pressure them if they
4      are filing lawsuits like sending mail out to your
5      best friends.
6          I mean, I think it's -- I think we have had
7      this problem that was ongoing and we had talked
8      about filing or putting some type of action in
9      back in April or May when we actually sent the
10     letter out from the Lowndes firm to tell them to
11     get our names off their stupid crap, and after
12     multiple, multiple times they still hadn't done
13     it.
14  Q  Did you ever send that letter to Dahn Corporation?
15  A    I don't know where it was -- I don't know who all
16     received it.  It was sent to the -- it was sent --
17     I don't know who -- I would have to look at the
18     letter.  I don't know.  I think Lowndes at this
19     point I think they still -- they may have still
20     represented them or that's when they stopped
21     representing them legally.  I don't recall
22     exactly, but I think Lowndes was like where they
23     were supposed to deliver stuff for Fund 7.  Now
24     I'm just kind of speculating a little bit because
25     I don't know for sure.

Page 215

1  Q    Are you aware of any cease and desist
2      correspondence or other communication regarding
3      these trademarks in this case that was ever sent
4      to Dahn Corporation prior to the filing of the
5      lawsuit?
6  A    I am not aware of ever sending it to the
7      Dahn Corporation, no, I am not aware of that.
8  Q    And then if you go back to interrogatory number
9      12, and this one asks identify the date on which
10     you first discovered the investor information link
11     on Dahn's website that is discussed in paragraph
12     97 of your second amended complaint.
13         Do you see that?
14  A    I do.
15  Q    Now, you have an understanding that Dahn had filed
16     a motion to dismiss in this case on plaintiffs'
17     first amended complaint?
18  A    Yes.
19  Q    And that was granted?
20  A    Well, I think it was granted partially maybe
21     should be more the way to describe that.
22  Q    It allowed plaintiffs the opportunity to include
23     additional allegations against Dahn, correct?
24  A    That's right, that's correct, yes.
25  Q    And the second amended complaint which is the one

Page 216

1      we've been discussing today, that has allegations
2      regarding this investor information link, correct?
3  A    This one does have that in there.  I'd have to
4      compare them to see if the other one did, but this
5      one does have it in there, yes.
6  Q    Well, I'll represent to you that it was not in
7      there.
8  A    Okay.
9  Q    And so in this interrogatory it states, "Plaintiff
10     state they learned of the investor information
11     link on Dahn's website in advance of filing the
12     second amended complaint."
13  A    Okay.
14  Q    So my question is:  Did you discover the investor
15     information link in between the first amended
16     complaint and the second amended complaint?
17  A    I don't recall when that happened.  I would have
18     to go back through all my e-mails to our counsel
19     and all that to see when that was discovered.
20     I don't recall.
21  Q    So sitting here today when plaintiffs filed either
22     the original complaint or the first amended
23     complaint, you don't recall whether or not
24     plaintiffs were aware of the investor information
25     link on the Dahn webpage?

Page 217

1      MR. STEWART:  Objection to form and
2      foundation, misstates the testimony and the
3      interrogatory.
4  A    I don't recall the date off the top of my head.
5      I don't recall.  I mean there's so much different
6      things going back and forth and e-mails and all.
7      I just don't recall the date on this one.
8  Q    Do you think upon further digging you could figure
9      out the exact date?
10  A    I think it's very likely that I probably could,
11     yes.
12  Q    And then going up to interrogatory number 10, that
13     states, "Describe in detail when and how you
14     became aware that Dahn, separate and apart from
15     any of the other defendants, infringe your
16     trademarks."  And there the answer is the spring
17     of 2018.
18         Do you see that?
19  A    Yes.
20  Q    And so my first question is:  Is that separate
21     from when you discovered the infringement by the
22     other defendants?
23  A    Yeah, that's a tough one.  I think I -- I think
24     we're aware of what the other defendants were
25     doing with much more clarity much earlier than --



Page 218

1    and then in the spring that's when I got the
2    letter which then allowed me to go download all
3    these documents, the track records and all that
4    from that letterhead that had a link to it.
5        That's when, you know, I had more
6    information or enough information to know that,
7    well, Dahn is involved with the management, the
8    property management, you know, and they were --
9    you know, they basically must have signed off on
10   all the different documents.
11       So that's -- I was aware of issues with the
12   Smiths prior to really Dahn. I mean, I just never
13   interacted with Dahn. I didn't really ever -- I
14   talked to him, I think, once and maybe e-mailed
15   once with him like months before that.
16       You know, I just don't -- I just don't
17   recall like -- I mean, I knew they were involved
18   with Dahn and the fund, but I don't recall like
19   specifically anything that Dahn did or didn't do,
20   because I didn't know who signed what
21   at that point, so it really was the spring when I
22   really knew the brunt of what I know.
23  Q   As to Dahn?
24  A   Right.
25  Q   You might have had information regarding the other

Page 219

1    defendants prior to that, is that correct?
2   A   That is correct, yes, because prior to that it was
3    the majority of issues were with investors and
4    confusing investors, and that was always coming
5    back not really to Dahn, but to the Smiths because
6    they are the ones out there communicating with all
7    the investors.
8        (Discussion off the record.)
9        THE VIDEOGRAPHER: The time is 4:03 and
10   we are off the record.
11       (Break taken.)
12       THE VIDEOGRAPHER: This is beginning of
13   media unit number four. The time is 4:04 and we
14   are back on the record.
15  BY MR. DANIELS:
16  Q   Mr. Reynolds, I believe you testified earlier that
17   you are now aware that Peter Reinert served as
18   counsel for Fund 7, correct?
19  A   That is correct.
20  Q   When did you first learn that Mr. Reinert was
21   legal counsel for Fund 7?
22  A   I want -- I want to say that it was -- boy, this
23   is tough because I just don't recall exactly the
24   date.
25       I mean, I knew -- I knew at some point, I

Page 220

1    think it was in January or February of 2018, that
2    he -- that he had mentioned that he had done some
3    work on Fund 7, I believe, for the Smiths
4    at that point and whatever eight months later.
5   Q   Sitting here today, do you have any knowledge of
6    whether or not Mr. Reinert reviewed and approved
7    the offering materials including the track record?
8   A   So I believe he approved most everything. I -- I
9    don't know that I ever saw an e-mail where he
10   approved the track record.
11       I think I saw an e-mail from one of the
12   associates at Lowndes that approved the track
13   record. I don't know that I ever saw that he
14   approved it.
15  Q   Do you think that makes a difference if it was Mr.
16   Reinert versus one of his associates?
17       MR. STEWART: Objection, form, legal
18   conclusion. You can answer.
19  A   Yeah, I mean, that's -- that's beyond what I know,
20   you know, between attorneys and what the
21   difference is. I don't know the answer to that.
22  BY MR. DANIELS:
23  Q   But is it your testimony that the best of your
24   recollection that you discovered that Mr. Reinert
25   was providing legal services to Fund 7 in

Page 221

1    January/February of 2018?
2   A   That's correct, or that he had provided those --
3    he had provided the services. I didn't know that
4    he was still providing services.
5   Q   Let's mark this as 11.
6        (Exhibit 11 marked.)
7   A   Okay.
8   Q   And you see at the very top Mr. Rolfe forwarded
9    you this e-mail chain on May 17th, 2017?
10  A   That's correct.
11  Q   And do you see that it starts with an announcement
12   regarding Fund 7?
13  A   Yes.
14  Q   And then Mr. Siragusa e-mails Ryan and Jamie and
15   asks what prior funds did you send this out to.
16       Do you see that?
17  A   Yes.
18  Q   And then there are some communications between
19   Mr. Rolfe and Mr. Reinert that have been redacted,
20   correct?
21  A   That's correct.
22  Q   And I'm assuming the e-mail you would have
23   received in 2017, this wouldn't have been
24   redacted, correct?
25  A   That would probably be correct, yes.



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

222..225

Page 222

1 Q   And after reviewing this e-mail, does that change
2       your testimony at all about when you first learned
3       that Mr. Reinert was providing legal services to
4       Fund 7?
5              MR. STEWART:  Objection to form and
6       foundation and attorney-client privilege.  Do
7       not relay information that is contained in the
8       redacted portions in your answer.  If you can
9       answer it other than relaying that, you may
10      answer.  Otherwise, you're instructed not to
11      answer.
12 BY MR. DANIELS:
13 Q   And I'm not asking for the content.  I am just
14      asking if reviewing this Deposition Exhibit 11
15      changes your testimony about your recollection of
16      when you first learned that Mr. Reinert
17      was involved.
18             MR. STEWART:  And you can answer
19      that question.
20 A   Yeah, I just -- I don't know that it changes.
21      You know, I just don't know if -- I don't even
22      know what the redacted stuff says, so I don't
23      know.  I don't think it changes it though.  That's
24      my recollection is January or February.
25             MR. CROSBIE:  And for the record, Craig,

Page 223

1       can I get an explanation of the assertion of a
2       privilege in May 2017 related to Fund 7?
3              MR. STEWART:  Well, I don't know that
4       it's necessarily related to Fund 7.  It's
5       related to communications with RV Horizons'
6       counsel.  I mean, it's communication between
7       RV Horizons and its counsel.  It's pretty
8       simple.
9              MR. CROSBIE:  Okay.  Well, we'll talk
10      about this offline.
11             MR. STEWART:  Sure.  Okay.
12 BY MR. DANIELS:
13 Q   And then going back to Exhibit Number 9 which are
14      the discovery responses, go to interrogatory
15      number 16 which is on page 12.
16 A   Okay.
17 Q   And this asks about the plaintiffs' relationship
18      with Mr. Reinert during the period of January 1,
19      2016 through the filing of this action, and there
20      is just a blanket objection on the
21      basis of privilege here.
22             And my question is though is it
23      your position that Mr. Reinert has provided legal
24      services to each of the plaintiffs during that
25      time period?

Page 224

1              MR. STEWART:  Objection to form and
2       foundation, but you can answer.
3 A   Well, I think that my understanding is that
4       Mr. Reinert through the filing of this action, so
5       Mr. Reinert, I believe, represented the Smiths in
6       -- my understanding is he represented the Smiths
7       up until the time that he started working for
8       RV Horizons through Lowndes.
9 Q   And my question though has to do with the
10      plaintiffs.  Did Mr. Reinert represent each of the
11      plaintiffs in this case at some point?
12 A   Okay.  Okay.  Sorry about that.  So he represented
13      RV Horizons when he came to work for RV Horizons
14      as counsel in April or March 2017.  I think it was
15      April.  I can't remember now.  He represented some
16      of the plaintiffs, I believe, not all of the
17      plaintiffs.
18             Do you want me to give you like my
19      recollection of that?
20 Q   Sure.
21 A   I mean, I think he was basically general counsel
22      or when -- when he was at Lowndes, Lowndes he
23      basically formed MHC America Fund.
24             My understanding is I think he was like
25      the -- he represented the managers, the management

Page 225

1       entity of MHC America Fund.
2              He -- you know, through RV Horizons, he
3       basically represented, I think, MHC America Fund
4       2, MHC America Fund 2, Class B, and I think that
5       would be all the funds that he actually
6       represented of the plaintiffs.
7 Q   Well, you said he represented RV Horizons when he
8       came over to RV Horizons?
9 A   Yeah.  He signed an employment agreement with
10      RV Horizons.
11 Q   And do you recall when that was again?
12 A   Boy, it's either 3-17 or 4-17-17.  I can't
13      remember the exact.  It was 4-17, yeah, the middle
14      of April, that's correct.
15 Q   All right.  That's all the questions I have.
16             EXAMINATION
17 BY MR. CROSBIE:
18 Q   Okay.  I just have a couple of follow-ups and one
19      more exhibit, and let me start with the exhibit.
20             (Exhibit 12 marked.)
21 BY MR. CROSBIE:
22 Q   Mr. Reynolds, is this a promotion for your mobile
23      home university bootcamp?
24 A   It looks to be something along that line, yes.
25      I'm not sure if it was -- I don't know where -- I



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS

226..229

Page 226

1    think it's a promotion for one of our products.  I
2    don't know which one.
3         I don't really have a lot of involvement
4    with MHU at this point and I have not for many
5    years.  I don't know exactly what this was, but it
6    looks like a -- the first sentence says "bootcamp"
7    so maybe it is bootcamp.
8  Q    Okay.  And does it describe what a participant in
9       the mobile home university bootcamp would receive?
10 A    Yes.  It says that -- yes, it has many of the
11      things that they would receive, yes, on the last
12      page there, or the second-to-last page.
13 Q    Okay.  I just wanted to follow up on the
14      discussions about when you knew that Peter Reinert
15      was working on Fund 7.
16          You began talking to Peter in February of
17      2017 about his potential employment by
18      RV Horizons, correct?
19 A    Yeah.  It was like a month or so before he came
20      on.  I can't remember the exact dates, but, yeah,
21      it was somewhere in that timeframe, yes.
22 Q    And Mr. Reinert didn't tell you that had some
23      ongoing client work that he was going to need to
24      finish even after he was employed by RV Horizons?
25 A    You know, the only -- the only thing I can recall

Page 227

1    that he said was that if -- let me think here --
2    is that he would retain some type of a -- I don't
3    remember.  I know we've called it like shareholder
4    emeritus or whatever.
5         I don't recall if that was the language he
6    used, but he would retain some type of
7    relationship with Lowndes whereby if he referred
8    business to Lowndes that he would get some type of
9    a cut of the profits if he referred, you know,
10   like his clients to Lowndes somehow, and that he
11   would take that share of profits and basically
12   give it to RV Horizons.  That's kind of the
13   conversation I remember.
14        I don't remember really talking about like
15   finishing up prior business.  I think that was
16   like why he started in April was that he was
17   finishing up that prior business.
18        That's why he didn't start earlier, but
19   there was a lot going on there and I just don't
20   recall a hundred percent, but it wasn't like he
21   said, yeah, I'm filing Fund 7 and it's a mobile
22   home park investment fund and self-storage fund
23   and it's for the Smiths.  No, I don't recall that
24   whatsoever.
25 Q    Okay.  I don't think I have anything else either.

Page 228

1         MR. STEWART:  I am not going to question
2    today.
3         THE VIDEOGRAPHER:  This concludes the
4    deposition of David Reynolds.  This is the end
5    of media unit number 4.  The time is 4:18 and we
6    are off the record.
7         THE COURT REPORTER:  Just on the steno
8    record, who would like a copy?  Mr. Crosbie?
9         MR. CROSBIE:  Yes.
10        THE COURT REPORTER:  Electronic or
11   hardcopy?
12        MR. CROSBIE:  Can you check with Orange
13   Legal?  I think they have done all this for us.
14        THE COURT REPORTER:  Mr. Daniels, would
15   you like a copy?
16        MR. DANIELS:  Just electronic is fine.
17        THE COURT REPORTER:  Electronic is fine?
18        MR. STEWART:  Electronic please.
19        (Deposition concluded at 4:18 PM.)
20
21
22
23
24
25

Page 229

1         I, DAVID REYNOLDS, do hereby
2    certify that I have read the foregoing transcript and that
3    the same and accompanying amendment sheets, if any,
4    constitute a true and complete record of my testimony.
5
6
7
                          _____
8                         Signature of Deponent
9                         ( ) No amendments
                          ( ) Amendments attached
10
11        Acknowledged before me this ____ day of
12   _____ 2019.
13
14        Notary Public: _____
15   My commission expires _____
16        Seal:
17
18
19
20
21
22
23
24
25



RV Horizons, Inc. vs Jamie Smith
DAVID REYNOLDS                                                                                    230

                                                              Page 230
1    STATE OF COLORADO)
2                   ) ss.        REPORTER'S CERTIFICATE
3    COUNTY OF DENVER )
4              I, Anne M. Sager, do hereby certify that I am
5    a Court Reporter and Notary Public within the State of
6    Colorado; that previous to the commencement of the
7    examination, the deponent was duly sworn to testify to the
8    truth.
9              I further certify that this deposition was
10   taken in shorthand by me at the time and place herein set
11   forth and was thereafter reduced to typewritten form, and
12   that the foregoing constitutes a true and correct
13   transcript.
14             I further certify that I am not related to,
15   employed by, nor of counsel for any of the parties or
16   attorneys herein, nor otherwise interested in the result of
17   the within action.
18             In witness whereof, I have affixed my
19   signature this 7th day of October, 2019.
20             My commission expires June 25, 2023.
21
22             _____
                Anne M. Sager
23              216 Sixteenth Street, Suite 600
                Denver, Colorado  80202
24
25

