**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-02780-NYW

RV HORIZONS, INC.,
MHC AMERICA FUND, LLC,
MHC AMERICA FUND CLASS C, LLC,
MHC AMERICA FUND 2, LLC,
MHC AMERICA FUND 2 CLASS B, LLC,
MHPS ALUMNI, LLC,
MHPS ALUMNI 2, LLC,
MHPS ALUMNI 3, LLC,
AFFORDABLE HOUSING COMMUNITY FUND 1, LLC,
AFFORDABLE HOUSING COMMUNITY FUND 2, LLC,
AFFORDABLE HOUSING COMMUNITY FUND 3, LLC,
AFFORDABLE HOUSING COMMUNITY FUND 4, LLC,
AFFORDABLE HOUSING COMMUNITY FUND 5, LLC,
AFFORDABLE HOUSING COMMUNITY FUND 6, LLC, and
AWA FUND 3, LLC,

   Plaintiffs,

vs.

JAMIE SMITH,
RYAN SMITH,
MHPI VII, LLC,
ELEVATION CAPITAL GROUP, LLC, and
DAHN CORPORATION,

   Defendants.

---

**MEMORANDUM OPINION AND ORDER**

---

Magistrate Judge Nina Y. Wang

  This matter comes before the court on the following motions:

  (1) Smith Defendants' Motion for Summary Judgment and Incorporated Memorandum
of Law ("Smith Defendants' Motion for Summary Judgment") [#97, filed March 6,
2020];[1]

---

[1] The court uses the convention [#__] to refer to filings on its Electronic Court Filing ("ECF")
system.  Ordinarily, the court refers to the page number as assigned by the ECF system.  However,

(2)     Dahn Corporation's Motion for Summary Judgment ("Dahn's Motion for Summary Judgment") [#99, filed March 6, 2020];

(3)     Smith Defendants' Motion to Exclude the Testimony of Jon Ahern and Ben Braband ("Smith Defendants' Motion to Exclude") [#112, filed April 24, 2020];

(4)     Plaintiffs' Motion to Exclude Defendants' Proffered Retained and Non-Retained Expert Opinion Testimony ("Plaintiffs' Motion to Exclude") [#113, filed April 24, 2020]; and

(5)     Dahn Corporation's Motion to Exclude the Opinions and Testimony of Jon S. Ahern ("Dahn's Motion to Exclude") [#114, filed April 24, 2020].

The undersigned Magistrate Judge fully presides over this case pursuant to 28 U.S.C. § 636(c), the Parties' unanimous consent [#42], and the Order of Reference dated January 4, 2019 [#44].  Upon consideration of the motions and related briefing and in light of the applicable legal standards, the Smith Defendants' Motion for Summary Judgment is **GRANTED;** the Dahn Motion for Summary Judgment is **GRANTED;** the Smith Defendants' Motion to Exclude is **DENIED AS MOOT;** Plaintiffs' Motion to Exclude is **DENIED AS MOOT**; and Dahn's Motion to Exclude is **DENIED AS MOOT**.

## BACKGROUND

The court has discussed in detail this action's background in previous rulings, *see, e.g.*, [#60; #84].  Due to the number of Parties and relevant non-Parties, and the nature of their relationships, the court first begins with a brief summary of the same before turning to the procedural background and undisputed facts underlying the instant Motions for Summary Judgment.

## I.     Parties

---

in the case of transcripts, the court refers to the ECF number, but the original page and line numbers for the purpose of consistency.

***Plaintiffs.***  Plaintiffs are a series of corporate entities owned by, among others, non-parties David Reynolds ("Mr. Reynolds") and Frank Rolfe ("Mr. Rolfe") and involved in the manufactured housing industry.  [#64 at ¶¶ 8–22, 30, 51; #87 at ¶ 1; #88 at ¶ 1 (denying based on lack of knowledge)]. Mr. Reynolds and Mr. Rolfe's business operations are divided across numerous corporate entities, owned at the highest level by a limited liability company ("LLC").  [#64 at ¶ 35, #87 at ¶ 35; #88 at ¶ 35 (denying based on lack of knowledge)].  Those high-level LLCs fund and own an interest, in whole or part, in a special purposed entity ("SPE"), which in turn owns a manufactured housing community or a group of communities.  [#64 at ¶ 35, #87 at ¶ 35; #88 at ¶ 35 (denying based on lack of knowledge); #49 at ¶¶ 23, 24].  Each high-level LLC also has a different member-manager, a separate entity, that is responsible for promoting the fund to potential investors.  [#64 at ¶ 51].

There are five distinct groupings of high-level LLCs which are relevant to this case: the Alumni Funds;[2] the Affordable Housing Community Funds;[3] the AWA Funds;[4] the MHPI Funds,[5] and the MHC America Funds. [#64 at ¶¶ 35, 37, 51, 52]. The MHC America Funds consist of Plaintiffs MHC America Fund, LLC ("Fund 1") and MHC America Fund 2, LLC ("Fund 2").[6] [*Id.* at ¶ 37; #87 at ¶ 37]. Fund 1 was formed in 2016 and included all of the sponsors previously spread among MHPI 1-4, Alumni 1-3, and AHCF 1-6. [#64 at ¶ 37]. Fund 2 was intended to be

---

[2] The Alumni Funds consist of MHPS Alumni, LLC ("Alumni 1"); MHPS Alumni 2, LLC ("Alumni 2"); and MHPS Alumni 3, LLC ("Alumni 3") (collectively, "Alumni 1-3"). These funds did not involve the Smiths or their entities. [#64 at ¶ 35; #87 at ¶ 35]. Dahn did not have interest or participate in Alumni 1-3. [#49 at ¶ 24].

[3] The Affordable Housing Community Funds consist of Plaintiffs Affordable Housing Community Fund 1, LLC ("AHCF 1"); Affordable Housing Community Fund 2, LLC ("AHCF 2"); Affordable Housing Community Fund 3, LLC ("AHCF 3"); Affordable Housing Community Fund 4, LLC ("AHCF 4"); Affordable Housing Community Fund 5, LLC ("AHCF 5"); Affordable Housing Community Fund 6, LLC ("AHCF 6") (collectively, "AHCF 1-6"). These funds did not involve the Smiths or their entities, other than an investment made in AHCF 6 through non-Party MHPI V. [#64 at ¶ 35; #87 at ¶ 35]. Dahn did not have interest or participate in AHCF 1-6. [#49 at ¶¶ 23, 24].

[4] The AWA Funds include non-Parties AWA Fund, LLC, and AWA Fund 2, LLC. Plaintiff AWA Fund 3, LLC ("AWA Fund 3") was created by merging these two non-Parties. [#64 at ¶ 22]. There is a dispute as to whether AWA Fund 2, LLC involved the Smiths or their entities. *Compare* [#64 at ¶ 35] *with* [#87 at ¶ 35]. Dahn did not have interest or participate in the AWA Funds. [#49 at ¶ 23].

[5] The MHPI Funds includes non-Parties MHPI I, LLC; MHPI II, LLC; MHPI III, LLC; and MHPI IV, LLC (collectively, "MHPI 1-4"). The Smiths or their companies participated in promoting these funds to investors. [#49 at ¶ 23]. Dahn did not participate in MHPI 1-4. [#49 at ¶ 23].

[6] In the briefing and declaration in opposition to Defendants' summary judgment motions, Plaintiffs and Mr. Reynolds refer to MHC America, LLC as "America Fund." *See, e.g.,* [#97 at #110 at 3-4 ¶¶ 3, 5-6]. The Smith Defendants refer to MHC America, LLC and MHC America 2, LLC as "MHC America" and "MHC America 2" as well as "MHCA" *See* [#97 at 2 ¶ 5, 7]. Dahn uses "MHC America"" to refer to MHC America, LLC. *See, e.g.,* [#99 at 3 ¶ 8]. But in their operative Second Amended Complaint, Plaintiffs define MHC America, LLC as "Fund 1" and MHC America 2 as "Fund 2." [#64 at ¶¶ 9, 11]. To track the operative Second Amended Complaint and to be consistent with terminology used in prior rulings in this matter, *see, e.g.,* [#60, #84], this court refers to Fund 1 and Fund 2.

a fund into which previous funds were "rolled-up" to simplify fund structure. [*Id.*][7]  Plaintiffs MHC America Class C, LLC ("Class C") and MHC America 2 Class B, LLC ("Class B") are separate entities that own and promote interest in Funds 1 and 2, respectively.  [*Id.*].  Each of the high-level LLCs contract with Plaintiff RV Horizons ("RV Horizons"), which, in addition to managing some of the high-level LLCs like Alumni 1-3 and MHPI 1-4, manages and identifies potential manufactured housing communities for investment and negotiates acquisitions.  [*Id.* at ¶¶ 35, 36, 38, 51, 52].

*Defendants.*  Defendants Jamie Smith ("Ms. Smith") and Ryan Smith ("Mr. Smith" and collectively, "the Smiths") own several corporate entities formerly or currently intertwined with Plaintiffs'.  [#64 at ¶ 52; #87 at 16 ¶ 52].  Specifically, the Smiths own Colonial Kitchen, LLC ("Colonial"), which in turn owns an interest in Alumni 1-3, and MHP Portfolio LLC ("MHP") which is invested in non-Parties MHPI 1-3, and Salvo Conducto which owns part of MHPI 4.  [#64 at ¶¶ 51-52; #49 at 7-8 at ¶¶ 23-24].  The Smiths also own MHPI V LLC, which in turn owns part of AHCF 6 as noted above.  [#64 at ¶¶ 51-52; #49 at ¶¶ 23-24].  Mr. Smith is a manager of Defendant Elevation Capital Group, LLC ("Elevation"), which is used to promote Defendant MPHI VII, LLC ("Fund 7").  [#97-1 at ¶ 2; #64 at ¶ 61; #87 at ¶ 61].  Defendant Dahn Corporation is a California corporation that, together with the Smith Defendants, created Fund 7 with the purpose of acquiring storage facilities and manufactured housing community through subsidiary single purpose entities.  [#64 at ¶¶ 4, 27, 86; #87 at ¶¶ 4, 27, 86; #88 at ¶¶ 4, 27, 86].

After working together on a number of projects, the business relationship between Mr. Reynolds, Mr. Rolfe, and the Smith Defendants soured.  *See generally* [#61 (Notice of Related Cases); #64].  Among other things, Plaintiffs believed that the Defendants were unfairly promoting

---

[7] Dahn had no interest in and did not participate in either Fund 1 or Fund 2.  [#49 at ¶ 24].

Fund 7 and discouraging investors from Fund 1 and Fund 2 by improperly capitalizing on Plaintiffs' trademarks, prior experience, and confidential business information.  *See generally* [#64].  This lawsuit followed.

## II.  Procedural History

Plaintiffs initiated this action on October 30, 2018, *see* [#1], and filed the operative Second Amended Complaint on March 22, 2019.[8]  [#64].  The Second Amended Complaint asserts seven claims for relief based on allegations that the Smith Defendants and Dahn misappropriated Plaintiffs' trademarks and otherwise engaged in unfair competition in promoting Fund 7 through, *inter alia*, an Offering Package that includes Supplement No. 2 dated October 31, 2017; Supplement No. 1 dated July 27, 2017; and a Private Placement Memorandum dated April 1, 2017 (collectively, "Offering Package") and misuse of trade secrets. [*Id.*].  Specifically, the claims asserted in the Second Amended Complaint include: (1) direct trademark infringement[9] in

---

[8] In the interim, Plaintiffs filed a First Amended Complaint on November 20, 2018. [#31].  The Smith Defendants and Dahn filed respective Motions to Dismiss directed at the First Amended Complaint shortly thereafter.  [#36; #38].  On March 7, 2019, this court issued a Memorandum Opinion and Order on the Defendants' Motions to Dismiss, granting in part and denying in part the Smith Defendants' Motion and granting Dahn's Motion in its entirety.  [#60].  Plaintiffs were granted leave to file an appropriate Motion to Amend their Complaint as contemplated by the Order.  [*Id.*].

[9] Although Plaintiffs refer to their names as "trademarks," *see, e.g.,* [#64 at ¶¶ 6, 97, 115, 134, 149, 164], their offerings to potential customers include services, *see, e.g.,* [*id.* at ¶¶ 39-50 ("The mark . . . is capable of distinguishing the services . . . from those of others."), 134 ("[C]onsumers only associate these companies' services with the specific company."), 136 ("[U]se of the trademarked names is likely to cause confusion among ordinary consumers as to the source . . . of the services . . ."), 149 ("[U]se of the trademarked names is likely to cause confusion among ordinary consumers as to the source . . . of the services . . ."), 164 ("[U]se of the trademarked names is likely to cause confusion among ordinary consumers as to the source . . . of the services . . .")].  The Lanham Act defines "service marks" as "any word, name, symbol, or device, or any combination thereof" that is used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." 15 U.S.C. § 1127.  The court will utilize "mark" or "trademark" to describe Plaintiffs' names as this is the nomenclature utilized by the Parties and "[t]he same standards apply equally

violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), by RV Horizons, Alumni 1-3, AWA 3, ACF 1-6, and Fund 1 against all Defendants ("Count I") [*id.* at ¶¶ 132-46]; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(B), by RV Horizons, Alumni 1-3, AWA 3, ACF 1-6, and Fund 1 against all Defendants ("Count II") [*id.* at ¶¶ 147-60]; (3) contributory trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1125(a), by RV Horizons, Alumni 1-3, AWA 3, ACHF 1-6, and Fund 1 against the Smiths, Elevation, and Dahn ("Count III") [*id.* at ¶¶ 161-77]; (4) misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, by RV Horizons, Fund 1, Class C, Fund 2, and Class B against Fund 7 and the Smiths ("Count IV") [*id.* at ¶¶ 178-83]; (5) misappropriation of trade secrets in violation of the Colorado Uniform Trade Secrets Act ("CUTSA") by RV Horizons, Fund 1, Class C, Fund 2, and Class B against Fund 7 and the Smiths ("Count V") [*id.* at ¶¶ 184-89]; (6) violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, by RV Horizons, Fund 1, Class C, Fund 2, and Class B against all Defendants ("Count VI") [*id.* at ¶¶ 190-96]; and (7) unjust enrichment by RV Horizons, Fund 1, Class C, Fund 2, and Class B against all Defendants ("Count VII") [*id.* at ¶¶ 197-203]. As relief, Plaintiffs seek compensatory and consequential damages, injunctive relief, pre-judgment and post-judgment interest, and allowable fees and costs. [*Id.* at 51-52].

After proceeding through extensive discovery,[10] on March 6, 2020, the Smith Defendants and Dahn filed their respective Motions for Summary Judgment presently before the court. [#97;

---

in an action for registered trademark or service mark infringement." *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 216 (7th Cir. 1978) (citing 15 U.S.C. § 1053).

[10] On April 17, 2019, the Smith Defendants and Dahn filed respective Motions to Dismiss Plaintiffs' Second Amended Complaint. [#72; #74]. After the Motions were fully briefed, [#75; #76; #77; #78], the court denied both the Smith Defendants' and Dahn's Motions to Dismiss on November 15, 2019. *See* [#84].

#99].  The Smith Defendants make arguments as to all seven of Plaintiffs' claims.  [#97].  However, because Counts IV and V are not asserted against Dahn, Dahn makes arguments only as to Counts I, II, III, VI, and VII.  [#99].  After the court granted two extensions of time, [#101; #105], Plaintiffs filed their Responses to the Motions for Summary Judgment on April 17, 2020, [#109; #110], as well as a separate Joint Appendix of Exhibits in Support of their Responses, [#111].  After an extension from the court [#119], Defendants filed their Replies in support of their respective Motions for Summary Judgment on May 11, 2020.  [#128; #129].  The instant Motions for Summary Judgment are ripe for determination.

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Henderson v. Inter-Chem Coal Co., Inc.* 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way.  A fact is material if under the substantive law it is essential to the proper disposition of the claim."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted). In other words, a fact is "material" if it pertains to an element of a claim or defense and a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *See Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. "Where

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1987) (citing *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)).

Where the nonmovant bears the burden of proof, the moving party may seek summary judgment based on the lack of evidence. *Celotex*, 477 U.S. at 324 (1986). Once the movant demonstrates an absence of evidence supporting an essential element of the nonmovant's claim, the burden shifts to the nonmovant to show that there is a genuine issue for trial. *Id.* To satisfy this burden, the nonmovant must point to specific facts in an affidavit, deposition, answers to interrogatories, admissions, or other similar admissible evidence demonstrating the need for a trial. *See Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995); *cf. Fazio v. City & Cty. of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) ("[A] mere 'scintilla' of evidence will be insufficient to defeat a properly supported motion for summary judgment; instead, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" (*quoting Anderson*, 477 U.S. at 249, 252)). Conclusory statements or those based on speculation, conjecture, or surmise provide no probative value on summary judgment, *see Nichols v. Hurley*, 921 F.2d 1101, 1113 (10th Cir. 1990); nor may the nonmovant rely on "mere reargument of his case or a denial of an opponent's allegation," *see* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed. 1998).

## UNDISPUTED MATERIAL FACTS

The following facts are drawn from the record before the court on summary judgment and the entire court docket. *See* Fed. R. Civ. P. 56(c)(1), (3)-(4). In some instances, a party has disputed the proffered material fact, but an examination of the record finds that such dispute is not

properly supported by evidence in the record.  Where that is the case, the court has noted the dispute and its determination.  In addition, this recitation is not exhaustive but includes the undisputed facts relevant to the court's analysis; where there are other undisputed facts – or lack of facts – this court has noted them in the relevant background or analysis sections.

1.      Plaintiff RV Horizons, a Colorado corporation, is a property management company that identifies potential, negotiates for acquisitions of, and manages manufactured home communities ("MHCs").  [#49 at 6 ¶ 1; #64 at ¶ 38; #99 at 2 ¶ 2; #99-2 at 28:18-39:13;[11] #109 at 2 ¶ 2].

2.      RV Horizons acted as the property manager for the properties owned by various funds, including Fund 1.  [#97 at 9; #98-4 at 72:9-13].

3.      At the highest level, a limited liability company is set up to fund and own an interest, in whole or in part, in a special purpose entity ("SPE"), which in turn owns an MHC or group of communities. [#49 at 7 ¶ 23].

4.      Among those high-level LLCs were MHPI 1-4.  [*Id.*]. The Smiths and their companies participated in promoting these funds to investors. [*Id.*].

5.      Other high-level LLCs included Alumni 1-3.  [*Id.*].  These funds did not involve the Defendants.  [*Id.*].

6.      AHCF 1-6 were also high-level LLCs that did not involve the Defendants (other than an investment the Smiths made in AHCF 6 through their entity, MHPI V, LLC).  [*Id.*].

7.      Additional high-level LLC were AWA and AWA 2, which did not involve the Defendants.  [#49 at 7 ¶ 23].

---

[11] When citing to a deposition, this court uses the convention of referring to the docket number as assigned by the court's ECF system, but the page and line numbers from the original transcript for the purposes of clarity and consistency.

8.      Alumni 1-3 are managed by RV Horizons and non-party Colonial.  [*Id.* at 8 ¶ 24].

9.      AHCF 1-6 are managed by non-party AHCF Management, LLC.  [*Id.*].

10.     The MHPI funds are managed by RV Horizons and non-party MHP Portfolio; Fund 1 is managed by non-party MHCA Management, LLC; and Fund 2 is managed by non-party MHCA Management 2, LLC. [*Id.*].  Dahn had no interest in and did not participate in any of the funds referenced in paragraphs 8 through 10.  [#*Id.* at 9 ¶ 24].

11.     RV Horizons owns the mark "RV Horizons." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

12.     Alumni 1 owns the mark "MHPS Alumni." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

13.     Alumni 2 owns the mark "MHPS Alumni 2." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

14.     Alumni 3 owns the mark "MHPS Alumni 3." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

15.     The MHPS Alumni funds were named as such because these funds included investors who were alumni of the bootcamps run by Messrs. Reynolds and Rolfe.  [#111-1 at ¶ 37].

16.     AWA 3 owns the mark "AWA Fund," through non-party AWA Fund.  [#64 at ¶ 35; #87 at ¶ 35; #99-3; #109 at 3 ¶ 4].

17.     "AWA Fund" refers to a fund opened to a particular subset of investors, i.e., ones who came through Argos Wealth Advisers, with whom Messrs. Reynolds and Rolfe do business. [#98-1 at 24:4-14; 48:4-7].

18.     AHCF 1 owns the mark "Affordable Housing Community Fund." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

19.     AHCF 2 owns the mark "Affordable Housing Community Fund 2." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

20.    AHCF 3 owns the mark "Affordable Housing Community Fund 3." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

21.    AHCF 4 owns the mark "Affordable Housing Community Fund 4." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

22.    AHCF 5 owns the mark "Affordable Housing Community Fund 5." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

23.    AHCF 6 owns the mark "Affordable Housing Community Fund 6." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4].

24.    "Affordable Housing Community Fund" refers to a fund for affordable housing communities. [#98-1 at 51:19-21].

25.    Fund 1 owns the mark "MHC America Fund." [#99 at 3 ¶ 4; #99-3; #109 at 3 ¶ 4]. (Collectively with other trademarks identified in [Undisputed Material Facts ("UMF") ¶¶ 11-16, 18-23], the "Marks.").[12]

26.    "MHC" refers to "mobile home community." [#97-1 at ¶ 26; #98-1 at 51:2-23, 51:19-21].

---

[12] In Paragraphs 39-50 of the Second Amended Complaint, Plaintiffs identify the Marks as their names without the "Inc." or "LLC" abbreviations, *e.g.*, "RV Horizons." [#64 at ¶¶ 39-50]. Elsewhere, however, Plaintiffs list the names that "constitute[] a protectable trademark" inclusive of the "Inc." or "LLC" abbreviations, *e.g.*, "RV Horizons, Inc." [*Id.* at ¶¶ 134, 149, 164]. In their Response to the Smith Defendants' Motion for Summary Judgment, Plaintiffs list their full names, with the LLC abbreviation, as well as abbreviations of their full names—*e.g.*, "Affordable Housing Community Fund 1, LLC" and "AHCF 1"—in arguing that their names are inherently distinctive. [#110 at 13-14]. Also in their Response, Plaintiffs mention "America Fund" as one of their names that is inherently distinctive, but this variation of Fund 1's name was not alleged as infringed in the Second Amended Complaint. *Compare* [*id.* at 14] *with* [#64 at ¶¶ 51, 134]. As a plaintiff may not effectively amend the complaint in a response to a motion, *see In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1203 (D. Colo. 2004), the court understands the asserted Marks in Plaintiffs' trademark claims (Counts I, II, and III) to be those listed in Paragraphs 134, 149, and 164 of the Second Amended Complaint. *See* [#64 at ¶¶ 134, 149, 164 (listing Plaintiffs' "protectable trademark[s]")].

27.     These Marks are not registered with the United States Patent and Trademark Office. *Compare* [#97 at 5] *with* [#110 at 13-16].  This court also takes judicial notice of the information located on the United States Patent and Trademark Office ("USPTO") trademark database, *see* https://www.uspto.gov/trademarks-application-process/search-trademark-database,           which indicates that none of the Marks is registered with the USPTO.[13]

28.     Plaintiffs have used these Marks in business such as in Operating Agreements; Private Placement Memoranda; and correspondence with third parties. [#64 at ¶¶ 39-50; #111-1].

29.     The Smiths and Dahn formed Fund 7.  [#64 at ¶ 86; #87 at ¶ 86; #88 at ¶ 86]. The Smiths are members and managers of Fund 7 through their membership in MHPI VII Management, LLC, which is not a party to this action.  [#97-1 at ¶ 3; #64 at ¶¶ 23-24; #87 at ¶¶ 23-25].

30.     The Smiths worked in investor relations for non-parties MHPI 1-4 and Fund 1. [#110 at 3-4 at ¶ 3; #111-1 at ¶¶ 6, 11, 13, 14, 88, 90; #111-2 at ¶ 18; #111-3 at ¶ 7; #111-6 at 46:25-48:7].

31.     Fund 7 was formed in April 2017 and launched thereafter in April or May 2017. [#97-1 at ¶ 5; #109 at 6 ¶ 28].

32.     As part of its solicitation for investors, Fund 7 issued a Private Placement Memorandum, LLC Agreement, Subscription Booklet, Investment Summary, Track Record, and a number of supplements (collectively, the "Offering Package").  [#97-1 at ¶ 4; #64-1; #111-10; #111-11; #111-12; #111-13; #111-14; #111-15; #111-16; #64 at ¶ 95; #87 at ¶ 95; #88 at ¶ 95].

---

[13] A court may take judicial notice of facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Hansen v. Harper Excavating, Inc*., 641 F.3d 1216, 1220 n.3 (10th Cir. 2011) (citing Fed. R. Evid. 201(b)(2)). The *Hansen* court noted that this judicial notice was proper "whether requested or not, under Rule 201(c), and at any stage of the proceeding under Rule 201(f)."  *Id.* at 1220 n.3 (internal quotation marks omitted).  In addition, the court may also consider other materials in the record in making its summary judgment determinations.  Fed. R. Civ. P. 56(c)(3).

33.    Fund 7's Offering Package identified RV Horizons as an "Affiliate" of Defendants at least between April 2017 and May 2018.  *See* [#97 at 8; #129 at 10; #111-14 at 8 (Ex. 10 at MHPI000223); #111-13 at 40-41 (Ex. 10 at MHPI000211-12); #111-15 (Ex. 10A at RVH_Fed_004735), #111-16 at 26-27 (Ex. 10B at RVH_Fed_123455–56)].

34.    The Fund 7 Offering Package is made available to potential investors through Elevation's website and Dahn's website at https://www.minustorage.com/about-dahn-corporation/.  [#64 at ¶¶ 95-97; #87 at ¶¶ 95-97; #88 at ¶¶ 95-97].

35.    Peter Reinert ("Mr. Reinert") became RV Horizons' Senior Vice President and General Counsel on April 17, 2017.[14]  [#99 at ¶ 18; #111-9 at 6:19-21; #111-1 at ¶ 174].  He continued in that role until December 2019.[15]  [#157 at 2].

36.    As Senior Vice President and General Counsel, Mr. Reinert was considered an "Executive" of RV Horizons, and his employment contract provided "[a]s General Counsel and Senior Vice President of the Company Executive [sic] will be a part of the senior executive leadership team with responsibility to provide legal guidance to the executive staff on all matters that affect the Company, manage the compliance, risk management and legal services groups, attend executive level meetings related to the future direction of the Company (including mergers and acquisitions, capital raising, debt facilities, and divestitures of the Company (including mergers and acquisitions) and adopting or changing Company policies [sic]."  [#157-1 at 1, 11].

---

[14] Although Plaintiffs challenge other facts contained in Paragraph 18 of Dahn's Statement of Material Facts, they do not challenge Mr. Reinert's position at RV Horizons or the date such position commenced.  *See* [#109 at ¶ 18 (citing [#111-1 at ¶ 174])].

[15] Though not asserted in the context of the briefing on the Motions for Summary Judgment, RV Horizons asserted this fact as part of the Parties' briefing on Defendants' Motion for Leave to (1) File Motion for Sanctions and (2) File Supplemental Briefing on Summary Judgment ("Motion for Leave") [#155, filed September 23, 2020], that the court granted in part and denied in part on October 28, 2020 [#163].  Pursuant to Rule 56(c)(3), this court may consider other materials in the record in making its summary judgment determinations.  Fed. R. Civ. P. 56(c)(3).

37.     Mr. Reinert participated in the drafting of Fund 7's Offering Package.  [#99 at 6 ¶ 20; #99-7 at 24:15-25:4, 62:5-22, 79:22-80:7; #109 at 5 ¶ 20].

38.     RV Horizons, Mr. Reynolds, Mr. Rolfe, Mr. Siragusa, and Mr. Reinert all learned of Fund 7 and its contact with potential investors no later than May 2017.  [#111-118; #99-14; #111-3 at ¶ 18].

39.     Investors contacted Mr. Siragusa no later than May 2017 inquiring about the relationship between Fund 7 and earlier and existing funds with Mr. Reynolds.  [#111-3 at ¶ 18; #111-111 (Ex. 95); #111-195 (Ex. 180)].

40.     The Smith Defendants use Elevation to promote Fund 7 on the internet and otherwise.  [#64 at 14  ¶ 61; #87 at 16 ¶ 61].

41.     Elevation's website included RV Horizons' business history.  [#64 at 15 ¶ 62; #87 at 16 ¶ 62].

42.     Elevation's October 3, 2016 Newsletter touts RV Horizons' reputation.  [#64 at 15 ¶ 63; #87 at 16-17 ¶ 63].

43.     Elevation's November 17, 2016 newsletter states that "[t]his content in this communication is being sent to members of MHC America Fund, LLC and Prior Funds. As such, any reference to 'we', 'our', 'Manager' or 'fund', regardless of capitalization, shall refer to MHC America Fund, LLC, and its Affiliates."  [#64 at 17 ¶ 65 (citing http://elevationcapitalgroup.com/2016/11/); #87 at 17 ¶ 65].  The terms "we," "our," "Manager," and "fund" are then used throughout the November 17 newsletter.  [#64 at 17 ¶ 65 (citing http://elevationcapitalgroup.com/2016/11/); #87 at 17 ¶ 65].

44.     Elevation's December 16, 2016 newsletter states that "[t]his content in this communication is being sent to members of MHC America Fund, LLC and Prior Funds. As such,

any reference to 'we', 'our', 'Manager' or 'fund', regardless of capitalization, shall refer to MHC America Fund, LLC, and its Affiliates." [#64 at 17 ¶ 66 (citing http://elevationcapitalgroup.com/2016/12/); #87 at 17 ¶ 66]. The terms "we," "our," "Manager," and "fund" are then used throughout the December 16 newsletter. [#64 at 17 ¶ 66 (citing http://elevationcapitalgroup.com/2016/12/); #87 at 17 ¶ 66].

45.     Elevation's July 20, 2017 newsletter expressly states that "[a]ny reference to 'we', 'our' or 'fund', regardless of capitalization, shall refer to MHC America Fund, LLC, and its Affiliates." [#64 at 17 ¶ 67 (citing http://elevationcapitalgroup.com/newsletter-0617/); #87 at 18 ¶ 67]. The terms "we," "our," and "fund" are then used throughout the July 20 newsletter. [#64 at 17 ¶ 67 (citing http://elevationcapitalgroup.com/newsletter-0617/); #87 at 18 ¶ 67].

46.     Mr. Reinert provided Messrs. Reynolds, Rolfe, and Siragusa a link to the Fund 7 website, www.elevationfund.com, no later than May 16, 2017.  [#111-114].

47.     Investor lists are maintained in RV Horizons' Infusionsoft software. [#111-1 at ¶ 188; #111-4 at ¶ 4; #98-1 at 122:3-5].

48.     The RV Horizons Infusionsoft account is password protected.  [#111-4 at ¶ 4]. Access is provided on an as-needed basis for investor relations.  [*Id.*].

49.     The investor lists at issue in Counts IV and V are not owned by Class B or Class C. [#110 at 28; #111-1 at ¶¶ 188-92].

50.     Jamie and Ryan Smith had access to the RV Horizons' Infusionsoft account until "the spring of 2018."  [#111-4 at ¶ 5].

51.     Fund 2 was not open for investment as of March 17, 2018.  [#98-1 at 135:2-5].

52.     Mr. Reinert testified that he was not aware of any facts that the Smiths were using Plaintiff's confidential proprietary investor lists.  [#98-3 at 79:4-10].

53.     Mr. Reynolds testified that he did not have actual evidence of any download of investor lists by the Smiths from Infusionsoft.  [#98-1 at 122:18-21].

54.     There is no evidence of any confidentiality agreements relating to the investor lists or the access and/or use of the RV Horizons Infusionsoft account. *Compare* [#97 at 15] *with* [#110 at 28].

55.     Three hundred sixty-eight Fund 7 investors received the Offering Package that reflected Plaintiffs as "Affiliates."  *See* [#97 at 3 ¶ 7 (citing [#97-1 at ¶ 14]); #110 at 29].  The remaining 402 Fund 7 investors never received that version of the Offering Materials. *See* [#97 at 3 ¶ 7 (citing [#97-1 at ¶ 14]); #110 at 5-6 ¶ 7; #110 at 29].

56.     All investors of Plaintiffs' funds must meet securities law requirements for accreditation.  [#98-1 at 52:6-17; #111-1 at ¶ 16].

57.     The minimum investment amount in Plaintiffs' various funds is either $25,000 or $50,000. [#98-1 at 45:2-7].

58.     The minimum investment amount in Fund 7 is $50,000.  *Compare* [#97 at 4 ¶ 11 (citing #97-1 at ¶ 15] *with* [#110 at 6 ¶ 11].[16]

## ANALYSIS

### I.     Counts I-III: Lanham Act Violations

Counts I-III are asserted by Plaintiffs RV Horizons, Alumni 1-3, AHCF 1-6, AWA Fund 3, and Fund 1 (collectively, the "Mark Holder Plaintiffs") against a combination of all Defendants under the Lanham Act for direct trademark infringement (Count I); unfair competition (Count II); and contributory trademark infringement (Count III).  It is undisputed that twelve of the fifteen

---

[16] Although Plaintiffs dispute this proffered Statement of Fact, they adduce no evidence that contradicts Mr. Smith's statement that the minimum investment amount in Fund 7 is $50,000. Thus, this fact is deemed undisputed.

Plaintiffs each assert that it owns a single, protected trademark in its name, capable of distinguishing its goods and services. [UMF ¶¶ 11-14, 16-23, 25]. In each of the causes of action, the Mark Holder Plaintiffs allege that the Marks are improperly used in the Offering Package for Fund 7 and such use "is likely to cause confusion among ordinary consumers as to the source, sponsorship, affiliation, or approval of the services because they are false or misleading representations regarding the scope of" Defendants' experience and their relationship with the Mark Holder Plaintiffs. [#64 at ¶¶ 132–60].

*Smith Defendants.* The Smith Defendants proffer four main arguments for summary judgment on Counts I through III. *See* [#97 at 5-11]. First, they contend that the Mark Holder Plaintiffs' trademarks are not protectable because Plaintiffs have failed to adduce sufficient evidence to demonstrate that the alleged marks are inherently distinctive or acquired secondary meaning. [*Id.* at 5-6]. And in the case of the "RV Horizons" Mark, the Smith Defendants argue that it has been abandoned. [*Id.* at 6-7]. Second, the Smith Defendants argue there is no likelihood of confusion regarding Mark Holder Plaintiffs and Fund 7 because the Offering Package is "clear in defining and explaining the relationship between Fund 7 and the plaintiffs." [*Id.* at 7]. The Smith Defendants continue they are not using Plaintiffs' names as trademarks, but that the names were included in the Fund 7 Offering Materials as "entities owned or managed by 'affiliates' of the Fund 7 manager," and therefore, cannot be confusing because they are true statements. [*Id.* at 7-8]. Third, they argue that to the extent Mark Holder Plaintiffs have protectable marks, their trademark infringement and unfair competition claims fail for lack of damages suffered because a number of the high-level LLCs do not conduct any business; Plaintiffs' expert only opined as to damages for Fund 1 and Fund 2; and Fund 1 was closed to investment while Fund 2 did not open for investment until a year after Defendants' Fund 7. [*Id.* at 10-11]. Fourth, the Smith Defendants

argue that because there is no cognizable claim for direct trademark infringement, they are also entitled to summary judgment for the contributory infringement asserted in Count III. [*Id.* at 11].

**Dahn**.  Although Dahn also disputes that Plaintiffs have protectable marks, *see* [#99 at 9], it makes no argument regarding this element of Plaintiffs' claims.  Dahn, like the Smith Defendants, argues that summary judgment in its favor is appropriate because there is no likelihood of confusion.  *See* [*id.* at 11-15].  In addition, Dahn offers two arguments not raised by the Smith Defendants.  First, Dahn contends that all Defendants are entitled to summary judgment on Plaintiffs' trademark claims because the claims fail as a matter of law under the doctrine of acquiescence.  [*Id.* at 9-11].  Generally, Dahn contends that Mr. Reinert, who was the Senior Vice President and General Counsel for RV Horizons, consented to Fund 7's use of the Marks and Plaintiffs did not raise a concern about use of the Marks "for almost a year," and it would be prejudicial to now impose liability on Defendants for use of the Marks.  [*Id.*].  Specific to Dahn, it also contends that there is no evidence of Dahn's own use of the Marks to support liability for direct trademark infringement nor is there any evidence of its control of the Smith Defendants to support liability for contributory trademark infringement.  [*Id.* at 15-17].

## A.  Applicable Law

For the Mark Holder Plaintiffs to establish a claim for trademark infringement under § 43 of the Lanham Act, they must show: (1) their marks are protectable; (2) Defendants used the marks in connection with goods or services; and (3) Defendants' use of the marks is likely to cause customer confusion.  *Gennie Shifter, LLC. v. Lokar, Inc.,* No. 07-CV-01121, 2010 WL 126181, at *9 (D. Colo. Jan. 12, 2010) (citing *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research,* 527 F.3d 1045, 1050 (10th Cir. 2008)).  "To prevail in an action for unfair competition under § 43(a), a plaintiff must establish that (1) her mark is protectable, and (2) the defendant's use

of an identical or similar mark is likely to cause confusion among consumers." *Donchez v. Coors Brewing Co*., 392 F.3d 1211, 1215 (10th Cir. 2004) (*citing Packman v. Chicago Tribune Co*., 267 F.3d 628, 638 (7th Cir. 2001)) (internal quotation marks omitted).  "Courts addressing claims of both trademark infringement and unfair competition, address the claims together because they have virtually identical elements[.]" *Cleary Bldg. Corp. v. David A. Dame, Inc.,* 674 F. Supp. 2d 1257, 1269 (D. Colo. 2009) (citing *Utah Lighthouse Ministry*, 527 F.3d at 1050).

The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has recognized that "[t]he law of contributory infringement evolved from the recognition that parties other than the direct infringer often play roles in the infringement." *Procter & Gamble Co. v. Haugen*, 317 F.3d 1121, 1128 (10th Cir. 2003). "Contributory infringement occurs when the defendant either (1) intentionally induces a third party to infringe on the plaintiff's mark or (2) enables a third party to infringe on the mark while knowing or having reason to know that the third party is infringing, yet failing to take reasonable remedial measures."  *1-800 Contacts, Inc. v. Lens.com, Inc*., 722 F.3d 1229, 1249 (10th Cir. 2013).  As observed by the *1-800 Contacts* court, contributory infringement is predicated on a finding of direct infringement.  *Id.* at 1249.

## B.    Are There Genuine Issues of Material Fact as to Whether the Marks are Protectable?

The court now turns to the first prong of the analysis, i.e., whether there is at least a genuine issue of material fact that the Marks are protectable.  "To be protectable, 'a mark must be capable of distinguishing the products or services it marks from those of others.'"  *Donchez*, 392 F.3d at 1216 (quoting *Lane Capital Mgmt. Inc, v. Lane Capital Mgmt., Inc*., 192 F.3d 337, 344 (2d Cir. 1999)).  A mark's eligibility for protection, and the degree of protection afforded, depend on its characterization.   Trademarks can be characterized "in one of five categories of increasing

distinctiveness and strength: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 555 (10th Cir. 1998).

**Arbitrary Mark.**   An arbitrary mark "involves words and symbols that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality[,] or characteristic of those goods or services." *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019) (internal quotation omitted).  *See also Donchez*, 392 F.3d at 1216 ("An arbitrary mark applies a common word in an unfamiliar way."); *Limitless Worldwide, LLC v. AdvoCare Int'l, LP*, 926 F. Supp. 2d 1248, 1253 (D. Utah 2013) (An arbitrary mark "has no descriptive connotation with this product" and "does not conjure up any mental reaction that suggests the nature or quality of the product or service" (internal quotations omitted)).  While "[t]he categorization of a mark is a question of fact; [] a plaintiff must present enough evidence at the summary judgment stage to allow a reasonable jury to conclude that the mark is protectable." *Aspen Roofing, Inc. v. Aspen Contracting, Inc.*, No. 17-cv-00447-PAB-KMT, 2019 WL 1317623, at *5 (D. Colo. Mar. 21, 2019) (citing *Donchez*, 392 F.3d at 1218).

**Suggestive Mark.**   "'A mark is suggestive if it merely suggests the features of the product [or service], requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods [or services].'"  *Donchez*, 392 F.3d at 1216 (*quoting Lane Capital Mgmt.*, 192 F.3d at 344) (brackets in original).  *See also Limitless Worldwide*, 926 F. Supp. 2d at 1253 ("[E]xamples of arbitrary marks include: arrow liqueurs, flash music group, horizon banking services, mustang motel, sun bank, and wild horse beer.").  "Marks that are suggestive, arbitrary, or fanciful are considered inherently distinctive and are entitled to protection," whereas descriptive marks are only protected if they have acquired "secondary meaning."  *Prince*

*Lionheart, Inc. v. Halo Innovations, Inc.*, No. 06-cv-00324-WDM-KLM, 2008 WL 878985, at *9 (D. Colo. Mar. 28, 2008).

    ***Descriptive Mark.***  In contrast, a descriptive mark "describes the product's [or service's] features, qualities, or ingredients in ordinary language or describes the use to which the product [or service] is put."  *Donchez*, 392 F.3d at 1216 (*quoting Lane Capital Mgmt.*, 192 F.3d at 344) (brackets in original); *see also Limitless Worldwide*, 926 F. Supp. 2d at 1253 ("[E]xamples of merely descriptive marks include: after tan post-tanning lotion, 5 minute glue, and yellow pages phone directory.").  "In the Tenth Circuit, the test for distinguishing the categories is whether the mark 'require[s] the buyer to use thought, imagination, or perception to connect the mark with the goods,' in which case the mark is suggestive, while a term that 'directly convey[s] to the buyer the ingredients, qualities, or characteristics of the product' is descriptive."  *Aspen Roofing, Inc.*, 2019 WL 1317623, at *5 (quoting *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1007 (10th Cir. 2014).  "With a suggestive mark, . . . a person without actual knowledge would have difficulty in ascertaining the nature of the products that the mark represents."  *Limitless Worldwide*, 926 F. Supp. 2d at 1253.

    ***Generic Mark.***  Generic marks are ineligible for protection.  *Donchez*, 392 F.3d at 1216 ("If a term is generic (the common name for a product or service), it is ineligible for protection because [t]he public has an inherent right to call a product or service by its generic name." (internal quotation omitted) (alteration in original)).

### 1.    Application

    As an initial matter, this court addresses a fundamental issue with respect to Plaintiffs' trademark claims.  Defendants argue, and Plaintiffs do not refute, that it is appropriate to consider each of the Marks individually.  But the analysis in this particular action can be grouped, given the

overlap in terminology. Thus, the court will consider "RV Horizons," "MPHS Alumni," "AWA Fund," "Affordable Housing Community Fund," and "MHC America Fund."

Plaintiffs bear the burden of proof to establish that their respective Marks are protectable. *See Donchez*, 392 F.3d at 1216. Therefore, Defendants may satisfy their respective burdens at summary judgment by identifying a lack of evidence on an essential element of Plaintiffs' claims. *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.* at 1115 (citing *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)).

### a.      Characterization of the Marks

The Tenth Circuit has emphasized that the factfinder's own perception of the mark is not the object of the inquiry. *See Donchez*, 392 F.3d at 1216. Rather, "the factfinder's function is to determine, based on the evidence before it, what the perception of the purchasing public is." *Id.* (citing *Lane Capital Mgmt.*, 192 F.3d at 344). Other courts have recognized that the determination of the characterization of the trademark is "critically important and fact intensive." *Ellipse Commc'ns, Inc. v. Caven*, No. 3-07-1922-O, 2009 WL 3398709, at *2 (N.D. Tex. Oct. 16, 2009) (citations omitted).

*MPHS Alumni, AWA Fund, Affordable Housing Community Fund, and MHC America Fund.* In support of the Smith Defendants' Motion for Summary Judgment, Mr. Smith declared that "the names of the plaintiffs identify exactly what they are. Mobile Home Community America Fund is abbreviated as 'MHC America Fund.' Affordable Housing Community Fund is abbreviated as 'AHCF.'" [#97-1 at ¶ 26]. In response to the Smith Defendants' contention that the naming conventions of the Marks ("Affordable Housing Community Fund" followed by a

number; MHPS for "mobile home park"; or MHC America for "mobile home community") tells the viewer exactly what the businesses do [#97 at 6], the Mark Holder Plaintiffs do not specifically discuss any evidence as to either the definition of the purchasing or consuming public,[17] or what evidence the jury should consider to factually determine that any of these Marks are inherently distinctive, i.e., arbitrary or suggestive, *see* [#110 at 13-14].  In their Brief, the Mark Holder Plaintiffs do not point to factual evidence that creates a genuine issue of material fact as to whether any particular Mark is arbitrary or suggestive, instead relying upon attorney argument and case citations.  [*Id.*].  *Cf. Donchez*, 392 F.3d at 1217 (observing that the plaintiff lacked evidence to create a genuine issue of material fact that the term "beerman" was suggestive, rather than descriptive); *Aspen Roofing*, 2019 WL 1317623 at *6 (finding insufficient evidence to create a genuine issue of material fact on the issue of whether the mark is suggestive).

While under no obligation to do so, this court was able to ascertain some evidence regarding the origin of the Marks cited by neither the Smith Defendants nor Plaintiffs.  As to "MHPS Alumni," Mr. Reynolds testified "[w]e named the MHPS Alumni funds as such because these funds included investors who were 'alumni' of the bootcamps run by me and Rolfe." [#111-1 at ¶ 37].  Rather than supporting conclusions that "MHPS Alumni," "MHPS Alumni 2," and "MHPS Alumni 3" "involve[] words and symbols that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality[,] or characteristic of those goods or services," this evidence suggests otherwise—

---

[17] While Plaintiffs deny that the investors are sophisticated and argue that the level of investor sophistication is immaterial because they allege improper affiliation, and not necessarily source, *see* [#110 at 6 ¶ 11], they do not point to any evidence a factfinder should consider to define the purchasing public for the purposes of trademark infringement.  *See* [#110 at 13-14].  It is undisputed that the funds were only open to sophisticated or accredited investors.  *See, e.g.*, [UMF ¶ 56].  It also appears from some exhibits in the record that the consuming public extends beyond current investors in the Mark Holder Plaintiffs' funds.  *See, e.g.*, [#111-26 (Ex. 110)].

particularly in light of Plaintiffs' concession that the use of "MHPS" in each of Alumni 1-3's Marks refers to "Mobile Home Parks." [#110 at 15]. Nor does Mr. Reynolds' statement create a genuine issue of material fact that "MHPS Alumni," "MHPS Alumni 2," and "MHPS Alumni 3" merely suggest the features of these funds, requiring the purchaser to use "imagination, thought, and perception to reach a conclusion as to the nature of the goods or services." *See Donchez*, 392 F.3d at 1216. And as discussed above, this statement about Alumni 1-3's respective Marks has no bearing on how a factfinder should characterize the remaining Marks of "RV Horizons," "AWA Fund," "Affordable Housing Community Fund 1," "Affordable Housing Community Fund 2," "Affordable Housing Community Fund 3," "Affordable Housing Community Fund 4," "Affordable Housing Community Fund 5," "Affordable Housing Community Fund 6," and "MHC America Fund."

As to these remaining Marks, the evidence in the record reflects that "AWA Fund" refers to a fund opened to a particular subset of investors, i.e., ones who came through Argos Wealth Advisers, with whom Messrs. Reynolds and Rolfe do business. [UMF ¶ 17]. There is nothing in the record highlighted by Plaintiffs or independently ascertained by the court that suggests that the AWA Fund included investors not associated with Argos Wealth Advisers. Likewise, in response to the query, "Are the Affordable Housing Community Funds affordable housing community funds?", Mr. Reynolds testified "Absolutely." [UMF ¶ 24; #98-1 at 51:19-21]. Mr. Reynolds further testified that "MHC" referred to "Manufactured Home Community." [UMF ¶ 26; #98-1 at 51:22-23; #98-1 at 51:19-21]. Again, Plaintiffs point to no evidence that these Marks required the purchasing public to use "imagination, thought, and perception to reach a conclusion as to the nature of the goods or services." *Donchez*, 392 F.3d at 1216.

Plaintiffs' reliance on attorney argument and citations to two cases, *Metro Brokers, Inc. v. Tann*, 815 F. Supp. 377 (D. Colo. 1993) and *Big O Tires, Inc. v. 4x4, Inc.*, 167 F. Supp. 2d 1216 (D. Colo. 2001), also do not create a genuine issue of material fact as to whether these Marks are appropriately characterized as inherently distinctive.  *See* [#110 at 14].  With respect to *Metro Brokers*, the page identified by the pinpoint citation reflects a fact-specific discussion as to the trademark at issue in that case; it is unclear to this court how such discussion regarding an entirely different mark, creates a genuine issue as to whether Plaintiffs' respective Marks in this case are individually inherently distinctive. *Metro Brokers*, 815 F. Supp. at 381.  Similarly, the *Big O Tires* court specifically found that Big O "presented evidence" regarding the adoption of its mark; that defendants admitted that Big O's mark was either arbitrary or suggestive; and no further evidence was presented to indicate that use of the mark was intended to suggest some quality or ingredient of the goods. *Big O Tires*, 167 F. Supp. 2d at 1226.  None of these circumstances is present here, and this court is unpersuaded by these cases that Plaintiffs have identified the requisite "more than a scintilla" of evidence required to avoid summary judgment as to the characterization of "MHPS Alumni," "MHPS Alumni 2," "MHPS Alumni 3," "Affordable Housing Community Fund 1," "Affordable Housing Community Fund 2," "Affordable Housing Community Fund 3," "Affordable Housing Community Fund 4," "Affordable Housing Community Fund 5," "Affordable Housing Community Fund 6," "AWA Fund," and "MHC America Fund" as inherently distinctive.[18]

*RV Horizons.*  But the Smith Defendants have not carried their burden to preclude the characterization of "RV Horizons" as inherently distinctive.  *See* [#97; #97-1].  The Smith

---

[18] Indeed, there appears to be no discussion of AWA Fund or any meaning of "AWA" at all, though this court was able to ascertain from the record, as discussed above, that "AWA" refers to Argos Wealth Advisors.

Defendants point to no evidence in the record that RV Horizons includes recreational vehicles or otherwise describes its products or services.  This court notes that Mr. Reynolds stated in his Declaration that RV Horizons "was created initially to manage a few RV Parks, which it did very successfully for many years."  [#111-1 at ¶ 22].  The Smith Defendants point to no evidence that RV Horizons continued to do so in the operative time period.  And having done so for the other Marks with respect to the argument regarding descriptiveness, this court is disinclined to scour the record in this case for evidence or arguments, particularly when all Parties have been represented by able counsel since the inception of this case.  *See Gross*, 53 F.3d at 1546 (holding that "[w]ithout a specific reference, we will not search the record in an effort to determine whether there exists dormant evidence which might require submission of the case to a jury"); *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (observing that the court has no obligation to make arguments or perform research on behalf of litigants).

Nor have the Smith Defendants persuaded the court that "RV Horizons" (or any other Mark) is generic as a matter of law either because it tells the viewer exactly what the business does or, in the case of RV Horizons, has been abandoned (as discussed in detail below).  [#97 at 6]. Trademarks become generic "[w]hen the relevant public ceases to identify a trademark with a particular source of a product or service but instead identifies the mark with a class of products or services regardless of source."  *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 544 (10th Cir. 2000). A court may not grant summary judgment when the moving party has not met its initial responsibility of demonstrating no genuine issue of material fact exists and that it is entitled to summary judgment as a matter of law.  *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002).

With respect to "RV Horizons," this court finds that, drawing all reasonable inferences in favor of RV Horizons, the Smith Defendants have failed to demonstrate that they are entitled to summary judgment—in the first instance—that this particular Mark is not inherently distinctive.  Similarly, this court finds that the Smith Defendants have failed to demonstrate that any of the Marks are generic.

### b.    Secondary Meaning

Assuming that some or all of the Marks are descriptive in nature,[19] this court now turns to the question of whether there is a genuine issue of material fact as to secondary meaning.  The Smith Defendants refer to Mr. Rolfe's deposition in support of their argument that there is no evidence of secondary meaning.  [#97 at 6 (citing [#98-2 at 62:4-13, 63:18-25])].  In turn, Plaintiffs point to their proposed Statements of Additional Undisputed Facts to assert that Plaintiffs exclusively use the Marks in commerce; Plaintiffs and investors use the Marks; and investors only associate those names with those companies.  [#110 at 15-16 (citing [*id.* at ¶¶ 15-18])].  In support of those proposed Statements of Additional Undisputed Facts, Plaintiffs rely upon the Declarations of Mr. Reynolds [#111-1 at ¶¶ 23-70, 76-78]; Mr. Siragusa [#111-3 at ¶¶ 55-56]; and Amy Burget ("Ms. Burget") [#111-5 at ¶ 5].  *See* [#110 at 8 ¶ 17].  In Reply, the Smith Defendants contend that the self-serving statements offered from Messrs. Reynolds and Siragusa, and Ms. Burget, do not constitute competent evidence of secondary meaning to preclude summary judgment.  [#129 at 8-9].

"An otherwise descriptive mark acquires a secondary meaning if it has been used so long and so exclusively by one producer with reference to his goods or articles that, in that trade and to

---

[19] In so doing, this court acknowledges that, assuming "RV Horizons" is inherently distinctive, i.e., arbitrary or suggestive, RV Horizons need not also prove secondary meaning.

that branch of the purchasing public, the word or phrase has come to mean that the article is his product." *Marco's Franchising LLC v. Marco's Coal Fired Pizza Inc*., No. 17-CV-2550-MSK-NYW, 2019 WL 4645431, at *7 (D. Colo. Sept. 23, 2019) (*quoting Educ. Dev. Corp. v. Econ. Co.*, 562 F.2d 26, 29–30 (10th Cir. 1977). The Parties and this court agree that secondary meaning can be established by direct or circumstantial evidence. *Prince Lionheart,* 2008 WL 878985, at *9. Direct evidence includes evidence of recognition by consumers, *see Hornady*, 746 F.3d at 1008, such as consumer surveys or testimony from consumers, *Aspen Roofing*, 2019 WL 1317623, at *6. Permissible circumstantial evidence includes (1) the length and manner of its use, (2) the nature and extent of advertising and promotion of the mark, and (3) the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture. *Prince Lionheart*, 2008 WL 878985, at *10. A plaintiff must also establish that the secondary meaning existed in the relevant marketplace prior to the defendant's use such that the defendant's use constituted infringement at the time that use began. *Marco's Franchising*, 2019 WL 4645431, at *8. Whether a trademark has acquired secondary meaning is a question of fact that should generally not be decided on summary judgment. *See Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988).

Plaintiffs have not pointed to any direct evidence of secondary meaning, such as consumer surveys or testimony from consumers. *See* [#110; #111]. Instead, they rely upon the Declarations of Messrs. Reynolds [#111-1 (Ex. 1)] and Siragusa [#111-3 (Ex. 3)], and Ms. Burget [#111-5 (Ex. 5)] for three general propositions: (1) Plaintiffs exclusively use the Marks in commerce; (2) Plaintiffs and investors use the Marks; and (3) investors only associate those names with those companies. *See* [#110 at ¶¶ 17-18 (citing [#111-1 at ¶¶ 23-70; #111-3 at ¶¶ 55-56; #111-5 at ¶ 5])]. In turn, Mr. Reynolds refers to several additional documents, including the Operating

Agreements for Alumni 1-3 [#111-22 (Ex. 11);[20] #111-24 (Ex. 13); #111-32 (Ex. 21); #111-26 (Ex. 15); #111-33 (Ex. 22)]; the Private Placement Memoranda for Alumni 1-3 [#111-23 (Ex. 12); #111-25 (Ex. 14); #111-27 (Ex. 16)]; correspondence between Mr. Siragusa and Kacey White, a third party about AHCF 2 directed at Alumni 1 investors [#111-40 at 2 (Ex. 29 at RVH_Fed_076864)]; correspondence between Mr. Siragusa and third party Darren P. Evans about ACHF 2, Alumni 1-3, and AHCF 1 [#111-47 (Ex. 36 at RVH_Fed_017026)]; correspondence between Mr. Siragusa and third party Jeremy Roll about AHCF 2 [#111-48 (Ex. 37 at RVH_Fed_076919)]; correspondence between Mr. Siragusa and Alumni 2 investors [#111-36 (Ex. 25)]; the Operating Agreements for AHCF 1-6 [#111-28 (Ex. 17); #111-42 (Ex. 31); #111-37 (Ex. 26); #111-50 (Ex. 39); #111-56 (Ex. 45); #111-59 (Ex. 48); #111-64 (Ex. 53)]; the Private Placement Memoranda for AHCF 1-6 [#111-29 (Ex. 18); #111-38 (Ex. 27); #111-51 (Ex. 40); #111-57 (Ex. 46); #111-60 (Ex. 49); #111-65 (Ex. 54)]; correspondence from Messrs. Reynolds and Rolfe to Alumni and AHCF 1 investors regarding AHCF 2 [#111-209 (Ex. 194)]; correspondence from Mr. Siragusa to AHCF 1 investors regarding AHCF 2 [#111-34 (Ex. 23)]; correspondence between Mr. Siragusa and third party David Stout regarding AHCF 2 [#111-35 (Ex. 24)]; correspondence between Mr. Siragusa and third party Ed Pepper regarding AHCF 2 [#111-41 (Ex. 30)]; correspondence between Mr. Siragusa and third parties David Fu and Robert Smith regarding AHCF 3 [#111-53 (Ex. 42); #111-54 (Ex. 43); #111-55 (Ex. 44)]; correspondence between Mr. Siragusa and third parties Steve Knauber and Brian Wolfe regarding AHCF 4 [#111-214 (Ex. 199); #111-215 (Ex. 200)]; correspondence between Mr. Siragusa and Alumni 1-3 and AHCF 1-4 investors regarding AHCF 5 [#111-61 (Ex. 50)]; correspondence between Mr. Siragusa

---

[20] For purposes of clarity, this court refers to both the docket number assigned by its ECF system, and the original exhibit number as utilized by the declarant.

and third party Karyn Young regarding her MHC Accounts [#111-79 (Ex. 63); #111-81 (Ex. 65)]; correspondence between Mr. Siragusa and third party Adam Freedman regarding Fund 1 and AHCF 4-6 [#111-104 (Ex. 88)]; correspondence between Mr. Siragusa and third party Susan Smith [#111-69 (Ex. 58)]; the Operating Agreements for AWA Fund [#111-62 (Ex. 51)]; the Private Placement Memorandum for AWA Fund [#111-63 (Ex. 52)]; correspondence between Mr. Siragusa and a third party regarding the subscription for AWA Fund [#111-217 (Ex. 202)]; correspondence between Mr. Siragusa and Brad Rymer, the Chief Financial Officer of RV Horizons, regarding AWA [#111-218 (Ex. 203)]; correspondence between Mr. Siragusa and Ryan Mason of Argos Wealth [#111-219 (Ex. 204)];[21] the LLC Agreement of MHC America Fund LLC [#111-70 (Ex. 59)]; the Subscription Booklet for MHC America Fund LLC [#111-72 (Ex. 60)]; correspondence between Mr. Siragusa and third party Kathleen Berry regarding MHC America Fund LLC [#111-73 (Ex. 61)]; and correspondence between Mr. Siragusa and third Party Lars Chapsky regarding MHC America Fund LLC [#111-146 (Ex. 130)].

In support of secondary meaning, Mr. Siragusa declared that he communicated with investors using the company names, citing to the same correspondence relied upon by Mr. Reynolds.  *Compare* [#111-3 at ¶¶ 55-56] *with* [#111-1 at ¶¶ 23-70, 76-78].  He further states, without additional citation, "I have always, since first getting involved with these investment funds, used the company names to identify the particular funds.  Investors do the same."  [#111-3 at ¶ 56].  Similarly, Ms. Burget declares that when she communicates with investors, she uses the Marks.  [#111-5 at ¶ 5].  Ms. Burget does not separately cite any further exhibits.  *See* [*id.*].

---

[21] This document appears to reflect private banking information of a third party subject to Rule 5.2 of the Federal Rules of Civil Procedure.  Out of an abundance of caution, this court *sua sponte* directs the Clerk of the Court to restrict [#111-219] with a Level 1 Restriction.

Despite this extensive record, this court finds that there is not a genuine issue of material fact that these Marks have acquired secondary meaning. As discussed above, there is no precise definition of the consuming public. *See supra*. Assuming that the consuming public is defined as potential investors who invest in mobile home park funds, there is simply insufficient evidence to demonstrate that such investors (particularly those beyond the actual investors in the particular funds) associate the Marks with the Mark Holder Plaintiffs with which the Marks are tied. The Tenth Circuit has long held that "[t]he crux of a secondary meaning is the origin of the goods from a single source." *Nat'l Nu Grape Co. v. Guest*, 164 F.2d 874, 877 (10th Cir. 1947). Drawing all justifiable inferences in Mark Holder Plaintiffs' favor, the continuous use of the Marks by Plaintiffs, without more, cannot establish sufficient evidence to survive summary judgment as to the association of the Marks to the respective Mark Holder Plaintiffs. *See Fernandez v. Jones*, 653 F. Supp. 2d 22, 30 (D.D.C. 2009). Nor does the substance of the correspondence between Mr. Siragusa and investors or potential investors create a genuine issue of material fact that potential investors who invest in mobile home park funds make "*a mental association* in buyers' minds between the alleged mark and a single source of the product." 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:5 (4th ed. 2009) (emphasis in original).

Further, the statements of Mr. Reynolds, Mr. Siragusa, and Ms. Burget are insufficient to create a genuine issue of material fact as to the mental association in the consuming public's mind. It is well-settled that Plaintiffs' own perception of the Marks is not the object of the inquiry but, rather, the focus is upon the perception of the purchasing, or consuming, public. *Donchez*, 392 F.3d at 1216. And though not addressed directly by the Tenth Circuit, other Circuit Courts of Appeals have found that "[e]vidence of secondary meaning from a partial source possesses very limited probative value." *Filipino Yellow Pages, Inc. v. Asian Journal Pubs., Inc.*, 198 F.3d 1143,

1152 (9th Cir. 1999). Courts have specifically found that "affidavits of employees and close affiliates of a trademark holder carry *de minimis* evidentiary weight in determining whether a trademark has acquired secondary meaning, and cannot defeat a defendant's motion for summary judgment." *Continental Lab. Prods., Inc. v. Medax Int'l, Inc.*, 114 F. Supp. 2d 992, 1005 (S.D. Cal. 2000). And an examination of the communications initiated by the various third parties does not suggest that the consuming public assigns a secondary meaning to "RV Horizons," "MPHS Alumni," "AWA Fund," "Affordable Housing Community Fund," or "MHC America Fund." Accordingly, this court finds that summary judgment in favor of Defendants as to "MPHS Alumni," "AWA Fund," "Affordable Housing Community Fund," or "MHC America Fund" on Counts I-III is appropriate.

## C. Abandonment of the RV Horizons Mark

Because this court finds that there is a genuine issue of material fact that precludes summary judgment as to whether "RV Horizons" is inherently distinctive, it now turns to the Smith Defendants' contention that the "RV Horizons" Mark is unenforceable because it has been abandoned. [#97 at 6-7]. In support, the Smith Defendants cite a single-page "2018 Q3 Macro Report" that indicates Plaintiffs have "improved the branding of [its] management company" and states, in part: "We have never liked the name 'RV Horizons' . . . we decided that it was time for an image overhaul." [*Id.* at 6 (citing [#72-1])]. Plaintiffs argue "the fact that RV Horizons has been succeeded by "Impact MHC Management, Inc.," in some instances since July 2018 "has no bearing on whether RV Horizons had a protectable mark," and that the use of RV Horizons in commerce has continued. [#110 at 14 n.7; #111-1 at ¶¶ 18, 20, 22].

The Lanham Act provides, in pertinent part, that

[a] mark shall be deemed to be "abandoned" if its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from

circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127.  Here, even accepting the Smith Defendants' proffered facts, three consecutive years have not passed since the 2018 Q3 Macros Report, and thus, there is no prima facie evidence of abandonment. *See* [#72-1].   Nor have the Smith Defendants' conclusively rebutted Mr. Reynolds' Declaration that "RV Horizons" continues to be used in commerce.  Thus, the court finds that there is genuine dispute of fact in the record as to whether RV Horizons has abandoned its mark such that summary judgment in favor of the Smith Defendants on this basis is not warranted.

> **D.** **Defendants' Use of "RV Horizons"**

Both the Smith Defendants and Dahn argue they are entitled to summary judgment on the Mark Holder Plaintiffs' trademark claims because they did not "use" RV Horizons[22] as contemplated under the Lanham Act.  *See* [#97 at 7-10; #99 at 14-15].  The Smith Defendants argue that to be actionable, a trademark must be used to identify the source of goods, and the Offering Package "'merely identifies the plaintiff entities as owned or managed by 'affiliates' of the Fund 7 manager," and "[i]n no sense is listing entities as affiliates of members akin to 'using' them as trademarks." [#97 at 8].  Relatedly, Dahn argues there is no evidence it, as opposed to the other Defendants, used Plaintiffs' Marks at all, including RV Horizons.  [#99 at 14].  Dahn continues that Plaintiffs' trademark claim is "premised solely on the fact that a Dahn-controlled website includes a link that, if clicked, takes the viewer to Elevation's website," and "[i]t is undisputed that the Plaintiffs' alleged marks are not used on the Dahn-controlled website."  [*Id.* at 14-15].

---

[22] Because of the court's other rulings herein, its analysis here is limited to RV Horizons.

Plaintiffs respond to the Smith Defendants with a list of instances in which their Marks were included in the Offering Package or its supplements and argue that listing their names in the Offering Package is "use" of the Marks. [#110 at 17-18].  But the only identified uses of "RV Horizons" occur between April 2017 through May 2018.  [*Id.* (citing [#111-14 at 8 (Ex. 10 at MHPI000223); #111-13 at 40-41 (Ex. 10 at MHPI000211-12); #111-15 (Ex. 10A), #111-16 (Ex. 10B)])].  Specifically, they contend that RV Horizons has no relationship to Fund 7 and, while the Smiths were involved in investor solicitation for Fund 1, suggesting RV Horizons is an affiliate of the Smiths and/or Fund 7 is "false and confusing."  [*Id.* at 19-20].  As to Dahn, Plaintiffs contend that Dahn owns 50% of Fund 7 and 50% of the LLC that manages Fund 7—and Fund 7 otherwise has no employees, so all of its operations are carried out by Dahn employees.  [#109 at 23].  Plaintiffs continue that Dahn and "Dahn's people" had input on components of the Offering Package and Dahn's President and employee distributed the Offering Package to investors.  [*Id.*].

*Use Generally*.  "A designation is used as a trademark when it identifies one source and distinguishes it from other sources."  *Go Pro Ltd. v. River Graphics, Inc.*, No. 01-cv-600-JLK, 2006 WL 898147, at *3 (D. Colo. Apr. 5, 2006); *see also* Restatement (Third) of Unfair Competition § 18 (1995) ("A designation is 'used' as a trademark . . . when the designation is displayed or otherwise made known to prospective purchasers in the ordinary course of business in a manner that associates the designation with the goods, services, or business of the user.").  With respect to services, a mark is in use in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce."  15 U.S.C. § 1127.   In reviewing Plaintiffs' evidence with respect to the use of "RV Horizons" by Defendants, there appears to be no real dispute that Fund 7's Offering Package identified RV Horizons as an "Affiliate" of Defendants at least between April 2017 and May 2018.  *See* [UMF ¶ 33].  *See also*

[#129 at 10]. The Offering Package was provided to potential investors with the intent to solicit investment in Fund 7. Drawing all inferences in favor of the Mark Holder Plaintiffs, this court is not persuaded that Defendants are entitled to summary judgment in their favor based on lack of use.[23]

*Dahn's Use.* With respect to Dahn's use, Dahn's Mini U Storage webpage includes a link for "investor information" that allows visitors to obtain the Fund 7 Offering Package. [UMF ¶ 34; #111-8 at 122:19-124:5]. And to the extent that Dahn argues that it is sufficiently distinct from Fund 7 and the Smith Defendants to avoid liability for direct or contributory infringement of RV Horizons, this court finds Dahn concedes that (a) it was involved in the formation of Fund 7 [#128 at 17], and (b) its attorneys from DLA Piper worked on drafting the Offering Package [#99-7 at 9:1-12. 23:4-11, 25:1-9, 62:23-63:13]. Therefore, there is at least a genuine issue of material fact as to the level of Dahn's involvement in preparing the Offering Package and the use of the language therein, thus precluding summary judgment on that basis.

### E. Likelihood of Confusion

This court turns to Defendants' various arguments that there is no genuine issue of material fact that there is a likelihood of confusion based on their use of "RV Horizons" in the Offering Package. Here, it is important again not to conflate the Marks, as only "RV Horizons" survives as a potential protectable Mark. "In this circuit, likelihood of confusion is a question of fact . . . amenable to summary judgment, only if no reasonable juror could find likelihood of confusion between plaintiff's and defendants' marks." *Affliction Holdings*, 935 F.3d at 1114 (internal quotations and citations omitted); *see also King of the Mt. Sports, Inc. v. Chrysler Corp.*,

---

[23] Defendants' arguments regarding whether the use of "RV Horizons" was accurate is better addressed through an analysis of likelihood of confusion. *1-800 Contacts,* 722 F.3d at 1239.

185 F.3d 1084, 1090 (10th Cir. 1999) ("Bearing this in mind, if, as in any case, the examination of the various factors establishes a genuine issue of material fact regarding the likelihood of sponsorship confusion, summary judgment is not appropriate.").   In determining whether a likelihood of confusion exists, the court considers the following, non-exhaustive factors:

> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks. These factors are interrelated and no one factor is dispositive. In this circuit, likelihood of confusion is a question of fact but one amenable to summary judgment in appropriate cases.

*Affliction Holdings, LLC*, 935 F.3d at 1114-15 (quoting *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002)).   The relative weight of these factors varies depending on the context of the case but, "[i]n both confusion of source and confusion of sponsorship cases, the similarity of the marks factor constitutes the heart of our analysis."   *King of the Mt. Sports, Inc.*, 185 F.3d at 1090.

To the extent that Dahn argues that there is no likelihood of confusion because RV Horizons is not being used as a source identifier [#99 at 12-13], this court respectfully declines to grant summary judgment on that basis.  As observed by the Tenth Circuit, there are multiple types of confusion, including direct confusion when the consumer confuses the origin of defendant's goods or services as plaintiff.  But "[c]onfusion need not be limited to the incorrect perception that one party was the source of the other party's product or service; it may also arise from a mistaken belief in common sponsorship or affiliation."  *See 1-800 Contacts*, 722 F.3d at 1239.  Indeed, in its Reply, *see generally* [#129], Dahn does not address the case law presented by the Mark Holder Plaintiffs regarding likelihood of confusion, *see* [#109 at 20-23 (citing *Atlas Biologicals, Inc. v. Kutrubes*, Case No. 15-cv-00355-CMA-KMT, 2019 WL 4594274 (D. Colo. Sept. 23, 2019))].  And while this court does not find *Atlas Biologicals* squarely on point given the differences between

the particular facts of that case and the distinct procedural postures therein, it does conclude that confusion need not depend on a showing that consumers confused the origin of the goods and services being offered by Defendants.  Rather, summary judgment can be avoided if the Mark Holder Plaintiffs adduce sufficient evidence for a factfinder to conclude that consumers could form a mistaken belief about common sponsorship or affiliation. Thus, this court turns to the Mark Holder Plaintiffs' proffered evidence regarding whether there is a likelihood of confusion regarding common sponsorship or affiliation with RV Horizons.

*Degree of Similarity Between Marks*.   Here, it is undisputed that "RV Horizons" is reflected in Defendants' Offering Package and, therefore, the marks are identical.  First, the court notes that the plain language of the Offering Package specifically identifies RV Horizons, Inc. as one of its "Affiliates" and states:

> In addition, the members of the Manager are backed by a strong extended team: Dave Reynolds is the owner and CEO of the 600+ employee company RV Horizons, Inc. ("RVH") that provides property management services for various affiliated funds and partnerships.  The Manager works with RVH to enact turn-around plans and perform the day-to-day operation of the Property acquired by the Fund.  RVH is headquartered in Cedaredge [sic] Colorado, but also has employees in Montrose, Colorado, Littleton, Colorado and Niles, Michigan (along with onsite managers and field supervisors across the country).  The team at RVH includes, but is not limited to, corporate office staff, acquisitions team, training team, on-site management, district management, regional managers and rehab crews who work with onsite managers.

[#111-13 at 41 (Ex. 10 at MHPI000212)].  The record reflects that "RV Horizons" is identical and the Defendants used it in the same manner.  This factor weighs against summary judgment.

*Intent of Alleged Infringers*.  Second, this court finds that there is at least a genuine issue of material fact as to the intent of Defendants in using "RV Horizons" in the Offering Package. Questions of intent and state of mind are ordinarily not amenable to summary adjudication, *see, e.g.*, 10B Wright & Miller, Fed. Prac. & Proc. § 2730 (observing that when state of mind or

38

"consciousness and conscience" is involved, credibility often will be central to the case and summary judgment inappropriate). Thus, this factor weighs against a finding of summary judgment.

*Actual Confusion.* Turning to actual confusion, the Mark Holder Plaintiffs contend that "[t]he evidence of actual consumer confusion here is abundant." [#110 at 24]. But looking at the actual evidence cited by these Plaintiffs, it is not clear that the confusion is with the use of "RV Horizons" instead of other factors, such as the photographs of Messrs. Reynolds, Rolfe, and Siragusa in, or the similar feel and look of, the offering materials. For instance, Exhibit 106, quoted by Plaintiffs, *see* [*id.*], makes no mention of RV Horizons. [#111-122]. Neither do Exhibits 89 [#111-105], 95 [#111-111], 109 [#111-125], or 111 [#111-127]. Similarly, one investor who wrote "Gee, the naming of it as 'Fund 7' kinda makes it look like a continuation of you guys…unless they truly did have 6 previous funds," does not link his statement to the use of "RV Horizons," but "Fund 7." [#111-108 (Ex. 92) (ellipses in original)]. Nor is the court persuaded that the Declarations of Messrs. Reynolds, Rolfe, Siragusa, and Brandon Reynolds demonstrate actual confusion arising from the use of RV Horizons. For instance, Mr. Brandon Reynolds declared that "[i]nvestors also emailed me directly, confused as to whether Dave and Frank were involved in Fund 7." [#111-4 at 2 ¶ 7 (citing [#111-185 (Ex. 170)])]. But the email relied upon by Mr. Brandon Reynolds makes no mention of "RV Horizons." [#111-185 (Ex. 170)]. And the additional documents cited by the Mark Holder Plaintiffs suffer from the same deficiency. *See* [#111-93 (Ex. 77); #111-144 (Ex. 128); #111-200 (Ex. 185)]. The Mark Holder Plaintiffs do not point to specific evidence that the use of "RV Horizons" caused actual confusion among the consuming public.

As observed by courts in this District, *de minimis* evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding likelihood of confusion. *See*

*King of the Mt. Sports, Inc*., 968 F. Supp. at 576, *aff'd*, 185 F.3d 1084 (10th Cir. 1999).  Consistent with the *King of the Mountain Sports* court, I conclude that the Mark Holder Plaintiffs' evidence of actual confusion arising from the use of "RV Horizons" falls clearly short of that necessary to support a finding of actual confusion, and I will not consider it here.

> *Similarity of Products and Marketing of Products.*  Though there are distinctions between the goods and services offered by Defendants, i.e., investment funds, and the services offered by RV Horizons, i.e., property management of mobile home communities, this court notes that the Offering Package does not attempt to distinguish Defendants' goods and services from RV Horizons'.  Indeed, Defendants' identification of "Prior Similar Funds" in Fund 7's Track Record contains a specific line address "Properties managed by RV Horizons?" and indicates that "Properties shown that are partially owned are all managed by RV Horizons, Inc., which is an Affiliate of the members of the Manager," suggests at least a common sponsorship or affiliation between RV Horizons and Defendants.   [#111-15 32 (Ex. 10A at RVH_Fed_004740)].  Accordingly, this court finds that this factor weighs against summary judgment.

> *Degree of Care Exercised by Purchasers*.  The Smith Defendants argue that "investors are sophisticated and should read the PPM before making an investment decision," [#97 at 9-10] and Plaintiffs respond by arguing that the sophistication of the investors is inapposite to the inquiry. [#110 at 23].  This court finds that the case law is not settled as to whether the degree of care exercised by the consuming party is irrelevant.  *Cf. Atlas Biologicals*, 2019 WL 4594274, at *9 (considering the degree of care exercised by consumers in determining likelihood of confusion). This court notes that the record reflects that the consumers were, in fact, asking questions regarding the origin of Fund 7, albeit not specifically tied to RV Horizons.  *See, e.g.*, [#111-105 (Ex. 89);

#111-111 (Ex. 95); #111-125 (Ex. 109)]; #111-127 (Ex. 111)]. This factor weighs in favor of summary judgment.

**Strength or Weakness of Mark.** Finally, the court notes that the strength or weakness of the Mark is in dispute as discussed above. Given the ambiguity, this factor weighs against summary judgment.

Balancing these factors and construing all evidence in favor of the Mark Holder Plaintiffs, this court concludes that summary judgment based on a lack of a likelihood of confusion is not warranted.

## F.      Acquiescence

The court now turns to Dahn's argument that RV Horizons acquiesced to the use of its Mark through the actions of its Senior Vice President and General Counsel, Mr. Reinert, which resulted in prejudice to Defendants.[24]  [#99 at 9-10]. Acquiescence is an affirmative defense that requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant express or implied, that plaintiff would not assert his trademark rights against the defendant." *Creative Gifts, Inc.*, 235 F.3d at 547–48 (*quoting Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569 (6th Cir. 2000)). When an affirmative defense is asserted in a motion for summary judgment, Defendants "must demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997). "If the defendant[s] meet[ ] this initial

---

[24] Though Dahn contends that Plaintiffs' delay in asserting their rights was not excusable and resulted in undue prejudice to Defendants, it does not appear that it is asserting the affirmative defense of laches. Laches is an affirmative defense that turns on showing that the trademark owner unreasonably delayed in asserting their claim and that the alleged infringer was prejudiced by the delay. *Marco's Franchising LLC v. Marco's Coal Fired Pizza Inc.*, No. 17-CV-2550-MSK-NYW, 2019 WL 4645431, at *10 (D. Colo. Sept. 23, 2019) (citing *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)). "[L]aches denotes a merely passive consent, while acquiescence implies an active consent." *Prince Lionheart,* 2008 WL 878985, at *5.

burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact." *Id*. "If the plaintiff fails to make such a showing, the affirmative defense bars his claim, and the defendant[s] [are] then entitled to summary judgment as a matter of law." *Id*.

It is undisputed that Mr. Reinert assumed the position of Senior Vice President and General Counsel on April 17, 2017. [UMF ¶ 35]. *See also* [#111-1 at ¶ 174]. It is also undisputed that Mr. Reinert had a role in drafting the Offering Package for Defendants. [UMF ¶ 37]. RV Horizons is a Colorado corporation, not a sole proprietorship, and therefore, the operative question is whether Mr. Reinert can bind the corporation for the purpose of acquiescence as to a third party and whether there is any genuine issue of material fact as to whether Mr. Reinert's actions constitute acquiescence.

RV Horizons is a Colorado corporation and, in the absence of any conflicts of law argument by the Parties, this court applies Colorado law.[25] The authority and powers of corporate officers and agents are governed by the ordinary rules of agency. *See Kuehn v. Kuehn*, 642 P.2d 524, 526 (Colo. App. 1981). Colorado law recognizes an agent as one with authority to act on behalf of and bind a principal. *See Dworkin, Chambers & Williams, P.C. v. Provo*, 81 P.3d 1053, 1058 (Colo. 2003) (citing Black's Law Dictionary 62 (7th ed. 1999) (defining "agency"); Restatement (Second) of Agency § 1 (1958) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.")). "A principal, who either intentionally or negligently causes a third party to act on an agent's apparent authority, will be estopped to deny that authority if the

---

[25] It appears that Mr. Reinert was located in Florida at the relevant time period, *see, e.g.*, [#97-10 (Ex. J at LOWNDES-01947)], but was undisputedly rendering advice to RV Horizons, a Colorado corporation. At some point, Mr. Reinert moved to Denver. *See* [#111-9 at 48:16-19]. It also appears that, at least for a time in 2017, Mr. Reinert may have been a member of the Colorado Bar. https://www.coloradosupremecourt.com/Search/Attinfo.asp?Regnum=50881.

third party has detrimentally relied on the principal's representation to such an extent that it would be unjust to deny that authority." *Kuehn*, 642 P.2d at 526 (*citing Franks v. City of Aurora*, 362 P.2d 561 (Colo. 1961); *Johnson v. Neel*, 229 P.2d 939 (Colo. 1951)). And the Tenth Circuit has observed that "an agent can serve multiple principals at once, even principals that are competing with one another." *1-800 Contacts*, 722 F.3d at 1250.

It is well-settled that in the context of litigation, an attorney of record generally has implied authority to bind her client to all matters of procedure during the progress of the trial, which are necessary or incidental to the management of the suit, and which affect only the procedure or remedy, as distinguished from the cause of action itself. *Middleton v. Stavely*, 235 P.2d 596, 599 (Colo. 1951). Similarly, at trial, an oral admission of fact can bind a party. *Moynahan v. Perkins*, 85 P. 1132, 1133 (Colo. 1906). Courts have extended that implied authority to out of court actions that affect only the remedy, and are necessary or incidental to the transaction or management of the suit or to the accomplishment of the purpose for which she has been retained. *Stone v. Labco Const. Co.*, 508 P.2d 399, 401 (Colo. App. 1973). But "[i]t is also well established that an attorney who is clothed with no other authority than that arising from his employment as attorney has no implied authority by virtue of his general retainer to compromise and settle a claim of his client." *Cross v. Dist. Court In & For First Judicial Dist.*, 643 P.2d 39, 41 (Colo. 1982).

Here, the employment agreement proffered by Plaintiffs in response to Defendants' Motion for Leave [#155] defines Mr. Reinert's duties to include, *inter alia*, providing legal guidance to the executive staff on all matters that affect the Company, managing the compliance, risk management and legal services groups, attending executive level meetings related to the future direction of the Company (including mergers and acquisitions, capital raising, debt facilities, and divestitures of the Company (including mergers and acquisitions)) and adopting or changing Company policies.

[UMF ¶ 36].  But Mr. Reynolds vigorously contests any knowledge on his part of Mr. Reinert's role in drafting the Fund 7 Offering Package or the use of "RV Horizons" and RV Horizons also contends that Mr. Reinert lacked authority to agree to the use of any Marks on its behalf.  [#111-1 at 27 ¶¶ 164-67; #109 at 17-19].  It is also not undisputed from the evidence adduced by Dahn that Mr. Reinert ever represented that he had authority to act on behalf of RV Horizons, as opposed to his role as Defendants' outside counsel, *see* [#98-3, #111-9], or that he ever represented in the context of his role as Senior Vice President and General Counsel of RV Horizons that RV Horizons approved of the use of the RV Horizons Mark,  *see* [#111-9 at 75:19-76:20].  Indeed, Mr. Reinert testified that he did not recall giving any advice regarding potential trademark issues.  [#111-9 at 76:18-20].  He also testified he did not perceive any conflict between RV Horizons, the Smiths, and Fund 7.  [*Id.* at 77:1-5].  Therefore, based on the record before it, this court cannot conclude that Defendants have carried their burden as to the affirmative defense of acquiescence, which requires an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant, *see Creative Gifts*, 235 F.3d at 547–48, to warrant summary judgment on that basis.

### G.     Injury and Damages

Finally, this court considers the Smith Defendants' argument that any trademark claims cannot survive summary judgment because there are no damages.  [#97 at 10-11].  Much of the discussion by both sides focuses on entities other than RV Horizons.  It is undisputed that Plaintiffs' expert, Jon Ahern, did not opine about any damages specific to RV Horizons.  [#97-12 (Ex. L)].  Nevertheless, the Mark Holder Plaintiffs[26] argue that they "suffered actual harm to their brands,

---

[26] Dahn argues that "<u>each Plaintiff</u> has the burden of establishing that the Defendants' use of <u>its</u> alleged mark is likely to cause confusion.  The individual Plaintiffs have failed to provide any

reputation, and goodwill."  [#110 at 26].  They further contend that they may seek disgorgement of the Smith Defendants' profits.  [*Id.* at 27].

But making an argument regarding the appropriate measure of damages, as opposed to providing evidence of such harm, is insufficient to survive summary judgment.  *See Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1135 (10th Cir. 2003).  RV Horizons, for its part, does not develop an argument as to the damages it suffered due to any alleged misappropriation of its Mark, and it advances no evidence whatsoever of loss of business or loss of profits to RV Horizons.  [#110 at 26-27].  Mr. Reynolds' statement that "[b]ecause in my opinion it does not appear that Fund 7 is financially succeeding, any failures by Fund 7 will harm RV Horizons' reputation and goodwill," is Mr. Reynolds' personal speculation and unsupported by any evidence.  *See* [#111-1 at 31 ¶ 193]. Nor is there any evidence to support Mr. Reynolds' speculation that "[j]ust being associated with Fund 7 has already harmed RV Horizons' reputation and goodwill because, based on the Fund 7 Supplements detailing its MHC acquisitions, Fund 7 has been unable to acquire sufficient MHCs and profitably manage the ones it has purchased."  [*Id.*].  For instance, there is no evidence (survey or otherwise) that the consuming public has downgraded its regard for RV Horizons, or that anyone has declined to do business with RV Horizons due to a perceived association with Fund 7.  Nor is

---

evidence of a likelihood of confusion regarding its alleged mark."  [#99 at 11-12 (emphases in original)].  Though not entirely clear, Dahn appears to be asserting an unarticulated standing argument.  However, this court includes the other Mark Holder Plaintiffs asserting Counts I-III, in its analysis regarding damages because claims under § 43(a) of the Lanham Act are not limited to trademark owners, but also "any person who believes that he or she is likely to be damaged" by the proscribed conduct. 15 U.S.C. § 1125(a).  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32, 134 S. Ct. 1377, 1390, 188 L. Ed. 2d 392 (2014) (holding that in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales to avail itself of § 43(a)); *Crocs, Inc. v. Effervescent, Inc.*, 248 F. Supp. 3d 1040, 1061 (D. Colo. 2017) (finding standing for a plaintiff who "alleges an injury to a commercial interest in reputation or sales," is within the "zone of interests" protected by § 43(a) of the Lanham Act); *Aspen Roofing, Inc. v. Aspen Contracting, Inc.*, No. 17-CV-00447-PAB-KMT, 2019 WL 1317623, at *4 (D. Colo. Mar. 21, 2019) (same).

there any evidence that MHCs have declined to be managed by RV Horizons because of a perceived association with Fund 7.

Plaintiffs contend that Class B and Class C have collectively lost over $200,000. [#110 at 25-26]. But neither Class B nor Class C are plaintiffs asserting Counts I-III. [#64 at 32-45 ¶¶ 132-77]. Having chosen the corporate form for their various entities, and chosen particular plaintiffs to assert Counts I-III, Plaintiffs and this court cannot now ignore them for the purposes of damages or, in turn, surviving summary judgment. *Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1241 (10th Cir. 2006) (observing "where parties choose the corporate form and receive all the benefits that flow from that structure, we should be hesitant to ignore the consequences").

As for the contention that the three Alumni Funds, the six AHCF Funds, AWA Fund, and Fund 1 all suffered actual harm to their brands, reputation, and goodwill, there is simply no evidence that these entities have been negatively impacted by any perceived association with Fund 7 or the use of the "RV Horizons" Mark. Indeed, Mr. Reynolds' own statement that "the reputation and goodwill of RV Horizons, the Alumni Funds, the AHCF Funds, AWA Fund, and America Fund have been unnecessarily put at risk by the Defendants," [#111-1 at ¶ 198 (emphasis added)], underscores not only that there is no genuine issue of material fact that any of these Plaintiffs has suffered any actual harm to date, but also the speculative nature of any future harm. Simply put, Mr. Reynolds' conclusory concerns regarding the impact of Fund 7's lack of success upon RV Horizons, Alumni 1-3, ACHF 1-6, the AWA Fund, or Fund 1 does not create an issue of fact and Plaintiffs' conclusory statements as to any injury or damages to these Plaintiffs are insufficient to oppose summary judgment. *Harvey Barnett, Inc.*, 338 F.3d at 1136.

Accordingly, this court **GRANTS** summary judgment in favor of Defendants on Counts I, II, and III.

## II.       Counts IV and V: Misappropriation of Trade Secrets

In Counts IV and V, RV Horizons, Fund 1, Class C, Fund 2, and Class B (or "Trade Secret Plaintiffs") bring trade secret claims under the DTSA and CUTSA against Fund 7 and the Smiths. The Smith Defendants[27] contend that summary judgment in their favor is warranted because the asserted trade secrets were, in fact, not legally protectable but instead were publicly available information.  [#97 at 11].  The Smith Defendants further argue that there is no evidence of their use of the alleged trade secrets or that they misappropriated such trade secrets.  [*Id.* at 11-17; #129 at 17].  Finally, the Smith Defendants argue that there are no cognizable damages and thus, summary judgment is warranted.  [#97 at 16-17].  In Response, the Trade Secret Plaintiffs assert that disputed issues of fact preclude summary judgment on their trade secret claims premised on RV Horizons, Fund 1, and Fund 2's respective investor lists.[28]  [#110 at 28].  They state that Class C and Class B also assert trade secret claims "because those entities are due the benefit for" Fund 1 and Fund 2's trade secrets.  [*Id.* at n.16].  On Reply, the Smith Defendants argue that the Trade Secret Plaintiffs have failed to adduce sufficient evidence to avoid summary judgment as to whether their investor lists constitute protectable trade secrets or whether the Smith Defendants engaged in any misappropriation. [#129 at 15-17].

The DTSA allows an owner of a misappropriated trade secret to recover damages by establishing (1) the existence of a trade secret; (2) misappropriation of the trade secret; and (3) the implication of interstate or foreign commerce.  *See Bellwether Cmty. Credit Union v. Chipotle*

---

[27] Though Elevation is not named as a defendant to Counts IV or V, this court refers to "the Smith Defendants" because all joined in a single Motion for Summary Judgment.

[28] The Trade Secret Plaintiffs concede that they are not proceeding on their trade secret claims to the extent they were premised on Plaintiffs' turnaround strategies or bootcamp materials.  [#110 at 28 n.15].

*Mexican Grill, Inc.*, 353 F. Supp. 3d 1070, 1086 (D. Colo. 2018).  The statute defines "trade secret" to include:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).  The DTSA further defines "'misappropriation' as the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or the disclosure or use of a trade secret without the consent of the owner." *See Camick v. Holladay*, 758 F. App'x 640, 644–45 (10th Cir. 2018) (citing 18 U.S.C. §§ 1839(5)(A)-(B)).  Improper means does not include independent derivation.  18 U.S.C. § 1839(6).

Colorado's analogue, the CUTSA, is similar.  Under the CUTSA, a trade secret is defined as:

> [T]he whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7–74–102(4). To establish a claim of misappropriation of trade secrets under Colorado law, RV Horizons, Fund 1, Class C, Fund 2, and Class B must show: (i) that they possessed a "trade secret," as defined in Colo. Rev. Stat. § 7-74-102(4), and (ii) that the Smith

Defendants "misappropriated" the secret, as that term is statutorily defined—i.e., acquired or disclosed the secret with actual or constructive knowledge that the acquisition or disclosure was by improper means. *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1180–81 (D. Colo. 2015). *See also* Colo. Rev. Stat. § 7-74-102(2). "Improper means" include theft, misrepresentation, or breach of a duty to maintain secrecy, among other acts. Colo. Rev. Stat. § 7-74-102(1). *See generally Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 525 (Colo. App. 2011).

*Ownership*. Before turning to whether the investor lists are protectable trade secrets, the court first addresses which Trade Secret Plaintiffs have the requisite ownership to bring trade secret claims against Fund 7 and the Smiths. Some courts have characterized this inquiry as one of standing, *see RMS Software Dev., Inc. v. LCS, Inc.*, No. 01-96-00824-CV, 1998 WL 74245, at *4 (Tex. App. Feb. 19, 1998), and whenever standing is unclear, this court must consider it *sua sponte* to ensure there is an Article III case or controversy before it. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014). Others, including the Tenth Circuit, have treated the issue of ownership as an element of the claim for trade secret misappropriation. *Gaedeke Holdings VII LTD v. Baker*, 683 F. App'x 677, 683 (10th Cir. 2017). Absent other authority, this court follows *Gaedeke Holdings* and treats this issue as an element of Claims IV and V.

The plain language of the DTSA limits a cause of action under that statute to an owner of a trade secret. 18 U.S.C. § 1836(b)(1) ("An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.") (emphasis added). *See Bellwether*

*Cmty. Credit Union*, 353 F. Supp. 3d at 1086; *Select Energy Servs., Inc. v. Mammoth Energy Servs., Inc.,* No. CIV-19-28-R, 2019 WL 1434586, at *4 (W.D. Okla. Mar. 29, 2019) (dismissing DTSA action when plaintiffs failed to allege ownership of the trade secrets).

With respect to the trade secret claim that arises under the CUTSA, the Parties cite—and this court found—no controlling decision from the Colorado Supreme Court.  Absent clear guidance from that court, this court makes a guess as to how the Colorado Supreme Court would rule, after giving proper regard to relevant rulings of other courts of Colorado.  *Pehle v. Farm Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir. 2005).  First, this court looks to the language of the statute to determine whether ownership is required.  *See Gaedeke Holdings,* 683 F. App'x at 683.  In *Gaedeke Holdings*, the Tenth Circuit looked to Oklahoma's statutory implementation of the Uniform Trade Secrets Act to determine whether ownership was required to bring a trade secret misappropriation claim under state law, and found that ownership was not an element of a claim for misappropriation of trade secrets under Oklahoma law.  *Id.*  But in doing so, the *Gaedeke Holdings* court distinguished the Oklahoma statute from the Minnesota one, which refers to owner in the definition of trade secret.  *Id.* at 684 (citing Minn. Stat. Ann. § 325C.01).[29]  And this court

---

[29] The Minnesota statute defines "trade secret" to mean:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> The existence of a trade secret is not negated merely because an employee or other person has acquired the trade secret without express or specific notice that it is a

finds that the CUTSA also refers to owner in defining "trade secret": "[t]o be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes." Colo. Rev. Stat. § 7–74–102(4). Courts have interpreted a cause of action under the CUTSA to be limited to the owner of the trade secret. *See RMS Software Dev., Inc.*, 1998 WL 74245, at *4 (in interpreting the CUTSA, holding that the plain language of the act contemplates that the "owner" of a trade secret is responsible for preventing its unauthorized disclosure) (citing *Mineral Deposits Ltd. v. Zigan,* 773 P.2d 606, 608 (Colo. App. 1988)). Taken together, this court concludes that ownership is a required element of a trade secret misappropriation claim under both the DTSA and the CUTSA.

It is undisputed that the investor lists at issue are not owned by Class B or Class C. [UMF ¶ 49]. But the Trade Secret Plaintiffs argue that Class B and Class C may "assert trade secrets claims because those entities are due the benefit for America Fund and America Fund 2's trade secrets." [#110 at 28 n.16]. Plaintiffs do not cite to authority to support this assertion, nor could this court find any independently. Accordingly, for the reasons articulated above, this court finds that summary judgment in favor of the Smith Defendants is appropriate with respect to any trade secret claims brought by Class B and Class C, in addition to the alternate basis articulated below.

The Trade Secret Plaintiffs point to the Declarations of Mr. Reynolds and Mr. Brandon Reynolds to establish that the investor lists stored in the RV Horizons Infusionsoft account are trade secrets. *See* [#110 at ¶ 8 (citing [#111-1 at ¶ 189; #111-4 at ¶¶ 4-5])]. Both Reynoldses

---

trade secret if, under all the circumstances, the employee or other person knows or has reason to know that <u>the owner</u> intends or expects the secrecy of the type of information comprising the trade secret to be maintained.

Minn. Stat. Ann. § 325C.01 (emphasis added).

assert that the investor list is stored in Infusionsoft, and Mr. Brandon Reynolds clarifies that the information is stored in the RV Horizons Infusionsoft account. *See* [#111-1 at ¶ 188; #111-4 at ¶ 4]. Mr. Reynolds declares that the investor list is for "various funds," and asserts that the Fund 1 list was improperly utilized by the Smiths. [#111-1 at ¶¶ 188, 191, 192]. It is also undisputed that RV Horizons acted as the property manager for the properties owned by various funds, including Fund 1. [UMF ¶ 2]. But Fund 2 is managed by MHCA Management 2, LLC, a non-party. [#49 at 8 ¶ 24]. Fund 2 is described in the operative Second Amended Complaint as "intended to be a fund into which previous funds were 'rolled-up' to simplify fund structure," unlike "separate entities" like Class C and Class B "that own the [sic] promote interest in Fund 1 and Fund 2, respectively." [#64 at 8 ¶ 37]. Though some ambiguity as to the ownership of the investor list remains and more evidence would be required to prove ownership, drawing all reasonable inferences in favor of RV Horizons, Fund 1, and Fund 2, this court finds that there is a genuine issue of fact that precludes summary judgment on this basis.

*Existence of a Trade Secret*. The first element that a plaintiff asserting a claim for misappropriation of trade secrets under the DTSA or the CUTSA must establish is the existence of a trade secret.[30] *Arctic Energy Servs., LLC v. Neal*, No. 18-CV-00108-PAB-KLM, 2018 WL 1010939, at *2 (D. Colo. Feb. 22, 2018). The court notes as an initial matter that customer lists may be considered trade secrets under the DTSA and Colorado law. *See, e.g.*, *Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1153 (D. Colo. 2016). As discussed above, the DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic,

---

[30] In the case of the DTSA, a plaintiff must also establish that the trade secret relates to a product or service used in, or intended to be used in, interstate or foreign commerce. 18 U.S.C. § 1836(b)(1). Because there appears to be no dispute between the Parties on this element, this court does not address it.

or engineering information," so long as the owner has taken "reasonable measures to keep such information secret" and such information "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by," another person.  18 U.S.C. § 1839(3).  Similarly, in determining whether information constitutes a trade secret under the CUTSA, Colorado courts consider

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Great Am. Opportunities, Inc. v. Kent*, 352 F. Supp. 3d 1126, 1134–35 (D. Colo. 2018) (citing *Porter Inds., Inc., v. Higgins*, 680 P.2d 1339 (Colo. App. 1984).  And in analyzing whether a customer list constitutes a trade secret, the Tenth Circuit looks to several similar factors, including

> (1) whether proper and reasonable steps were taken by the owner to protect the secrecy of the information; (2) whether access to the information was restricted; (3) whether employees knew customers' names from general experience; (4) whether customers commonly dealt with more than one supplier; (5) whether customer information could be readily obtained from public directories; (6) whether customer information is readily ascertainable from sources outside the owner's business; (7) whether the owner of the customer list expended great cost and effort over a considerable period of time to develop the files; and (8) whether it would be difficult for a competitor to duplicate the information.

*Hertz v. Luzenac Grp.*, 576 F.3d 1103, 1115 (10th Cir. 2009).  Guided by these principles, this court turns to whether there is a genuine issue of material fact that any investor list(s) constitute trade secrets under either or both statutes.

**Reasonable Precautions**.  The issue of whether the precautions taken by RV Horizons, Fund 1, and Fund 2 are reasonable and sufficient to confer trade secret protection to the investor lists is a question of fact under both the DTSA and CUTSA.  *Harvey Barnett*, 338 F.3d at 1129 (citations omitted); *Rivendell Forest Prods., Ltd. v. Georgia-Pacific Corp.*, 28 F.3d 1042, 1045

(10th Cir. 1994); *Oklahoma Land Holdings, LLC v. BMR II, LLC*, No. CIV-17-1036-D, 2020 WL 4284806, at *12 (W.D. Okla. July 27, 2020).  The Smith Defendants argue that they are entitled to summary judgment because the Trade Secret Plaintiffs have failed to take measures to prevent the secret from becoming available to persons other than those selected by the owner because there is no non-compete or restrictions on the use of customer information.  [#97 at 15; #129 at 17].  In Response, the Trade Secret Plaintiffs argue that "Plaintiffs protect and maintain these lists with the utmost secrecy in their Infusionsoft account," and that "the lists were expensive to create and maintain."  [#110 at 28].  In support of these arguments, RV Horizons, Fund 1, and Fund 2 proffer the Declarations of Mr. Reynolds and Mr. Brandon Reynolds.  [*Id.*].  Mr. Brandon Reynolds declares that the customer lists are stored in the RV Horizons Infusionsoft account.  [#111-4 at ¶ 4].  He further states that the Infusionsoft account is password protected, and access is provided only to a limited number of individuals on an as-needed basis for investor relations.  [*Id.*].

Though Plaintiffs describe the lists as being protected and maintained "with utmost secrecy," [#110 at 6 ¶ 8], the record belies such characterization.  Neither Mr. Reynolds nor Mr. Brandon Reynolds provides any specific evidence regarding "the limited number of individuals" who have access to the RV Horizons Infusionsoft account today or historically.  [#111-1 at ¶¶ 188-192; #111-4 at ¶¶ 4-5].  There is no evidence that the investor lists for Fund 1 or Fund 2 were segregated in the Infusionsoft account from investor lists for MPHI 1-5—investors to whom Mr. Smith admitted he sent Fund 7 materials.  [#111-107 (Ex. 91)].  Nor is there any evidence of any type of confidentiality agreement, handbook, or training regarding the access to or use of investor lists or the RV Horizons Infusionsoft account.  *Cf. State Regulatory Registry, LLC v. Bartholomew,* No. 17-cv-01834-PAB-NRN, 2019 WL 7290934, at *12 (D. Colo. Sept. 27, 2019) (finding no genuine issue of material fact as to whether plaintiff took reasonable measures to keep information

secret when plaintiff stored the information "in a secure database with limited access rights, require[d] non-disclosure agreements, and [implemented] constant video and audio surveillance of [individuals with access to trade secrets]"); *API Ams. Inc. v. Miller*, 380 F. Supp. 3d 1141, 1148 (D. Kan. 2019) (finding non-disclosure and non-competition language in agreement ostensibly preventing employees from disclosing and using such information without consent sufficient to establish "reasonable measures").   Nor is there any evidence in the record that the Trade Secret Plaintiffs or anyone on their behalf—including Mr. Reynolds, Mr. Brandon Reynolds, and Mr. Reinert (who, as General Counsel of RV Horizons, was tasked with "providing legal guidance to the executive staff on all matters that affect the Company, [and] managing the compliance, risk management and legal services groups")—ever informed the Smiths, before their access was turned off in the spring of 2018, that the investor lists were confidential trade secrets. *See* [#111-1 at ¶¶ 188-192; #111-4 at ¶¶ 4-5; #98-1; #111-9].   And to the extent that the Trade Secret Plaintiffs contend that they had some implicit understanding with the Smiths regarding the acceptable use of the RV Horizons Infusionsoft account or the investor lists—which is also not substantiated by the record—this court finds that such an implicit understanding is insufficient, *see Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1300 (11th Cir. 2018) (affirming summary judgment in favor of defendant even in light of Florida's recognition of implied confidential relationships), particularly given the lack of any Colorado authority offered by Plaintiffs regarding implied confidential relationships, or such relationships being sufficient to trigger trade secret liability.   Finally, there is no evidence in the record that the Trade Secret Plaintiffs specifically advised the Smith Defendants that such lists were trade secrets or acted to secure the RV Horizons Infusionsoft account or the investor lists contained therein until the "spring of 2018," <u>even after</u> RV Horizons, and its employees like Messrs. Reynolds, Rolfe, Siragusa, or Reinert:

- learned of Fund 7 and its contact with various potential investors no later than May 2017, *see, e.g.*, [UMF ¶¶ 38–39; #111-118; #111-114; #99-14];

- had knowledge that the Smith Defendants were using Elevation to promote Fund 7 and had knowledge of and actual and/or constructive access to Elevation's website by May 16, 2017 [UMF ¶¶ 38–40, 46; #64 at 14 ¶ 61; #111-114];

- had actual knowledge of investors' inquiries regarding Fund 7's relationship with Mr. Reynolds' earlier and existing funds [UMF ¶ 38; #111-108; #111-118; #111-114; #99-11; #111-3 at ¶ 18] that continued throughout 2017 and into 2018 [#111-3 at ¶¶ 26-29];

- Mr. Siragusa clarified for investors that Mr. Smith's Fund 7 venture was separate from the Trade Secret Plaintiffs' ventures [#111-108]; and

- had actual and/or constructive knowledge regarding the Smith Defendants' statements made in Elevation newsletters including and touting RV Horizons and its business history [UMF ¶¶ 41, 46; #64 at 15 at ¶¶ 62-63; #87 at 16 ¶¶ 62-63] and Elevation's October, November, and December 2016 newsletters that state "[t]his content in this communication is being sent to members of MHC America Funds, LLC and Prior Funds.  As such, any reference to 'we', 'our' or 'fund', regardless of capitalization, shall refer to MHC America Fund, LLC, and its Affiliates," [UMF ¶¶ 42–46; #64 at 15-16 ¶¶ 64-66; #87 at 17 ¶¶ 64-66], [#111-1 at ¶ 190; #111-4 at ¶ 5].

In light of these undisputed facts, this court concludes that no reasonable jury could find that the Trade Secret Plaintiffs employed reasonable efforts to secure the information.

*Cost and Effort.*  Even if the court were to find that there was a genuine issue of material fact as to the reasonableness of the Trade Secret Plaintiffs' security measures, it would also find that these Plaintiffs have failed to adduce sufficient evidence of the value of the investor list.  Mr. Reynolds declares that he has maintained an investor list in Infusionsoft "for my various funds for many years."  [#111-1 at ¶ 188].  He unequivocally states that "I do not, nor have I ever, sold my investor lists."  [*Id*. at ¶ 189].  But there is no evidence of the economic value of the Trade Secret Plaintiffs' investor list(s) over any other list of potential investors, such as Elevation's "ECG database."  [#111-107 (Ex. 91)].  This deficiency is an alternate basis for summary judgment in favor of Defendants on Counts IV and V.

For these reasons, this court respectfully **GRANTS** summary judgment in favor of Defendants on Counts IV-V.

### III.     Count VI: Colorado Consumer Protection Act

In Count VI, RV Horizons, Fund 1, Class C, Fund 2, and Class B (or "CCPA Plaintiffs") assert a claim under the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101 *et seq.*, against all Defendants.  [#64 at ¶¶ 190-96].  They allege that the inclusion of their "names, experience, history, and success" in the Fund 7 Offering Package "constitutes an unfair or deceptive trade practice because it misleadingly suggests to Colorado consumers that Fund 7, the Smiths, Elevation, and Dahn are associated with Plaintiffs."  [*Id.* at ¶ 192].  To prevail on claim under the CCPA, a plaintiff must prove: (1) the defendants engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of defendant's business; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods or services; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury.  *Rhino Linings USA, Inc. v. Rocky Mt.*

*Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003); *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1259 (D. Colo. 2014) (citing *Hall v. Walter*, 969 P.2d 224, 235 (Colo. 1998)). The Smith Defendants move for summary judgment based on the third element while Dahn proffers arguments as to both the first and third elements. *See* [#97 at 18-19; #99 at 17-19]. Because this court finds the public impact element dispositive, it does not address the other elements. *See Christenson v. Citimortgage, Inc.*, No. 12-CV-2600-CMA-KLM, 2016 WL 7868812, at *3 (D. Colo. June 7, 2016) (observing that "[i]f one element of a CCPA claim is not met, the entire claim fails").

### A.   Public Impact

The Smith Defendants argue for summary judgment on Plaintiffs' CCPA claim because Plaintiffs have put forth no evidence to demonstrate the number of consumers directly affected by the alleged improper practices such that a reasonable factfinder could conclude their conduct "affects a significant number of consumers." [#97 at 18]. They continue that the CCPA Plaintiffs failed to inform the court of the sophistication of the investors who, they contend, are "sophisticated" and "understand that they should review the PPM in full before making an investment." [#97 at 18-19]. The CCPA Plaintiffs respond that the original Offering Package was available on the Fund 7 website from April 2017 through October 2018; the Offering Package still contains deceptive pieces today; and Defendants admit the allegedly misleading materials went to 368 investors. [#110 at 29]. The CCPA Plaintiffs also appear to contend that because the issue of public impact is a question of fact, this precludes the grant of summary judgment on their CCPA claim. [*Id.*]. They continue that Defendants cite no authority for the proposition that the sophistication of potential Fund 7 investors means there was no public impact of their actions. [*Id.*]. On Reply, the Smith Defendants contend that there is no evidence of widespread

advertisement in this case because consumers had to specifically request a copy of the Fund 7 Offering Documents, and Plaintiff fails to show how many customers were *actually harmed* versus simply received the Fund 7 Offering Package.  [#129 at 18-19].

As an initial matter, summary judgment may be appropriate when a party fails to adduce sufficient evidence to demonstrate that there is a genuine issue of material fact on the key element of public impact under the CCPA.  *Sierra v. Stonebridge Life Ins. Co*., No. 10-CV-03123-PAB-KMT, 2013 WL 5323083, at *6 (D. Colo. Sept. 23, 2013); *Benton v. Avedon Eng'g, Inc.*, No. 10-CV-01899-RBJ-KLM, 2012 WL 5866303, at *6 (D. Colo. Nov. 19, 2012) (granting summary judgment on the public impact element because "there has to be some indication that there was a significant impact on the public").  The Colorado Supreme Court has interpreted the CCPA's public impact element to require the challenged impact to "significantly impact the public as actual or potential consumers of the defendant's goods, services, or property."  *Hall v. Walter*, 969 P.2d 224, 234 (Colo. 1998).  In considering whether there is a genuine issue of material fact as to public impact under the CCPA, this court is guided by three factors: "(1) the number of consumers directly affected by the challenged practice, (2) the relative sophistication and bargaining power of the consumers affected by the challenged practice, and (3) evidence that the challenged practice has previously impacted the other consumers or has the significant potential to do so in the future."  *See NetQuote, Inc. v. Byrd*, 504 F. Supp. 2d 1126, 1136 (D. Colo. 2007) (quoting *Crowe v. Tull,* 126 P.3d 196, 208 (Colo. 2006)).

***Number of Consumers Directly Affected by the Challenged Practice***.  It is undisputed that 368 investors received the Offering Package that reflected Plaintiffs as "Affiliates."  *See* [UMF ¶ 55].  But it is also undisputed that the remaining 402 investors never received that version of the Offering Package.  *See* [*id.*].  And while the CCPA Plaintiffs point to the website as a continued

source of the challenged trade practices of including the identification of Messrs. Reynolds, Rolfe, Siragusa, and RV Horizons as "Affiliates" of Fund 7; false descriptions of the Smith Defendants' actual experience; and a false track record, the CCPA Plaintiffs concede that they do not know how many people downloaded the Offering Package. [#110 at 6 ¶ 7]. The mere availability of the challenged statements on the website is not enough to establish public impact. *Benton*, 2012 WL 5866303, at *6 (holding that "[t]he mere fact that displays at trade shows and on websites can be, and presumably are, viewed by numerous people is not enough").

Other evidence in the record suggests that the number of consumers directly affected by the challenged practices are limited. When asked about whether the Marks were publicly-facing, Mr. Reynolds concedes that Plaintiffs' funds are:

> only open to depending on the fund, sophisticated or accredited investors, and so if you weren't falling into that arena, then you would not have the opportunity to see it, but if you wanted to invest and get the information, yeah, I guess it would be public to those people if they wanted to. It wasn't like on a storefront window, but it was circulated amongst the industry. It's a very small industry and people talk amongst themselves in the industry.

[#98-1 at 51:24-52:17]. Mr. Reynolds explained that most of the funds required a $25,000 or $50,000 minimum investment. [*Id.* at 45:2-7]. Mr. Rolfe repeatedly distinguished a general "consumer" from an individual looking to invest in particular funds. [#98-2 at 62:4-13, 63:18-25]. And there is simply no evidence that suggests the Fund 7 Offering Package, or any other materials related to Fund 7, were part of a generalized advertising campaign, made available to the public in general, rather than upon a case-by-case basis to specific individuals who requested that material. *See MDM Grp. Assocs., Inc. v. Resortquest Int'l, Inc.*, No. 06-CV-01518-PAB-KLM, 2009 WL 2924821, at *17 (D. Colo. Sept. 9, 2009) (granting summary judgment in favor of defendant where a brochure was made available on a case-by-case basis to property renters). In Response to Dahn's Motion for Summary Judgment, the CCPA Plaintiffs fail to identify a number of consumers

directly affected by the challenged practice and their argument that there is a public impact, standing alone, is "essentially irrelevant in resolving a Summary Judgment Motion." *Christenson*, 2016 WL 7868812, at *6 (granting summary judgment on a CCPA claim for lack of evidence).

  ***Sophistication and Bargaining Power of the Affected Consumers.*** This court next considers the sophistication of the affected consumers.  To the extent that the CCPA Plaintiffs contend that the sophistication of the consumers is immaterial, [#110 at 6 ¶ 11], that argument appears directed at the trademark claims and is inapplicable to the CCPA claim, as the legal authority clearly identifies the sophistication of affected consumers as a factor to consider in assessing public impact.  *See* [#110 at 29–30]; *NetQuote,* 504 F. Supp. 2d at 1136.  Insofar as the CCPA Plaintiffs contend that summary judgment is precluded because sophistication of the affected consumers is a question of fact, *see* [#110 at 29–30], this court again notes that it is incumbent upon the non-moving party on summary judgment to adduce sufficient evidence to create a genuine issue of material fact as to public impact generally.  *See supra*.  One element of that analysis is the sophistication of the affected consumers.

  It is undisputed that all investors of Plaintiffs' funds must meet securities law requirements for accreditation.  [UMF ¶ 56].  In his deposition, Mr. Reynolds concedes that even the non-accredited investors were still sophisticated.  [#98-1 at 45:13-16].  As discussed above, the minimum investment was $25,000 or $50,000.  [*Id.* at 45:2-7].  Mr. Rolfe acknowledged that investors looking to invest "would certainly know that there would be a difference" between funds and would be "very knowledgeable about the fact they were investing in the fund that they're investing in."  [#98-2 at 63:18-64:7].  Mr. Siragusa testified at deposition that the individuals who invest in Plaintiffs' various funds should be sophisticated.  [#98-5 at 69:20-23].  And while the CCPA Plaintiffs rely upon the fact that most of their investors are not normally represented by

counsel and do not have specialized knowledge in MHC investments, [#110 at 29 (citing [#111-1 at ¶ 16])], this statement sidesteps the operative inquiry of what level of sophistication applied to the affected consumers—not just Plaintiffs' investors.

In addition, there is no evidence that the potential investors at issue here have any type of compromised bargaining power. There is no suggestion that any of these investors, who are contemplating investments of at least $25,000, are beholden to the Smith Defendants to provide accurate information. *See James River Ins. Co. v. Rapid Funding, LLC*, No. 07-CV-01146-CMA-BNB, 2009 WL 524994, at *6 (D. Colo. Mar. 2, 2009). There is no evidence of a coercive element to the relationship between the Smith Defendants and potential investors. *Cf. Shekarchian v. Maxx Auto Recovery, Inc.*, -- P.3d --, 2019 WL 1830337, *7 (Colo. App. 2019). The fact that investors are contacting Mr. Siragusa to clarify RV Horizons' or Messrs. Reynolds, Rolfe, and Siragusa's involvement with Fund 7, [#111-3 at ¶¶ 26-29], not only indicates a certain level of knowledge and sophistication, but also an even level of bargaining power between any investor and the Smith Defendants. *James River Ins.*, 2009 WL 524994, at *6.

***Evidence of Prior or Future Impact.*** The Parties proffer arguments related to harm, and specifically whether any harm caused by the Offering Package's inclusion of Plaintiffs' Marks is ongoing or whether past conduct can form the basis of public impact. *See* [#97 at 19; #110 at 29]. Respectfully, these arguments simply miss the mark. Here, there is no evidence of <u>harm to the consuming public</u>, as opposed to alleged <u>private harm to Plaintiffs</u>. It is insufficient to show that the consuming public was "exposed to this deception." *2-BT, LLC v. Preferred Contractors Ins. Co. Risk Retention Grp., LLC*, No. 12-CV-02167-PAB-KLM, 2013 WL 5729932, at *5 (D. Colo. Oct. 18, 2013). Moreover, all of the alleged damages are to Plaintiffs, not to any investor or the consuming public, [#111-1 at ¶¶ 193-98; #97-12], and it is axiomatic that the CCPA is not intended

to right a private wrong. *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 805 F. Supp. 2d 1115, 1121 (D. Colo. 2011) (citing *Crowe v. Tull*, 126 P.3d 196, 208 (Colo. 2006)). It is insufficient at summary judgment for Mr. Reynolds to speculate that "in my opinion it does not appear that Fund 7 is financially succeeding." [#111-1 at 31 ¶ 193].

Finally, even assuming there is a sufficient number of consumers directly affected by the challenged practice, there is no indication what percentage of those people were harmed. *See Christenson*, 2016 WL 7868812, at *7. Putting aside the fact that Plaintiffs' expert expressly did not opine about the damages to the CCPA Plaintiffs [#97-12 at 6], there are simply no facts in the record upon which he could opine.

For these reasons, this court respectfully concludes that no reasonable juror could find that the challenged practices had a sufficient public impact and, thus, summary judgment in favor of Defendants on Count VI for a violation of the CCPA is appropriate.

## IV.   Count VII: Unjust Enrichment

Lastly, Count VII of the Second Amended Complaint is for unjust enrichment, asserted on behalf of RV Horizons, Fund 1, Class C, Fund 2, and Class B (or "Unjust Enrichment Plaintiffs") against all Defendants. [#64 at ¶¶ 197–203]. This claim is based on the Defendants profiting off of the Unjust Enrichment Plaintiffs' goodwill, boot camp materials, and investor lists. [*Id.*]. All Defendants move for summary judgment, arguing that there is insufficient evidence to reach a jury on the unjust enrichment claim. [#97 at 19; #129 at 20; #99 at 19-20; #128 at 18-20]. Dahn again emphasizes that these Plaintiffs may not simply conflate their alleged harms but, rather, "[e]ach Plaintiff must identify what benefit Dahn received at that Plaintiff's expense, and identify why it would be unfair to retain those benefits." [#99 at 19]. *See also* [#128 at 19]. The Smith Defendants also contend that that the Unjust Enrichment Plaintiffs have failed to come forward with sufficient

evidence regarding any benefit conferred upon Defendants at those Plaintiffs' expense. [#129 at 20].

With respect to Dahn, the Unjust Enrichment Plaintiffs counter that there is a genuine issue of material fact that precludes summary judgment as to the unjust enrichment claim because "[t]he evidence establishes that Dahn and Fund 7 used the trademarks, goodwill, reputation, and brand history of the Alumni Funds, the AHCF Funds, AWA Fund 3, MHC America Fund, and RV Horizons, as well as the reputations, biographies, and likenesses of Messrs. Reyonds, Rolfe, and Siragusa."[31] [#109 at 28]. With respect to the Smith Defendants, the Unjust Enrichment Plaintiffs contend that the Smith Defendants "received the following benefits to the detriment of plaintiffs: (1) the trademarks, goodwill, reputation, brand history, investment distribution history, and association with the success of the Alumni funds, AHCF funds, AWA fund, America fund, RV Horizons, Reynolds, Rolfe, and Siragusa," and "(2) the use of the investor lists to promote Fund 7." [#110 at 30]. The Unjust Enrichment Plaintiffs also assert that the Smith Defendants received "millions of dollars in fees related to Fund 7." [*Id.*].

"The claim of unjust enrichment is a judicially-created remedy designed to undo the benefit to one party that comes at the unfair detriment of another." *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (en banc), *as modified on denial of reh'g* (Aug. 18, 2008). The elements of an unjust enrichment claim are: "(1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without compensating the plaintiff." *Reich v. Genzyme Corp.*, No. 14-cv-01684-RM-MJW, 2015 WL 13236347, at *11 (D. Colo. Aug. 14, 2015) (citing *Hottinger Excavating & Ready Mix, LLC v. R.E. Crawford Constr., LLC*, No. 14-cv-00994-KMT, 2014 WL 6461350, at *6 (D. Colo. Nov. 18,

---

[31] Fund 2 does not have any asserted trademarks. [#64 at ¶ 164].

2014)).  Unlike at the motion to dismiss phase, here the Unjust Enrichment Plaintiffs must come forward with evidence to establish Defendants received things of value that would be inequitable to retain without payment.  *Cf.* [#84 at 23-26 ("In denying Defendants' respective Motions to Dismiss, this court specifically does not pass on the merits of whether ultimately Plaintiffs will be able to survive summary judgment, if filed . . . .")].

Even construing the record in the light most favorable to Plaintiffs, there simply is insufficient evidence adduced in this record for a finder of fact to conclude that Defendants received a benefit from RV Horizons, Fund 1, Class B, Fund 2, or Class C's trademarks, goodwill, reputation, brand history, investment distribution history, association or investor lists at these Plaintiffs' expense.  First, there is no evidence that the investor lists (or the bootcamp materials) have independent value, given that neither are trade secrets.  Second, even assuming that the investor list has independent value, these Plaintiffs fail to identify a genuine issue of material fact that Fund 7's investors were identified and/or solicited through the use of the RV Horizons Infusionsoft lists.  Mr. Reynolds' supposition that the Defendants impermissibly accessed the investor list stored in the RV Horizons Infusionsoft account is not supported by admissible evidence.  *See* [#111-1 at 122:20-123:9 ("I don't have actual evidence that I actually see the download, but I am pretty certain that they did, because I don't know how they would be contacting many of the investors that they have contacted about Fund 7 when those investors had never even heard of them before . . . .")].  There is no forensic evidence that suggests a download; no admission of a download by the Smith Defendants; nor, as discussed above, any comparison between the RV Horizons Infusionsoft list versus Elevation's ECG database to which Mr. Smith refers when communicating with Mr. Siragusa in May 2017.  *See* [#111-107].

Third, there is also no evidence in the record that Fund 7's investors decided to invest in Fund 7 because of a perceived association with RV Horizons, Fund 1, Class B, Fund 2, or Class C. While the Unjust Enrichment Plaintiffs contend that Fund 7 and Mr. Smith diverted Paul Jansen ("Mr. Jansen") from investing in Fund 1 to investing in Fund 7, the evidence that they cite for that proposition does not reflect that Mr. Jansen contacted Mr. Smith or Fund 7 due to any use by Defendants of RV Horizons, Fund 1, Class B, Fund 2, or Class C's trademarks, goodwill, reputation, brand history, investment distribution history, association or investor lists, or ultimately invested in Fund 7 because of a perceived association. [#110 at 11-12 ¶ 41 (citing [#111-226 (Ex. 211); #111-227 (Ex. 212); #111-228 (Ex. 213)])]. Similarly, there is no evidence to support Plaintiffs' assertion that Albert Tejidor ("Mr. Tejidor") "came across" Fund 7 due to the RV Horizons' Mark, the identification of Affiliates, or any association with these Plaintiffs in the Supplement 2 for the Fund 7 Offering, [#110 at 12 ¶ 42 (citing [#111-234 (Ex. 219)])], or that Mr. Tejidor shifted investment from Fund 2 to Fund 7 due to RV Horizons, Fund 1, Class B, Fund 2, or Class C's trademarks, goodwill, reputation, brand history, investment distribution history, association or investor lists, [*id.* (citing [#111-229 (Ex. 214); #111-230 (Ex. 215); #111-231 (Ex. 216); #111-232 (Ex. 217); #111-233 (Ex. 218); #111-234 (Ex. 219); #111-235 (Ex. 221)])]. The Unjust Enrichment Plaintiffs do not offer any evidence from these third parties to suggest that their investment decisions were triggered or driven by any association between Fund 7 and these Plaintiffs' trademarks, goodwill, reputation, brand history, investment distribution history, or association. Similarly, Plaintiffs point to no evidence from the individuals whom Mr. Reynolds identifies as not having any previous contact with the Smiths—Max Hicks, Steve and Rebecca Tefas, or Merrill Blasdell—that indicate that these individuals invested money in Fund 7 (or declined to invest in Fund 1, Class B, Fund 2, or Class C) because of Fund 7's email to them. *See*

[#98-1 at 123:5-14].  Though Mr. Ahern's inability to opine as to damages associated with unjust enrichment might not preclude the claim as a matter of law, [#97-12 at 6], the lack of supporting evidence does.

Neither unsupported conclusory allegations nor mere scintillae of evidence are sufficient to create a genuine dispute of material fact on summary judgment. *See Mackenzie v. City and Cty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). Despite months of discovery and a record spanning over 3700 pages, this court finds that Plaintiffs have failed to make the requisite showing to avoid summary judgment on any of the counts asserted in the Second Amended Complaint.

## CONCLUSION

For the reasons set forth herein, it is **ORDERED** that:

(1)     Defendants Jamie Smith; Ryan Smith; MHPI VII, LLC; and Elevation Capital Group LLC's Motion for Summary Judgment and Incorporated Memorandum of Law  [#97] is **GRANTED**;

(2)     Defendant Dahn Corporation's Motion for Summary Judgment [#99] is **GRANTED**;

(3)     The Clerk of the Court to **DIRECTED to RESTRICT** [#111-219] with a Level 1 Restriction pursuant to Fed. R. Civ. P. 5.2;

(4)     Smith Defendants' Motion to Exclude the Testimony of Jon Ahern and Ben Braband [#112] is **DENIED AS MOOT**;

(5)     Plaintiffs' Motion to Exclude Defendants' Proffered Retained and Non-Retained Expert Opinion Testimony  [#113] is **DENIED AS MOOT**;

(6)     Dahn Corporation's Motion to Exclude the Opinions and Testimony of Jon S. Ahern. [#114] is **DENIED AS MOOT;**

(7)     The Clerk of the Court is directed to **ENTER JUDGMENT** in favor of Defendants Jamie Smith; Ryan Smith; MPHI VII, LLC; Elevation Capital Group, LLC; and Dahn Corporation on all counts; and

(8)     Defendants, as the prevailing parties, shall be awarded their costs pursuant to Rule

54(d)(1) of the Federal Rules of Civil Procedure and D.C.COLO.LCivR 54.1.


DATED:  November 13, 2020                    BY THE COURT:

_____

Nina Y. Wang
United States Magistrate Judge